# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654
United States

Adam C. Paul, P.C.
To Call Writer Directly:
+1 312 862 3120
adam.paul@kirkland.com

+1 312 862 2000

Facsimile:
+1 312 862 2200

www.kirkland.com

July 26, 2018

**VIA ELECTRONIC FILING**

Honorable Martin Glenn
United States Bankruptcy Court for the
Southern District of New York
One Bowling Green
New York, NY 100004-1408

Re:     In re Agrokor d.d., et al., Case No. 18-12104 (MG)
        Foreign Recognition Hearings of Agrokor

Dear Judge Glenn:

I write at the Court's request on behalf of Agrokor d.d. and certain of its subsidiaries and affiliates (the "Debtors"), currently seeking chapter 15 recognition of their extraordinary administration proceedings pending in the Republic of Croatia (the "Croatian Proceedings") under the *Act on the Extraordinary Administration Proceedings in Companies of Systemic Importance of the Republic of Croatia* (the "EA Law").

As referenced at the July 17 hearing, in addition to recognition in these chapter 15 cases, in July and August 2017, certain of the Debtors and certain Agrokor d.d. subsidiaries sought recognition of the Croatian Proceedings in six foreign jurisdictions: England and Wales, Serbia, Slovenia, Bosnia-Herzegovina, Montenegro, and Switzerland.[1] This letter sets forth a summary of the recognition efforts in each of those jurisdictions. I have also provided a short overview table of the summaries originally appearing in our papers, attached to this letter as **Appendix A**, and English-translation copies of each recognition decision referenced herein, attached to this letter for ease of reference as **Appendix B**.

The Debtors' recognition efforts were primarily in response to the actions of two creditors, Sberbank of Russia ("Sberbank") and Banca Intesa a.d. Beograd ("Banca Intesa"). Sberbank

---

[1]     England and Wales, Serbia, Slovenia, and Montenegro have enacted legislation based on the UNCITRAL Model Law on Cross Border Insolvency (the "Model Law"), while Switzerland and Bosnia-Herzegovina have not.

Beijing   Boston   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

Honorable Martin Glenn
July 26, 2018
Page 2

initiated litigation in each of these countries after the Croatian Proceedings commenced, while Banca Intesa initiated litigation only in Serbia.  The six prior applications defensively sought recognition of the Croatian filing and a moratorium against actions brought by creditors against assets of the group outside Croatia.

Recognition has been granted in England and Wales and Switzerland.  In particular, His Honour Judge Paul Matthews (sitting as a Judge of the High Court of England and Wales) found that the EA Law satisfied the requirements of both English law and the Model Law as a law relating to insolvency and subjecting the assets and affairs of the Debtors to the control and supervision of the Croatian court.  The English court also held that the Croatian Proceedings were collective proceedings for the purpose of reorganization and complied with English public policy.  Although Switzerland has not enacted legislation based on the Model Law, the Swiss court similarly found that the Croatian Proceedings qualified for recognition and that the decision to commence the Croatian Proceedings was enforceable under Swiss law.

Recognition has been denied (sometimes following appeals) in Serbia, Slovenia, Bosnia-Herzegovina, and Montenegro for several different reasons.  For example, in Slovenia, Bosnia-Herzegovina, and Montenegro, the courts held that the Croatian Proceedings violated the country's public policy or that they were inconsistent with those jurisdictions' bankruptcy laws.  There were also various interpretations of the local enactments of the Model Law in Serbia, Slovenia, and Montenegro, where the courts suggested that the Croatian Proceedings involved substantive consolidation, had a purpose other than reorganization or liquidation, and that the EA Law is not a law relating to insolvency.  The Debtors disagree with (and in some cases continue to appeal) the decisions denying recognition.  In particular, the Debtors believe there is no legitimate public policy reason not to recognize the Croatian Proceedings, as found by the courts in England and Wales and Switzerland.

Sberbank was the main opposing creditor in each contested proceeding.  (The recognition proceeding in Switzerland was uncontested.)  Since Sberbank's initial opposition, the Debtors and the Extraordinary Administrator have resolved the disputes with Sberbank, and Sberbank supported and voted in favor of the Settlement Agreement.  Sberbank's opposition to the Debtors' recognition efforts will end once the Croatian court's order approving the Settlement Agreement is no longer appealable.  *See* Settlement Agreement, Art. 8.6, attached as **Exhibit C** to the Verified Petition; Agrokor's June Monthly Report, p. 35, excerpted and attached hereto as **Appendix C**.  It is unclear whether Banca Intesa will continue to oppose recognition; if so, it would only apply to the Serbian recognition proceedings.

## KIRKLAND & ELLIS LLP

Honorable Martin Glenn
July 26, 2018
Page 3

**England and Wales**

The Extraordinary Administrator filed an application in the Chancery Division of the High Court of England and Wales seeking recognition of the Croatian Proceedings as "foreign main proceedings" under the Cross-Border Insolvency Regulations 2006 on July 27, 2017. The application was opposed by Sberbank. Following the exchange of evidence, including expert reports on Croatian law, a hearing was held on October 23-26, 2017. On November 9, 2017, the High Court granted recognition of the Croatian Proceedings in England and Wales in respect of the Debtor, thereby staying all present and future actions brought by creditors in England and Wales against the Debtor. Sberbank applied to the High Court for permission to appeal the recognition decision. At a hearing held on December 18, 2017, the High Court gave a final order, rejecting Sberbank's application for permission to appeal the decision, and ordering Sberbank to pay the Extraordinary Administrator's costs of the proceedings caused by Sberbank's opposition to the application.

Sberbank filed an application to the Court of Appeal for permission to appeal the order granting recognition of the Croatian Proceedings, and for expedition of the appeal process. Permission to appeal was granted by the Court of Appeal on April 27, 2018. Following the judgment of the High Court granting recognition of the Croatian Proceedings in England and Wales, on December 11, 2017, Sberbank applied to lift the stay imposed by the recognition order to allow it to continue the arbitration proceedings. The parties exchanged evidence, including further expert evidence, and a hearing was held to determine the issues on February 21, 2018. The High Court ordered that the application to lift the stay on the arbitration proceedings should not be granted until the recognition decision had been "finally determined," which would not be the case until the appeal of the recognition order was determined and no further appeals were possible. Sberbank was denied permission to appeal this decision by the High Court. It subsequently sought permission to appeal from the Court of Appeal, and for expedition of this appeal process to be heard at the same time as its appeal of the recognition order. The applications were granted, and the appeal will be heard at the same time as the appeal of the recognition order.

The parties have exchanged legal submissions and a hearing is to be listed before three justices of the Court of Appeal for the first available date after October 1, 2018. The stay on proceedings in England and Wales remains in effect while these proceedings are ongoing.

**Switzerland**

The Extraordinary Administrator filed an application with the Cantonal Court of Zug on December 20, 2017 for the recognition of the Croatian Proceedings in Switzerland, as well as the appointment of the Extraordinary Administrator to represent the Debtors and deal with their assets in Switzerland under the Swiss International Private Law Act. By decision dated February 2, 2018,

## KIRKLAND & ELLIS LLP

Honorable Martin Glenn
July 26, 2018
Page 4

the Cantonal Court of Zug recognized the Extraordinary Administration in respect of the Debtors with effect for the entire Swiss territory and authorized the Extraordinary Administrator to represent the Debtors in Switzerland and deal with their assets there.  The decision was not appealed and has become final under Swiss law.

### Slovenia

On July 10, 2017, the Extraordinary Administrator filed an application with the District Court of Ljubljana for the recognition of the Extraordinary Administration process in Slovenia. The application was granted on July 14, 2017, whereby all proceedings initiated against the Debtors in Slovenia were suspended by operation of law.  The decision was appealed by Sberbank and the Republic of Slovenia.  Subsequently, the appellate court overturned the decision of the first instance court and rejected the recognition application.  The Extraordinary Administrator filed an appeal against this decision to the Supreme Court of Slovenia on December 1, 2017, including an expert report from Prof. Dr. Aleš Galič from the University of Ljubljana – Faculty of Law and a further report from a retired Judge of the Supreme Court of the Republic of Croatia, mr. sc. Andrija Eraković.  On March 14, 2018, the Supreme Court of the Republic of Slovenia dismissed the appeal and rejected the application for recognition.  Four days later, the Extraordinary Administrator appealed that decision to the Constitutional Court of Slovenia.  That appeal remains pending.

### Serbia

On July 26, 2017, the Extraordinary Administrator filed an application with the Commercial Court in Belgrade for the recognition of the Extraordinary Administration process in Serbia.  On August 28, 2017, the court rejected the recognition application.  The Extraordinary Administrator appealed that decision on September 14, 2017.  On October 25, 2017, the Commercial Court of Appeal rejected the Extraordinary Administrator's appeal.  On December 20, 2017, the Extraordinary Administrator filed an appeal to the Constitutional Court of Serbia.  That appeal remains pending.

### Bosnia-Herzegovina

On July 27, 2017, the Extraordinary Administrator filed an application with the Cantonal Court of Sarajevo for the recognition of the Extraordinary Administration process in Bosnia-Herzegovina.  The application was rejected on November 13, 2017.  The Extraordinary Administrator appealed that decision on November 27, 2017.  The Supreme Court rejected the appeal by a decision dated December 18, 2017.  The Extraordinary Administrator filed an appeal at the Constitutional Court on March 16, 2018.  That appeal remains pending.

# KIRKLAND & ELLIS LLP

Honorable Martin Glenn
July 26, 2018
Page 5

**Montenegro**

On August 7, 2017, the Extraordinary Administrator filed an application with the Commercial Court of Montenegro for the recognition of the Extraordinary Administration process in Montenegro.  The court dismissed the application on December 16, 2017.  The Extraordinary Administrator filed an appeal against this decision on October 25, 2017.  The Commercial Court of Montenegro granted permission to Sberbank to join the appeal as an interested party.  An appeal was filed against that decision on February 28, 2018.  That appeal remains pending.

**EU Regulation**

Finally, as referenced at the July 17 hearing, it is notable and relevant that on July 4, 2018, the European Parliament added the *Law on Extraordinary Administration Proceeding for Companies of Systemic Importance for the Republic of Croatia* (the "EA Law") to the European Union's *Acquis Communautaire*, the accumulated body of the European Union's laws and obligations.  Specifically, the Recast Insolvency Regulation (EU) 2015/848 (attached hereto as **Appendix D**, the "EU Regulation") provides:

> This Regulation shall apply to public collective proceedings . . . which are based on laws relating to insolvency and in which, for the purpose of rescue, adjustment of debt, reorganisation or liquidation: (a) a debtor is totally or partially divested of its assets and an insolvency practitioner is appointed; (b) the assets and affairs of a debtor are subject to control or supervision by a court; or (c) a temporary stay of individual enforcement proceedings is granted by a court or by operation of law, in order to allow for negotiations between the debtor and its creditors, provided that the proceedings in which the stay is granted provide for suitable measures to protect the general body of creditors, and, where no agreement is reached, are preliminary to one of the proceedings referred to in point (a) or (b).

EU Regulation, Art. 1(1).  Accordingly, the European Union has found that extraordinary administrations under the EA Law satisfy all required criteria to qualify as "insolvency

# KIRKLAND & ELLIS LLP

Honorable Martin Glenn
July 26, 2018
Page 6

proceedings" entitled to automatic recognition across all European Union member states, including Serbia where the Debtors' application was originally rejected.

We will provide further updates to the Court as any of the foregoing information materially changes or develops during these chapter 15 cases.

Respectfully submitted,

Adam C. Paul, P.C.

Attachments:

Appendix A - Table Overview of the Status of Agrokor's Foreign Recognition Proceedings

Appendix B - Foreign Recognition Decisions

Appendix C - Excerpt from Agrokor June Monthly Report

Appendix D - Recast Insolvency Regulation (EU) 2015/848

## **Appendix A**

**Foreign Recognition Proceedings Summary Table**

## Foreign Recognition Proceedings

*The Extraordinary Administrator of Agrokor d.d. has sought recognition of the Croatian Proceeding in several foreign jurisdictions. The below table provides a summary of those efforts and the status of recognition in each of those countries.*

| Jurisdiction | Recognition Status | Material Developments |
|---|---|---|
| **England and Wales** | **Granted (Appeal pending)** | The Extraordinary Administrator filed an application in the Chancery Division of the High Court of England and Wales seeking recognition of the Croatian Proceedings as "foreign main proceedings" under the Cross-Border Insolvency Regulations 2006 on July 27, 2017. The application was opposed by Sberbank. Following the exchange of evidence, including expert reports on Croatian law, and a hearing, the High Court granted recognition of the Croatian Proceedings in England and Wales in respect of the Debtor, thereby staying all present and future actions brought by creditors in England and Wales against the Debtor. Sberbank ultimately appealed this decision to the Court of Appeal. Sberbank also sought to lift the stay imposed by the recognition order to allow it to continue the arbitration proceedings, but when this application was denied, Sberbank also appealed this decision to the Court of Appeal. The parties have exchanged legal submissions and a hearing is to be listed before three justices of the Court of Appeal for the first available date after October 1, 2018. The stay on proceedings in England and Wales remains in effect while these proceedings are ongoing. |
| **Serbia** | **Denied (Appeal pending)** | On July 26, 2017, the Extraordinary Administrator filed an application with the Commercial Court in Belgrade for the recognition of the Extraordinary Administration process in Serbia. On August 28, 2017, the court rejected the recognition application. The Extraordinary Administrator appealed that decision on September 14, 2017. On October 25, 2017, the Commercial Court of Appeal rejected the Extraordinary Administrator's appeal. On December 20, 2017, the Extraordinary Administrator filed an appeal to the Constitutional Court of Serbia. That appeal remains pending. |

| Jurisdiction | Recognition Status | Material Developments |
|---|---|---|
| **Slovenia** | **Denied (Appeal pending)** | On July 10, 2017, the Extraordinary Administrator filed an application with the District Court of Ljubljana for the recognition of the Extraordinary Administration process in Slovenia.  The application was granted on July 14, 2017, whereby all proceedings initiated against the Debtors in Slovenia were suspended by operation of law.  The decision was appealed by Sberbank and the Republic of Slovenia.  Subsequently, the appellate court overturned the decision of the first instance court and rejected the recognition application.  The Extraordinary Administrator filed an appeal against this decision to the Supreme Court of Slovenia on December 1, 2017, including an expert report from Prof. Dr. Aleš Galič from the University of Ljubljana – Faculty of Law and a further report from a retired Judge of the Supreme Court of the Republic of Croatia, mr. sc. Andrija Eraković.  On March 14, 2018, the Supreme Court of the Republic of Slovenia dismissed the appeal and rejected the application for recognition.  Four days later, the Extraordinary Administrator appealed that decision to the Constitutional Court of Slovenia.  That appeal remains pending. |
| **Bosnia-Herzegovina** | **Denied (Appeal pending)** | On July 27, 2017, the Extraordinary Administrator filed an application with the Cantonal Court of Sarajevo for the recognition of the Extraordinary Administration process in Bosnia-Herzegovina.  The application was rejected on November 13, 2017.  The Extraordinary Administrator appealed that decision on November 27, 2017.  The Supreme Court rejected the appeal by a decision dated December 18, 2017.  The Extraordinary Administrator filed an appeal at the Constitutional Court on March 16, 2018.  That appeal remains pending. |

| Jurisdiction | Recognition Status | Material Developments |
|---|---|---|
| **Montenegro** | **Denied (Appeal pending)** | On August 7, 2017, the Extraordinary Administrator filed an application with the Commercial Court of Montenegro for the recognition of the Extraordinary Administration process in Montenegro. The court dismissed the application on December 16, 2017. The Extraordinary Administrator filed an appeal against this decision on October 25, 2017. The Commercial Court of Montenegro granted permission to Sberbank to join the appeal as an interested party. An appeal was filed against that decision on February 28, 2018. That appeal remains pending. |
| **Switzerland** | **Granted (Final)** | The Extraordinary Administrator filed an application with the Cantonal Court of Zug on December 20, 2017 for the recognition of the Croatian Proceedings in Switzerland, as well as the appointment of the Extraordinary Administrator to represent the Debtors and deal with their assets in Switzerland under the Swiss International Private Law Act. By decision dated February 2, 2018, the Cantonal Court of Zug recognized the Extraordinary Administration in respect of the Debtors with effect for the entire Swiss territory and authorized the Extraordinary Administrator to represent the Debtors in Switzerland and deal with their assets there. The decision was not appealed and has become final under Swiss law. |

## Appendix B

**Foreign Recognition Decisions**

# **Appendix B-1**

**Decision of the Supreme Court of the Republic of Slovenia**

**Cpg 2/2018-3**

Supreme Court of the Republic of Slovenia

DECISION

The Supreme Court of the Republic of Slovenia, in a panel of the Supreme Court judges Vladimir Balažic as the president and dr. Miodrag Đorđević (judge-rapporteur) and Franc Seljak as members of the panel,

Decided at its sitting dated 14 March 2018

in the non-contentious matter

of the applicant: **AGROKOR koncern za upravljanje družtvima, proizvodnju I trgovinu poljoprivrednim proizvodima, d. d. (short company name AGROKOR, d. d.),** Trg Dražena Petrovića 3, 10000 Zagreb, Republic of Croatia – together with its subsidiaries and affiliated companies, represented by Law firm Rojs, Peljhan, Prelesnik & partners, o. p., d. o. o., from Ljubljana, and

opposing parties: (1) **SBERBANK OF RUSSIA**, 19 Vavilova St., 117997 Moscow, Russian Federation, (first opposing party), represented by SCHÖNHERR Attorneys-at-law - branch Slovenia and Marko Frantar, attorney in Ljubljana, (2) **REPUBLIC OF SLOVENIA**, (second opposing party), represented by the State Attorneys Office, and (3) **Sberbank banka, d. d.**, Dunajska cesta 128A, Ljubljana, (third opposing party), represented by SCHÖNHERR Attorneys-at-law - branch Slovenia and Marko Frantar and Mark Jo Moggi, attorneys in Ljubljana,

due to recognition of a foreign extraordinary administration procedure,

on **the appeals of the second opposing party** and **the applicant** against decision of the District court in Ljubljana R-St 642/2017 dated 26 October 2017,

AS FOLLOWS:

I. The appeal of the second opposing party shall be rejected and the decision of the court of first instance shall be upheld in point I of the operative part of the decision.

II. Each party shall bear its own costs of the procedure regarding the appeal of the second opposing party.

III. The appeal of the applicant shall be rejected and the decision of the court of first instance shall be upheld in point II of the operative part of the decision.

IV. Each party shall bear its own costs of the procedure regarding the appeal of the applicant.


REASONING:


**Course of legal procedure up to now**

1. With the decision R-St 642/2017 dated 26 October 2017, the court of first instance recognized in the Republic of Slovenia an extraordinary administration procedure against a debtor AGROKOR koncern za upravljanje društvima, proizvodnju I trgovinu poljoprivrednim proizvodima, d. d. (short company name AGROKOR, d. d.) and its subsidiaries and affiliated companies (listed by name), which was initiated on the basis of decision of the **Commercial Court in Zagreb** (*Trgovački sud u Zagrebu*), ref. no. 47. St-1138/17 dated 10 April 2017, in connection with decision of the same court, ref. no. 47. St-1138/17-52 dated 21 April 2017. The procedure before the court of first instance concerned a recognition of a procedure against the company of systemic importance for the Republic of Croatia (Paragraph 1 and 2, Article 4 of the Extraordinary Administration Act, hereinafter the EA) and its subsidiaries and affiliated companies (Paragraph 1 and 2,[1] Article 5 of EA).

2. With the decision R-St 642/2017 dated 26 October 2017, the court of first instance (hereinafter referred to as challenged decision) dismissed the objection of the second opposing party due to lack of legal interest of the second opposing party (point I.a of the operative part of the decision). Consequently, the court decided that the second opposing party is obligated to pay costs of the applicant in the amount of EUR 114.24 together with potential statutory default interests (point I.b of the operative part of the decision).

3. By the challenged decision, the court of first instance upheld the objection of the first and third opposing party and set aside the decision R-St 642/2017 of 14 July 2017 and rejected the application for recognition of the extraordinary administration procedure against AGROKOR, d. d., and affiliated companies and subsidiaries as foreign insolvency procedure (point II.a of the operative part of the decision). It concluded that the foreign extraordinary administration procedure does not possess the characteristics of a foreign insolvency procedure referred to in Point 1 Paragraph 2 Article 446 of ZFPPIPP[2] (Point 2 Paragraph 1 Article 462 of ZFPPIPP)[3]; that it is

---

[1] Affiliated companies and subsidiaries in the context of EA are companies having their registered seat in the Republic of Croatia and in which the company of systemic importance holds at least 25 % of shareholdings. Poslovni sistem MERCATOR, d. d. hereinafter referred to as MERCATOR, d. d.) does not meet those criteria.

not a procedure that would be conducted for the account of all creditors of the debtor; and that its purpose is not primarily restructuring or liquidation of the debtor. In addition, it ruled that the recognition of the extraordinary administration procedure under EA would be contrary to the public policy of the Republic of Slovenia. Consequently, the applicant was ordered to reimburse the costs of the first opposing party in the amount of EUR 8,810.38 and the cost of the third opposing party in the amount of EUR 114.24, both with statutory default interests (point II.b of the operative part of the decision).

4.  The second opposing party filed an appeal against the decision by which its objection was dismissed (point I of the challenged decision), on account of a material breach of the provisions of the procedure, erroneous finding of the facts and misapplication of substantive law, and notified the costs of the procedure with statutory default interests. The applicant appealed against the decision on setting aside the decision on the initial recognition of the foreign extraordinary administration procedure and the subsequent rejection of the application for its recognition (point II of the operative part of the challenged decision), on all grounds of appeal, and notified the costs of the procedure, including the costs of translation of documents.

5.  The applicant replied to the appeal of the second opposing party, and all three opposing parties replied to the applicant's appeal. All parties notified the costs of the procedure, the first opposing party also with the costs of translation of documents, and the first and the third opposing party also with any statutory default interests.

## LEGAL BASIS FOR RECOGNITION OF A FOREIGN INSOLVECY PROCEDURE IN THE REPUBLIC OF SLOVENIA

6.  The Republic of Slovenia and the Republic of Croatia are both European Union Member States. However, the legal basis for the recognition of a foreign insolvency procedure in this case are not provisions of Council Regulation (EC) No. 1346/2000 of 29 May 2000, as recast by Regulation (EU) No. 848/2015 of 20 May 2015 (since this is not a matter of recognizing the insolvency procedure listed in Annex A), but the provisions of Chapter 8 of the ZFPPIPP[4] and pursuant to Paragraph 2 Article 449 of ZFPPIPP[5], provisions of Articles 20 - 23 of the Treaty between the Republic of Slovenia and the Republic of Croatia on Legal Assistance in Civil and Criminal Matters (hereinafter the Treaty)[6] which are the provisions on recognition and

---

[2] »A foreign procedure due to insolvency shall be any court or administrative procedure: 1. conducted in a foreign country for the joint account of all creditors of the debtor due to financial restructuring or liquidation of the debtor.«

[3] »The court shall issue a decision on recognition of a foreign procedure due to insolvency if the procedure which is the subject of the request for recognition has the characteristics of a foreign procedure due to insolvency referred to in the second paragraph of Article 446 of this Act [i.e. ZFPPIPP].«

[4] The Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast) (Brussels I) is not applicable since Article 1.b. stipulates that the regulation shall not apply »to bankruptcy, procedure relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous procedure.«

[5] »The rules laid down in Chapter 8 of this Act [i.e. ZFPPIPP] shall not apply to relations otherwise provided in international treaties concluded by the Republic of Slovenia with one or more foreign countries.«

[6] Official Gazette of the RS, no. 42/1994 of 13 July 1994.

enforcement of judgments, whereas Paragraph 1 Article 23 of Treaty in relation to the procedure for recognition [and enforcement] of the decision refers back to the rules of the country that decides on recognition [and enforcement], so back to ZFPPIPP.

7. Article 459 of ZFPPIPP provides that »*recognition of foreign insolvency procedure shall be subject to the general rules on the recognition [and enforcement] and implementation of foreign court rulings provided for by the act governing international private law and procedure [i.e. Private International Law and Procedure Act, Zakon o mednarodnem zasebnem pravu in postopku, hereinafter ZMZPP[7]], unless otherwise provided for in Section 8.3 of this Act [i.e. ZFPPIPP]*«. In the procedure for the recognition of foreign court decisions, Article 111 of ZMZPP further (in a procedural manner) refers to the *mutatis mutandis* application of the provisions of the Non-Contentious Civil Procedure Act (*Zakon o nepravdnem postopku*, hereinafter ZNP), while in Article 37 (also in procedural terms) of ZNP refers to a *mutatis mutandis* application of the provisions of the Contentious Civil Procedure Act (*Zakon o pravdnem postopku*, hereinafter ZPP).


**APPEAL OF THE SECOND OPPOSING PARTY**

**Grounds of Appeal**

8. The second opposing party challenges the conclusion of the court of first instance that its legal interest in filing a legal remedy (appeal or objection) against the challenged decision is not demonstrated. In this regard, it refers to the legal benefit which is supposed to arise from **the Act Setting Conditions for the Appointment of Associate Members of Management Boards in Systemically Important Companies in the Republic of Slovenia (hereinafter referred to as ZIČUDSP)**.[8] It emphasizes that the purpose of adopting this act was precisely in the protection of MERCATOR, d. d., against the interests of the majority shareholder AGROKOR, d.d. In addition, failure to comply with the principle of equal treatment of creditors is contrary to the public policy of the Republic of Slovenia. In relation to its legal interest, it refers to Paragraph 5 Article 462 of ZFPPIPP and to Paragraph 1 Article 19 of ZNP. Moreover, it relies on the findings of the study »Potential Changes in the Business Position of Mercator - Evaluation of Network Effects (*Potencialne spremembe poslovnega položaja Mercatorja – ocena mrežnih učinkov*), EIPF, Ekonomski inštitut, d. o. o.«

**The appeal is not grounded**

*Regarding the legal interest under ZFPPIPP*

9. An objection against a decision on the recognition of a foreign insolvency procedure may also be filed by a person possessing a legal interest (Paragraph 5 Article 462

---

[7] Official Gazette of the RS, no. 56/1999 and 45/2008 – ZArbit.

[8] The Government of the Republic of Slovenia may, in accordance with Paragraph 1 Article 3 and in relation to Paragraph 1 Article 4 ZIČUDSP, propose to the court to appoint an extraordinary member of the management board in a company of systemic importance in a non-litigious procedure; pursuant to Article 7 ZIČUDSP, it may also propose to the court his/her dismissal.

of ZFPPIPP), however this interest cannot be equated to the public interest referred to in Article 452 of ZFPPIPP. Nor can the legal interest in bringing an objection to the decision on the recognition of a foreign insolvency procedure be equated with the public interest in filing a request for the protection of legality. Namely, public interest of the Republic of Slovenia in the procedure for the recognition of a foreign insolvency procedure is safeguarded already by the domestic court. Additionally, in order to remedy the illegality, which has occurred through an unlawful final judgment, the request for the protection of legality as a specific extraordinary legal remedy[9] is provided, which may be filed by the Public Prosecutor's Office as a special state authority with adequate procedural legitimacy, which is regulated in the procedural provisions of the ZPP. Its aim is to reduce the possibility of the existence of decisions which, with their content, would be contrary to the basic principles of the legal order. The protection of party's [subjective] interests is only an indirect and subordinate purpose of the request for the protection of legality. It is about [the protection of] the benefit of the party, however through the protection of the legal system.[10]

10. In this respect, the dual position of the state has to be observed. When the state asserts that its measures concern the protection of the public interest, it refers to its powers as a public authority (*de iure imperii*). However, this position does not enable it that in order to protect the public interest (the protection of which is intended to be under its authority), intervenes in a specific judicial procedure in which the court decides on the recognition of a foreign judicial decision, which is alleged to have impact on the property rights of individual entities in the territory of the Republic of Slovenia. Moreover, granting a state intervention in a judicial procedure which does not concern its position as a civil law entity (*de iure gestionis*) would constitute an interference with the constitutional principle of the separation of powers.

11. Therefore, the second opposing party (which was recognized as such by the court of first instance) should demonstrate its own legal interest: that is that a success with its objection would enable it to exercise its right or benefit or that its entry into the proceeding is necessary in order to protect its legal benefits (and not in order to protect its alleged economic, social or financial benefits). However, the second opposing party could not satisfy this criterion. In addition, the decision on the recognition of a foreign extraordinary administration procedure does not affect the legal position of the Republic of Slovenia, since the contested decision does not directly apply to it. In any case, the Republic of Slovenia secured its public interest by adopting the ZIČUDSP, by appointing an extraordinary member in the management board of MERCATOR, d. d. (and by imposing some restrictions on corporation rights of affiliated companies under the act governing companies).

### *Regarding the legal interest under ZNP*

12. The Republic of Slovenia is not a "*person against whom the motion [was] lodged (the opposing party)*" nor "*a person directly concerned by the court decision*" (Paragraph 1 Article 19 of ZNP), nor was it recognized as a party in the procedure

---

[9] Decision of the Supreme Court II Ips 378/1992 dated 17 December 1992
[10] Ibidem

for recognition of foreign extraordinary administration (Paragraphs 1 and 4 Article 19 of ZNP) (its objection was dismissed as unfounded due to the lack of legal interest).

13. A "*person whose legal interest may be affected by a court decision*" may also be party in the procedure (Paragraph 1 Article 19 of ZNP). According to the established case law, the legal interest must be substantial and direct, and in case of a favourable decision of the Supreme Court (for the opposing party), its legal position has to be improved.[11] Since the decision on the recognition of a foreign extraordinary administration procedure has not (directly) influenced the legal position of the Republic of Slovenia, it is not clear how setting aside this decision could improve its legal position.

14. The court may take into account the legal interest on any legal basis. However, it cannot be taken into consideration when the alleged facts which justify it, do not correspond to any legal basis.[12] Hence, it cannot take into account the references of the second opposing party to the ZIČUDSP, as there is no substantial and direct connection between the recognition of the foreign extraordinary administration procedure relating to the AGROKOR d. d. group of companies, and the legal position of the state (the Republic of Slovenia). ZIČUDSP determines the conditions for the appointment (and dismissal) of an extraordinary member of the management board in companies of systemic importance for the Republic of Slovenia (this member was successfully appointed) and some corporate legal restrictions on the operation of companies of systemic importance (Article 6 ZIČUDSP). Relying of the second opposing party on the "study of the impact of the deterioration in the position of Mercator [,] d. d. [,] on public finances." is thus not legally relevant.

15. Since (as explained) the direct effect of recognizing the foreign extraordinary administration procedure on the legal position of the Republic of Slovenia has not been demonstrated, there is no basis for the alleged "preventive" submission of an objection against the decision on the recognition of a foreign insolvency procedure.


**Decision on the appeal**

16. When the opposing party does not have legal interest for filing an objection, its objection must be dismissed. Therefore, the Supreme Court (on the basis of the explained) rejected the appeal of the second opposing party and confirmed the challenged decision in the Point 1. of its operative part (Point I. of the operative part) (Article 459 ZFPPIPP in connection with Article 111 of ZMZPP, Article 37 of ZNP and Point 2 Article 365 of ZPP).


**Decision on costs of the appellate procedure**

---

[11] Decision of the Supreme Court of RS G 15/2007 of 12 December 2007 (Point 9 of the reasoning) in connection with the decision of the Constitutional Court U-I-157/04 of 3 June 2004.
[12] Decision of the Supreme Court of RS III Ips 112/2009 of 8 March 2011 (Point 10 of the reasoning).

17. Decision on costs of the procedure relating to the appeal of the second opposing party (Point II of the operative part) is based on Article 459 of ZFPPIPP in connection with Article 111 of ZMZPP and Paragraph 1 Article 35 of ZNP.


## APPEAL OF THE APPLICANT

### Grounds of appeal

18. Applicant firstly oppose to assessment of the court of first instance, which recognized legal interest to the first and the third opposing party for filing an objection. Then it invokes that a court of first instance prematurely assessed the content of the settlement in the procedure for recognition of extraordinary administration; that it has falsely, speculatively and on the basis of abstract arguments, established a conclusion, that the extraordinary administration procedure is allegedly a procedure, which introduces substantive consolidation; that extraordinary administration is not in any way procedure which introduces substantive consolidation; that a court of first instance's conclusion on existence of substantive consolidation as an element, which deprives the extraordinary administration procedure of characteristic of foreign insolvency procedure, should be wrong; that a court of first instance's conclusion that an extraordinary administration procedure is not a procedure which is intended for restructuring or liquidation of a debtor, should be wrong; and that a conclusion of a court of first instance on existence of public policy reservation should be wrong.

19. Hereinafter, the Supreme Court has, within the scope of assertions of appeal, answered on individual grounds of appeal (subject to their sequence and systematic).


## The appeal is not grounded

### *Regarding legal interest of the first and the third opposing party*

20. Subject of recognition of a foreign insolvency procedure is recognition of the foreign extraordinary administration procedure. **One of the legal consequences of (possible) recognition of the procedure against the corporate group AGROKOR, d. d., in the Republic of Slovenia would be that against the company AGROKOR d .d. and its affiliated companies or subsidiaries "*[it would not be] permissible to initiate enforcement or security procedure",* while "*pending procedures would be terminated*" (Point 1 Paragraph 1 Article 466 of ZFPPIPP).** In connection with such legal consequences, the applicant asserted that the court of first instance did not assess a question of the substantial influence of success (failure) of filed legal remedy [i.e. objection against the decision on recognition of foreign extraordinary administration procedure] on receivables of the first and the third opposing party and that it did not take into account that enforcement of their receivables in enforcement procedure is not prevented by effects of recognition of foreign extraordinary administration

procedure, but the fact that they do not have enforcement titles, and consequently they cannot improve their legal position even if their objection would be successful.

21. Nevertheless, this assertion in the appeal is not grounded. Namely, the applicant does not face the arguments of the court of first instance (in Points 26 to 30 of reasoning of challenged decision), which refer to receivables in question, (legal) consequence of recognition of foreign insolvency procedure in the present case and substantial consequences in practice, but rather tries to undermine them with assertions about theoretical approach and abstract conclusions and with assertions about superficial and insufficient findings. Therefore, the Supreme Court (taking into account a sufficient and adequate reasoning of the court of first instance) did not answer to such (abstract) assertions.

22. The applicant has also asserted that the court of first instance did not take into account that the receivables, which are claimed in foreign extraordinary administration procedure, had also been claimed by the first opposing party in the arbitration procedure in London and that the third opposing party had also claimed its receivables, which are claimed before the court in the Republic of Slovenia, in the extraordinary administration procedure in the Republic of Croatia (where it was supposedly directed to a litigation procedure with respect to their existence), which should result in effects of lis pendens and should have as a consequence a suspension of all procedures for enforcing the receivables of the first and the third opposing party.

23. Also this assertion in the appeal is not grounded. Due to the fact that this is a procedure for recognition of foreign (Croatian) insolvency procedure in the Republic of Slovenia, only possible effects of (international) lis pendens in the Republic of Slovenia are relevant, and not those in the United Kingdom of Great Britain and Northern Ireland. Otherwise, in connection with competition of two procedures for recognition of foreign procedure (due to insolvency) it cannot be possibly spoken about lis pendens as they are two procedures in which decisions of the court have effect, which is limited to an individual country where such recognition has been demanded.

24. Therefore, also the recognition of foreign (Croatian) extraordinary administration procedure in the United Kingdom of Great Britain and Northern Ireland with judgement of **The High Court of Justice**, no. CR-2017-005571 as of 9 November 2017 (hereinafter referred to as English judgement), on the basis of The Cross-Border Insolvency Regulations 2006 (hereinafter referred to as CBIR) is not important. Additionally, the High Court of Justice (by judge HHJ Paul Matthews) built its argumentation, despite the incorporation of *UNCITRAL Legislative Guide on Insolvency Law*, on common law and case law, in which it had ruled in accordance with that law, whereby understanding and use of insolvency law institutes under common law differentiate from the Slovenian law (civil law).

25. Due to the fact that the case is about the procedure for recognition of foreign (Croatian) insolvency procedure in the Republic of Slovenia, competition between procedures in the Republic of Croatia and the Republic of Slovenia could be important from the view of (international) lis pendens. However, in connection with

the receivables, which had been claimed in both countries, none of the parties has (in connection with Article 88 ZMZPP) proposed a suspension of the procedure in the Republic of Slovenia, so that lis pendens could represent a procedural obstacle.

26. The applicant also asserts the time limitation of extraordinary administration procedure and consequently claims that the effects of its recognition as of foreign insolvency procedure are limited in time. However, despite asserting the breach of the right to be heard in a procedure and the right to equal protection of rights, that does not have a special weight and impact. Namely, extraordinary administration procedure began with decision of Commercial Court in Zagreb, ref. no. 47. St-1138/2017 dated 10 April 2017, which, subject to (15 months) deadline determined in the last (third) indent of Article 47 of EA, means that it the extraordinary administration procedure will run at least to 10 July 2018, which further means that in the event of possible adoption of favourable decision, the recognition of foreign extraordinary administration would (still) effect the legal position of the first and the third opposing party.

### *Regarding premature decision on the content of the settlement*

27. The Applicant asserts that the court of first instance prematurely, i.e. in the procedure for recognition of foreign insolvency procedure, assessed the content of the settlement, since with the recognition of foreign insolvency procedure (foreign extraordinary administration procedure) solely consequences from Paragraph 1 Article 466 of ZFPPIPP would apply, while recognition of decision on approval of settlement, concluded in the extraordinary administration procedure, should be pursuant to Paragraph 1 Article 467 of ZFPPIPP possible to achieve only with special decision adopted on the basis of application of foreign administrator.[13]

28. Recognition of foreign judicial decisions does not only mean a recognition of existence of foreign judicial decision, but also [and in particular] recognition of legal consequences of foreign judicial decisions in the territory of the Republic of Slovenia.[14] The case at hand relates to recognition of legal effects of foreign extraordinary administration procedure (and not yet of possible decision on approval of settlement, concluded in the extraordinary administration procedure), i.e. legal consequences under Paragraph 1 Article 466 of ZFPPIPP, which refer to the initiation of foreign extraordinary administration procedure as a foreign insolvency procedure. However, it is exceptionally possible, already when deciding on the recognition of foreign insolvency procedure, to also assess legal consequences in connection with the completion of this procedure, in the respective case consequences with respect to the content of the settlement (referred to in Article 43 of EA). If, (due to processual or substantive reasons), already when deciding on the application for recognition of foreign procedure, it is not possible to see legally grounded possibilities for recognition of settlement according to which creditors in the extraordinary administration procedure are supposed to be paid

---

[13] *»If a court recognises a foreign procedure due to insolvency [as main or ancillary procedure], it decides on legal consequences of such recognition in the Republic of Slovenia with a decision on recognition of such legal procedure or with a special decision on the basis of application of a foreign administrator.«*
[14] Decision of Supreme Court Cpg 2/2017 dated 26 October 2017 (Point 8 of the reasoning of the judgement).

(second indent Article 47 of EA) or for the successful conclusion of the extraordinary administration procedure, there is a well-grounded obstacle for recognition of such procedure in the Republic of Slovenia.[15]

**Regarding the assertion that extraordinary administration procedure introduces substantive consolidation (procedurally)**

29. Applicant alleged that the court of first instance wrongly, speculatively and on an abstract basis came to the (otherwise) wrong conclusion that the extraordinary administration procedure is a procedure that introduces substantive consolidation, and in that respect that the court prejudiced facts that do not even exist yet. However, the assertions in the appeal are unfounded.

30. One of the measures in the extraordinary administration procedure (point 3 paragraph 1 Article 3 of EA) is the conclusion of a settlement for the repayment of creditors (Article 43 of EA). Therefore, the court of first instance in respect of the fulfilment of the condition referred to in point 1 paragraph 2 Article 446 ZFPPIPP for the recognition of a foreign insolvency procedure from point 2 paragraph 1 Article 462 ZFPPIPP, justifiably analysed the conditions for initiation of the extraordinary administration procedure and the legal consequences (effects) of the initiation and conclusion of this procedure. Namely, if the extraordinary administration procedure does not have the required characteristics (to be run for the joint account of all debtors' creditors and due to the financial restructuring or liquidation of the debtor), it cannot be recognized as a foreign insolvency procedure.

31. This is not an assessment of the obstacles which constitute a reservation of public policy under Article 452 of ZFPPIPP[16], but an assessment whether a foreign insolvency procedure fulfils the conditions for recognition.

***Regarding the existence of substantive consolidation as an element that deprives an extraordinary administration procedure of the characteristics of the foreign insolvency procedure***

32. In the light of the foregoing, is the applicant's argument that in connection with the assessment of the conditions for the recognition of a foreign insolvency procedure, the assessment whether the extraordinary administration procedure should be conducted for the joint account of all debtor's creditors (Point 1 Paragraph 2 Article 446 ZFPPIPP) or whether the principle of equal treatment of creditors is respected in this procedure is not justified, is unfounded.

**Regarding the assertion that the extraordinary administration procedure introduces substantive consolidation (substantive assessment)**

---

[15] See also Point 36 of the reasoning of this decision (on »settlement, which has characteristics of substantive consolidation«) and Point 49 of the reasoning of this decision (on non-provision of »equal treatment and equal (pari passu) payment« [of the creditors]).

[16] *"Domestic court can refuse the recognition of a foreign procedure due to insolvency [or a request of a foreign court or administrator for help or cooperation], if this could negatively impact the sovereignty, security or public interest of the Republic of Slovenia."*

33. In the appeal, the applicant insisted on the view that the extraordinary administration procedure is only a form of procedural consolidation, by which certain procedural acts are conducted for several entities at the same time, however separate legal identity of entities included in the procedure is maintained; that the provisions of EA do not provide that in the (extraordinary administration) procedure a pooling of funds and obligations of different companies occurs; that the extraordinary administration procedure is not a liquidation procedure, but a restructuring procedure, in which a uniform group of assets that would serve as a source of repayment of creditors is not formed. The key reason for the first instance court decision to abolish the decision on the recognition of a foreign extraordinary administration procedure and to reject such a proposal was that in the procedure of the extraordinary administration, due to the application of the substantive consolidation measure, the principle of equal treatment of creditors is not respected *(par conditio creditorum)*, which is one of the fundamental principles of insolvency procedures.

34. The measure of substantive consolidation is different form procedural coordination, referred to by the applicant, namely because the **substantive consolidation** represents the treatment of assets and obligations of two or more companies, members of the group, as one (single, unified) group of assets, while the **procedural coordination** is merely coordinated management of two or more insolvency procedures against the companies, members of the group. None of the measures is legally defined, but they are both given substance by the UNCITRAL Legislative Guidelines for Insolvency Law, namely their third part on the treatment of enterprise groups in insolvency *(Part three: Treatment of enterprise groups in insolvency)*. The Slovenian legislator took into account the UNCITRAL Legislative Guidelines for Insolvency Law when formulating principles and key solutions in the ZFPPIPP, since they pursue the formation of such guidelines and recommendations, which aim at preparing (harmonized) arrangements for domestic and cross-border insolvency procedures and the creation of internationally acceptable standards of best practice in insolvency procedures. Therefore, the court of first instance, when considering the conditions for the recognition of a foreign extraordinary administration procedure in the Republic of Slovenia, proceeded correctly by interpreting the rules on insolvency procedures with international element in the light of their international origin and taking into account the need for their unified application (Article 453 of ZFPPIPP).[17]

35. The court of first instance concluded, after having carried out a substantial, detailed and precise analysis of provisions of EA (Points 45 to 61 of the reasoning of the challenged decision), that the established characteristics of the extraordinary administration procedure correspond with the essential characteristics of the substantive consolidation measure (Point 52 of the reasoning of the challenged decision), which, as such, leads to an unequal treatment of creditors (Points 55 and 62 of the reasoning of the challenged decision), which in turn means that the foreign extraordinary administration procedure does not fulfil the condition for the recognition of a foreign insolvency procedure (referred to in Point 1 Paragraph 2 Article 446 of ZFPPIPP in relation to Point 2 Paragraph 1 Article 462 of ZFPPIPP).

---

[17] *"When interpreting the provisions set out in chapter 8 of this law [that is the provisions of ZFPPIPP on insolvency procedures with international element], it is necessary to take into account their international origin, the need for encouraging their unified application and observance of good faith principle."*

This conclusion was contested by the applicant; however, applicant's assertions are unfounded.

36. The Supreme Court finds that the conclusions of the court of first instance are substantively correct. That is why the Supreme Court will not reiterate them. If the court of appeal agrees with the reasons of the court of first instance, it is not necessary to explicitly answer the legal assertions, which are repeated in the appeal. It is sufficient that it is evident from other statements in the reasoning that the court is familiar with the arguments of the party and that it considered them.[18] However, with regard to the applicant's references in the appeal to certain Articles of EA, which allegedly do not imply the substantive consolidation, the court adds that it is evident from the provisions of *EA that EA* is pursuing the interest of the Republic of Croatia for rescuing AGROKOR, d. d., with substantive consolidation. It is evident from Article 43 EA that the substantive consolidation is a systemically foreseen measure under *EA.* In the event that the legislator adopted an act (which on the outside appears like a systemic legislation) in order to save a certain business entity, which is said to be of a systemic importance for the Republic of Croatia, and at the same time in the same act envisioned the conclusion of a settlement as a (sole) systemic measure, which has characteristics of substantive consolidation, such measure must be understood as in advance foreseen manner of solving a systemically endangered entity (debtor).

37. Group of companies is a (corporate legal) connection between legally independent legal entities forming a group, which are connected in order to achieve their common (commercial) objective, under one single management (joint management) of the holding (controlling) company, however, under the EA such independency is blurred as EA integrates the companies, members of the group, in an economic whole, which is a characteristic of a substantive consolidation. Namely, under the EA enables: that an extraordinary administration procedure comprises assets and liabilities of all companies in the procedure; that a creditor of one company may lodge an objection against a receivable which belongs to the other creditor against the other company the same procedure; that creditors of a debtor do not only share the debtor's assets with the other debtor's creditors, but also with creditors of other debtors.

38. Since the accumulation of assets of different companies, members of the group, the extraordinary administration procedure does not necessary lead to the higher payment of each creditor, but rather to the equal payments of all creditors, that is to the higher payment of some creditors on the account of the others; furthermore, the extraordinary administration procedure affects the legal certainty and exercise of the rights in rem for securing receivables [as the basis for a right to separate satisfaction] – which are both characteristic of a substantive consolidation (Point 110, Section II, Third chapter UNCITRAL Legislative Guide on Insolvency Law). Additionally, EA also enables the expansion of procedure to the solvent members of the group, which is a characteristic of a substantive consolidation as well (Point 111, Section II, Third chapter UNCITRAL Legislative Guide on Insolvency Law). In relation thereof the Commercial Court of Appeal of the Republic of Serbia concluded that "the EA enables a [single] extraordinary administration procedure against the

---

[18] Decision of the Constitutional Court Up 373/97-15 dated 22 February 2001 (point 9 of the reasoning).

holding company, its affiliated and controlled companies, and that based on the assumption that the pre-bankruptcy or bankruptcy reason exist on the part of the holding (controlling) company, irrespective of the existence of such reasons on the part of its affiliated and controlled companies, which led to the specific lifting of the corporate veil of the controlling and affiliated companies" (last paragraph of the reasoning on page 12 of the translation of its order, no. 7 Pvž 396/17 dated 25 October 2017).

39. Deficiencies of the substantive consolidation are also confirmed in the foreign literature,[19] which effect: in "horizontal" (instead of "vertical") consolidation of assets; in that that the creditors of less solvent companies benefit on the account of the creditors of (more) solvent companies, and vice versa; and in that that a consolidation of assets and liabilities fundamentally changes the value of the creditors' receivables.

40. In the appeal the applicant mentioned also the Recommendation 220 of the Part three of the UNCITRAL Legislative Guide on Insolvency Law, where the substantive consolidation (irrespective of the well-established principle of independent, separate legal personalities of legal entities) is exceptionally allowed under some specific and limited circumstances: (a) where the assets or liabilities of the companies, members of the group, are intermingled to such an extent that the ownership of assets and responsibility for liabilities cannot be identified without disproportionate expense or delay; (b) where the companies, members of the group, are engaged in a fraudulent scheme or activity with no legitimate business purpose and that substantive consolidation is essential to rectify that scheme or activity. However, the aforementioned circumstances (which the applicant allegedly "was [not] able to present before the court of first instance") provided by the applicant in the appeal were not substantiated and elaborated enough. It is for this reason that the Supreme Court did not need to address the possibilities under the Recommendation 220 of the Part three of the UNCITRAL Legislative Guide on Insolvency Law.

***Regarding the assertion that the purpose of the extraordinary administration procedure is not restructuring or liquidation of the debtor***

41. The applicant argued that the Court of First Instance did not provide substantiated explanation on why the extraordinary administration procedure should not be regarded as the restructuring procedure. This argument (irrespective of the allegations regarding the infringement of right to be heard under Point 8 Paragraph 2 Article 339 of ZPP and the right to equal protection of rights under Article 22 of the Constitution) is however not justified as the applicant did not consider the argumentation under Point 44 of the reasoning of the challenged decision of the court of first instance. As the applicant did not address the argumentation of the court of first instance, the Supreme Court did not address the Applicant's allegations in the appeal alleging that the extraordinary administration procedure should be regarded as the procedure run with the purpose of restructuring. However, in the interest of clarity the Supreme Court summarizes the challenged decision as

---

[19] For example Andrew Brasher: "Substantive Consolidation: A Critical Examination", accessible at: *http://www.law.harvard.edu/programs/corp_gov/papers/Brudney2006_Brasher.pdf*

follows: "restructuring or liquidation of a debtor shall be conducted in a manner that the interests of creditors are protected, that equal or proportional payment of creditors Is ensured, whereas the proper balance between interests of different creditors, debtor and other interests shall be ensured".

### *Regarding the public policy*

42. The applicant asserted in the complaint that under the modern law there is a presumption that the conditions for the recognition of foreign judgment are fulfilled and therefore the assessment should only be formal in nature, however, this complaint is not justified. Namely, provisions regarding the recognition of foreign insolvency procedure (Section 8.3 of ZFPPIPP) are not applicable merely in the cases regarding the recognition of foreign insolvency procedure of Member States of the European Union, if such decision on the initiation of the procedure has direct legal effects in the territory of the Republic of Slovenia (Paragraph 1 Article 486 of ZFPPIPP in relation to Paragraph 2 Article 445 of ZFPPIPP), since in other cases also the substantive assessment is carried out (in the case at hand according to Point 2 Paragraph 1 Article 462 of ZFPPIPP in relation to Point 1 Paragraph 2 Article 446 of ZFPPIPP).

43. Additionally, the applicant asserted that with regard to the assessment of the public policy infringements the abstract content of the foreign law is irrelevant but rather how the foreign law was (or was not) applied in the case at hand, for which reason at the stage of recognition of foreign insolvency procedure (in relation to the assessment of the effects of the initiation of the procedure) the final result of such procedure shall not be assessed, however, even this complaint is not justified. Namely, the court of first instance did not assess the final result of the extraordinary administration procedure as such (this is settlement)[20], but addressed the fulfilment of conditions for the recognition of the extraordinary administration procedure as foreign insolvency procedure, where (as already explained) the identification of any obstacle to recognition of the foreign insolvency procedure was not assessed (public policy reservation under Article 452 of ZFPPIPP).

44. The public policy reservation should be used only as a last resort, where its non-application would cause consequences that are unsustainable for a national legal order.[21] The court of first instance explained such "unsustainability" as a failure to comply with the principle of equal treatment of creditors (in the extraordinary administration procedure), which forms, as one of the fundamental provisions in the procedures due to insolvency (Article 46 of ZFPPIPP),[22] a part of the public policy of the Republic of Slovenia.

45. The Supreme Court summarizes (as correct) that the notion of public policy does not include all mandatory provisions of domestic law, but only those imperative legal norms [and moral rules] violation of which would undermine the legal [and

---

[20] Under Section VII *EA* the settlement is only one possibility to terminate the extraordinary administration procedure, in addition to the possibility of converting the procedure to the bankruptcy procedure (Article 42 *EA*), stay of proceedings (Article 46 *EA*), and termination of the procedure due to the unsuccessful expiry of the 15-month time limit from the commencement of the procedure (third indent Article 47 *EA*).

[21] Decision of the Supreme Court II Ips 462/2009 dated 28 January 2010 (point 12 of the reasoning).

[22] *»In insolvency proceedings all creditors who are in equal position towards the insolvent debtor shall be treated equally.«*

moral] integrity of the legal system (Point 65 of the reasoning of the challenged decision). Since the recognition of a foreign court decision means recognition of its legal effects on the territory of the Republic of Slovenia, only a decision (procedure) which corresponds to the fundamental legal principles of procedures due to insolvency under ZFPPIPP may be recognized. A recognition of a foreign extraordinary administration procedure, that does not ensure an equal treatment of creditors, would adversely affect the public interest of the Republic of Slovenia, which in domestic insolvency procedures determines (and safeguards) the common (basic) principle of equal treatment of creditors, whereas in insolvency procedures with an international element (on its territory) recognizes only financial restructuring procedures or liquidation procedures of the debtor for the joint account of all creditors (which corresponds to the principle of equal treatment of creditors).

46. A comparison between ZIČUDSP and EA offers itself in regard to the question of protection of the public policy of the Republic of Slovenia. Both regulations are a form of state interventionism and economic protectionism, the purpose of which is to protect the companies of systemic importance (company Mercator, d.d., in the Republic of Slovenia; company AGROKOR, d. d., its affiliated companies and subsidiaries in the Republic of Croatia), but with a difference that ZIČUDSP in its provisions only interferes with provisions of the Companies Act regarding affiliated companies (Article 6 ZIČUDSP) and not with the rules of procedures due to insolvency, whereas EA in its provisions regarding legal consequences of the initiation of extraordinary administration procedure interferes with the basic rules of the insolvency procedures, primarily with the principle of equal treatment of all creditors and with the legal effects of security in rem as the basis for a right to separate satisfaction**.**

47. EA interferes with the basic rules of the procedures due to insolvency (primarily with the principle of equal treatment of all creditors who are in equal position in relation to the debtor!) by determining a possibility for priority payment of receivables from the operational business (Article 39 Paragraph 1 of EA), super-seniority of newly undertaken obligations (Paragraphs 1 and 3 Article 39 of EA) and payment of receivables to chosen creditors, namely those due receivables which arose prior to the decision on the initiation of the extraordinary administration procedure (Paragraphs 1 and 2 Article 40 Paragraphs of EA), whereas decisions on all of these matters are, despite the prescribed consent from the creditors' committee, within the jurisdiction of the extraordinary administration, and by prescribing a ban on enforcement of the right to separate payment during the extraordinary administration procedure (Paragraph 5 Article 41 EA). Additionally, the respective actions referred to in Articles 39 and 40 EA, even though they are listed among the legal consequences of the initiation of the extraordinary administration, are not substantially (normatively) defined as legal consequences of the initiation of this procedure, but as very broad (arbitrary) rights of the extraordinary administrator.

48. The extraordinary administration procedure is subordinated to the interest of the country (extraordinary administrator who conducts the debtor's business, is named according to the proposal of the government of the Republic of Croatia (Paragraph 1 Article 11 of EA)) and does not protect the interest of the creditors as it does not

guarantee equal treatment nor equal (*pari passu*) payment. This is not about all creditors being treated equally but only those who are equal in their relation to the debtor! In addition to the fact that EA does not provide the basic rights to the creditors, it does not even provide the basic rights the creditors would have under the Slovenian insolvency legislation (where according to the principle of minimal protection of creditors, they would not be worse off in the extraordinary administration procedure as they would be in the bankruptcy procedure).

49. In relation to that, the Supreme Court does not address the issue of *EA*'s compliance with the public policy of the Republic of Croatia, as each country in principle decides for itself which values are of fundamental importance in terms of national public policy. The scope and the content of public policy depend on how an individual country values its interests. Additionally, the role of public policy is in the context of recognition of foreign procedure softened, since the home country only recognizes the legal consequences of the procedure that has been already initiated in a foreign country. It shall be however noted that other countries (from the SFRY area, former common country) have, based on grounds similar to the ones in this reasoning, rejected the recognition of Croatian extraordinary administration procedure, which, also when considering a broader (international) public policy,[23] shows that a possible recognition of the procedure based on *EA* in the countries from the same legal environment (with similar bankruptcy laws, all arising from the former Yugoslavian Compulsory Composition, Bankruptcy and Liquidation Act - ZPPSL[24]) in which AGROKOR, d. d. group of companies has assets and liabilities, would not be justified and proportional.

50. With the decision Rs. No. 21/17, dated 16 October 2017, the **Supreme Court of Montenegro** found that »the extraordinary administration procedure [under EA] does not represent a procedure of which has as a goal collective payment of creditors« (last paragraph of the reasoning on page 10 of the translation of the decision); that the extraordinary administration procedure has »a goal to protect the interest of the Republic of Croatia and is determined in accordance with interest of the state rather than the interest of the creditors of the debtor and its subsidiaries and affiliated companies« (first paragraph of the reasoning on page 11 of the translation); that the extraordinary administration procedure does not have »a goal of collective payment of creditors, considering that the bankruptcy procedure cannot be initiated and collective payment of creditors cannot be performed due to the introduction [correctly beginning] of the extraordinary administration procedure« (second paragraph of the reasoning on page 11 of the translation); that EA »does not represent a law regulating insolvency, but rather a law regulating extraordinary administration procedure regarding solvent as well as insolvent debtors, depending on whether these are companies of systemic importance to the Republic of Croatia« (first paragraph of the reasoning on page 13 of the translation).

51. With decision no. 7 PvŽ 396/17, dated 25 October 2017, the **Appellate Commercial Court of the Republic of Serbia** found that »the level of protection that is intended to be attained with [*EA*] as special law is determined by the interest of the Republic of Croatia and not by the interest of creditors. The goal of insolvency

---

[23] International public policy is not the concept of international law, bu tof the national law (is therefore national public policy in the sense of international private law).
[24] Official Gazette of the SFRY, No. 84/1989, 22.12.1989.

procedure cannot exclusively be the conservation and maintenance of legal entities of systemic importance to the country, but rather the goal has to be payment of creditors in accordance with the basic principles of bankruptcy law« (second paragraph of the reasoning on page 12 of the translation of the decision); that »the goal of this regulation [i.e. EA] is not collective payment of creditors but protection of the interest of the country that has adopted this regulation« (first paragraph of the reasoning on page 13 of the translation).

52. With decision no. 09 V 029120 17 Gž, dated 18 December 2017, the **Supreme Court of Federation of Bosnia and Herzegovina** found that »the goal of extraordinary administration procedure is not the collective payment of creditors, as a basic goal of bankruptcy procedure, but the protection and stability of economic, social and financial stability of the R[epublic] of Croatia, more specifically, continuing existence of certain commercial companies in Croatia. Such a goal of the extraordinary administration is considerably subordinated to the interest of the R[epublic] of Croatia and is pursued in order to protect the interests of this country rather than the interests of the creditors, [and with that] the principle of equal treatment of creditors is violated« (last paragraph of the reasoning on page 3 of the translation of the decision).

53. In terms of national public policy, the European public policy has to be taken into account along with the regional public policy. The court cannot reject the recognition of a foreign insolvency procedure despite the fact that such procedure would be in contradiction to the national public policy if such a rejection of recognition would be unjustified or disproportionate in terms of »European standpoint«. Both the Republic of Slovenia as well as the Republic of Croatia are members of the European legal environment, that is European Union, however it is a matter of each of the two, how they determine the types of procedures due to insolvency and the requirements for their initiation, running and conclusion, which (procedures or decisions) can later be subject to recognition (automatic or according to prescribed procedure)[25] in other countries, as well as how they determine the interests, to which the consequences of the recognition of the foreign insolvency procedure apply, they are protecting. The Republic of Slovenia decided to protect the interests of the creditors (Article 453 of ZFPPIPP in connection with Point 7, First section UNCITRAL Legislative Guide on Insolvency Law), their equal treatment (Articles 46, 34 and 128.a of ZFPPIPP), which is also a fundamental value of the European (insolvency) public policy, which means that the rejection of recognition of a foreign extraordinary administration procedure does not contradict this order.[26]

**Decision on the appeal**

54. With this the Supreme Court addressed the allegations of the applicant in the appeal, which in its opinion were essential according to the substantive law.

---

[25] The courts of the Republic of Slovenia (as the country of recognition) can, according to the generally adopted principle of strictly limited review, only assess the correctness of the merits of a foreign decision from the point of its compliance with the international public policy of the Republic of Slovenia.
[26] Even the procedure of substantive consolidation is conducted for the joint benefit of all creditors of the consolidated companies, members of the group (point 105, Chapter II, Third section UNCITRAL Legislative Guide on Insolvency Law).

Additionally, court's position and answers regarding other allegations that were not addressed directly, can be ascertained from the context of the reasoning.

55. Since the reasons in the appeal (as explained) are not substantiated, the Supreme Court rejected the appeal and confirmed the challenged decision in Point II. of its operative part (Point III. of the operative part) (Article 459 of ZFPPIPP in connection with Article 111 of ZMZPP, Article 37 of ZNP and Point 2 Article 365 of ZPP).

**Decision on the costs of the procedure with the appeal**

56. Decision on the costs of the procedure with the appeal of the applicant (point IV. of the operative part) is based on Article 129 of ZFPPIPP (in connection with Article 110 of ZMZPP).[27]

**Decision making**

57. The decision was adopted unanimously.

Ljubljana, 14 March 2018

President of the panel:
Vladimir Balažic, l.r.

---

[27] Decision of the Supreme Court Cpg 2/2017 dated 20 October 2017 (point 11 of the reasoning).

## **Appendix B-2**

**Decision of the Commercial Appellate Court of the Republic of Serbia**

7 Pvz 396/17

Lawyer's office
Veselinovic
Note on acceptance
Date: November 20, 2017.

ACCEPTED
On November 13, 2017
In     COMMERCIAL     COURT     IN
BELGRADE

Republic of Serbia
COMMERCIAL APPELATE COURT
7 Pvz 396/17
October 10, 2017
Belgrade

THE COMMERCIAL APPELLATE COURT in the Council composed of Judge Jasminka Obucina, as the President of the Council, Judge Tatjana Djurica and Judge Slobodanka Videnovic, as members of the Council, deciding on the application for recognition of a foreign proceeding and granting a releif of the applicant Ante Ramljak from Zagreb, Nova Cesta 126, OIB: 16959950253, as the foreign representative of the Business Company "AGROKOR" Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb, the City of Zagreb, Trg Drazena Petrovica No. 3, registration number: 03449602, OIB: 05937759187 and the foreign representative of the Agrokor's related and subsidiary companies, represented by Jovan Cirkovic, a lawyer from Belgrade, Street Bulevar Mihaila Pupina No. 6, deciding on the complaint of the applicants against the decision of the Commercial Court in Belgrade, No. 3 St 157/17 from August 28, 2017, has made the following

## DECISION

The complaint of Ante Ramljak from Zagreb, as the foreign representative of the business company "AGROKOR" Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb, from Zagreb, and the foreign representative of the Agrokor's related and subsidiary companies **IS REJECTED** and the Decision of the Commercial Court in Belgrade No. 3 St 157/17 from August 28, 2017 **IS CONFIRMED**.

*Reasoning*

The appealed Decision filed by the Commercial Court in Belgrade No. 3 St 157/17 from August 28, 2017, the request from July 26, 2017 for recognition in its entirety as the main foreign proceeding with all the legal consequences arising from the recognition of a foreign proceeding in the Republic of Serbia was rejected, the procedure of extraordinary administration opened with the decision of the Commercial Court in Zagreb to open the procedure of extraordinary administration

1

7 Pvz 396/17

No. St 138/17-3, from April 10, 2017, which is supplemented by a decision of the Commercial Court in Zagreb, No. St 1138/17-52, from April 24, 2017, over the debtor "AGROKOR"Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb, from Zagreb, and over the debtor's related and subsidiary companies, described in Paragraph I, Item 1, under b) of appealed Decision, as well as the request that Ante Ramljak, who is appointed as an Emergency Trustee in charge of extraordinary administration, is recognized as the foreign representative of a recognized foreign proceeding, to prohibit the initiation of new proceedings and to stop the proceedings in the Republic of Serbia in connection with the property, rights, obligations and responsibilities of companies listed in Item 1 of Paragraph I of this decision, to prohibit enforcement in the Republic of Serbia over the property of companies listed in Item 1, Paragraph I of the same decision, and to order the register of companies that is kept with the Business Registers Agency in the Republic of Serbia, to register a decision annotation on the recognition of a foreign court proceeding, with a prohibition in relation to the business companies referred to in Paragraph I, Item 5 of the appealed Decision.

In paragraph II of the pending ruling, the request of July 26, 2017 was rejected, to prohibit enforcement over shares and stocks owned by "AGROKOR"Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb (City of Zagreb), Trg Drazena Petrovica No. 3, registration number: 03449602, OIB: 05937759187, and related and subsidiary companies which are in the procedure of extraordinary administration before the Commercial Court in Zagreb, No. St 1138/17-52, in particular in the following business companies registered in the Republic of Serbia, that are listed in the paragraph II, Item 1, of appealed Decision, that initiation of new proceedings be prohibited and initiated proceedings be discontinued in the Republic of Serbia relating to the assets specified in Item 1 of paragraph II of this Decision, that enforcement be prohibited in the Republic of Serbia over the assets of the business companies specified in Item 1 of paragraph I of this Decision, that the management or sale of the assets, a portion of the assets or any part of the assets specified in item 1 of paragraph II of the Operative Part are to be entrusted to Ante Ramljak, with the address at Nova Cesta 126, Zagreb, personal ID number: 16959950253, as an extraordinary trustee for the purpose of protection and preservation of the value of the assets which, due to their nature or other circumstances, are at the risk of perishing, loss of value or in jeopardy in some other manner, and that the competent Companies Register maintained at the Serbian Business Registers Agency be ordered to enter annotation of injunctions.

Against the said decision, a prosecutor submits a timely complaint for substantial violations of the provisions of the procedures referred to in Article 374, paragraph 2, Item 7 and 12 of the Law on Civil Procedure, due to the wrongful application of the material law and the wrongful and incompletely established factual state.

He indicates that the first instance court erred in a decision rejecting the request of a foreign representative without having any legal reason for rejecting it. Furthermore, he considers that, pursuant to Article 294, Paragraph 2 of the Law on Civil Procedure, the court was obliged to hold a hearing in which the prosecutor would be allowed to declare rejection. He further states, this is a general rule and the legislator did not anticipate any exemption from it, and therefore the foreign representative is prevented from discussing it before the court. Also, by rejecting the request, the creditors of the bankruptcy debtor are prevented from discussing it before

2

the court, as according to the provision of Article 188, paragraph 8 of the Law on Bankruptcy, creditors have the right to appeal against a decision rejecting a motion for recognition of a foreign proceeding. By rejection, instead of refusing, the first-instance court ruled out such a creditor right. Such a decision also prevented the foreign representative and creditors from discussing in court. He goes on to point out that from the reasoning it follows that the court considers the procedure of extraordinary administration is not in accordance with the public order of the Republic of Serbia, and on the basis of such an argument it could only refuse, but not reject the request of a foreign representative. Furthermore, the violation of the provision of Article 374, paragraph 2, point 7 of the Law on Civil Procedure was also made in that it was not possible for the applicant to inspect the case files, despite the request he submitted. He further states that the decision was affected by a violation of the provisions of Article 374, paragraph 2, item 12 of the Law on Civil Procedure, since the sentence is incomprehensible, contradicting itself and given reasons. He further states that the wrongful conclusion of the first instance court is that the procedure of extraordinary administration is not a foreign proceeding defined by Article 174, paragraph 2 of the Law on Bankruptcy, and that the first instance court appears to have explained its decision using the arguments that the creditor of "Sberbank" usually makes in his submissions, and without considering that the court does not invoke the "Sberbank" submissions in the reasoning of the appealed Decision, precisely using the standard unfounded arguments of this creditor, rejects the request. It is wrongful, as further stated, that the court finds that the procedure of extraordinary administration provided for by the Act on Extraordinary Administration, which is lex specialis in relation to the Law on Bankruptcy of the Republic of Croatia, is not a procedure aimed at collectively or jointly settling the creditors, as prescribed also by the Law on Bankruptcyof the Republic of Serbia and Law on Bankruptcy of the Republic of Croatia, but the viability of the business operations of certain companies due to their systemic importance for the Republic of Croatia, whereby the level of protection that is achieved by the Act on Extraordinary Administration is determined it is the interest of the Republic of Croatia to implement the procedure of extraordinary administration, and not the interests of the creditors of these companies. The first instance court, above all, wrongly interpreted the provision of Article 174, paragraph 2 of the Law on Bankruptcy, as well as the relevant provisions of the Act on Extraordinary Administration, did not take into account the essential facts or provisions of the Act on Extraordinary Administration, nor the provisions of other relevant international sources and failed to apply the norm of Article 181 of the Law on Bankruptcy, and is conducting a wrong conclusion by filing the facts under the norm of Article 2 of the Law on Bankruptcy of the Republic of Serbia and the Law on Bankruptcy of the Republic of Croatia. The Court interpreted very restrictively the provision of Article 174, paragraph 2 of the Law on Bankruptcy, without taking into account the legislator's intent when making such a legislative decision or the relevant international sources on the basis of which such a provision was introduced into the legal system of the Republic of Serbia, but it is endorsing a very conservative linguistic interpretation of the same, without taking into account its purpose and meaning. In other words, as further states, the court failed to take into account the relevant provisions of the Uncitral Model Law of 1997 and other sourcesin connection with it, such as the Uncitral Legislative Guides and the Uncitral Guide to Legalization and Interpretation. Namely, the provisions of the Law on Bankruptcy regarding international bankruptcy were taken from the Model Law, and in this sense the Model Law became an integral part of our legislation, and the court

had to consistently interpret the definition of a foreign proceeding under Article 174, paragraph 2 of the Law on Bankruptcy, which was just taken from it. The Model Law in paragraphs 69 to 72, clearly defines what the purpose of the meaning of a foreign proceeding as collective, and in that sense it also provides a rule by which it can be determined whether the foreign proceeding is collective, by which one should first answer the key question whether all assets and liabilities of the company are involved in the foreign proceeding. In that sense, the interpreting guide gives an example of a foreign proceeding that would be considered collective in terms of its relation to creditors, and states that it should be such that the creditors to whom the foreign proceedings are affected have the right to report their claims, to receive a fair distribution or settlement of those claims, participate in a foreign proceeding, or be informed of a foreign proceeding in order to be able to participate in it. It follows that the term "collectively" should be broadly interpreted. Having in mind the explanation of the concept of collective settlement from the Guide for Interpretation, it can undoubtedly be concluded that one of the basic objectives of the Act on Extraordinary Administration is the collective settlement of creditors. In addition, in the definition of the term "foreign proceeding", and what is accepted by our legislator, considerably broader concepts than the notion that would be common for the bankruptcy procedure conducted in the Republic of Serbia or the Republic of Croatia are introduced by introducing the foreign proceeding as a judicial or administrative procedure, to be carried out aiming at "reorganization, bankruptcy or liquidation", and that it is a procedure that is conducted in accordance with the regulations governing insolvency, which is obviously a broader concept than the notion of bankruptcy. The Appellant further points out that the court did not adequately examine the provisions of the Act on Extraordinary Administration because it did not find the purpose and the provisions of the same in a meaningful way. He indicates that the procedure of extraordinary administration, such as the procedure in question, is nothing new in the practice of restructuring and reorganization of certain large groups of systemic importance for the Member States of the European Union. Even if the concept of a foreign proceeding is strictly interpreted, as a procedure that is being carried out for the purpose of collective settlement of creditors, the very procedure of extraordinary administration is undoubtedly the procedure implemented for the purpose of collective settlement of creditors. The Court wrongfully and incompletely determines the facts when it brings its conclusion pursuant to Article 1 of the Act on Extraordinary Administration according to which it is not explicitly stated that the procedure of extraordinary administration is conducted for the purpose of collective settlement of creditors, which, according to the wrongful conclusion of the first instance court, should automatically be interpreted as that it actually is not. However, the aforementioned can not be accepted as correct, since neither the Law on Bankruptcy and Liquidation of Banks and Insurance Companies does not indicate that the aim of this procedure is the collective settlement of creditors, so it can not be concluded that this regulation does not provide for collective settlement. In addition, whether it is a procedure that is conducted for the purpose of collective settlement, one answer can not be answered from the point of view of only one provision, but through the analysis of all the provisions of the said Law. Pursuant to Article 70 of the Guidelines for Interpretation, in assessing whether a procedure is collective, it is crucial to determine whether all the assets and liabilities of the debtor are covered by the procedure, with regard to the exemptions from the law relating to the rights of the secured creditors, and in view of the provision of the Act on Extraordinary Administration can undoubtedly be concluded that this Law covers all rights and

4

obligations of the debtor. Namely, the procedure of extraordinary administration envisages the existence of creditor's bodies, both the creditor's council and the temporary creditor board (Article 31), the creditors are grouped into groups based on the nature of their claims (Article 29), all creditors are obliged to declare their claims which are examined in a unique procedure applicable to all creditors (Article 32), provides for the possibility of challenging legal actions of the debtors (Article 38), other instruments are also foreseen that prevent the taking of actions that would be in the interest of individual creditors (E.g., Article 7 and Article 41 of the Act on Extraordinary Administration). The purpose of the procedure is to settle the creditors by reaching an agreement, which essentially represents the reorganization plan, and about which all the creditors vote. The provisions of the Law on Bankruptcy of the Republic of Croatia shall apply accordingly to the extraordinary administration procedure. The Appellant further points out that the key question was whether the procedure of extraordinary administration can be considered a "foreign proceeding" within the meaning of Article 174, paragraph 2 of the Law on Bankruptcy of the Republic of Serbia, which obviously gives a much wider definition of the term "foreign proceeding" by the legislator than the notion of bankruptcy in the sense of the Law on Bankruptcy of the Republic of Serbia or the Law on Bankruptcy of the Republic of Serbia. If the legislator wanted to admit to the term "foreign proceeding" only those acts that were bankrupt in the sense of general provisions, then it would not introduce the notion and definition of a "foreign proceeding" that is obviously wider than the notion of bankruptcy under the Law on Bankruptcy of the Republic of Serbia. Regarding the court's assertion that the state is not a creditor in the procedure of extraordinary administration, and therefore it is not the collective settlement procedure of the creditors, it points out that such a statement is insufficiently clear, since there are no provisions of the Act on Extraordinary Administration which favor the state as a creditor in relation to others. First of all, such a conclusion can not be drawn, because the Republic of Croatia through its organs is a creditor in the procedure of extraordinary administration and duly reported its claims in that proceeding. It is further pointed out that the fact that the Act on Extraordinary Administration did not list protecting creditors as the main goal, can not and should not be interpreted as that the Act on Extraordinary Administration does not provide protection to the creditors. The Appellant points out that the first instance court completely arbitrarily states that the procedure of extraordinary administration is conducted also against the company in relation to which the existence of a bankruptcy or pre-emptive reason prescribed by the Law on Bankruptcy of the Republic of Croatia has not been established, because, on the contrary, when deciding on the request for the opening of the procedure of the extraordinary administration of the Commercial Court in Zagreb has obviously established the existence of a pre-emptive reason in relation to the debtor and its related and subsidiary companies covered by the related Decision. It further indicates that, contrary to the conclusion of the first instance court, the provision of Article 174, paragraph 2 of the Law on Bankruptcy of the Republic of Serbia does not state that the condition for the recognition of a foreign proceeding is that the debtor is insolvent, but the same provision also implies procedures that are implemented through reorganization, bankruptcy and liquidation in a foreign country in accordance with the regulation governing insolvency. It follows that the term "foreign proceeding" which includes liquidation extends beyond the concept of bankruptcy. The Guide to Interpretation in paragraph 72 clearly indicates that the Model Law recognizes that insolvency proceedings can be carried out under specific circumstances, which do not necessarily imply that the debtor is

5

indeed insolvent. The Model Law thus recognizes various legislative solutions in different jurisdictions, since in different jurisdictions the concept of insolvency can be interpreted in different ways. The Legislative Guide states in Article 15 that a debtor who is not or will not be able to repay his due obligations is considered by the debtor insolvency proceedings, and on which the definition of a foreign proceeding in the sense of the Model Law may be applied. Thus, even that individual entities associated with Agrokor are solvent, it can not be interpreted as automatically assuming that the procedure of extraordinary administration is not a procedure that regulates insolvency in terms of the definition of a foreign proceeding under Article 174, paragraph 2 of the Law on Bankruptcy. He further indicates that Article 1 of the Model Law specifies, inter alia, the purpose of facilitating the rescue of companies facing financial problems, thus protecting the investments and jobs, and thus being the same integral part of our legislation as it is incorporated into the provisions of Chapter XII of the Law on Bankruptcy of the Republic of Serbia, it is clear that the provision of Article 174, paragraph 2 of the same Act must be interpreted in the sense and purpose in which it is determined, and in accordance with the above. It is not clear why the court only selectively interprets certain provisions of the Act on Extraordinary Administration, instead of interpreting all the provisions of the same, if it finds that the Law on Bankruptcy of the Republic of Croatia is appropriately applied in the procedure of extraordinary administration. It is particularly pointed out as an wrongful interpretation of the provision of Article 7 (2) of the Act on Extraordinary Administration by the first instance court, according to which the court concludes from the fact that until the completion of the extraordinary administration procedure, the initiation or implementation of pre-trial and bankruptcy proceedings is not allowed, that a extraordinary administration proceeding is not a bankruptcy proceeding, and the Appellant explains that the court obviously does not interpret the valid provisions of the Law on Bankruptcy of the Republic of Serbia, to which our legislation introduced a reorganization as a form of bankruptcy and by consistently implementing such an interpretation, prepackaged reorganization plan of the Law on Bankruptcy does not meet the conditions for recognition outside Serbia, because after their submission during the procedure of the prepackaged reorganization plan no court in Serbia would have made a decision on opening of bankruptcy proceedings against the debtor. In the light of the foregoing, he considers that the fact that the Act on Extraordinary Administration is lex specialis can not justify the conclusion that the procedure of extraordinary administration is not a "foreign proceeding" within the meaning of Article 174, paragraph 2 of the Law on Bankruptcy of the Republic of Serbia.  In the sense of  given reasoning in the appeal, the Appellant proposes that the appeal is adopted and the decision is changed or the appeal is adopted and the first instance decision from paragraph I is revoked and the alteration is changed in paragraph II, or the appeal is adopted and the decision abolished.

On October 18, 2017, through power of attorney given to Nevena Veselinović from Belgrade, the applicant submitted a supplement to the appeal.

Having examined the legality and regularity of the first instance decision within the limits of the provisions of Articles 386 and 402 of the Law on Civil Procedure, which is applied in accordance with Article 7 of the Law on Bankruptcy, the Commercial Appellate Court, as a second instance court, finds that the appeal is not reasonable.

In the first instance procedure, no violation was made under the provisions of Article 374, paragraph 2 of the Law on Civil Procedure, to which this court is acting ex officio, nor the violation from the provision of Article 374, paragraph 2, Item 7, to

7 Pvz 396/17

which the appeal is unfounded. Contrary to the appeal allegations, the appealed Decision is not affected by any violation of the provisions of Article 374, paragraph 2, Item 12 of the Law on Civil Procedure, which is applicable, since there are no defects that can not be examined, the sentence is understandable and clear, not contradictory to itself, nor to the given reasons, while the first-instance court gave clear reasons for the essential facts in accordance with the state given in the files.

According to the state of the files, on July 26, 2017, Ante Ramljak, acting in the capacity of the Extraordinary Trustee of the "AGROKOR" Business Company, Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb,filed a request that he addressed as a request for recognition of a foreign main (bankruptcy) proceeding with a request for granting a releif from Article 190 of the Law on Bankruptcy. The applicant supplemented his request with the allegations as are laid out in the submission from August 25, 2017. He stated that the same is based on the provisions of the Law on Bankruptcy, in accordance with the provisions of Articles 174 to 203 of the Law on Bankruptcy, and that the authority for filing this claim derives from the fact that he is an Extraordinary Trustee in a foreign proceeding of extraordinary administration that is being conducted in the Republic of Croatia, and on the provisions of Article 86, paragraph 1, Item 1 and Article 174, paragraph 3 of the Law on Bankruptcy, which defines a foreign representative as a person or body, including those who are temporarily appointed, who are in a foreign proceeding authorized to conduct reorganization, bankruptcy or liquidation of property and the debtor's affairs, or to take actions as a representative of a foreign proceeding. He further stated that the purpose of the proceedings before the Commercial Court in Zagreb is to implement a quick and effective procedure of preventive restructuring of companies of systemic importance for the Republic of Croatia in order to ensure liquidity, viability and stability of operations, and as such clearly and unambiguously foreign proceeding in the sense of Article 174, paragraph 2 of the Law on Bankruptcy. He provided, among other things, a notarized certified copy of the decision on the extraordinary administration issued by the Commercial Court in Zagreb with evidence of enforceability and the power of attorney and translation into the Serbian language by an authorized court interpreter, which opens the proceeding of extraordinary administration for companies and the name of a foreign representative, the original excerpt from the register of companies for all companies confirming the registration of the relevant proceeding of extraordinary administration and the appointment of an Extraordinary Trustee with a translation into the Serbian language by an authorized court translator for the Croatian language, a notary certified statement by a foreign representative in Serbian language  which lists all parties referred to in the proceedings in relation to the company known to him, in accordance with Article 186, paragraph 2 of the Law on Bankruptcy, the original extract from the register of companies held at the Business Registers Agency for all companies registered in the Republic of Serbia, in which some of the companies have ownership or stakes, as well as the Law on the Extraordinary Administration. He proposed that the court adopts there quest and fully recognize in its entirety as the main foreign proceeding, with all legal consequences arising from the recognition of a foreign proceeding in the Republic of Serbia, the procedure of extraordinary administration opened by the decision of the Commercial Court in Zagreb to open the procedure of the extraordinary administration No. St-1138 / 17-3 of April 10, 2017, which was supplemented by the decision of the Commercial Court in Zagreb, No. St 1138 / 17-52 from April 21, 2017, Ante Ramljak is recognized as a foreign representative of a recognized foreign proceeding, to prohibit the initiation of new

7

proceedings and to stop the proceedings in the Republic of Serbia in connection with the property, rights, obligations and responsibilities of companies referred to in paragraph I of the request, to prohibit enforcement over the property of companies more closely specified in paragraph I of the request, to order the register of companies that is kept with the Business Registers Agency in the Republic of Serbia, to register a decision annotation on the recognition of a foreign proceeding, with a prohibition in relation to the business companies "Ino projektgradnja" d.o.o. Belgrade in liquidation, "Dijamant" a.d. Zrenjanin, Frozen Food Industry "Frikom" d.o.o. Belgrade, "Idea" d.o.o. Belgrade, "MG Mivela" d.o.o. Belgrade, "M- profil SPV" Limited Liability Company, Belgrade, Company for Information Technology and Consulting "Kron" d.o.o. Belgrade, Limited Liability Company "Nova Sloga" Trstenik, "Mstart business solutions" d.o.o. Belgrade, Novi Beograd. He also proposed that the court pass a measure prohibitingenforcement over stakes and stocks owned by "AGROKOR"Group for Company Management, Production and Trade in Agricultural Products, Joint-Stock Company Zagreb,over companies registered in the Republic of Serbia, namely "Mstart business solutions" d.o.o. Belgrade, Limited Liability Company "Nova sloga" Trstenik, Company for Information Technology and Consulting "Kron" d.o.o. Belgrade, "M-profile SPV" Limited Liability Company Belgrade, "MG Mivela" d.o.o. Belgrade , "Idea" d.o.o. Belgrade, Frozen Food Industry "Frikom" d.o.o. Belgrade, "Dijamant" a.d. Zrenjanin and "Ino projektgradnja" d.o.o. Belgrade in liquidation, to prohibit the initiation of new proceedings and to stop the proceedings in the Republic of Serbia in connection with the property of these persons, to entrust the management or sale of property or part of the property of the aforementioned entities to Ante Ramljak, and to order the register of companies that is kept with the Business Registers Agency in the Republic of Serbia, to register a decision annotation on the prohibition.

In the further course of the proceedings, on July 28, 2017, and August 17, 2017,submissions of interested parties "Sberbank" Russia, Vavilova 19, Moscow and "Sberbank" d.d. Ljubljana, Dunajska cesta 128, challenging the conditions for recognition, were requested. On August 07, 2017,the request of "Banca Intesa" a.d. Belgrade arrived, to refuse the request for recognition of a foreign proceeding and to refuse the request for providing legal assistance through imposing measures for the prohibition of enforcement over the assets of the bankruptcy debtor in the territory of the Republic of Serbia.

The first instance court brought the appealed Decision outside the hearing. The first instance court in its reasoning, with reference to the provision of Article 174 and Article 188 of the Law on Bankruptcy, states that the basic procedural prerequisite for the recognition of a foreign bankruptcy proceeding in the Republic of Serbia is that it represents a proceeding pursuant to Article 174, paragraph 2 of the Law on Bankruptcy, and if this is not the case, the filed request is rejected. The first instance court explains that in order to recognize a foreign proceeding in accordance with the aforementioned legal provisions, it is necessary to refer to a procedure conducted in a foreign country with the aim of collective settlement of creditors through reorganization, bankruptcy or liquidation, and that the Act on Extraordinary Administration of companies of systemic importance for the Republic of Croatia itself, prescribes in Article 1 its aim, that is to say, to "protect the viability of business operations of companies of a systemic importance for the Republic of Croatia, which by its operations individualy or together with their subsidiary or affiliated companies, affect the overall economic, social and financial stability in the Republic of Croatia, and that the level of protection achieved by this Act is necessary, appropriate and

8

7 Pvz 396/17

proportionate to the interest of the Republic of Croatia, to implement a quick and effective procedure of preventive restructuring of companies of a systemic importance for the Republic of Croatia in order to ensure liquidity, viability and stability of operations". Having in mind the imperative provision of Article 2 of the Law on Bankruptcy, according to which the purpose of bankruptcy is the most favorable collective settlement of bankruptcy creditors by obtaining the highest possible value of the debtor or his assets and the provision of Article 2 of the Law on Bankruptcy in force in the Republic of Croatia, according to which "the bankruptcy proceeding is conducted for the joint settlement of the creditor of the insolvent debtor by the realization of his property and the division of collected funds to the creditors". The first instance court concludes that the extraordinary administration procedure provided for by the Act on Extraordinary Administration of Companies of Systemic Importance for the Republic of Croatia which is lex specialis in relation to the Law on Bankruptcy of the Republic of Croatia does not represent a procedure that aims to collectively or collectively settle the creditors as prescribed by the Law on Bankruptcy of the Republic of Serbia and the Law on Bankruptcy of the Republic of Croatia, but the viability of operations of certain companies due to their systemic importance for the Republic of Croatia, whereby the level of protection achieved by the said law determines the interest of the Republic of Croatia in the conduct of the proceedings in question, and not the interests of creditors of those companies. Hence, the first instance court concludes that the procedure of extraordinary administration can not be given the character of the collective and / or collective settlement of the creditor, which is envisaged by the Law on Bankruptcy of the Republic of Serbia and the Law on Bankruptcy of the Republic of Croatia. The first instance court further explains that the viability of the business of the company can certainly have potential positive effects also to the interests of the creditors of the company in terms of settling its claims against the company, however, the viability of the business of the company can not be the aim of a foreign proceeding whose recognition is sought under Article 174 paragraph 2 of the Law on Bankruptcy, but can only be in the function of the collective settlement of creditors, even in the case of a debtor - a company of systemic importance for a single state,  because the state in the collective settlement procedures of the creditors appears as a creditor in relation to which the imperative norm of Article 4 of the Law on Bankruptcy applies, according to which in the bankruptcy procedure all creditors are provided with equal treatment and equal status of creditors of the same pay order, that is, the same class in the reorganization process. The first instance court concludes that in the collective settlement procedure referred to in Article 174, paragraph 2 of the Law on Bankruptcy, the State is a creditor, and not a legal entity in relation to which the criteria for initiating and conducting the said foreign proceeding against a particular company are established. The first instance court further explains that according to the provision of Article 174, paragraph 2 of the Law on Bankruptcy, "foreign proceeding" is conducted in a foreign state in accordance with the regulation regulating insolvency, which implies that this regulation provides for a procedure for a company where a condition that the Law on Bankruptcy of the Republic of Croatia is provided for in Article 4 that a pre-bankruptcy proceeding may be opened if the court determines the existence of incapacity for payment, that the incapacity for payment exists if the court is in assurance that the debtor will not be able to meet its existing obligations at maturity, while Article 5 stipulates that the bankruptcy proceedings can be opened if the court determines the existence of the reasons for bankruptcy, while the bankruptcy reasons are in capacity for payment / insolvency and over indebtedness. As from the

9

abovementioned provisions of the Act on Extraordinary Administration in Companies of Systemic Importance to the Republic of Croatia arises that the procedure of extraordinary administration is conducted also over companies for which the existence of a bankruptcy or preliminary bankruptcy reason from the Law on Bankruptcy of the Republic of Croatia has not been established, it follows that the said law does not represent a regulation that regulates insolvency in the sense of Article 174, paragraph 2 of the Law on Bankruptcy. Namely, as the Court of First Instance further elaborates, the said Law provides for the procedure of extraordinary administration and of related or subsidiary companies for which the insolvency requirement is not fulfilled in the sense of existence of a bankruptcy or preliminary bankruptcy reason from the Law on Bankruptcy of the Republic of Croatia, therefore, also with solvent companies, while as the only conditions for extraordinary administration procedure of a solvent company foresees the existence of such a bankruptcy reason with a dominant company that is independently or with its solvent subsidiary or affiliates, of systemic importance for the Republic of Croatia. Therefore, the said Law does not constitute a regulation that regulates insolvency in the sense of Article 174, paragraph 2 of the Law on Bankruptcy, but a regulation that regulates one and the same procedure of extraordinary administration, both against solvent and insolvent companies, depending on whether these companies are of a systemic importance for the Republic of Croatia, which certainly does not present the reasons for pre-bankruptcy or bankruptcy proceedings under the Law on Bankruptcy of the Republic of Serbia and the Law on Bankruptcy of the Republic of Croatia. The first instance court finds that the Act on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia is *lex specialis* in relation to the Law on Bankruptcy of the Republic of Croatia, that it is not a regulation that specifically regulates insolvency in relation to the Law on Bankruptcy, that the procedure of extraordinary administration prescribed by The Act on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia is a *sui generis* procedure that does not have the aim of collective settlement of creditors in the sense of the Law on Bankruptcy of the Republic of Serbia and Law on Bankruptcy of the Republic of Croatia. Although the Act on Extraordinary Administration for Companies of Systemic Importance for the Republic of Croatia stipulates that the legal consequences of the opening of the extraordinary administration procedure shall be appropriately applied to the lawful consequences of the opening of a bankruptcy proceeding prescribed by a special law governing bankruptcy, unless otherwise provided by this Law, the aforementioned provision does not constitute the procedure of extraordinary administration by bankruptcy proceeding, because in the procedure of extraordinary administration they are characterized by other provisions of this Law, primarily its aim as defined in Article 1 and the inadmissibility of the initiation of preliminary bankruptcy and bankruptcy proceedings over the course of time of the extraordinary administration procedure. Following that, finding that the condition referred to in Article 188, paragraph 1, point 1, in relation to Article 174, paragraph 2 of the Law on Bankruptcy, was not fulfilled, the court rendered a decision as in paragraph I. As the request for recognition of a foreign proceeding was rejected, the court concluded that there exists no reason for application of the provisions of Articles 190 and 191 of the Law on Bankruptcy, and brought a decision as in paragraph II.

The decision of the first instance court is correct, for the following reasons:

Article 174, paragraph 1 of the Law on Bankruptcy stipulates that international bankruptcy provisions shall apply if: 1) a foreign court or other foreign

authority exercising control or supervision over the property or business of a debtor or a foreign representative requests assistance in connection with a foreign proceeding, 2) the court or bankruptcy administrator requests assistance in a foreign country in connection with bankruptcy proceedings conducted in accordance with this Law in the Republic of Serbia, 3) the foreign proceeding is conducted simultaneously with the bankruptcy procedure conducted in the Republic of Serbia in accordance with this Law. The provision referred to in paragraph 2 of the said Article prescribes that under a foreign proceeding, for the purpose of this Law, a judicial or administrative procedure, including a preliminary proceeding, is understood as a means of collective settlement of creditors through reorganization, bankruptcy or liquidation in a foreign country in accordance with a regulation regulating insolvency, in which the property and business of the debtor is under the control or supervision of a foreign court or other competent authority. According to the provision of paragraph 3, a foreign representative within the meaning of paragraph 1 of this article is a person or body, including those who are temporarily appointed, who are in a foreign proceeding authorized to conduct reorganization, bankruptcy or liquidation of the assets or affairs of the debtor, or to undertake acts as a representative of a foreign proceeding.

Pursuant to the provision of Article 175, paragraph 1 of the Law on Bankruptcy, the law of the country in which the bankruptcy proceeding has been initiated is applied on bankruptcy proceedings and its actions, unless otherwise provided by this Law.

Pursuant to the provisions of Article 179 of the Law on Bankruptcy, the competent court may refuse to take action in connection with international bankruptcy, if such a transaction would be contrary to the public order of the Republic of Serbia.

The provision of Article 181 of the Law on Bankruptcy prescribes that when applying the provisions on international bankruptcy, the competent court shall take into account, in particular, their international character and the need to improve their uniform application in good faith.

By the provision of Article 182, paragraph 2 of the Law on Bankruptcy, it is stipulated that, when undertaking the actions referred to in paragraph 1 of this Article, the foreign representative, by submitting an appropriate request or in some other manner, in order to prove his capacity is obliged to submit 1) a decision on the initiation of a foreign proceeding and appointment of a foreign representative in the original or a certified copy or a certified copy translated into a language that is in official use in a competent court in the Republic of Serbia, together with proof of its enforceability under the law of the foreign state, 2) a confirmation by a foreign court or the other competent authority on the existence of a foreign proceeding and the appointment of a foreign representative, and 3) any other proof of the existence of a foreign proceeding or the appointment of a foreign representative for which the competent court in the Republic of Serbia considers acceptable, and that in the absence of the evidence referred to in paragraph 1 and 2 of this paragraph.

The provision of Article 188 of the Law on Bankruptcy provides that, except in the case referred to in Article 179 of this Law, the foreign proceeding shall be recognized if 1) has the characteristics of the procedure referred to in Article 174, paragraph 2 of this Law, 2) a foreign representative who submits a request for recognition is a person or body referred to in Article 174, paragraph 4 of this Law, 3) the request meets the requirement of Article 182, paragraph 2 of this Law, 4) the request has been submitted to the competent court in accordance with Articles 176 and 177 of this Law.

7 Pvz 396/17

By the provision of Article 190, paragraph 1 of the Law on Bankruptcy, , from the moment of filing a request for the recognition of a foreign proceeding, until the decision on that request, acting upon the request of a foreign representative, the court may provide the necessary assistance of a temporary nature in the case when such assistance is urgently needed for the purpose of the protection of the assets of the debtor or interest of creditors.

Finally, the provision of Article 191 of the Law on Bankruptcy regulates the legal effect of recognition of the main foreign proceeding, and it is defined that the consequences of the recognition of the main foreign proceeding are prohibition: 1) of the initiation of new proceedings and stopping of initiated proceedings in relation to property, rights, obligations or responsibilities of the debtor, 2) of enforcement over the property of the debtor, and 3) transfer, burden or other disposal of the debtor's assets. Paragraph 2 defines that the court may impose an exemption from the application of the consequences of paragraph 1 of this article only in cases provided for by this Law for exemption from the application of the consequences of the opening of the bankruptcy proceedings, as well as when it determines that the main foreign proceeding does not provide adequate protection of the interests of the creditors in Republic of Serbia.

Paragraph 1 of the Law on the Procedure of Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia stipulates in paragraph 1, that this Law is adopted in order to safeguard the viability of business operations of companies of a systemic importance for the Republic of Croatia which by its own operations, or together with their subsidiary or affiliated companies affect the overall economic, social and financial stability in the Republic of Croatia, and in paragraph 2, that the level of protection achieved by this law is necessary, appropriate and proportionate to the interest of the Republic of Croatia to implement a quick and effective procedure for preventive restructuring of companies of systemic importance for the Republic of Croatia in order to ensure liquidity, viability and stability of operations.

Article 2 of the same regulation stipulates that this Law regulates the measure of extraordinary administration for companies of systemic importance for the Republic of Croatia, the competent bodies in the procedure of extraordinary administration and other issues in this regard.

The provision of Article 4, paragraph 1 of the aforementioned regulation provides that the procedure of extraordinary administration shall apply to the joint-stock company of the debtor and all its subsidiary and affiliated companies, if the existence of any of the bankruptcy grounds in the sense of Article 5 of the Law on Bankruptcy (Official Gazette No. 71/15) or the pre-bankruptcy reason referred to in Article 7 of the Law on Bankruptcy in relation to the debtor as a governing company and which joint-stock company is independently or together with its subsidiary or affiliated companies of systemic importance for the Republic of Croatia.

In accordance with the provisions of Article 5, paragraph 1, the procedure of extraordinary administration shall also be exercised over a company which does not meet the conditions referred to in Article 1, paragraphs 1 and 2 of this Law, provided that it is considered as a subsidiary in the sense of Article 475 of the Companies Act or affiliated company (the debtor is a company that holds a majority stake or a majority right in the decision-making, subsidiary or ruling company, a company of a concern or a company with a shareholding under the Companies Act), and the governing company, alone or together with its subsidiary or affiliated companies fulfills the requirements of Article 4 of this Law.

12

Pursuant to the provision of Article 7, paragraph 1, the same regulation of the Republic of Croatia during the procedure of extraordinary administration is not permitted to initiate the liquidation proceedings of the company, and according to the provision of paragraph 2, if the extraordinary administration procedure is initiated, its completion is not permitted to initiate pre-bankruptcy or bankruptcy proceedings. Pursuant to Article 11 of the said Law, the Extraordinary Trustee may be any person who meets the requirements for a member of the Management Board in accordance with the provisions of the Law on societies. The extraordinary commissioner is appointed by the court at the proposal of the Government of the Republic of Croatia, in accordance with Article 24 of this Law. Pursuant to Article 24, paragraph 3, the court shall, immediately, but not later than two working days from the date of receipt of the decision of the Government of the Republic of Croatia on the proposal for the appointment of an extraordinary commissioner, issue a decision on the opening of the procedure of extraordinary administration and issue a decision on the appointment of the extraordinary commissioner, The Government of the Republic of Croatia, unless on the basis of the submitted documents and the statements of the applicant establishes that one of the conditions referred to in Article 4 of this Law has not been fulfilled.

Bearing in mind the previously cited provisions of the Law on Bankruptcy of the Republic of Serbia, it is concluded that the Republic of Serbia prescribed special conditions for the recognition of foreign bankruptcy decisions. Therefore, the procedure for the recognition of foreign bankruptcy decisions, according to domestic legislation, was not reflected in the general regime of recognition of foreign court decisions.

The Law on Bankruptcy prescribes the conditions for the recognition of a foreign bankruptcy proceeding. First, a foreign proceeding can be recognized if it has features of a bankruptcy proceeding. The Law on Bankruptcy, in Article 174, paragraph 2, defines such a "foreign proceeding" as a court or administrative procedure, including the one that is carried out in a foreign state for the purpose of collective settlement of creditors through reorganization, bankruptcy or liquidation in accordance with the regulation governing insolvency, in which the assets and operations of the debtor are controlled or under supervision by a foreign court or other competent authority. The second condition for recognition is that the proposal for recognition has been submitted by an authorized foreign representative, that is, a person in a foreign proceeding authorized to conduct reorganization, bankruptcy or liquidation of the assets and affairs of the debtor, or to take actions as a representative of a foreign proceeding. Thirdly, it is necessary that a foreign representative, along with a request for recognition, provide proof of the existence of a foreign proceeding and of his capacity as a foreign representative. Following this, it is necessary that the request for the acceptance shall be submitted to the real and competent court in the Republic of Serbia. Furthermore, a foreign court decision may be recognized only if it is in legal effect under the law of the State in which it is brought. Finally, a foreign court decision to open a bankruptcy proceeding could be recognized only if the recognition would not be in contradiction with the public order of the Republic of Serbia.

Contrary to the Appellant's allegations, the absence of assumptions concerning the public order, that is, the accordance of the decision with the public order of the Republic of Serbia and the lack of legal effect of the foreign bankruptcy decision, leads to the rejection of the request for recognition. The lack of other assumptions leads to the rejection of the request. Hence, correct is the conclusion of the first

13

7 Pvz 396/17

instance court that, in the absence of a procedure that according to the provisions of Article 174, paragraph 2 of the Law on Bankruptcy can be considered as a foreign proceeding, the request for recognition should be rejected.

The Commercial Appellate Court finds that correct is the conclusion of the first instance court that the procedure of extraordinary administration regulated by the Act on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia can not be regarded as a "foreign proceeding" in the sense of the aforementioned provision of Article 174, paragraph 2 of the Law on Bankruptcy. Namely, when assessing whether the procedure whose recognition is sought can be considered as a foreign proceeding in the sense of the cited provision of Article 174, paragraph 2 of the Law on Bankruptcy, it should not be required to have all the characteristics of the domestic bankruptcy proceedings, but it is essential that it corresponds to its essence and aims. In the opinion of this court, under a foreign proceeding in the sense of the provision of Article 174, paragraph 2 of the Law on Bankruptcy, it can be considered a procedure that in a system generally regulates the issue of insolvency and in which the property and business of the debtor is under the control or supervision of a foreign court, or another competent authority. In this specific case, this is not such a procedure, that is, a procedure that is carried out according to the law, which in general regulates the issue of insolvency in the Republic of Croatia, but it is a procedure regulated by a special law, *lex specialis*, which is a *sui generis* regulation adopted for the purpose of protecting viability of business operations of companies of a systemic importance for the Republic of Croatia which, independently or jointly with subsidiary or affiliated companies, affect the overall economic, social and financial stability in the Republic of Croatia, and as is laid out in Article 1, Paragraph 1 of the Act on Extraordinary Administration in companies of systemic importance for the Republic of Croatia. In addition, in paragraph 2 of the same Act, it was further explained that "the level of protection that is achieved by this law is necessary, appropriate and proportionate to the interests of the Republic of Croatia", so the correct conclusion of the first instance court is that the level of protection sought by that regulation, being a special law, is determined by the interests of the Republic of Croatia, and not by the interests of the creditors. The objective of the insolvency proceedings of the debtor can not be solely the viability of the business of legal entities that have a systemic significance for a single state or a major significance for a single state, but the settlement of creditors in accordance with the basic principles of the Law on Bankruptcy, such as the principle of equal treatment of creditors, the principle of comprehensiveness, economy, principle of subsidiarity, bankruptcy, etc.

The first instance court correctly finds that the Act on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia prescribes a unique extraordinary management procedure for the parent company and its subsidiary and affiliated companies, on the assumption that there is a pre-bankruptcy or bankruptcy reason with the parent company , and regardless of whether there is one of these reasons for its subsidiary and affiliated companies (Article 4 paragraph 1 of the Act on Extraordinary Administration in Companies of Systemic Importance for the Republics Croatia). This provision resulted in a specific breakthrough in the legal personality of parent companies and subsidiaries, and with the fact that the same law prohibits the initiation and further conduct of civil, executive, administrative procedures, security procedures, as well as extra-judicial bailouts against the debtor and its subsidiary or affiliated companies, except for procedures related to disputes arising from labor relations during the duration of the

14

7 Pvz 396/17

extraordinary administration procedure, as well as the inadmissibility of initiating the pre-bankruptcy and bankruptcy proceedings (Article 7, paragraph 2 of the same regulation) clearly indicates that the aim of this regulation, contrary to the allegations of the appeal, is not the aim of the collective settlement of creditors, but the protection of the interests of the state, the creator of such a regulation. Finally, the procedure of extraordinary administration does not represent a procedure that is under the control or supervision of a foreign court or other competent authority, since the Republic of Croatia, or its Government, is exercising the decisive influence in that proceeding. Namely, it is true that in accordance with the provisions of Article 24, paragraph 2 of that regulation, the decision on the opening of the procedure of extraordinary administration is made by the court. However, the Republic of Croatia, or its Government, has a significant influence, by the fact that it appoints an Extraordinary Trustee as prescribed by Art. 11 of the Act on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia.

In the light of the above, the Commercial Appellate Court finds that the conclusion of the first instance court is correct stating that the procedure of extraordinary administration does not constitute a procedure under the provision of Article 174, paragraph 2 of the Law on Bankruptcy, which could be recognized, and that it was, therefore, properly followed by the first instance court when, due to the lack of procedural assumptions rejected the same proposal.

It is unfounded when the Appellant refers to the provision of Article 294 of the Law on Civil Procedure, with the assertion that the first instance court was obliged to hold a hearing before the dismissal of the request in the sense of the cited provision. The aforementioned Article 294, paragraph 2 of the Law on Civil Procedure prescribes that before issuing a decision on the dismissal of the lawsuit for the reasons prescribed in paragraph 1 of this Article, the court is obliged to hold a hearing in which it will enable the Appellant to declare a rejection of the claim. In the specific case, the request was not rejected at all for any of the reasons stated in paragraph 1, of the Article 294 of the Law on Civil Procedure.

It is of no effect the Appellant's claim that the first-instance court did not decide on the request for insight into the files and that it did not submit submissions of interested parties, namely "Sberbank", in the fact that it was a unilateral proceeding and that on the other hand, the court did not base its decision on the allegations from the submissions of those persons. Therefore, allegations that violations were made under the provision of Article 374, paragraph 2, point 7 of the Law on Civil Procedure, to which it applies in accordance with the law, are with no ground.

The Commercial Court of Appeal further notes that the Appellant's appeal was received on August 30, 2017, and that as of August 31, 2017, the deadline for appealing began. The Appellant filed the appeal with the court on October 18, 2017, ie, after the expiration of the legal deadline for filing an appeal, and therefore the Commercial Appellate Court did not take into consideration the appeal supplement, since it was submitted untimely.

Having in mind the aforementioned, the Commercial Appellate Court, in accordance with the application of the provision of Article 401, Item 2 of the Law on Civil Procedure, in relation to Article 7 of the Law on Bankruptcy, decided as in the Decision.


PRESIDENT OF THE COUNCIL – JUDGE


15

7 Pvz 396/17

Jasminka Obucina, signed

For accuracy of this dispatch, signed

## **Appendix B-3**

**Ruling of the Supreme Court of the Federation of Bosnia and Herzegovina**

BOSNIA AND HERZEGOVINA
FEDERATION OF BOSNIA AND HERZEGOVINA
SUPREME COURT
OF THE FEDERATION OF BOSNIA AND HERZEGOVINA
Number: 09 V 029120 17 Gž
Sarajevo, 18 December 2017

The Supreme Court of the Federation of Bosnia and Herzegovina, Chamber of Judges: Goran Nezirović, Chairman of the Chamber, Jasminka Kubat and Enisa Bilajac, members of the Chamber, in the non-contentious proceedings concerning the request of the Proponent, AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb (AGROKOR, concern for management of companies, production and trade in agricultural products, Ltd. Zagreb), at Trg Dražena Petrovića 2., Identification number /OIB/ 05937759187, with extraordinary manager Ante Ramljak from Zagreb, Republic of Croatia, and represented by Branko Marić, Dijana Ivanović, Višnja Dizdarević, Predrag Radovanović, Ezmana Turković, Džana Smailagić-Hromić, Selma Demirović –Hamzić, Maja Glišić and Arijana Hadžiahmetović –Softić, attorneys from Marić & Co d.o.o. Law Firm, from Sarajevo, Mehmeda Spahe 26, for recognition of a foreign court ruling, and deciding on Proponent's appeal against the Sarajevo Cantonal Court sentence no. 09 V 029120 17 V, of 7 November 2017, at the Chamber's session of 18 December 2017, passes the following:

## R U L I N G

The appeal is hereby rejected and the first instance ruling confirmed.

### Grounds for Ruling

The Sarajevo Cantonal Court Ruling number 09 V 029120 17 V of 7 November 2017, rejects the proposal of recognition of the final and binding Zagreb Commercial Court Decision, no. 47. St-1138/17 of 10 April 2017, which establishes the extraordinary management over the debtor, AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb (AGROKOR, concern for management of companies, production and trade in agricultural products, Ltd. Zagreb), City of Zagreb, Trg Dražena Petrovića 3, Identification number /OIB/: 05937759187, and over the debtor's affiliates and subsidiaries (in the Republic of Croatia, and with registered address in the Republic  of Croatia), as well as of recognition of the final and binding Zagreb Commercial Court Decision number 47. St-1138/17-52 of 21 April 2017, which complements the Zagreb Commercial Court Decision number St-1138/17-3 of 10 April 2017, in Item I of the operative part.

The Proponent lodged an appeal against the said ruling in due time and owed to alleged breaches of the civil proceedings, incorrect or incomplete determination of facts and wrong application of material law, and suggested that the second instance court should adopt the appeal, change the contested Ruling so to recognise the foreign court decision with the stated effects, and/or to cancel the contested Ruling and return the case to the first instance court for new proceedings.

After analysing the contested Ruling within the scope of the appeal and ex officio, under Article 221, and in relation with Article 236 of the Law on Civil Proceedings (FB&H

Official Gazette number 53/03, 73/05, 19/06 and 98/15, hereinafter the LCP), the second instance court decided as above, due to the following reasons:

The appeal is not grounded.

In its decision on the Proponent's request to recognise the Zagreb Commercial Court Decision number 47. St-1138/17 of 10 April 2017 and the Zagreb Commercial Court Decision number 47. St-1138/17-52 of 21 April 2017, which complements the Zagreb Commercial Court Decision number St-1138/17-3 of 10 April 2017, specifically, in Item I of the operative part, the first instance court determined that the foreign court ruling to be recognised is final and binding, that it was passed in a legal matter that does not fall under the exclusive jurisdiction of courts of Bosnia and Herzegovina, that the ruling to be recognised was passed within proceedings where the Proponent was a party, that in the same legal matter between the same parties there is no final and binding decision of a court in Bosnia and Herzegovina as signatory state which is supposed to recognise the ruling,that there are no proceedings before any court in Bosnia and Herzegovina such as litigation or bankruptcy proceedings in the same legal matter and between the same parties, that the foreign ruling to be recognised is contrary to the Constitution and the legal order of Bosnia and Herzegovina, that the legislation Bosnia and Herzegovina does not include the concept of extraordinary management of companies and that the recognition of the relevant decisions in that sense would prevent the application of positive regulations in the Federation of Bosnia and Herzegovina, especially if we bear in mind that the substantial effects of the foreign ruling can breach the legal order thereof.

These findings of the first instance court were not contested in the Proponent's appeal.

Based on these findings, the first instance court proceeded correctly when it applied the provisions of Articles 86 to 96 of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters ("SFRY Official Gazette" no. 43/82 and 72/82, "RB&H Official Gazette" no. 2/92 and 13/94) that, in accordance with Article 458 of the Law on Civil Proceedings ("FB&H Official Gazette" number: 53/03, 73/05 and 19/06 – hereinafter: LCP), Article 202 of the Bankruptcy Law (FB&H Official Gazette" number: 29/03, 32/04 and 42/06) and the provisions of Article 2, Paragraph 1, of the Law on Non Contentious Proceedings ("FB&H Official Gazette" number 2/98, 39/04 and 73/05) apply in the proceedings before the courts of Bosnia and Herzegovina, as well as the provisions of Articles 20, 21, 22 and 23 of the Agreement between the Governments of B&H, Federation B&H and Republic of Croatia on judicial assistance in civil and criminal matters ("RB&H Official Gazette - International Agreements" number 1/96), and refused to recognise the relevant final and binding decisiona of the Commercial Court in Zagreb, Republic of Croatia.

The Proponent's allegation that there was a breach of the proceedings before the first instance court is unfounded when it states that the first instance ruling does not include the grounds for ruling and that it does not take into account or explain the Proponent's statements from the proposal of recognition of a foreign decision.

As the grounds of the first instance ruling include all the elements provided in Article 200 of the LCP, and the court, contrary to the statements of the appeal, analysed the Proponent's allegations from its request, and in the grounds of its ruling, on pages 15, 16, 17, 18 and 19, gave clear and correct reasons why they had not been accepted, based on the case and on the provisions of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters and the Bankruptcy Law of FB&H, this Court deems that there was no breach of the proceedings, as stated by the appellant.

Further, the Proponent's claims of wrong application of substantial law are also incorrect, when it states that the conditions of Article 91 of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters for recognition of foreign decisions were met - as the appellant believes that the decision was to be recognised under Article 229 of the  FB&H Bankruptcy Law.

Article 229 of the Bankruptcy Law provides that this Law, in the part regarding recognition of foreign rulings on bankruptcy proceedings, applies to recognition of foreign decisions on compulsory settlement or bankruptcy plan, and to the recognition of foreign decisions passed proceedings similar to bankruptcy.

Contrary to the appeal, the first instance court, in accordance with the above mentioned legal provision, and deeming that in this specific case the recognition refers to a foreign court ruling passed in proceedings similar to bankruptcy, applied correctly the provisions of Article 205, related to Article 229, of FB&H Bankruptcy Law, when it decided as in the challenged ruling. It concluded correctly that the legal provisions for recognition of a foreign court decision on extraordinary management were not met, and that its effects on companies established under FB&H laws cannot be recognised.

Article 17 of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters provides that legal entities are governed by the laws of states in which they were founded and according to their registered addresses, so this determines the relevant law to be applied, and, as in this specific case, the legal entity Konzum d.o.o. Sarajevo, where the Proponent says to hold shares, was established under this country's laws and has its registered address in B&H, it is considered B&H legal entity according to Article 17 of the above Law, and not a Croatian legal entity.

In order to be able to recognise the relevant foreign ruling in FB&H, the Bankruptcy Law, among other things, provides that the proceedings should be aimed at collective settlement of the creditors, either through reorganisation or through pro rata settlement, and that they are conducted in a foreign country according to its regulations on insolvency, and that the recognition of the decision cannot be contrary to the Federation B&H legal order (Article 2 and Article 205, Paragraph 1, Items 1, 2 and 3 of the FB&H Bankruptcy Law).

The extraordinary management over the Proponent's and its affiliates' and subsidiaries' assets in the Republic of Croatia, according to the relevant Act on Extraordinary Management Proceedings in Companies of Systemic Importance for the Republic of Croatia was passed within foreign proceedings, as well as the decision to be recognised, and as such, together with its effects, it cannot be recognised under the FB&H legal system and in accordance with Article 229, in relation with Articles 202 and 205 of the FB&H Bankruptcy Law.

All the more so, as this Court also deems that the conditions for recognition of the foreign court ruling on extraordinary management were not met under the legislation on international bankruptcy, that is, Articles 195 to 229 of the FB&H Bankruptcy Law, which stipulate, when applied properly, the fulfillment of conditions for recognition of a foreign decision passed within proceedings similar to bankruptcy, such as extraordinary management.

In this specific case, the extraordinary management is not aimed at collective settlement of the creditors, which should be the basic purpose of bankruptcy proceedings according to Article 2 of the FB&H Bankruptcy Law and Article 2 of the Bankruptcy Law of the Republic

of Croatia, but at protection of economic, social and financial stability of the Republic of Croatia and the sustainability of certain Croatian companies. The purposes of extraordinary management are in this specific case subject to the interests of the Republic of Croatia and it is implemented in order to protect this country's interests and not the interests of the creditors which are not even mentioned in the proposal. This is contrary to the basic principles of the FB&H Bankruptcy Law as it breaches the principle of equality or equal treatment of creditors.

The recognition of the ruling requested by the Proponent produces legal effects under Article 41 of the Law on Extraordinary Management in Companies of Systemic Importance for the Republic of Croatia so that, during the whole period of extraordinary management, no civil, executive or guarantee proceedings, or extra judicial payments regarding the debtor and its affiliates and subsidiaries are not allowed, other than the proceedings under Labour Law. It also bans any liquidation, pre-bankruptcy or bankruptcy proceedings.

The legal effects of the ruling to be recognised cannot be applied to legal entities established under this country's laws, as, contrary to the allegations from the appeal, during registration of Konzum d.o.o. Sarajevo, the excerpts and the registration decision number 065-0 RegZ-17-001263 of 16 February 2017, do not include any detail or entry stated in the appeal as basis for recognition, namely that Konzum d.o.o. Sarajevo is Proponent's affiliate or subsidiary, a fact that should be entered in the court register if it were so, as this kind of entries is mandatory at registration of legal entities under Article 16 of the Law on Registration of Business Entities in FB&H ("Federation B&H Official Gazette" number 27/05, 68/05, 43/09 and 63/14).

The controversial legal matter from the appeal is whether the court can recognise the effects of compulsory regulations of another country, when the facts are similar to that included in the FB&H Bankruptcy Law, but such regulations and purposes are contrary to the regulations of the state in which the recognition is requested, and whether such decision can be recognised to apply the regulations of the foreign country, regardless of the law of the country which is supposed to recognise the decision.

The international case law provides that in such cases, and based on equality of the parties, the court will consider their nature, purposes and effects of application or non application in the country that recognises, which is precisely also provided in Article 205, Paragraph 1, Item 3 of the FB&H Bankruptcy Law that states that in order to recognise a foreign decision on bankruptcy proceedings and/or proceedings similar to bankruptcy, such decision must not contravene the legal order of the Federation, being the legal order the sum of regulations that provide for application of the highest and most important legal principles of a country.

As the Court believes that this specific foreign court ruling is not aimed at collective settlement of the creditors, which should be the basic purpose of bankruptcy proceedings according to the FB&H Bankruptcy Law as well as the Bankruptcy Law of the Republic of Croatia, and that the company Konzum d.o.o. Sarajevo, contrary to the allegations of the appeal, under the laws of this country is not an affiliate or subsidiary of the Proponent (Article 1 of the Law on Companies, "FB&H Official Gazette" number 81/15), the first instance court was right to consider that the legal provisions for recognition of a foreign ruling were not met.

Apart from the above, this country's legislation does not include the concept of extraordinary management of companies, so the recognition of the relevant decisions would

produce effects under the law of the country that established the extraordinary management, and this would be contrary to the B&H legal system as the recognition, given the nature and the effects of extraordinary management under Article 41 of the Act on Extraordinary Management Proceedings in Companies of Systemic Importance for the Republic of Croatia would refer not only to the shares in these companies but also to companies as a whole and their business. In addition, these companies were established in the Federation of Bosnia and Herzegovina and have their registered addresses in this country, so they are considered legal entities of B&H and fall under exclusive jurisdiction of B&H courts, and they are subject to its legislation and not to the legislation of Croatia under Article 19 and Article 89 of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters. The protection of economic, social and financial stability  of the Republic of Croatia cannot jeopardize the FB&H legal order, and this opinion of the first instance court, contrary to the appeal, is not different from the international case law, according to which protection and maintenance of economic, social and financial stability of one country in the proceedings of recognition of a foreign ruling, in a situation where the compulsory regulations are opposed - which is the case here- cannot jeopardize the legal order of another country where the decision is to be recognised, as otherwise the principle of equality would be breached.

The appellant's statement that the UK court recognised the extraordinary management has no effect here, as this decision was based on material laws and legislation of that country which is different from the legal system and regulations of FB&H, so it cannot be applied to this specific subject matter.

Further, as the Federation B&H laws on procedural regulations do not define the concept of extraordinary management of companies, this Court also deems that the foreign court ruling introducing this concept unknown to our legal system, cannot be recognised under Article 91 of the Law on Resolving Conflict of Laws with Regulations of Other Countries in Certain Matters, especially if we have in mind that the substantial effects of the foreign ruling could breach our legal order.

In view of the above, the Proponent's appeal is rejected under Article 235, Item 2 of the LCP, in relation with Article 2 of the Law on Non Contentious Proceedings.


Chairman of the Chamber
Goran Nezirović, signed.

## <u>Appendix B-4</u>

**Decision of the High Court of Justice (Chancery Division - Companies Court)
of England and Wales**



Neutral Citation Number: [2017] EWHC 2791 (Ch)

Case No: CR-2017-005571

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 09/11/2017

**Before** :

**HHJ PAUL MATTHEWS**
**(sitting as a Judge of the High Court)**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

**IN THE MATTER OF AGROKOR DD**
**AND IN THE MATTER OF THE CROSS-BORDER**
**INSOLVENCY REGULATIONS 2006**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Tom Smith QC and William Willson** (instructed by **Kirkland & Ellis International LLP**) for the **Applicant**
**David Allison QC and Adam Al-Attar** (instructed by **Linklaters LLP**) for the **Respondent**

Hearing dates: 23-26 October 2017
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

HHJ PAUL MATTHEWS (SITTING AS A JUDGE OF THE HIGH COURT)

**HHJ Paul Matthews :**

## Introductory

1.      This is my judgment on an application dated 27 (but issued by the court on 28) July 2017, by Ante Ramljak. He is the "foreign representative" within article 2(j) of Schedule 1 to the Cross-Border Insolvency Regulations 2006 ("CBIR") of Agrokor DD ("the company"), a company incorporated under the laws of Croatia. The application is for recognition in Great Britain (*ie* England, Wales and Scotland) under the CBIR of what are called "extraordinary administration proceedings" in Croatia as a "foreign proceeding" within article 2(i) of Schedule 1 to the CBIR. It is opposed by Sberbank, a Russian bank, who is accepted to be a creditor of the company. That bank claims to be owed in excess of €1 billion. The application was argued before me on 23-26 October 2017, by Tom Smith QC and William Willson, instructed by Kirkland & Ellis International LLP, for the applicant, and by David Allison QC and Adam Al-Attar, instructed by Linklaters LLP, for the respondent.

## Background

2.      The background to this matter is as follows. The company is the holding company of a group of companies specialising in agriculture, food production and related activities in Croatia. It is said to be the largest privately owned company in that country, with annual revenue of about €6.5 billion, amounting to approximately 15% of Croatia's gross domestic product, increasing to 30% if supply chains are included. Like many other large businesses, in recent times it has encountered financial difficulties. Because of its size, however, these difficulties appear to have prompted the enactment by the Croatian legislature of new legislation intended to facilitate the restructuring of the company and its subsidiaries and affiliates and to preserve their businesses as going concerns. Such restructuring apparently could not be carried out pursuant to the existing Croatian Bankruptcy Law 2015 ("the Bankruptcy Law"), replacing an earlier law (several times amended) of 1996.

3.      This new law, the Law on Extraordinary Administration Proceeding in Companies of Systemic Importance for the Republic of Croatia ("the Extraordinary Administration Law"), was passed by the Croatian Parliament on 6 April 2017. The legislation was drafted and passed in a hurry. The drafting itself shows signs of haste. The next day, the company made an application to the Croatian court for the commencement of extraordinary administration. On 10 April 2017 the Croatian court made such an order. The order states that the company and 50 affiliates are companies of systemic importance and that it was satisfied that the grounds for pre-bankruptcy under article 4 of the Bankruptcy Law had been satisfied. The commencement of extraordinary administration has several consequences, one of which is to prohibit the bringing or conducting of civil or enforcement proceedings against the company and its controlled and affiliated companies (with limited exceptions): see art 41 of the Extraordinary Administration Law. In effect, there is a moratorium on claims pending the restructuring.

4.      But this was an order of the Croatian court, pursuant to Croatian law. The company might have assets outside Croatia, and might be amenable to the jurisdiction of court or tribunals outside the country. Some of the company's debt obligations, for example, are governed by English law and subject to the jurisdiction of the English

courts. Although the respondent bank as a creditor has submitted proofs of debt in the extraordinary administration (indeed, it is a member of the provisional creditors' committee), it has also taken steps in other countries in relation to its claims. This includes court applications in neighbouring Serbia and Slovenia. In addition, in early July 2017 the respondent commenced two arbitrations in London under the rules of the LCIA. Those arbitrations are however currently stayed by consent, pending the determination of this application.

5.      It does not follow automatically that the order of the Croatian court will be recognised and, if need be, enforced, outside Croatia. The recognition and enforcement in this country of orders of foreign courts is a part of that branch of our law known as private international law. Some such orders are enforceable at common law. Others are enforceable only pursuant to a special statutory regime. Some such regimes are specific, and relate only to particular kinds of orders. Others are more general, and cover a wide variety. Perhaps the most well-known of such regimes known today in this country are those created under the auspices of the European Union, such as the Brussels I Regulation, dealing with litigation in civil and commercial matters. There is of course an EU Regulation dealing with jurisdiction and recognition of judgments in insolvency proceedings (Council Regulation (EC) No 848/2015, replacing Regulation (EC) No 1346/2000). But that does not assist here, and is not the focus of the present case. The regime which *is* claimed to be relevant in the present case, and under which recognition is sought, is however not an EU regulation. Instead, it is that created by the CBIR.

**The Cross-Border Insolvency Regulations**

6.      The CBIR were made under the Insolvency Act 2000, section 14. This section enabled the model law drafted by the 30th session of the United Nations Commission on International Trade Law ("UNCITRAL") relating to cross-border insolvency to "have the force of law in Great Britain", that is England, Wales and Scotland. This model law had been drafted to deal with the increasing problem that insolvencies in one country created in other countries in an increasingly globalised world. The insolvency procedures set up in one country were not, or not always, recognised in another, and certainly not in a predictable way. Whereas the EU insolvency regulation was designed to regulate insolvencies between member states of the European Union, and is therefore reciprocal between them, this model law was intended for use in the wider world. But, unlike the insolvency regulation, the model law does not require reciprocity from other countries in order for the enacting state to be obliged to recognise foreign insolvency procedures. (That said, some states – though not the UK – have in fact enacted it in a form which requires reciprocity.)

7.      In an *Explanatory Memorandum* on the CBIR prepared by the UK Government's Insolvency Service, the authors described the attitude of the British government as follows:

> "7.2. The British Government has a commitment to the promotion of a rescue culture and supports the Model Law as an appropriate legislative tool to support this objective and the wider international stage. In addition, implementation of the Model Law will be beneficial in serving the cause of fairness towards creditors who may be located anywhere in the world. We hope that it may also provide an example to other countries of our readiness to engage in a genuine process of

cooperation in international insolvency matters and that our actions will encourage other countries to implement the Model Law. In this way, insolvency officeholders in Great Britain should be able to enjoy, progressively, the same benefits abroad as their international counterparts, and be able to reduce administrative costs incurred in recovering assets from overseas. As a result funds available for distribution to creditors, wherever they are located, should increase.

[ … ]

7.18. The Model Law is a legislative text that is recommended to countries for incorporation into their national law. In Great Britain, we have tried [to] follow UNCITRAL's exhortation to stay as close as possible to the original drafting in order to ensure consistency, certainty and harmonisation with other countries enacting the Model Law.

7.19. The language of the Model Law is similar to that used in international treaties and conventions and will almost certainly be approached by the courts in that way, i.e. it will be interpreted purposively. Accordingly the UNCITRAL Guide to Enactment will be a useful tool in interpreting the text."

8.    The 2000 Act enabled the Model Law to be enacted in Great Britain with modifications. Regulation 2(1) of the CBIR provides that the UNCITRAL Model Law

"shall have the force of law in Great Britain in the form set out in schedule 1 to these regulations (which contains the UNCITRAL Model Law with certain modifications to adapt it for application in Great Britain)".

9.    Regulation 2(2) provides that:

"Without prejudice to any practice of the courts as to the matters which may be considered apart from this paragraph, the following documents may be considered in ascertaining the meaning or effect of any provision in the UNCITRAL Model Law as set out in schedule 1 to these Regulations –

(a)  the UNCITRAL Model Law;

(b) any documents of the United Nations Commission on International Trade Law and its working group relating to the preparation of the UNCITRAL Model Law; and

(c)  the guide to enactment of the UNCITRAL Model Law (UNCITRAL document A/CN.9/442) prepared at the request of the United Nations Commission on International Trade Law made in May 1997."

10.   As already stated, the CBIR apply only to Great Britain. Although it is not relevant in this case, similar provision has also been made for Northern Ireland. The Insolvency (Northern Ireland) Order, SI 2002/3152, art 11, enabled the making of the Cross-Border Insolvency Regulations (Northern Ireland) 2007. These regulations enacted the Model Law in a form modified differently from Great Britain, but appropriate for Northern Ireland.

11.    The effect of recognition under the CBIR is the same in scope and effect as if the company "had been made the subject of a winding-up order under the Insolvency Act 1986": CBIR, Sch 1, art 20(2). In other words, there will be a moratorium on proceedings and on the enforcement of orders by way of execution on the company's assets, and the right to dispose of or encumber the company's assets will be suspended: CBIR, Sch 1, art 20(1). In the light of the arbitrations started in England, it can be seen why the company, even in the absence of assets here, should seek recognition of the extraordinary administration, and equally why the respondent should oppose it.

12.    In addition to the provisions of regulation 2, referred to above, schedule 1 to the CBIR relevantly provides as follows:

"2. For the purposes of this Law—

(f) "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

(g) "foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

(h) "foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of sub-paragraph (e) of this article;

(i) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

(j) "foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;"

[ … ]

6. Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of Great Britain or any part of it.

[ … ]

8. In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

[ … ]

17.1. Subject to article 6, a foreign proceeding shall be recognised if –

5

(a) it is a foreign proceeding within the meaning of subparagraph (i) of article 2;

(b) the foreign representative applying for recognition is a person or body within the meaning of subparagraph (j) of article 2;

(c) the application meets the requirements of paragraphs 2 and 3 of article 15; and

(d) the application has been submitted to the court referred to in article 4.

17.2. The foreign proceeding shall be recognised –

(a) as a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

(b) as a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph (e) of article 2 in the foreign State.

[ … ].

20.1. Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article –

(a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

(b) execution against the debtor's assets is stayed; and

(c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended

20.2. The stay and suspension referred to in paragraph 1 of this article shall be –

(a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding up order under the Insolvency Act 1986; and

(b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

[ … ]

20.6. In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay

and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

[ …]"

13.    So far as concerns the provisions of article 17 above, there is no dispute between the parties that the company has its centre of main interests in Croatia. Accordingly, if the foreign proceeding is recognised, under article 17.2 it shall be recognised as a foreign main proceeding.

14.    So far as concerns the provisions of article 20 set out above, it is important to notice that in this case no application has been made under paragraph 6 of that article for any modification of the stay and suspension referred to in paragraph 1 of that article. The only application is that by the foreign representative for recognition of the extraordinary administration proceeding in Croatia as a foreign main proceeding in respect of the company.

15.    Schedule 2 to the CBIR relevantly provides as follows:

"25. (1) At the hearing of the application, the applicant and any of the following persons (not being the applicant) may appear or be represented –

(a) the foreign representative;

(b) the debtor and, in the case of any debtor other than an individual, any one or more directors or other officers of the debtor…

[ … ]

(j) with the permission of the court, any other person who appears to have an interest justifying his appearance.

[ … ]

30. (1) The CPR and the practice and procedure of the High Court (including any practice direction) shall apply to proceedings under these Regulations in the High Court with such modifications as may be necessary for the purpose of giving effect to the provisions of these Regulations and in the case of any conflict between any provision of the CPR and the provisions of these Regulations, the latter shall prevail.

(2) All proceedings under these Regulations shall be allocated to the multi-track for which CPR Part 29 (the multi-track) makes provision, and accordingly those provisions of the CPR which provide for allocation questionnaires and track allocation shall not apply."

16.    The respondent in the present case does not fall within any of the categories in paragraph 25(1) other than subparagraph (j). Accordingly, it requires not only an interest justifying its appearance, but also the permission of the court, in order to be heard. In fact, the applicant does not oppose the grant of permission to the respondent. But it was suggested that the fact that Mr Justice Barling had made an order by consent on 3 August 2017 directing sequential filing of evidence, including evidence

from the respondent, impliedly gave permission to the respondent to appear. I certainly do not say that it is impossible that permission could be given impliedly by an order of this kind. However, in order for the court to be in a position to make up its mind whether or not to give permission, evidence would have to be filed, in order to show (if possible) an interest justifying appearance. So the mere fact of being directed to file evidence would not, I think, be conclusive. But the point was not actually argued, and there is no need to reach a decided view.

17.    This is because, having read the material filed, it seems to me that the respondent has demonstrated a sufficient interest to justify appearance. This is, at a minimum, an economic or other significant interest to protect (*eg* the debts it claims from the company) coupled with an argument which is sufficiently cogent to deserve to be put and adjudicated upon as to whether or not the foreign proceeding should indeed be recognised. The respondent passes this low threshold easily. Accordingly, at the outset of the hearing before me, I formally gave permission to the respondent to appear on this application. For the sake of completeness, I add, however, that I was told on behalf of the applicant that other creditors support the application, and that in this respect the respondent is "out on a limb".

18.    I should just record that I was not addressed on the extent of any duty of full and frank disclosure in relation to this kind of application. An application for recognition may have effects on third parties not before the court. In the present case, of course, the application is opposed by the respondent, who has played a full part in the application, and so the need to consider any such duty does not arise in practice. I have been treated to very full arguments on each side.

19.    In *Re Transfield ER Cape Ltd* [2010] EWHC 2851 (Ch), Warren J said (at [1])

>    "As has been said elsewhere, the court's function on recognition is something of a 'tick box' exercise. The presumption is that the registered office of the company is the centre of main interests and case law establishes that that would be displaced only where the contrary evidence is objective and based on ascertainable factors."

This case, however, is anything but a 'tick-box' exercise. I bear in mind that, even though much of the argument put to me was why the applicant should fail, the burden of proof is upon the applicant to show that the application should be granted. However, I accept that not much is needed on certain points to raise a prima facie case, and thereby push the evidential burden onto the respondent.

**The arguments in summary**

20.    The respondent argues:

1. that the extraordinary administration proceeding pending in Croatia is not a "foreign proceeding" within article 2(i) of Schedule 1 to the CBIR, because (i) the extraordinary administration law is not a "law relating to insolvency", (ii) that law was not one passed for the purpose of reorganisation,  (iii) the proceeding is not a "collective proceeding", (iv) it is not "subject to control or supervision by a foreign court", in each case within the meaning of that provision; and (v) it is a *single* group

8

proceeding in respect of *both* the holding company and all its controlled companies and affiliates, outside the scope of article 2(i).

2. that, even if it were such a "foreign proceeding", recognition of that proceeding would be manifestly contrary to English legal public policy, because the legislation is manifestly contrary to fundamental principles designed to ensure a fair insolvency proceeding, including the right to practical and effective access to a legal remedy and the right to private property.

**Witnesses**

21.     In considering this application, I have had the benefit of the following factual evidence in writing:

1. The first affidavit of the applicant, Ante Ramljak, originally dated 27 July 2017, but sworn in error before a person who should not have administered the oath, and therefore re-sworn correctly on 28 August 2017;

2. The affidavit of Bruce Bell, a partner in Linklaters LLP, acting for the respondent, dated 31 July 2017;

3. The affidavit of Sergei Volk, managing director of the respondent, dated 17 August 2017;

4. The second affidavit of the applicant, dated 7 September 2017.

22.     The parties agreed that none of these witnesses need be tendered for cross-examination, and hence none of them gave oral evidence before me. That of course means that there are limits on how far I can decline to accept a statement of this kind as true. The general rule is that the court is not entitled to reject any written evidence as being untrue, *unless* on the basis of all the evidence before the Court the Court considers that that written evidence is simply incredible: see *eg Long v Farrer & Co* [2004] BPIR 1218, [57]-[61], applied in *Shierson v Vlieland-Boddy* [2005] 1 WLR 3966, CA, [56], *Coyne v DRC Distribution Ltd* [2008] EWCA Civ 488, [58]. At the hearing, I was not invited to disregard any of the written evidence on that basis.

23.     In addition, I had the benefit of opinion evidence on the relevant law of Croatia from two witnesses tendered as experts in that field, namely Judge Andrija Erakovic (for the applicant) and Professor Alan Uzelac (for the respondent). Mr Justice Barling gave the relevant permission under CPR Part 35 in his order of 3 August 2017. Each expert gave evidence in the form of a written report, and then a written joint statement identifying the areas of agreement and disagreement between them. I also had the benefit of seeing them give evidence in person on the first and second days of the hearing. Here I will briefly describe each of them.

24.     Judge Erakovic graduated in law at the University of Zagreb in 1970, and passed the Croatian bar examination in 1975. From 1980 to 1987 he was a judge of the commercial court of Rijeka, sitting at first instance, and dealing with (amongst other things) bankruptcy proceedings. From 1987 to 2002 he was a judge of the high commercial court of Croatia in Zagreb, sitting on appeal from first instance decisions of the commercial courts. This also included sitting on appeal from decisions in

bankruptcy proceedings. From 2002 to 2015 (when he retired) he was a judge of the Supreme Court of the Republic of Croatia, sitting in the civil department, covering civil and commercial disputes. He has written four books on commercial and insolvency law, including one on bankruptcy law in 1997 and one on company law in 2008. He has also written more than 150 articles and papers in the areas of commercial, contractual and civil procedural law, most referring also to insolvency law. He now sits as an arbitrator in the arbitration court of the Croatian Chamber of Commerce.

25.    Prof Uzelac is a Professor and Head of the Department of Civil Procedure in the Faculty of Law at the University of Zagreb. The Department carries out research and teaching in litigation, enforcement, non-contentious proceedings, bankruptcy and the organisation of the judiciary. Prof Uzelac holds graduate degrees in law, philosophy and comparative literature from the University of Zagreb, as well as the degrees of Master of Law and Doctor of Law from the same university. He has written several books and a large number of papers on national and comparative civil procedure, evidence and procedural human rights. He has worked for a number of international organisations, and been active as a national delegate in organisations such as UNCITRAL and the Council of Europe. He has been one of the draughtsman of a number of Croatian procedural laws, including the Code of Civil Procedure, the Enforcement Act and the Legal Aid Act. He has been invited to give legal opinions on various issues of procedural and insolvency legislation by various national bodies, including the Constitutional Court of Croatia. From 2011 to 2015 he was a member of the State Judicial Council, which is the supreme body for the appointment, discipline and removal of judges. From 2013 to 2016 he was an examiner in the State Judicial Examination in relation to the part concerning civil procedure.

26.    The applicant has criticised Prof Uzelac as

"an academic specialising in procedural law based at the University of Zagreb … who appears to have little if any relevant expertise of insolvency and/or restructuring."

In my view the criticism is misplaced. It must be borne in mind that professors of civil law who specialise in the law of civil procedure will normally cover the whole of Part III of the scheme of the Roman law scholar Gaius set out in his *Institutes*, that is, the law of actions, *including bankruptcy*. So these are the professors who can be expected to know about bankruptcy. As is well known, in civil law countries the role of university professors in contributing to the practising legal community is for largely historical reasons both more central and more pronounced than it is in common law ones. And Croatia is a civil law jurisdiction.

27.    But in any event I do not think that, even if (which is not the case) Prof Uzelac had only a small amount of relevant bankruptcy expertise, it would mean that he was not an expert for the purposes of giving opinion evidence on Croatian law. On the other hand, that might go to weight, especially where there is a conflict between the opinions of the two experts. Judge Erakovic appears to have more experience of insolvency law, and certainly more *practical* experience of the application of insolvency law, than Prof Uzelac.

28.    Having seen them both in the witness box, my impressions of these two witnesses are as follows. Judge Erakovic was a solemn and careful witness, who took time to think before answering. He plainly has had very significant experience in this field. He gave his evidence through an interpreter, because his English was not strong enough. This slowed matters down somewhat, and made it a little more difficult for the cross examiner. But nevertheless I have no hesitation in accepting what he said as his best attempt to assist the court. His evidence was not shaken in any material particular by cross-examination.

29.    Prof Uzelac is a generation younger than Judge Erakovic. As befits the generational change, he spoke fluent English and had no difficulty expressing his ideas to me. He was very knowledgeable, but of course had less practical experience of how judges decide cases, especially novel ones. This was exposed in cross-examination. He was also apt sometimes to wander from the point. I attributed this to his undoubted intellectual curiosity. I am sure he was doing his best to assist the court. On the whole, on practical matters of how courts would actually cope with bankruptcy situations, I usually preferred the approach of Judge Erakovic to that of Prof Uzelac. But I took his evidence into account in all cases.

**The Extraordinary Administration Law**

30.    The Extraordinary Administration Law of Croatia was said to have been based, at least in part, on the Italian *Legge Marzano*, specifically enacted in relation to the collapse of the Parmalat group (see Ramljak 2, [15(a)]). But it is accepted that the present Law is different from that Law in significant ways, and I do not rely on it. The present law is also different from other administration laws elsewhere, and a large number of its terms were specifically referred to before me.

31.    I therefore set out here the relevant provisions of the Law (in the English translation provided to me):

> "1. (1) This Law is passed for the purpose of protection of sustainability of operations of the companies of systemic importance for the Republic of Croatia which with its operations individually or together with its controlled or affiliated companies affect the entire economic, social and financial stability of the Republic of Croatia.
>
> (2) The level of protection achieved by this Law is necessary, appropriate and proportionate to the interest of the Republic of Croatia to conduct a fast and effective preventive restructuring procedure of companies of systemic importance for the Republic of Croatia to secure liquidity, sustainability and stability of business operations.
>
> 2. This Law governs the extraordinary administration measure for companies of systemic importance for the Republic of Croatia, responsible bodies in the extraordinary administration proceeding and other relevant issues.
>
> 3. (1) the extraordinary administration measure from article 2 above shall be exercised in a special proceeding governed by this Law, the following being particularly detailed:

11

1 prerequisites for the opening of the extraordinary administration proceeding

2 conducting of the extraordinary administration proceeding and

3 legal consequences of the opening and conduct of the extraordinary administration proceeding.

(2) the relationship between the debtor and the creditors to whom this law relates, is governed by the introduction of the extraordinary administration measure defined in article 2 above with simultaneous commensurate observance of the interests of other participants.

4(1) The extraordinary administration proceeding shall apply to the debtor's joint-stock company (hereinafter debtor) and all his affiliated and controlled companies if any of the reasons for bankruptcy exist in terms of article 5 of the Bankruptcy Act (Official Gazette, no 71/15, hereafter: Bankruptcy Act) or pre-bankruptcy reasons from article 4 of the Bankruptcy Act in relation to the debtor as a controlling company and which company individually or jointly with its controlled or affiliated companies is of systemic importance for the Republic of Croatia.

(2) A company of systemic importance for the Republic of Croatia is the one which individually or together with its controlled or affiliated companies cumulatively fulfils the following requirements:

 - in the calendar year preceding the year of filing of the petition for the opening of the extraordinary administration proceeding individually or together with its controlled or affiliated companies employs on average more than 5000 employees and

 - the existing balance sheet liabilities individually or together with its controlled or affiliated companies exceed HRK 7,500,000,000, i.e. in the event of balance sheet liabilities denominated in other currencies, if they exceed the counter value of HRK 7,500,000,000 calculated on the date of the filing of the petition for the opening of the extraordinary administration proceeding.

(3) This Law shall not apply to credit institutions as defined in article 4, paragraph 1, item 1 of the regulation (EU) number 575/2013 and financial institutions as defined in article 4, paragraph 1, item 26 of the regulation (EU) number 575/2013.

5. (1) Extraordinary administration proceeding shall also be conducted against a company not fulfilling the requirements from article 4, paragraphs 1 and 2 of this law, provided that it is regarded a controlled company in the meaning of article 475 of the Companies Act (Official Gazette, nos 11/93, 34/99, 121/99, 52/00, 118/03, 107/07, 146/08, 137/09, 125/11, 111/12, 168/13, 110/15, hereinafter: Companies Act) or an affiliated company (the debtor is a company which holds in another company a majority share or voting majority, a controlled or controlling company, concern company or a company mutually holding shares under the Companies Act) where the controlling company independently or jointly with its

12

controlled or affiliated companies fulfils the requirements from article 4 of this Law.

(2) In the meaning of this Law affiliated and controlled companies are companies having their principal place of business in the Republic of Croatia which are existing and operating under Croatian law, in which the company from article 4 of this Law holds at least 25% share.

6. (1) In the extraordinary administration proceeding the exclusive jurisdiction has the Commercial Court of Zagreb (hereinafter: the Court), regardless of the registered seat of the debtor and affiliated companies to which this Law applies and regardless of the registered seat of his controlled and/or affiliated companies.

(2) In the extraordinary administration proceeding, the lower court proceeding is conducted by a sole judge, unless otherwise ordered for by this Law.

(3) In the extraordinary administration proceeding, the senior court represented by a council of three judges decides about the appeal.

(4) The extraordinary administration proceeding is urgent.

7. (1) During the extraordinary administration proceeding it is not admissible to institute liquidation proceeding against the debtor.

(2) If the extraordinary administration proceeding has been instituted, before its closing it is not admissible to institute prebankruptcy i.e. bankruptcy proceedings.

8. Unless this Law defines otherwise, to the extraordinary administration proceeding accordingly apply procedural rules from a special law governing bankruptcy.

9. The bodies of the extraordinary administration proceeding are the Court, extraordinary commissioner, advisory body and creditors' committee.

10. In the extraordinary administration proceeding the Court is authorised to take any actions and pass any decisions not expressly conferred by Law into responsibility of other bodies.

11 (1) Extraordinary commissioner may be any person fulfilling the requirements for a member of the management board under the Companies Act. He is appointed by the Court on the proposal of the government of the Republic of Croatia in accordance with article 24 of this law.

(2) To responsibilities of the extraordinary commissioner accordingly apply the provisions of articles 92 and 93 of the Bankruptcy Act.

12. (1) The extraordinary commissioner has rights and obligations of a debtor's organ.

(2) The extraordinary commissioner represents the debtor solely and independently.

13

(3) The extraordinary commissioner exercises any and all rights arising from the debtor's ownership share in the affiliated and controlled companies in accordance with the current laws.

(4) The extraordinary commissioner shall act conscientiously and with due care, shall respect the periods set by this Law and perform transactions conferred on him by this Law.

[ … ]

(6) The extraordinary commissioner's deputies, on the proposal of the Government of the Republic of Croatia, shall be appointed by the decision of the Court within 5 working days from the receipt of a written proposal of the Government of the Republic of Croatia.

(7) The extraordinary commissioner shall manage debtor's operations independently and perform any and all transactions in the Proceeding conferred on him …

(8) The extraordinary commissioner may not without approval of the creditors committee pass decisions or take any actions to dispose of debtor's real property, shares or shares held in the controlled and other companies or to transfer parts of the undertaking, if the value is exceeding HRK 3,500,000.

(9) The extraordinary commissioner shall from the appointment, each month until adoption of the settlement agreement submit reports to the central authority of the government administration responsible for economic operations (hereinafter: Ministry), advisory body, the Court and the creditors committee about the economic and financial status of the debtor and about implementation of the measures contemplated by this Law.

[ … ]

(11) The extraordinary commissioner shall within 30 days from his appointment elect a restructuring adviser and, as necessary, auditors, legal and other advisers specialised in certain areas. … For appointment of the advisers by the extraordinary commissioner prior approval of the Ministry is required.

(12) The extraordinary commissioner has also other rights and obligations explicitly conferred on him under this Law, and to him applied subordinately the provisions of the Bankruptcy Act governing bankruptcy receiver.

[ … ]

14. The Court is exclusively competent to supervise the work of the extraordinary commissioner.

15. The Court may remove the extraordinary commissioner and appoint a new one at any time on the proposal of the government of the Republic of Croatia.

16. (1) The head of the Ministry appoints the advisory body within 15 days from the appointment of the extraordinary commissioner.

[ … ]

17. (1) The advisory body gives opinions about decisions and actions of the extraordinary commissioner in cases contemplated by the Law if so requested by the Ministry or the Court.

[ … ]

18. (1) The creditors' committee has up to 9 members and consists of the representatives of the creditors…

19. (1) From its constitution until the closing of the extraordinary administration proceeding the creditors' committee has the right to be informed about the condition of the debtor and his controlled and affiliated companies.

(2) The creditors' committee shall participate in the name of the creditors in preparation and drawing up of the settlement agreement and gives approval to the extraordinary commissioner for the final text of the settlement agreement.

[ … ]

21. (1) The petition for the opening of the extraordinary administration proceeding may be filed by:

 - the debtor fulfilling the requirements from article 4 of this Law or

 - a creditor of the debtor and/or debtor's controlled or affiliated companies, subject to debtor's approval.

[ … ]

(3) If the petition for the opening of the extraordinary administration proceeding is not filed jointly by all persons authorised to represent the debtor by law or all members of the management board or board of directors of the joint-stock company, the petition is admissible if the petitioner makes it credible that a prebankruptcy reason from article 4 of the Bankruptcy Act exists i.e. any bankruptcy reason from article 5 of the Bankruptcy Act in respect of the debtor.

[ … ]

(5) From the filing of the petition for the opening of the extraordinary administration proceeding until issuance of an order to refuse the petition i.e. issuance of an order to open the extraordinary administration proceeding the debtor may not dispose of his assets, save for dispositions made in the course of ordinary operations or unless provided for otherwise by this law.

[ … ]

24. (1) The Court shall inform the Government of the Republic of Croatia and the Ministry about the petition filed for the opening of the extraordinary administration proceeding on the same day upon receipt of the petition.

(2) Within two working days from the receipt of the notification of the Court regarding the opening of the extraordinary administration proceeding the Government of the Republic of Croatia shall on the proposal of the Ministry decide about the proposal for the appointment of the extraordinary commissioner and shall deliver the decision to the Court without undue delay.

(3) The Court shall immediately, but not later than two working days from the receipt of Government' decision about the proposal for the appointment of the extraordinary commissioner, issue order to open the extraordinary administration proceeding and shall pass a decision on the appointment of the extraordinary commissioner in accordance with the proposal of the Government of the Republic of Croatia, except that from the documents and petitioner's statements provided it establishes that any of the requirements from article 4 of this Law is not met.

[ … ]

26. (1) Entitled to file appeal against the order opening the extraordinary administration proceeding are the Ministry and the petitioner who filed the petition for the opening of the extraordinary administration proceeding and the debtor.

[ … ]

29. (1) The creditors in the extraordinary administration proceeding are personal creditors who at the time of the opening of the extraordinary administration proceeding have property claims on the debtor and/or affiliated and controlled companies.

(2) The creditors from paragraph 1 above shall be classified by their claims into categories.

(3) The rights of creditors from paragraph 1 above may vary if so provided for by this Law.

[ … ]

30. (1) Within five days from the pronouncement of the decision from article 33, paragraph 3 of this Law, the extraordinary commissioner shall by invitation in the Official Gazette invite the creditors whose claims have been recognised to inform the extraordinary commissioner and the Court within 30 days about the members of the creditors' committee.

[ … ]

(6) The creditors' committee shall be deemed duly constituted if a simple majority of all special categories of creditors duly elects its members in the creditors' committee and informs about it the extraordinary commissioner…

[ … ]

16

31. (1) The Court shall, for the purpose of protection of the interests of the creditors in the extraordinary administration proceeding, by its decision constitute a provisional creditors' committee.

[ … ]

(5) The provisional creditors' committee shall have the same rights, powers and obligations defined by this Law for the creditors committee and shall assume and perform the functions of the creditors' committee until constitution of the creditors' committee pursuant to article 30 of this Law.

39. (1) The extraordinary commissioner, with prior approval of the creditors' committee, may assume new debt in the name and for the account of the debtor where it is necessary for the reduction of the system risk, continuation of business activities, preservation of assets or if it concerns settlement of the claims from the ordinary operations which will have priority in satisfaction over other claims of the creditors, save for claims of employees and former employees.

[ … ]

41. (1) From the opening of the extraordinary administration until its closing it is not permitted to bring civil or enforcement proceedings, or proceedings securing the claims or out-of-court collection proceeding and exercise rights to separate satisfaction against the debtor, his controlled and affiliated companies, save for proceedings relating to employment.

[ … ]

43. (1) Within 12 months from the opening of the extraordinary administration proceeding, the extraordinary commissioner, with approval of the creditors' committee may propose satisfaction of the creditors by the settlement agreement.

(2) The 12 month period from paragraph 1 of this article shall be prolonged by three additional months by the court at the request of the extraordinary commissioner. The period of three months is calculated from the expiration of the period of 12 months.

(3) The extraordinary commissioner shall propose a settlement agreement to the creditors' committee and the creditors if in his opinion the determination of relations of the creditors and the debtor by a settlement agreement is reasonable taking into account all circumstances of this particular case.

(4) In the name of the creditors in preparation of this settlement agreement participates the creditors' committee.

(5) By the settlement agreement it is, inter alia, possible:

– to transfer a part or all assets of the debtor to one or more already existing persons or persons to be constituted, with exclusion of application of the general rule of adherence to debt in the case of take over of a property unit from the law governing contractual relations and duty to give a statement on nonexistence of debts from the law governing the procedure in the court register

–  to leave to the debtor all assets or part of his assets for the purpose of continuation of debtor's operations

– to merge the debtor with another entity or entities by takeover or amalgamation company

– to sell all assets part of assets of the debtor, distribute all assets or part of assets of the debtor among the creditors

– reduce or postpone payment of debtor's obligations

– to convert debtor's obligations into credit or loan i.e. equity of the debtor or some of his controlled or affiliated companies i.e. into equity of newly founded companies

– to assume guarantee or give another security for fulfilment of debtor's obligations

– to determine the responsibility of the debtor after the settlement agreement.

(6) In the extraordinary administration proceeding conducted against the debtor and affiliated and controlled companies a single proposal of the settlement agreement shall be made.

(7) Upon agreeing the text of the settlement agreement between the extraordinary commissioner and the creditors' committee, extraordinary commissioner shall deliver the proposal of the settlement agreement to all creditors through its publication on the web page of the court.

[ … ]

(9) The creditors vote at the hearing scheduled by the court in a period of not less than five and not more than 15 days from the receipt by the court of the notification of the extraordinary commissioner and the creditors committee that they agree about the contents of the settlement agreement to be proposed to the creditors.

(10) At the request of the extraordinary commissioner the court shall determine the list of creditors and voting rights pertaining to them at the hearing.

[ … ]

(14) The settlement agreement shall be deemed adopted if a simple majority of all creditors voted for it and if in each category of the sum of claims of creditors who voted for the settlement agreement exceeds the sum of claims of the creditors who voted against the acceptance of settlement agreement. Exceptionally, it shall be deemed that the creditors accepted the settlement agreement if the total sum of claims of the creditors who voted for the settlement agreement amounts at least two thirds of the total claims.

Re Agrokor DD and the Cross-Border
                                                                        Insolvency Regulations 2006

(15) The settlement agreement which is accepted by the creditors shall be confirmed by the court by its order confirming the settlement agreement. Such order has the force of an enforceable deed.

(16) the court shall ex officio withhold the confirmation of the settlement agreement:

1. if the regulations governing the contents of the settlement agreement and the procedure for its preparation and adoption as well as acceptance by the creditors have been grossly violated except that these defects can be removed or

2. if the acceptance of the settlement agreement has been obtained in an inadmissible way.

[ … ]

(18) The settlement agreement is effective from the issuance of the order confirming the settlement agreement in relation to all creditors including the creditors who have not and who have participated in the proceeding and whose contested claims have been later determined.

[ … ]

(21) To the relations not governed by the provisions of this article adequately apply the provisions of the Bankruptcy Act governing the bankruptcy plan.

[ … ]

45. (1) At any time during the course of the extraordinary administration proceeding the court may at the request of the extraordinary commissioner, with prior approval of the creditors committee decide that the extraordinary administration proceeding be terminated and that a bankruptcy proceeding be opened if it establishes that the circumstances have occurred due to which no probability exist for the restoration of economic balance and continuation of operations of the debtor on a permanent basis and it establishes that any of the bankruptcy reasons exists pursuant to article 5 of the Bankruptcy Act.

(2) Prior to the filing of the petition from paragraph 1 of this article the extraordinary commissioner shall obtain prior approval of the Ministry.

[ … ]"

32.   I should just add a word here in relation to article 29(1), to which counsel specifically drew my attention. This provision defines the creditors for the purpose of the extraordinary administration proceeding as "personal creditors who … have property claims on the debtor". To a common lawyer this phrase looks odd. The main problem is that it is not possible to find satisfactory translations into English of all the words used in the original Croatian, many of which are in fact technical legal words. As Judge Erakovic confirmed during his expert evidence, Croatia was formerly part of the Austro-Hungarian Empire and subject to the Imperial Austrian Civil Code of 1811. Indeed, the judge told me that, despite the breakup of the Empire after the First

World War and the creation of Yugoslavia (which in turn broke up in the 1990s), in substance, he was applying Austrian civil law well into the 1970s.

33.     The Austrian law, as is well known, is a codification of rules of law based on Roman law. I know from my own comparative law research and teaching that Austrian law even today distinguishes between (a) claims to property which exclude any claims of other creditors (so-called *real* property rights, meaning claims to the thing itself, rather than land in the common law sense) and (b) claims to property of the debtor which can ultimately be made good only in competition with other creditors (*ie* what we would call claims in personam, which in the Austrian code are called *personal* property rights, but again not using that word in the common law sense): see article 307 of the ABGB. Article 29(1) is clearly referring to the latter kind of claim.

## The court's role

34.     The English court's role is to decide whether the proceeding the subject of the application fulfils the criteria for recognition under the CBIR. Those regulations are a part of English law and hence this is a question of English law. The *characteristics* of the proceeding are however a matter for Croatian law, which is the law that gives it existence. But by the rules of the English court (which is the forum to decide the application) questions of foreign law are questions of *fact*, to be decided (mainly) on the basis of evidence of appropriate experts as to what that law is. I have been fortunate enough to receive such evidence, as already described above. But I am not bound by the way in which Croatian law itself categorises the proceeding or the law in question; nor by the way in which the experts do so. Indeed, I consider that evidence of how Croatian law would categorise the proceeding, or the law, is in fact irrelevant, because the question is what *English* law thinks, and the experts are not experts in English law (and expert evidence of *English* law could not be received by the court in any event). Whether in Croatian terms the proceeding is a foreign proceeding or the law an insolvency law is irrelevant.

35.     All that said, it would be wrong to construe the CBIR as if I were construing an ordinary piece of domestic UK legislation. The CBIR are, as I have already stated, the British adaptation of a non-national model law, itself the product of an international convention procedure. Sch 1 (at least) of the CBIR should not be construed by reference to any national system of law: see *eg* CBIR, Sch 1, art 8 (enjoining me to have regard to "its international origin and to the need to promote uniformity in its application"); *Re Stanford International Bank Ltd* [2011] Ch 33, [6], [9], [23].

36.     Nor should I slavishly follow the decisions of other countries' courts where they are based on different adaptations of the Model Law or do not accord with the preparatory materials (reports of working groups) that led to the CBIR. In *Fibria Cellulose S/A v Pan Ocean Co Ltd* [2014] EWHC 2124 (Ch), Morgan J was asked to grant specific relief under (in particular) article 21 of the CBIR in a case where a Korean company was in an insolvency proceeding already recognised by the English court. The judge examined US authority but concluded that the words "any appropriate relief" in article 21 were not to be construed in the way that authority indicated.

37.     Morgan J said:

"107. I am directed by reg. 2 of the CBIR to consider the documents relating to the working group on the Model Law. On my reading of the reports of the working group, it was not intended that 'any appropriate relief' would allow the recognising court to go beyond the relief it would grant in relation to a domestic insolvency. I do not think that there is sufficient in the discussion in those reports which would allow me to conclude (as the court concluded in *Re Condor Insurance Co Ltd*) that the words 'any appropriate relief' were intended to replicate the position under section 304 of the former US Bankruptcy Code. I also note that whenever the legal position under article 21 has been described in an English case or in a textbook on the CBIR, the discussion proceeds on the basis that 'any appropriate relief' allows the court to grant the same sort of relief as it would grant in relation to a domestic insolvency.

108. Accordingly, I am not persuaded that that the words 'any appropriate relief' allow me to grant relief which would not be available to the court when dealing with a domestic insolvency."

I bear in mind these precepts in construing the relevant words in the CBIR in what follows.

## The arguments in detail

38.     I now turn to consider the arguments in some detail. The first series of points considers whether the extraordinary administration proceeding in Croatia is a "foreign proceeding" within regulation 2(i) of Sch 1 of the CBIR.

## Group proceeding outside the scope of the CBIR?

39.     The first of these is whether the proceeding is a *group* proceeding outside the scope of the CBIR. Unlike the other points raised as to the compatibility of the proceeding with the CBIR, which raise questions as to specific words or phrases in the definition, this question turns on something which is not made express in the regulations. The evidence in the present case is that the proceeding in Croatia is a single group proceeding against the company as a debtor *and* against all its affiliated and controlled companies, that is, the whole group of companies. The application for recognition before me, however, is one in respect only of *the company itself*, and not the controlled or affiliated companies.

40.     The question in this part of the case therefore is this: do the CBIR make it possible to recognise in England a foreign proceeding which is expressly brought in a foreign court in respect of a *group* of companies, even though recognition here is sought only in relation to *one specific company* which is identified in the application? The applicant says yes; the respondent says no.

41.     In his closing written submission, the applicant summarises it this way.

"Neither the Model Law nor the CBIR provide that where a debtor is part of a group of companies or subject to a group proceeding, the proceeding cannot be recognised in relation to that debtor. There is no textbook or case law to support this and no basis for reading down the legislation in this way (on the contrary)."

21

42.     The respondent summarises the argument in its skeleton argument in this way:

> "The Model Law is, as such, premised upon a proceeding in respect of a single debtor, whether natural or individual. It is in this sense that a proceeding must be collective to fall within the Model Law. It has to be between a debtor and its creditors, not between a debtor and another's creditors."

43.     Regulation 2(2) of the CBIR, as already mentioned, enables the court to have regard to certain interpretive materials. These include the Guide to Enactment of the Model Law, and any documents of UNCITRAL and its working group relating to the preparation of the Model Law. Indeed, in the *Pan Ocean* case (see at [36] above), Morgan J not only looked at various working group reports, he also reached a conclusion on the meaning of the CBIR which differed from that reached in certain American cases.

44.     The Guide to Enactment makes plain at various points that what is generally being considered in the creation of the Model Law is the case of the *individual* debtor company which undergoes an insolvency procedure. The position of *groups as such* is generally ignored.

45.     In the UNCITRAL Legislative Guide on Insolvency Law, Part 3, chapter III "Addressing the insolvency of enterprise groups: international issues", it says (at page 84):

> "3. In the international context, the models that have been created to address cross-border insolvency issues have always stopped short of dealing satisfactorily with enterprise groups. When the House of Lords of the United Kingdom of Great Britain and Northern Ireland considered whether the United Kingdom should subscribe to the European Convention on insolvency proceedings, the relevant committee commented on the failure of the convention to deal with groups of companies – the most common form of business model. When the convention became European Council (EC) regulation number 1346/2000 of 29th of May 2000 on insolvency proceedings, it still did not address the issue. When the text of what became the UNCITRAL Model Law was debated, groups were regarded as 'a stage too far'."

46.     The same is true of the working group reports. They emphasise that the Model Law is concerned with individual debtor companies. Yet another UNCITRAL publication, "The UNCITRAL Model Law on Cross-Border Insolvency: the Judicial Perspective", says the same thing in chapter III, "Interpretation and application of the UNCITRAL Model Law."

47.     At paragraph 68 (page 24) it says:

> "A number of the decided cases that considered the meaning of 'foreign proceeding', 'foreign main proceeding' and 'foreign non-main proceeding' have involved members of enterprise groups. For the purposes of the model law, the focus is on each and every member of an enterprise group as a distinct legal entity. It may be that the centre of main interests of each individual group member is found to lie in the same jurisdiction, in which case the insolvency of those group members can be addressed together, but there is no scope for

addressing the centre of main interests of the enterprise group as such under the Model Law".

48.    In my judgment, this passage is important. Reference is made to cases decided in relation to individual members of groups of companies. Regardless of whether those cases can be said to be correctly decided, the commentators do not complain in any of these materials that the judges have misunderstood the Model Law by applying it to single companies within groups. Instead the focus is on each individual member of the group *as a distinct legal entity*, even though it is also a member of a wider group.

49.    The cases which are referred to are two American cases, *Re Rede Energia SA* 515 BR 69 (SDNY 2014) and *Re OAS SA* 533 BR 83 (SDNY 2015). Rede was the parent company of a group of companies operating in the energy sector in Brazil. Five of the companies were debtors in Brazilian bankruptcy proceedings. Other members of the group were not. Pursuant to those proceedings a reorganisation plan was approved by creditors and confirmed by the court. The foreign representative of Rede applied for and obtained recognition of the Brazilian proceedings under the US Bankruptcy Code, Chapter 15 (the Model Law). The reorganisation plan was very contentious. The foreign representative sought an order that the reorganisation plan confirmation order be enforced in the US. This was granted, the court specifically holding that it was not "manifestly contrary to United States public policy".

50.    In the second case, OAS was the Brazilian holding company of a group of companies carrying on an infrastructure construction business, both in Brazil and elsewhere in Latin America, the Caribbean and Africa. Some of the companies were based outside Brazil. The group got into difficulties following dealings with the Brazilian oil company Petrobras. In March 2015 several of the companies in the group started Brazilian bankruptcy proceedings, seeking a reorganisation. Three of those companies each presented an individual petition to the US court under Chapter 15, seeking recognition of the proceedings as foreign main proceedings. The petitions were granted, again despite opposition and in particular an argument that recognition would violate US public policy.

51.    In neither of the two cases, however, was there any express consideration given by the court to the issue whether the Model Law enables an application to be made for recognition on behalf of a single company forming part of a larger group proceeding. So they are only helpful on this point in the sense that those taking part (including those vigorously opposing the relief sought, and also the judges) did not think it necessary to draw attention to what (if the respondent is right) would be an immediate and complete disqualification for recognition.

52.    There is nothing in the language of article 2 of schedule 1 of the CBIR to compel a decision either way. The effect of recognition, as shown by article 20 and 21 of schedule 1, is on the particular debtor and the particular debtor's position, so there would be no problem in itself in recognising a foreign proceeding in relation to a particular debtor. As I have said above, the Guide, the working group reports and the Judicial Perspective Paper all show that the focus is on the individual debtor and not on groups. It is clear that a group proceeding cannot be recognised as such. But the materials do not say that it is impossible to recognise a group proceeding as a proceeding *in respect of a particular debtor*, if it otherwise meets all the relevant

criteria. On the contrary, the Judicial Perspective Paper at [64] assumes that this is possible. So do the American cases of *Rede* and *OAS*.

53.     Given the problems that are or might be caused by attempting to recognise group proceedings as such, it may well have been a good idea not to provide for this in the Model Law. But at the same time it would be sensible to allow for the recognition of the position of individual debtors caught up in a group insolvency procedure. Since such groups are today very common, not to do so would leave a significant hole in the range of possible options for international recognition. Whenever there were insolvency proceedings involving a group of companies as such, it would not be possible to recognise those proceedings *in relation to any debtor*. That would be going much further than refusing to recognise the group proceedings as a group. And in my judgment it is not the law.

54.     Of course there may then arise a further question, which is how to decide what is an insolvency involving a group of companies. There was some debate before me as to whether an appropriate test would be whether there was simply procedural consolidation of the proceedings involving different companies, so that the distinct proceedings were heard simultaneously by the same judge and using the same materials, or whether it was necessary to have substantive consolidation of those proceedings, so that the estates were merged. But it is not necessary for me now to resolve any of these questions. The important point is simply this. There is nothing in the CBIR to prevent a foreign proceeding being recognised, which in the foreign court involves a group of companies, but the recognition is sought in this country in relation only to a particular individual debtor. In my judgment, the respondent's objection here is without foundation.

**Law relating to insolvency**

55.     The next point is whether the Extraordinary Administration Law of Croatia is a "law relating to insolvency" within article 2(i) of Schedule 1 to the CBIR. The applicant says it is. The respondent says it is not. The Guide to Enactment says ([73]):

> "liquidation and reorganisation might be conducted under law that is not labelled as insolvency law (*eg* company law), but which nevertheless deals with or addresses insolvency or severe financial distress."

Moreover, the phrase uses the words "relating to". These are wide words of connection. The law concerned certainly does not have to be a law *confined* to insolvency.

56.     In *Re Stanford International Bank Limited* [2011] Ch 33, a company was ordered to be wound up in Antigua on the just and equitable ground (corresponding to the equivalent English law), but in so deciding the court relied on the obvious insolvency of the company. An application was made for the Antiguan proceeding to be recognised in England. At first instance, Lewison J said:

> "94. It is, in my judgment, clear from the court's order and the judgment of Harris J that it was not basing the order on section 300 alone. It made the order because, having considered the evidence, it concluded that it was just and equitable that SIB be wound up. An important part of the evidence was that SIB was insolvent

and could not be reorganised via the receivership. In my judgment at least one of the reasons why Harris J made the order that he did was that he was satisfied that SIB was insolvent.

95. I hold, therefore, that the liquidators were appointed pursuant to a law relating to insolvency and that they are entitled to be recognised as foreign representatives of a foreign proceeding."

57.    The Court of Appeal affirmed the decision of Lewison J. Sir Andrew Morritt C (with whom Arden and Hughes LJJ agreed on this point) said:

"15. In my view Lewison J was right to conclude that the Antiguan liquidation was a foreign proceeding as defined. Part 4 of the relevant Act provided for the winding up of corporations incorporated in Antigua for the purpose of carrying on an international trade or business on just and equitable grounds, which include insolvency, as well as infringements of regulatory requirements. The combination of that part of the Act and the order of the court made provision for the collection of all the assets of SIB and their application in satisfaction of all its obligations in the order of priority for which the law provided. That process was expressly subject to the supervision of the High Court of Antigua and Barbuda. Creditors and others were obliged to seek their remedy in the liquidation because individual proceedings were stayed or prohibited. The ultimate purpose of the process was the liquidation, in the sense of dissolution of SIB. Such a process satisfies all the conditions for the application of the definition because it is collective, judicial and pursuant to law relating to insolvency."

58.    In *Re Betcorp Ltd*, 400 BR 266 (2009), an Australian company resolved to go into members' voluntary winding up, and a liquidator was appointed, pursuant to the Corporations Act, the relevant Australian statute law. There were no court proceedings as such. Nor was there any assertion or allegation that the company was insolvent. Indeed, the members averred solvency, so as to bring the company within the members' voluntary model of winding-up. The liquidator applied to the United States Bankruptcy Court for the winding up to be recognised as a "foreign main proceeding" within chapter 15 of the US Bankruptcy Code, enacting the Model Law.

59.    Judge Bruce A Markell said:

"5. For Betcorp's winding up to qualify as a foreign proceeding, the winding up must be authorised or conducted under a law related to insolvency or the adjustment of debts. Importantly, this element does not require the company to be either insolvent or to be contemplating using provisions of Australian law to adjust any debts. Two facts favor a finding that Betcorp's winding up satisfies this fifth criterion: (1) the unified structure of the external administration provisions of the Corporations Act; and (2) the Australian Parliament's own interpretation that Australia's company laws qualify under the Model Law.

As explained above, the Corporations Act regulates the whole of the corporate life-cycle of an Australian corporation. In this regard several subparts of chapter 5 contain provisions that deal with corporate insolvency and allow for the adjustment of debts … These facts, combined with statutory ability to shift among various forms of dissolution given changing circumstances, demonstrate

that winding up is achieved under a law relating to insolvency or the adjustment of debts.

Additionally, the court finds persuasive the Australian legislature's interpretation of its Corporations Act, published in connection with Australia's adoption of the Model Law … Accordingly, based upon the Australian legislature's interpretation of the UNCITRAL Model Law and Australian domestic law, a company engaged in a voluntary winding up is being administered under a law relating to insolvency. This evidence supports the court's determination that Betcorp's winding up satisfies the 'law relating to insolvency' criterion of section 101 (23). Therefore, the court finds that this element of section 101 (23) is satisfied."

60. In *Re Chow Cho Poon (Private) Limited* [2011] NSWSC 300, 80 NSWLR 507, a Singaporean company was ordered to be wound up by the Singapore court on the just and equitable ground. The liquidator subsequently sought to realise assets of the company in New South Wales. The recognition of his appointment in Australia was sought, not under the Model Law, but under the provisions in the local bankruptcy legislation requiring the Australian courts to act in aid of other foreign courts. However, these provisions were "trumped" by the provisions of the Model Law, so that it was necessary for the court to consider whether the Model Law applied.

61. Barrett J considered the *Stanford International Bank* case and said:

"47. The ground for winding up was thus confined to regulatory misbehaviour. Insolvency was, in the particular case, a factor relevant to the court's discretion to make a winding up order. As the English Court of Appeal observed, however, the law allowing winding up on the regulatory ground was a law comprehending several grounds, including insolvency, so that it was correct to characterise it as a law relating to insolvency."

62. The judge also considered the *Betcorp* case, and another American case called *Re ABC Learning Centres Ltd* 2010 WL 5439808 (Bkrtcy D Del), and then said:

"51. These English and American decisions point to a clear basis on which the whole of the *Singapore Companies Act* or, at the least, the whole of its winding up provisions might be classified as "a law relating to insolvency", even though the particular winding up was ordered on the just and equitable ground alone and, so far as this court has been told, without any finding (express or implied) of insolvency."

63. From these authorities and guides to interpretation, it is clear that the requirement that the law under which the proceeding is brought be "an insolvency law" is satisfied if insolvency is one of the grounds on which the proceeding can be commenced, even if (as in *Re Betcorp*) insolvency could not actually be demonstrated, and there was another basis for commencing the proceeding. The matter is obviously all the clearer if insolvency can indeed be demonstrated.

64. The Extraordinary Administration Law of Croatia by article 4 provides that there shall be an extraordinary administration proceeding in relation to a company (and in relation to all affiliated and controlled companies) "if any of the reasons for bankruptcy exist in terms of article 5 of the Bankruptcy Act … or prebankruptcy

Re Agrokor DD and the Cross-Border
Insolvency Regulations 2006

reasons from article 4 of the Bankruptcy Act in relation to the debtor as a controlling company," as long as the company, individually or together with the controlled or affiliated companies, is of systemic importance.

65.    Article 5 of the Bankruptcy Law provides that:

"(1) Bankruptcy proceedings may be opened if the court establishes the existence of the grounds for bankruptcy.

(2) The bankruptcy grounds shall be insolvency and over indebtedness."

The concept of insolvency is further explained in article 6, and that of over-indebtedness in article 7.

66.    Article 4 of the Bankruptcy Law provides in part that:

"(1) Prebankruptcy proceedings may be opened if the court establishes the existence of impending insolvency. Impending insolvency shall be deemed to exist if the court is of the conviction that the debtor will not be able to meet its existing obligations as they become due."

Article 4(2) deems an impending insolvency to exist in certain cases of failure to make payment of some kinds of debts or taxes. These include cases where one or more of the debtor's bank accounts has been blocked by the Croatian Financial Agency in order to secure the payment of debts, and a debt has still not been paid.

67.    Article 22(2) of the Extraordinary Administration Law provides that, where the petition for the opening of the proceeding is filed by the company itself, the company can demonstrate its inability to make payment of imminent liabilities if it submits an excerpt from its accounting records "proving the existence of creditors' claims due and outstanding". I will have to return to the significance of this provision later.

68.    It is thus clear that the extraordinary administration proceeding in Croatia is begun on grounds *either* of insolvency *or* of impending insolvency, whether proved or deemed. Unlike the cases of just and equitable winding up, it is not possible to start an extraordinary administration proceeding on other grounds.

69.    As a matter of fact, the unchallenged evidence of the applicant (in Ramljak 2) was that:

"19. … As at April 2017 Agrokor and the wider group was in a state of serious financial distress. Indeed, the evidence that was considered by the Croatian court when the proceedings were commenced on 10 April 2017 clearly demonstrated that the requirements in article 4 of the Bankruptcy Law for the opening of prebankruptcy proceedings were satisfied in relation to Agrokor and the group more widely.

[ … ]

24. FINA [the Financial Agency] is a state governed financial mediation company which provides, amongst other services, a centralised platform for the enforcement of debts pursuant to the Funds Enforcement Law 2012 and which,

27

under its statutory powers, is able to freeze the relevant debtor's bank accounts and perform a daily cash sweep from them in order to satisfy creditors' claims. Under article 4(2)(a) of the Bankruptcy Law, a debtor is deemed imminently insolvent if it has one or more unsettled Registered Claims. A spreadsheet prepared by the Treasury department of Agrokor shows that the total amount of Registered Claims in relation to 15 key group entities as at 7 April 2017 was in excess of HRK 3 billion … and that 15 bank accounts have been frozen by FINA. I understand from the Treasury department that these 15 core companies accounted for a very significant proportion of the group's revenue…"

70.    It is agreed by the experts in the present case that, whatever the position for the company itself (Agrokor), there is no requirement in the Extraordinary Administration Law that any of the affiliated or controlled companies should be insolvent or facing insolvency before they can be brought into this proceeding. That view was supported by certain decisions of the Croatian courts. But recent decisions of the courts of Belgrade in Serbia and in Montenegro say that, because there is no insolvency criterion relating to the affiliated and controlled companies, the Law is *therefore* not a law relating to insolvency for the purposes of the Model Law. (I was told that both Serbia and Montenegro have enacted legislation incorporating the Model Law.)

71.    Thus, the Belgrade court judgment of 28 August 2017 says this (at pages 12 to 13 of the English translation supplied):

"Since the cited provisions of the Law on Extraordinary Administration in Companies of Systemic Importance for the Republic of Croatia stipulate that an extraordinary administration procedure is also conducted against the companies for the existence of a bankruptcy or a prebankruptcy condition as referred to in the Bankruptcy Law was not determined, therefore implying that the aforementioned Law does not represent a regulation governing insolvency within the meaning of article 174 (2) of the Bankruptcy Law. Namely, the Law stipulates that extraordinary administration procedures also apply to affiliate and subsidiary companies not meeting any of the insolvency conditions within the meaning of the existence of a bankruptcy condition as referred to in the Bankruptcy Law in a holding company that independently or in conjunction with its solvent affiliates or subsidiaries bears a systemic importance for the Republic of Croatia. Therefore, the aforementioned Law does not represent a regulation governing insolvency within the meaning of article 174 (2) of the Bankruptcy Law, but rather a regulation prescribing one and the same extraordinary administration procedure for solvent and insolvent companies alike, depending on whether the companies are of fundamental importance for the Republic of Croatia, which by no means represents a condition for a prebankruptcy procedure as referred to in the Bankruptcy Law of the Republic of Serbia and the Bankruptcy Law of the Republic of Croatia, despite the petitioner's claim from the request dated 26/7/2017 that the said procedure represented a foreign bankruptcy procedure."

72.    The decision of the Commercial Court of Montenegro says this (at page 12 of the English translation provided):

"Based on the above, it follows that the extraordinary administration proceeding is also carried out against companies in relation to which the existence of insolvency grounds from the Insolvency Act of the Republic of Croatia have not

been established; therefore, the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act is not a regulation that governs insolvency, and therefore the present extraordinary administration proceeding, whose recognition is sought, does not have the character of a foreign proceeding. Namely, the above Act provides for an extraordinary administration proceeding also against affiliates and subsidiaries that are not insolvent, and are without any insolvency grounds; consequently, the extraordinary administration proceeding can also include solvent companies if they are connected with the governing company, which ultimately does not make this Act a regulation that governs insolvency within the meaning of article 178 paragraph 2 of the Insolvency Act".

73.   It is clear that the test applied in these decisions for a law relating to insolvency is whether under the law concerned there must *necessarily* be insolvency shown in relation to *all* the companies concerned. That is far from the test applied in the "common law" cases discussed above, where it was accepted that a law could be a law relating to insolvency if insolvency was one of the grounds on which a proceeding could be brought. Indeed, in the *Betcorp* case, the evidence was that the company subject to members' voluntary winding up was in fact solvent. But insolvency would have been a basis for such a winding up, as it was in *Re Stanford International Bank*. In my judgment I should not reject the wider approach of those common law cases in favour of the narrower one adopted by the courts of Belgrade and Montenegro. But I further say, contrary to the decisions in Belgrade and Montenegro, that the mere fact that a subsidiary or affiliate company or companies not subject to any threat of insolvency on its own may be joined in the same (foreign) proceeding as a holding or other group company subject to such a threat does not mean that the proceeding is not brought under the law relating to insolvency. It is in fact the insolvency, actual or threatened, of one company which triggers the proceeding, and the law under which the proceeding is brought is accordingly in principle a law relating to insolvency for this purpose.

74.   But there is a further matter with which I must deal before I can conclude whether the Extraordinary Administration Law is a law relating to insolvency. This is that, pursuant to article 22 (2) of that Law, where the debtor company presents the petition to begin this proceeding, based on its own insolvency or impending insolvency, the state of actual or impending insolvency is proved by the use of a presumption. The company has only to submit an excerpt from its accounting records "proving the existence of creditors claims due and outstanding", and it will be deemed that the debtor company has proved its imminent inability to make payments of debts. The respondent's expert, Prof Uzelac, says that the presumption is irrebuttable, and therefore amounts to a rule of law. He says that the applicant's expert, Judge Erakovic, agrees. The respondent says that, since the threshold condition of actual or impending insolvency can be so easily demonstrated by the debtor company, merely by showing that a debt is outstanding even for a single day, and even if the company otherwise enjoyed an entirely solvent position, this is not a law relating to insolvency within the meaning of the Model Law.

75.   I see the force of the submission. But applications for recognition of a foreign proceeding on the basis of an irrebuttable presumption of insolvency where the presumption gives a false impression, because the company concerned is obviously

not insolvent at all, can be dealt with as and when they arise. It may be, for example (though without deciding) that such applications would fail  on some other ground, such as being manifestly contrary to public policy. The fact is that in the present case the respondent does not say that the company does not satisfy the insolvency criteria. On the unchallenged evidence before me (see [69] above), it plainly does.

76.    I proceed on the basis that presumptions are used in many parts of the law, including the (UK) Insolvency Act, for example in section 123 (1) (a). Even if the presumption is irrebuttable, that in itself makes no difference. The legislature has made a policy decision to proceed on a certain basis when certain other facts are shown, and is unwilling to contemplate litigation over whether it is in fact true or not. The legislative policy is to choke off unnecessary disputes on a point of fact where the known circumstances otherwise point towards that fact. This is a common policy indeed, in England as elsewhere. But in any event the presumption applies in the Croatian law only where the petition is presented by the debtor company itself. It does not apply if the petition is presented by anyone else. And, at the end of the day, the basis of which the law intervenes *is* that of insolvency, even if the insolvency can be proved more easily than might be the case in another country. I do not lose sight of the fact that I am construing legislation which will (to a greater or lesser extent) apply in other legal systems and therefore expressions used must mean the same so far as possible in all such systems. Matters of evidence and proof should as a general rule be left to the individual systems to decide upon, subject of course to questions of public policy.

77.    Accordingly, for these reasons, I conclude that the Croatian Extraordinary Administration Law is a law relating to insolvency for the purposes of the CBIR.

**Subject to the control or supervision of the court**

78.    In order to qualify as a foreign proceeding under the CBIR, that proceeding must be such that "the assets and affairs of the debtor are subject to control or supervision by a foreign court". The applicant says that the Croatian proceeding satisfies this requirement, whereas the respondent says it does not.

79.    In the Guide to Enactment, there is the following discussion of this criterion:

"The Model Law specifies neither the level of control or supervision required to satisfy this aspect of the definition nor the time at which that control or supervision should arise. Although it is intended that the control or supervision required under subparagraph (a) should be formal in nature, it may be potential rather than actual. As noted in paragraph 71, a proceeding in which the debtor retains some measure of control over its assets, albeit under court supervision, such as a debtor in possession would satisfy this requirement. Control or supervision may be exercised not only directly by the court and also by an insolvency representative where, for example, the insolvency representative is subject to control or supervision by the court. Mere supervision of an insolvency representative by a licensing authority would not be sufficient."

From this it is clear that the control or supervision required can not only be potential rather than actual, but can also be indirect rather than direct.

80.    In the American case of *Re Ashapura Minechem Ltd*, 480 BR 129 (2012), a foreign representative of an Indian company successfully petitioned for recognition of insolvency proceedings started voluntarily by the company in India as a foreign main proceeding, and the Bankruptcy Court granted a stay against an order enforcing a creditor's arbitration award against the company. The creditor appealed, but the appeal failed. One of the points dealt with by the court was whether the company's assets and affairs were subject to the control or supervision of a foreign court.

81.    The US District Court hearing the appeal said (at p 138)

"Supervision or control of the company's affairs is not a demanding standard. The foreign court need not control the day to day operations of the debtor. It is sufficient, for instance, that the body monitor compliance with the repayment plan negotiated between the debtor and creditors. One court has held that the mere fact that a commission was granted authority from a Spanish court to recover a set off from an arbitration proceeding for distribution to creditors 'plainly demonstrate[d] that the [court] maintains control of [both the debtor's] assets and affairs'. By contrast, the fact that actions in a foreign court related to the proceeding are typically initiated by interested parties and that liquidators proceed with most of their duties without court involvement was found 'not [to] undermine the … court's supervisory role."

82.    Having considered the facts in the case, the court concluded (at p 144)

"Given the low legal standard for supervision over a debtor's affairs, I conclude that Ashapura did meet its burden of proving that the BIFR had supervision or control over Ashapura's affairs and assets."

83.    In the present case Judge Erakovic says that the procedure is under the control of the Croatian court. The respondent's expert, Prof Uzelac, accepted (day 2/114/21 – 24) that the assets and affairs of the debtor were effectively in the control of the extraordinary administrator, and also that the court has certain powers over the extraordinary administrator. They include powers to impose liability on the extraordinary administrator for breach of duty under articles 92 and 93 of the Bankruptcy Law (under article 11 (2) of the Extraordinary Administration Law), and (at least) to check the extraordinary administrator's compliance with the law, under article 14 of the Law.

84.    Judge Erakovic gave evidence that under article 76 (3) of the Bankruptcy Law, as applied by article 12 (2) of the Extraordinary Administration Law the court had power to give directions to the extraordinary administrator, and this was not challenged in cross examination. Prof Uzelac takes a different view. However, to my mind it makes sense in the structure of the Extraordinary Administration Law to take over from the Bankruptcy Law the power of the court to give directions to the representative of the debtor company. It seems to me that, where article 92 of the Bankruptcy Law contemplates liability for failure to comply with the court's directions, article 11 (2) of the Extraordinary Administration Law carries over that liability, thus reinforcing the idea that the power to give directions applies just as much to the Extraordinary Administration Law as to the Bankruptcy Law.

85.    It is also clear that the court has various powers in relation to the settlement agreement which may ultimately be made between the creditors and the debtor. These also contribute to the degree of control and supervision which the court exercises in relation to the proceeding. First of all, the court is to confirm the settlement agreement accepted by the creditors, under article 43 (15), except that it must withhold confirmation in circumstances stated in article 43 (16). This is similar to the position under the Bankruptcy Law, article 336.

86.    However, there is a difference between each of these two provisions. In article 336, paragraph 2 reads:

> "if the bankruptcy plan was adopted in an illicit way, especially by placing certain creditors in a more favourable position."

On the other hand, in article 43 (16), paragraph 2 reads:

> "if the acceptance of the settlement agreement has been obtained in an inadmissible way."

87.    Having looked at the original Croatian texts of these two provisions, it seems to me that, in the original, the words used in the first part of paragraph 2 in article 336 are identical with those in paragraph 2 of article 43(16), with the exception of the words "stecajnoga plana" in article 336 and "nagodbe" in article 43(16). These may stand for "bankruptcy plan" and "settlement agreement" respectively. I do not know. But whether one looks at the Croatian or the English, it seems to me that, in substance at least, the first half of paragraph 2 of article 336 and paragraph 2 of article 43(16) are saying the same thing. The question is whether it makes a difference that, in article 336, paragraph 2 ends with the words "especially by placing certain creditors in a more favourable position". The applicant says it does not, because this is simply an example of the "illicit way" referred to in the first half of the paragraph. So its omission does not change the sense. Whatever it included before, it continues to include. But the respondent says that the omission is significant, because it means expressly to remove the principle of pari passu as necessary for a valid settlement agreement.

88.    In my judgment, the applicant is right as a matter of logic. But he is also right because it seems to me implausible that, if the legislator had wished to remove the principle of minimum protection he would have done it in such an ambiguous way. It is too important a principle to be removed by equivocal language. The natural meaning of paragraph 2 of article 43 (16) is to include everything that is done in an "inadmissible way". Violation of the principle of minimum protection is clearly within the scope of that phrase, especially considering the explanation given in article 336, paragraph 2.

89.    As to the principle of equal (that is, rateable) treatment of creditors, Judge Erakovic confirmed that in his opinion it applied to the settlement agreement. Prof Uzelac would only go so far as to say that this was possible, but not probable (day 2/139/4 – 7). Again, I regard this is too important to have been dislodged by a side wind. The concept of the settlement agreement is taken over from the idea of the bankruptcy plan in the bankruptcy legislation, and the principle is deeply embedded there. I am comforted in the conclusions to which I have come, in relation to these two principles, by the knowledge that the applicant himself has said (in his second affidavit, at [60])

that he will apply the principles of equal treatment and minimum protection in any event.

90.    The respondent complains that the government controls too much in the extraordinary administration proceeding. It is the government's decision to make or consent to the choice of the extraordinary administrator (article 24 (2)), his deputies (article 12 (6)), his advisory committee (articles 16(1), 20(3)) and his advisers (article 12(11)). The court is unable to remove the extraordinary administrator or to end the extraordinary administration proceeding without the consent of the government. Many of these powers are given under the bankruptcy legislation to the creditors' committee.

91.    The fact that the structure of the Extraordinary Administration Law gives significant powers to the government of Croatia is both hardly surprising, and nothing to the point. It is hardly surprising, because this law is concerned with companies of strategic importance to the economy of Croatia that get into financial difficulty, and the government has a role to play in such cases. It is after all the government's job – or one of them – to look after the economy of a country. The ordinary rules of insolvency as between creditor and debtor, although a useful starting point, may well not be enough. The applicant cited the Banking Act 2009 as an example of a similar phenomenon in English law. There the Bank of England (as regulator) has considerable powers in the winding up of a bank.

92.    It is nothing to the point because the test which I am to apply is whether the proceeding is subject to the control or supervision of the court, and not whether the government has any particular power in relation to it. If I conclude (taking account of the roles and powers of the various actors) that overall the proceeding *is* subject to the control and supervision of the court, it is irrelevant that the government also has powers in relation to it.

93.    In my judgment, given the powers and provisions set out above, it is quite clear that, once the proceeding has been commenced, and for so long as it lasts, it is under the control or supervision of the court, through the medium of the extraordinary administrator. Accordingly, this limb of the definition is also satisfied.

**Collective proceeding**

94.    The Model Law and the CBIR require that the proceeding in order to be recognised should be a "collective proceeding". The Guide to Enactment puts the matter this way:

> "69. For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State. Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up or conservation proceeding that does not also include provision for addressing the claims of creditors…
>
> 70. In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and

liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors. A proceeding should not be considered to fail the test of collectivity purely because a class of creditors' rights is unaffected by it…"

95.   In the *Stanford International Bank* case, at first instance, Lewison J said this ([2009] EWHC 1441 (Ch), [39]):

"I was not referred to any English authority on the nature of collective proceedings, but I was shown the decision of Judge Markell in the U.S. Bankruptcy Court for Nevada in *Re Betcorp Ltd* 400 BR 266. He said (page 281):

'A collective proceeding is one that considers the rights and obligations of all creditors. This is in contrast to a receivership remedy instigated at the request and for the benefit of a single secured creditor'."

In the Court of Appeal, the decision of Lewison J was affirmed on this point by Sir Andrew Morritt C, with whom Arden and Hughes LJJ agreed.

96.   Judge Erakovic gave evidence that the extraordinary administration under the Croatian law related to all the assets and liabilities of the company, and Prof Uzelac accepted this. The basic structure is that the creditors prove their claims against the company, its controlled and affiliate companies, and vote on the proposed settlement agreement, participating through the creditors committee. That committee has various powers and duties under the Extraordinary Administration Law.

97.   The respondent objects that in this context "collective" must mean relating to the debtor and its own creditors, and not the debtor and creditors of others. Since the claims made will not just be against the company itself but also against other companies in the group, this is not about the relationship of the debtor and its own creditors, but instead about the debtor, its creditors, the other group companies and the creditors of those other companies.

98.   Here the proceeding encompasses all the assets and liabilities of all the companies within the proceeding. The creditors may be claimants against an affiliated company. Under the Extraordinary Administration Law a creditor of one company can object to a claim against another company in the same proceeding. The extraordinary administrator will make a proposal for a single settlement agreement between the companies in the proceeding and all their creditors. But the respondent says that the fundamental nature of a collective proceeding is that you have regard to the separate legal personality of your debtor when sharing with others who have claims against the debtors. Essentially, the respondent says that in the present case the creditors of the debtor do not share the assets of the debtor only with the other creditors of the same debtor, but are obliged to share them with the creditors of other debtors as well. (Of course, this works both ways, because creditors will be able to share in the assets of other debtors as well).

99.   It seems to me that the objection here is not that this proceeding is not collective enough; rather it is that it is *too* collective. The objection is that a proceeding to deal with the whole group at once cannot be fitted into the Model Law because, even taking just a single debtor focus, it allows persons who are creditors of another entity

34

to claim a share in the assets of the debtor. I have already dealt with the objection that a group proceeding cannot be given recognition at all, even as respects a single debtor. My answer to the respondent on the question whether this is a *collective* proceeding is that there may perhaps be other objections under the text of the Model Law to the recognition of group wide proceedings, but it cannot be said that this is not a "collective" proceeding.

**For the purposes of reorganisation or liquidation**

100.    The Legislative Guide, Part One, Ch II (at [23]) says:

> "As a procedure designed to save a debtor or, failing that, a business, reorganisation may take one of several forms and may be more varied as to its concept, acceptance and application around the world than liquidation. For the sake of simplicity, the term 'reorganisation' is used in the guide in a broad sense to refer to the type of proceedings whose ultimate purpose is to allow the debtor to overcome its financial difficulties and resume or continue normal commercial operations (even though in some cases it may include reduction in the scope of the business, its sale as a going concern to another company or its eventual liquidation)."

So it is clear that the purpose of the proceeding must be to allow the debtor to overcome its difficulties and resume its commercial purpose.

101.    The proposal for the Croatian Extraordinary Administration Law sets out in some detail why the Law was proposed and what it was meant to do. On page 3 of the English translation, reference is made to the Bankruptcy Law and the Financial Operations and Prebankruptcy Settlement Law, enabling bankruptcy and pre-bankruptcy proceedings, and payment operations and financial supervision of companies. But it says that these would be insufficient in the event of serious financial difficulties in companies and groups of companies of systemic importance for Croatia, where the uncontrolled collapse of such companies might seriously jeopardise the whole economic system. The new law was proposed to protect the sustainability of such companies "during business, financial and ownership restructuring, all this to prevent adverse consequences on the overall economic, social and financially stability of the Republic of Croatia…" (page 4).

102.    The evidence of the experts was that the purposes of the law would also be set out at the beginning of the legislative text. In the present case, the Extraordinary Administration Law of Croatia in article 1 states as follows:

> "(1) This Law is passed for the purpose of protection of sustainability of operations of the companies of systemic importance for the Republic of Croatia which with its operations individually or together with its controlled or affiliated companies affect the entire economic, social and financial stability of the Republic of Croatia.
>
> (2) The level of protection achieved by this Law is necessary, appropriate and proportionate to the interest of the Republic of Croatia to conduct a fast and effective preventive restructuring procedure of companies of systemic importance

for the Republic of Croatia to secure liquidity, sustainability and stability of business operations."

103.    The article is in two parts. The first deals with protecting the sustainability of the operations of companies of systemic importance. The second deals with the protection necessary to conduct an effective restructuring of such companies. In my judgment, these two purposes are not incompatible. On the contrary, the former may be achieved through the latter, in that restructuring companies in serious financial difficulty may enable them to continue commercial operations. Where companies can continue commercial operations they can continue to employ their workers and can continue to deal with their suppliers, so supporting micro businesses lower down the chain. Judge Erakovic said in his report (at [2.2]) that the objective was to enable business operations to be continued after the settlement agreement. Prof Uzelac said in his report (at [32]) that "the sole objective of the Lex Agrokor [as he termed it throughout] is therefore the protection of the going concern status of 'systemically important companies'." In cross examination (day 2/66/16 – 21), he accepted that the objectives of protecting the going concern status of companies and of reorganising their affairs were not mutually exclusive, though he considered that they could come into conflict. He did not accept that they were complementary, because for him insolvency situations were usually a "zero-sum game". There would have to be sacrifices, and the law indicated that it would protect the debtor against the creditors. At the same time, he also accepted (day 2/75/14 – 19) that where an insolvency regime put social interests in priority to creditors' rights, that would not itself mean that the proceeding was not an insolvency proceeding.

104.    The respondent moreover says that an extraordinary administration proceeding could come to an end, having achieved its purpose under article 1, without a settlement agreement being concluded, and without going into bankruptcy. It argued that there might be cases where the effect of the moratorium on legal action alone, or taking on new money, or paying some debts and not others, would enable the company to get back on its feet, without any restructuring at all. So the Law was not for the purpose of reorganisation or liquidation.

105.    In my judgment, the purpose of this law is clearly to protect the stability of the economic system against systemic shocks by enabling the restructuring of companies of systemic importance that get into financial difficulty. Restructuring obviously implies protection for the debtor whilst the restructuring goes ahead. It also implies reduced payments to creditors, or payments over a longer term, just as might occur in a bankruptcy. Prof Uzelac said (at [205]) that the settlement agreement was the end result of the proceeding, although he accepted in cross examination that it was also the means of achieving the restructuring of a systemically important company (see day 2/69/18 – 24). In my judgment, it is clear that this law is intended to facilitate the restructuring of certain companies in systemically important situations.

106.    It is also clear that, if restructuring is not possible for any reason, then under article 45 the proceeding can be transformed into a bankruptcy proceeding, if the relevant conditions are then met. This would obviously give priority to liquidating assets and paying creditors. The fact that it would be theoretically possible to embark on a proceeding under this Law and the protection of a company's business as a going concern be achieved without either a restructuring or a bankruptcy does not mean that the sole purpose of the Law is to protect systemically important Croatian companies

36

at the expense of their creditors. In my judgment, it can nonetheless be described as a law for the purposes of reorganisation or liquidation within the meaning of the CBIR.

107.   The respondent also argued that the Law does not respect the principle of minimum protection for creditors, *ie* they cannot be worse off than in a bankruptcy. Judge Erakovic said that the Law did respect that principle, imported from the Bankruptcy Law, article 337, into the Law by virtue of article 43(21) : day 2/10/16 – 20. Prof Uzelac denied that (Report, [217]).

108.   In my judgment, Judge Erakovic is right. I have already held that article 43 (16) includes the principle of minimum protection for creditors (as made express in article 336 (2) of the Bankruptcy Law. This applies where the court is considering the confirmation of a settlement agreement ex officio. It would make no sense not to bring in the same principle where a creditor wishes to raise the same point for itself before the court. In the Bankruptcy Law it is dealt with by article 337. Unlike article 336, this is not made express in the Extraordinary Administration Law, but it is part of the relationship between creditors and debtor, so in my judgment it is brought in by article 43 (21), as Judge Erakovic says.

## Manifestly contrary to English public policy

109.   The question whether the recognition of the Croatian proceeding would be manifestly contrary to English public policy only arises if the respondent fails on the other arguments set out above. Such public policy clauses are common in international conventions (see for example the Hague Conventions on private international law). The form including the word "manifestly" before "contrary" or "incompatible" is well known. The inclusion of the word "manifestly" must mean something more than mere contrariness or incompatibility. So it should be harder to demonstrate that something is *manifestly* contrary to public policy than that it is simply contrary to it. What is not clear is how much harder. One view is that "manifestly" means "more serious", rather like "gross" in the phrase "gross negligence". Another view is that "manifestly" does not add any further depth to the requirement. It is still the standard of being "contrary to public policy" after all. But it does add the need for *clarity*. Where there is any doubt or any confusion as to whether it is contrary to or incompatible with public policy, there cannot be anything "manifestly" contrary to public policy.

110.   I have already referred to the attitude of the British Government in enacting the Model Law, expressed in the Explanatory Memorandum of the Insolvency Service. It seeks to "to ensure consistency, certainty and harmonisation with other countries enacting the Model Law" (para 7.18). Consistently with that approach, it is clear from the Guide to Enactment and also from the US decision of *Ashapura* that the exception for manifest contrariness to public policy is to be narrowly construed. See the Guide at 29 – 30, 101 – 104 and the US decision in *Ashapura* at 139.

111.   In *Re Bud-Bank Leasing SP* [2010] BCC 255, Mr Registrar Baister said:

> "27. … The fact that foreign proceedings may differ from those of this country, as they invariably do, even in relation to creditors' rights in respect of priorities, would not of itself be a reason to refuse relief (see, for example, the recent decision of the House of Lords in *McGrath v Riddell* [2008] UKHL 21)."

*McGrath v Riddell* is better known as *Re HIH Casualty & General Insurance Ltd,* and reported at [2008] 1 WLR 852. I deal with it further below.

112.    In *Nordic Trustee ASA v OGX Petroleo e Gas SA* [2016] EWHC 25 (Ch), Snowden J said:

> "44. I accept that, in the ordinary case, recognition of a foreign proceeding within the meaning of that expression in Article 2(i) of the Model Law is intended to follow if the applicant can satisfy the requirements of Articles 15 and 17 of the Model Law. Article 17 provides that if the requirements are satisfied, the foreign proceeding "shall" be recognised. Further, although Article 17 is subject to Article 6, which provides that the court can refuse to take any action which would be 'manifestly contrary to the public policy of Great Britain or any part of it', it is clear that this public policy exception is intended to be restrictively interpreted.
>
> 45. The Guide to Enactment of the Model Law explains this at paragraphs 29-30,
>
> > '29. One of the key objectives of the Model Law is to establish simplified procedures for recognition of qualifying foreign proceedings that would avoid time-consuming legalization or other processes and provide certainty with respect to the decision to recognize. The Model Law is not intended to accord recognition to all foreign insolvency proceedings. Article 17 provides that, subject to article 6, when the specified requirements of article 2 concerning the nature of the foreign proceeding (i.e. that the foreign proceeding is, as a matter of course, a collective proceeding for the purposes of liquidation or reorganization under the control or supervision of the court) and the foreign representative are met and the evidence required by article 15 has been provided, the court should recognize the foreign proceeding without further requirement. The process of application and recognition is aided by the presumptions provided in article 16 that enable the court in the enacting State to presume the authenticity and validity of the certificates and documents, originating in the foreign State, that are required by article 15.
> >
> > 30. Article 6 allows recognition to be refused where it would be "manifestly contrary to the public policy" of the State in which recognition is sought. This may be a preliminary question to be considered on an application for recognition. No definition of what constitutes public policy is attempted as notions vary from State to State. However, the intention is that the exception be interpreted restrictively and that article 6 be used only in exceptional and limited circumstances (see paras. 101-104). Differences in insolvency schemes do not themselves justify a finding that enforcing one State's

laws would violate the public policy of another State'."

113.    The backdrop against which these questions must be considered is the decision of the Court of Appeal in *Antony Gibbs & Sons v La Société Industrielle et Commerciale des Métaux* (1890) 25 QBD 399. This represents a kind of private international law bedrock for the recognition of the effects of foreign insolvency proceedings. An English firm of merchants carrying on business in London brought an action against a French company carrying on business in Paris for non-acceptance of quantities of copper which the defendant had purchased. The contract of sale and purchase had been brokered on the London Metal Exchange, and performance on both sides was to be made in England. Between entering into the contract and the commencement of the action the defendant had gone into a form of liquidation in France, pursuant to a court order. The defendant had failed to accept part of the copper sold before that court order, but the time for delivery of the remainder fell afterwards, and the defendant had given notice that they would not accept it (and it was not tendered). The French liquidator gave notice to the plaintiffs that if they did not prove any claim they had against the defendant it would be barred and they would not share in any distribution of the company's assets. A claim was accordingly made to prove in the liquidation. The liquidator rejected that part of the claim in respect of the copper which had not been delivered, in accordance with French law. The evidence of French law filed in the present action was to the effect that no action was now maintainable against the defendant, and that no claim could be made in the liquidation in respect of copper not delivered. As to that, the contract was cancelled and no claim for damages for non-acceptance was possible.

114.    Both at first instance and on appeal the plaintiffs were successful. In the Court of Appeal, Lindley LJ said (at pp 409-10):

> "The first thing to be borne in mind is that the contracts sued upon are English contracts, made and to be performed in England. The defence set up is in substance, that the defendants are a French company which is being wound up in France. Where such is the case, there is no remedy by the French law against the defendants except in the winding up proceedings. The question is whether that is a defence to an action brought here. The defendants must be considered as domiciled in France, and I will assume for a moment, though I think it doubtful, that liquidation proceedings are equivalent to bankruptcy. It is contended for the defendants that by reason of the bankruptcy law in France, in which country the defendants are domiciled, the action cannot proceed. Even if the defendants had obtained what was equivalent to a discharge in bankruptcy according to French law, I think that the proposition so contended for is wrong. There is really no authority for it."

115.    Lopes LJ said shortly (at p 411):

> "Assuming that there were what is equivalent to a discharge in bankruptcy in France, of which I am very doubtful, I am of opinion that such discharge cannot operate as a discharge in respect of a contract made in England, though the defendants be domiciled in France… Consequently, there is no answer to this action."

Lord Esher MR gave judgment to similar effect, though at greater length. The consequence is that it is necessary to find something in *English* law to take away creditors' rights. In modern times, provisions in the Companies Act and in the Insolvency Act may have this effect, but it is always a matter of construction whether in fact they do so.

116.    In the evidence of Mr Bell for the respondent, he makes three complaints about the extraordinary administration proceeding, which he says justify the court refusing recognition on the grounds of public policy. These are:

1. There is no right to a practical and effective access to a legal remedy, because an opposing creditor cannot appeal or otherwise seek a judicial review of the opening of the proceeding, which entails important effects including a stay on existing and new civil proceedings (see at [41]).

2. There is no protection of creditors' rights, because the settlement can be imposed on all creditors and the Croatian court has no power to review the proposed settlement (see at [42]).

3. The extraordinary administration applies to subsidiaries as well as the parent company so that there is substantive consolidation of their estates, and the assets of all companies are used to satisfy the creditors of all legal entities (see at [43]).

117.    By the time this matter was argued before me, the claim under this part of the case had been refined in the skeleton argument on behalf of the respondent to a *twofold* claim:

"164. The English legal public policy infringed in the present case is:

(1) the requirement for an insolvency proceeding to accord creditors pari passu treatment within an insolvency proceeding; and

(2) the requirement that creditors should have a right to object to the compromise of their rights in an insolvency proceeding."

118.    As to the first point, the applicant accepts that in relation to the settlement agreement itself, the pari passu principle is not necessarily respected by the Extraordinary Administration Law. But the applicant says the pari passu principle is not critical, and relies upon the decision in *Re Bank of Credit and Commerce International SA (No 3).* [1993] BCLC 1490, CA. In that case, which was one before the enactment of the CBIR, the liquidators of the company sought the sanction of the court for two proposals. One was a "pooling agreement", whereby the company's assets and those of another company would be pooled. The other was a "contribution agreement" whereby (1) the majority shareholders of the company, a foreign government, would contribute a significant sum to the funds available to creditors, (2) there would be a mutual release of claims between the company and other companies in its group on the one hand and the foreign government and related persons on the other, and (3) that foreign government and related persons would be admitted as creditors in the liquidation, to the extent that between 20 and 25% of the foreign government's contribution would actually be returned to it or its related parties in due course.

119.    At first instance, the proposals were approved by the judge. The creditors appealed on the footing that the judge lacked jurisdiction to make the order, in part on the basis that the contribution agreement infringed the pari passu principle. The appeal was dismissed. The court held that, where it was proposed to depart from the principle of pari passu distribution, the preferred solution would be to carry out the arrangement as a scheme of arrangement, under section 425 of the Companies Act 1985. However, in this case it was not feasible to call a meeting of the creditors as required by that section. In the circumstances the liquidators were entitled to exercise their compromise powers under the Insolvency Act 1986, schedule 4, paragraphs 2 and 3, and it was permissible to depart from the pari passu principle of distribution where this was ancillary to the exercise of such powers.

120.    Dillon LJ (with whom Russell and Farquharson LJJ agreed) said:

"As I see it, in a liquidation  … there can be a departure from the pari passu rule if it is merely ancillary to exercise of any of the powers which are exercisable with the sanction of the court under Part I of schedule 4 to the Insolvency Act 1986.

There are some things that cannot be done without a scheme of arrangement and in the normal run that would include a very large number of proposals, and indeed almost all, if not all, proposals for rearrangements of rights as between creditors of different companies or different classes of creditors. But the compromise powers within their scope are an alternative way of doing things, and I do not believe that the *British Eagle* decision [*British Eagle International Airlines Ltd v Air France* [1975] 1 WLR 758] precludes that being exercised in a way which may, in an ancillary fashion, involve the departure from the strict pari passu rule. If any compromise is dissected, it may involve elements of give and take as to who is to have what, which may make it quite impossible to fit the compromise in with the strict pari passu rule. Here the condition is that these two aspects I have mentioned are part of the scheme of the Contribution Agreement, but not negotiable."

121.    On the other hand, there are the decisions in *Re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213 and *Re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852, HL. In the former case, there were liquidations of the company simultaneously both in Luxembourg and in England. The English liquidators wished to release funds at their disposal to the Luxembourg liquidators for distribution among creditors worldwide pari passu. But the money once transferred to Luxembourg would be distributed according to Luxembourg insolvency law, which did not allow set-off for a debtor who was simultaneously owed money by the insolvent (unlike English law). Sir Richard Scott V-C held that, although in this case the English winding up was ancillary to the winding up of the company in the place of incorporation, that did not relieve the English court of the obligation to apply English law to the resolution of any issue arising in the winding up in the English court. There was no jurisdiction to disapply the set-off rules, but even if there were it would not be appropriate to do so. The English liquidators were therefore obliged to retain sufficient funds to make provision for the dividend that would be received in the English liquidation by net creditors entitled to take advantage of the English insolvency rules of set-off.

122.   In the latter case, four Australian insurance companies carried on authorised insurance business in the UK. They became insolvent and the Supreme Court of New South Wales made winding up orders and appointed liquidators in Australia. Provisional liquidators were appointed in England by the High Court. The Australian court issued a letter of request to the High Court under section 426 of the Insolvency Act 1986, asking that the provisional liquidators be directed to remit the assets collected by them to the Australian liquidators for distribution. Although the basic principle of the Australian insolvency system was distribution pari passu, preference was given by Australian law in this case to insurance creditors of the companies to the prejudice of other creditors. The judge refused to give the direction, and the Court of Appeal dismissed an appeal. The Australian liquidators appealed to the House of Lords.

123.   The House of Lords allowed the appeal, on the basis that under section 426 of the Insolvency Act 1986 English courts were required to assist the Australian courts in relation to insolvency and had a discretion to order the remission of assets situated in England to Australia. Their Lordships were divided on whether, at common law, the English court would be able to, or should, direct a remission of assets abroad which would result in a distribution which was inconsistent with the pari passu principle, but were unanimous in holding that section 426 conferred jurisdiction to do so, and that the jurisdiction should be exercised in the present case.

124.   Lord Hoffmann said of the position at common law:

"21. It would in my opinion make no sense to confine the power to direct remittal to cases in which the foreign law of distribution coincided with English law. In such cases remittal would serve no purpose, except some occasional administrative convenience. And in practice such a condition would never be satisfied. Almost all countries have their own lists of preferential creditors. These lists reflect legislative decisions for the protection of local interests, which is why the usual English practice is, when remittal to a foreign liquidator is ordered, to make provision for the retention of funds to pay English preferential creditors. But the existence of foreign preferential creditors who would have no preference in an English distribution has never inhibited the courts from ordering remittal. I think that the judge was inclined to regard these differences as de minimis variations which did not prevent the foreign rules from being in substantial compliance with the pari passu principle. But they are nevertheless foreign rules. The fact that the differences were minor might be relevant to the question of whether a court should exercise its discretion to order remittal. But any differences in the English and foreign systems of distribution must destroy the argument that an English court has absolutely no jurisdiction to order remittal because it cannot give effect to anything other than the English statutory scheme."

125.   On the other side, Lord Scott said:

"If an ancillary liquidation is being conducted in England under an insolvency scheme that does not include section 426, *eg* where the country of the principal liquidation is not a United Kingdom country and has not been designated a 'relevant country or territory'; the position seems to me quite different. The English courts have a statutory obligation in an English winding up to apply the English statutory scheme and have, in my opinion, in respectful disagreement

with my noble and learned friend Lord Hoffmann, no inherent jurisdiction to deprive creditors proving in an English liquidation of their statutory rights under that scheme. I expressed that opinion in *In re Bank of Credit and Commerce International (No 10)* [1997] Ch 213 and remain of that opinion. Luxembourg was not a 'relevant country or territory'. Australia, however, is and, accordingly, section 426 is part of the statutory scheme applicable under the 1986 Act to these four Australian companies. I do not think it would be proper for the courts of this country, in reliance on an inherent jurisdiction, in effect to extend the benefits of section 426 to a country that had not been designated a 'relevant country or territory' by the Secretary of State, and thereby to deprive some class of creditors of statutory rights to which they would be entitled under the English statutory insolvency scheme. There is no case law that supports the proposition that the inherent jurisdiction can be used so as to bring about such deprivation."

126.    The applicant accepts that in *BCCI (No 10)* the court declined to allow proceeds to be remitted abroad to foreign insolvency proceedings, where the pari passu principle was not respected, and may or may not have done so in HIH, except for the existence of section 426 (which has no application in the present case). These cases were about whether the English court would take the positive step of sending the funds out of the jurisdiction, where they would not be applied rateably. (I note in passing that *BCCI (No 10)* was not a case about public policy at all, but one about jurisdiction.) The applicant submits that this is different from the question whether the court should recognise a foreign proceeding.

127.    In any event, the applicant also submits that the principle of pari passu will come in only later, when the approval of any settlement agreement is in issue. So recognition of the settlement agreement is not the real question here. That is something for the future. Such recognition will depend at that stage on other considerations, for example the submission by the creditors to the jurisdiction of the foreign proceeding. Lastly, although there is no right in the Extraordinary Administration Law for the creditors to object to the settlement agreement, there is nevertheless a right of appeal under section 339 of the Bankruptcy Law, as applied to the Extraordinary Administration Law, as Prof Uzelac accepted in cross-examination (Day 2/138/4-8).

128.    The respondent also argues, at [165] of the skeleton argument, that

"It was necessary [in the *HIH* case] that the creditors of English law debts should receive at least the same fundamental rights as they would do under English insolvency law."

The problem is that that case (*HIH*) was about set-off, so it concerned their debts towards and their rights against the company the subject of the insolvency proceeding. These are the fundamental "building bricks" of the insolvency. The question there was not (as the complaint is here) about what you do with them once you have ascertained what they are. The policy of the forum of the main proceeding may be to give priority to some creditors over others, as indeed it did in *HIH*. That is not in itself a violation of public policy.

129.    The respondent also complains (skeleton, [167]) that the reconstruction provided for by the Extraordinary Administration Law involves the "arbitrary and unjustified deprivation of rights to property" and is therefore "not lawful". But it is apparent that

43

the phrase "not lawful" really means "in contravention of article 1 of the First Protocol to the European Convention on Human Rights". The respondent accepts that a scheme of arrangement under English law does not breach this requirement because of the requirement of "give and take", and the fact that the court will consider the overall fairness of the scheme before approving it.

130.    In fact the authority cited (*Bramelid v Sweden* (1982) 29 DR 64) was not concerned with insolvency at all, let alone company restructuring. It held that a complaint that legislation allowed a 90% shareholder compulsorily to acquire the remainder of the shares at a price to be determined by arbitration was inadmissible. It does not appear to stand for the proposition stated in the skeleton argument. But in any event it cannot be said that a settlement agreement approved by the committee of creditors on the proposition of the extraordinary administrator must necessarily be either arbitrary or unjust. At the very least, it must depend on the circumstances.

131.    Drawing the threads together, in my judgment there is no violation of English public policy, let alone a manifest violation, in merely recognising the extraordinary administration proceeding in Croatia as a foreign main proceeding within the CBIR. The fact that the priorities of the Croatian law in reorganising or liquidating the company are different from those which apply or would apply under English law, is simply not enough. *HIH* shows that there is no requirement that the result of a court order consigning assets to a foreign proceeding be no less favourable under the foreign law than under the English law. The fact that it may be possible in some circumstances for the pari passu principle not to be complied with in entering into a settlement agreement as the outcome of the extraordinary administration, when no such settlement agreement has yet been proposed, let alone approved, and indeed may never be, is not enough either. The principle of pari passu can be overridden in appropriate cases even under English law: see *BCCI (No 3)*. Again, I note the statement of the applicant, to the effect that he intends that the principle should apply (Ramljak 2, [60]). There is in any event therefore no evidence before the court that it will not.

## Conclusion

132.    Accordingly, in my judgment the evidence adduced and submissions made on this application satisfy me that the criteria for recognising the extraordinary administration proceeding in Croatia as a foreign main proceeding within the CBIR have been met in the present case, and therefore I will grant recognition as sought in the application.

133.    I am very conscious that this is not a field into which I regularly venture. I therefore cannot part with the case without complimenting the advocates (and their juniors, who laboured mightily in many ways, both written and unwritten) for their unfailingly helpful submissions and interventions. I also record my gratitude for the solicitors for their meticulous preparation of the evidence (factual and expert) and other materials supplied, and their excellent presentation.

## **Appendix B-5**

**Decision of the Commercial Court of Montenegro**

Rs. no. 21/17

**THE COMMERCIAL COURT OF MONTENEGRO**, president of the court – judge Blažo Jovanić, in the legal matter of Ante Ramljak, Nova Cesta 16, Zagreb, Republic of Croatia, personal ID no.: 16959950253, acting in the capacity of the extraordinary administrator of the company **AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničarsko društvo Zagreb**, Trg Dražena Petrovića 3, corporate ID number: 03449602, tax ID number: 05937759187, and its affiliated companies and subsidiaries, represented by Vera Vučelić, attorney at law from Podgorica, deciding upon the request for recognition of foreign main insolvency proceedings and request for relief, outside of a hearing, on 16 October 2017, has issued the following:

DECISION

**I REJECTING** request for:

**1.** recognition as foreign main proceedings, with all legal consequences stemming from the recognition in Montenegro, of the extraordinary administration proceedings instituted by the Decision of the Commercial Court in Zagreb no. St-1138/17-3 dated 10 April 2017 instituting the extraordinary administration proceedings that was supplemented by the Decision of the Commercial Court in Zagreb no. St-1138/17-52 dated 21 April 2017, against the debtor AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničarsko društvo Zagreb, Trg Dražena Petrovića no. 3, tax ID no: 05937759187, and against its subsidiaries and affiliated companies:

1)     AGROKOR - TRGOVINA d.o.o. having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 40715974731 (100%) that has share in: AGROKOR-ENERGIJA d.o.o. having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 43446169521 (100%) that holds shares in following companies: A.N.P. Energija d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 81033553099 (34,96%), that holds share in company Energija Gradec d.o.o, Zagreb, Trg Dražena Petrovića 3, tax ID number: 83373928482 (100.00%);

2) AGROLAGUNA d.d. having its registered seat in Poreč, Mate Vlašića 34, tax ID number: 84196188473, (34.21%);

3) BELJE d.d. Darda having its registered seat in Darda, Svetog Ivana Krstitelja 1a, tax ID number: 92404445155 (BLJE-R-A 29.17%, BLJE-R-B 74.77%);

4) BELJE AGRO-VET d.o.o, Darda, Mece, Kokingrad 4, tax ID number: 78769491591 (Belje d.d. 100%);

5) JAMNICA d.d. having its registered seat in Zagreb, Getaldićeva 3 tax ID number: 05050436541 (75.92%), which holds share in : MLADINA d.d. having its registered seat in Jastrebarski, Bana Josipa Jelačića 85, tax ID number: 00233318664, (60.89%), ROTO DINAMIC d.o.o. having its registered seat in Zagreb, Samoborska cesta 102, tax ID number: 24723122482, (100%), which holds shares in: VINARIJA NOVIGRAD d.o.o., Rijeka, Tome Strižića 8, tax ID number: 67539583469 (100%) and DB Kantur Veleprodaja d.o.o. having its registered seat in Zagreb, Samoborska cesta 102, tax ID number: 57339268482 (Roto Dinamic 100%);

6) KONZUM d.d. having its registered seat in Zagreb, Marijana Čavića 1/a, tax ID number: 29955634590 (61.78%) which holds shares in: PIK Vrbovec d.d. having its registered seat in Vrbovec, Zagrebačka 148, tax ID number: 78909170415 (87.07%), which owns share in: Industrija mesa d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 75501147946 (100%); Žitnjak d.d. having its registered seat in Zagreb, Marijana Čavića 8, tax ID number: 25435300118, (80.43%); Euroviba d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/a, tax ID number: 19818276224 (94,55%); KRKA d.o.o. having its registered seat in u Šibenik, Bana Josipa Jelačića 13, tax ID number: 45256190469 (82.41%); MULTIPLUS CARD d.o.o. having its registered seat in Zagreb, Trg Dražena Petrovića 3, OIB: 18207737728 (75%); Aureum Stelia d.o.o., having its registered seat in Zagreb, Marijana Čavića 1/a, tax ID number: 92567161547 (100%); Bio zone d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/a, tax ID number: 69838261198 (100%), Jolly projekti jedan d.o.o. having its registered seat in Drniš, Trg kralja Tomislava 2, tax ID number: 171727176990 (100 %); SK - 735 d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/A, tax ID number: 81441487023 (100%); Latere Terram d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/A, tax ID number: 682897793370 (100%); Pet-prom ulaganja d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/A, tax ID number: 77713684270 (100%); VELPRO CENTAR d.o.o. having its registered seat in Zagreb, Marijana Čavića 1, tax ID number: 466608004680 (100%) and TERRA ARGANTA d.o.o., Vukovar, Sajmište 113/c, tax ID number: 20453182684 (95%);

7) LEDO d.d. having its registered seat in Zagreb, Čavićeva 1a, tax ID number: 87955947581 (48,11%) which owns share in: IRIDA d.o.o. having its registered seat in Daruvar, Petra Zrinskog 34, tax ID number: 72383446154 (100%);

8) L.G. Moslavina d.o.o. having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 55613437019 (100%);

9) mStart d.o.o. having its registered seat in Zagreb, Slavonska avenija 11a, tax ID number: 19895453012 (100%), which owns shares in: MONDO-TERA d.o.o., Zagreb, Marijana Čavića 1/a, tax ID number: 14072680184 (100%);

10) PIK-VINKOVCi d.d. having its registered seat in Vinkovci, Matije Gupca 130, tax ID number: 17774531631 (42,06%), which owns shares/stock in the following entities: EKO BIOGRAD d.o.o., Vinkovci, Matije Gupca 130, tax ID number: 42005576448, (100.00%); FELIX d.o.o. Vinkovci, Vinkovci Matije Gupca 130, tax ID number: 94397504836, (100.00%); Poljoprivreda d.o.o., Vinkovci, Matije Gupca 130, tax ID number: 06919626383 (100.00%);

11) ROTO ULAGANJA d.o.o. having its registered seat in u Rijeka, Tome Strižića 8, tax ID number: 28189962659 (100%);

12) SOLANA PAG d.d. having its registered seat in Pag, Svilino bb, tax ID number: 349491147151 (96,93%);

13) TISAK d.d. having its registered seat in Zagreb, Slavonska avenija 11a, tax ID number: 75917721668 (51,34%), which owns shares/stocks in: Backstage d.o.o., Zagreb, Slavonska avenija 11 a, tax ID number: 84411860203 (50%); Tisak-usluge d.o.o. Zagreb, Slavonska avenija 11 a, tax ID number: 85003955783 (100%); Tisak inPost d.o.o., Zagreb, Slavonska avenija 11 a, tax ID number: 21436767937; PHOTO BOUTIOUE d.o.o. having its registered seat in Zagreb, Heinzelova 60/1, Zagreb, tax ID number: 737279120033 (100%); VJESNIK-

USLUGE d.o.o. having its registered seat in Zagreb, Slavonska avenija 4, tax ID number: 21825610728 (27%);

14) ZVIJEZDA d.d. having its registered seat in Zagreb, Ulica Marijana Čavića 1, tax ID number: 91492011748, (51.84%) which holds shares in: SOJARA d.o.o. having its registered seat in Zadar, Ulica 84 Gardijske bojne HV Termiti 40, tax ID number: 87720689078 (100%);

15) VUKOVARSKI POLJOPRIVREDNO INDUSTRIJSKI KOMBINAT d.d, (VUPIK d.d.) having its registered seat in Vukovar, Sajmište 113/c, OIB: 06849543412 (VPIK-R-A 7.26%, VPIK-R-A 7.26%);

16) A007 d.o.o. having its registered seat in Zagreb, Marijana Čavića 1a, tax ID number: 42312821469 (100%);

17) 360 MARKETING d.o.o. having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 76677251904 (100%);

18) ADRIA RETAIL d.o.o. having its registered seat in Zagreb, Marijana Čavića 1/a, tax ID number: 00776795695 (100%);

19) ADRIATICA.NET d.o.o. having its registered seat in Zagreb, Izidora Kršnjavog 1, tax ID number: 20350489217 (92.35%), which holds shares/stocks in: ATLAS d.d., Dubrovnik, Vukovarska 19, tax ID number: 02041978827 (67.11%) KOMPAS d.o.o., Poreč, Mate Vlašića 20, tax ID number: 13785319050 (100% ATLAS d.d.); Go.adriatica d.o.o., Zagreb, Izidora Kršnjavog 1, tax ID number: 75299430948 (100.00%);

20) ALIQUANTUM ULAGANJA d.o.o., having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 25317715808 (100%);

21) HOTEL FORUM d.o.o., having its registered seat in Zagreb, Trg Dražena Petrovića 3, tax ID number: 62755106142 (100%);

22) PLODOVI PODRAVINE d.o.o. having its registered seat in Ferdinandovac, Grgura Karlovčana 2/a, tax ID number: 40177414551 (100%);

23) POLIKLINIKA AVIVA having its registered seat in Zagreb, Nemetova, OIB: 01916835772 (70%);

24) RIVIJERA d.d. having its registered seat in Ičići, Liburnijska 46, tax ID number: 80911267020, (91,32%);

25) BELJE ABC d.o.o., Beli Manastir, Imre Nagya 1, tax ID number: 00051870955 (Belje d.d. 100.00%);

26) DALMARINA d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 88061796935 (80.00%), which holds shares in: KONSOLIDATOR d.o.o., Zagreb, Nova Ves 11, Zagreb, tax ID number: 736780654715 (33.00%);

27) GULLIVER TRAVEL d.o.o, Dubrovnik, Obala Stjepana Radića 25, tax ID number: 25636115130 (30.00%);

28) KARISMA HOTELS ADRIATIC d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 77301543615 (33.00%) which holds shares/stocks in: ADRIASENSE d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 87006524500 ( 100.00%);KHA tri d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 23699589651 (100.00%) ;KHA pet d.o.o., Zagreb, Trg

Dražena Petrovića 3, tax ID number: 83931898966 (100.00%); HOTELI KOLOČEP d.d., Koločep, Donje Čelo 45, tax ID number: 30328587951 (95.15%) HOTELI ŽIVOGOŠĆE d.d., Živogošće, Porat 136, tax ID number: 88429213928 (KARISMA HOTELS ADRIATIC d.o.o. 64.57%; ADRIASENSE d.o.o. 31.08%);

29) KHA četiri d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 34678966530 (25.00%);

30) KOR - BROKER d.o.o., Zagreb, Trg Dražena Petrovića 3, tax ID number: 05673278055 (100.00%);

31) PROJEKTGRADNJA d.o.o, Gornja Vrba, Vrbska 3, tax ID number: 19659143269, (75.8%);

32) ZAGREB PLAKAT d.o.o., Zagreb, Koturaška 51, tax ID number: 32111742300 (49.00%).

2. recognition as the foreign representative Ante Ramljak, having residence at Nova Cesta 126, Zagreb, Republic of Croatia, Personal ID no. 16959950253, who has been appointed, in the aforementioned foreign proceeding, as the extraordinary administrator of the aforementioned companies.

3. to prohibit initiation of new, and termination of all already initiated proceedings with respect to the property, rights, obligations, and liabilities of the aforementioned companies.

4. to prohibit enforced collection over the property of the aforementioned companies.

5. to prohibit transfer, encumbrance and any other disposal of the property of the aforementioned companies.

6. to order the Montenegrin Central Registry of Business Entities to inscribe annotation of the existence of this decision on the recognition of the foreign proceedings with prohibitions under paragraph I of this decision, with respect to the following companies:

Ledo d.o.o. Podgorica, corporate ID number 50020822, tax ID number: 02126265, having its registered seat in Podgorica, Liješnje bb - 100% share held by Ledo d.d. Zagreb;

Super kartica d.o.o. Podgorica, corporate ID number 50764274, tax ID number: 03093972, having its registered seat in Podgorica, Put Radomira Ivanovića broj 2 - 100% share held by Agrokor d.d. Zagreb.

## II REJECTING the request:

1. to prohibit enforced collection over shares held by *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb*, Trg Dražena Petrovića 3, OIB: 05937759187 and its affiliates and subsidiaries subjected to the extraordinary administration proceedings before the Commercial Court in Zagreb, ref. no. St-1138/17-52 in the following companies established in Montenegro: Ledo d.o.o. Podgorica, registration number: 50020822, tax number: 02126265, with a registered office in Podgorica, Liješnje bb and Super kartica d.o.o. Podgorica, registration number: 50764274, tax number: 03093972, with a registered office in Podgorica, Put Radomira Ivanovića 2.

2. to prohibit the initiation of new and the continuation of pending proceedings initiated against the property of companies referred to in item 1, paragraph II of the operative part of the decision.

3. to entrust the management or sale of the property or part of the property of the debtors referred to in item 1, paragraph II of the operative part of the decision, located in Montenegro, to foreign representative Ante Ramljak, address: Nova Cesta 126, Zagreb, Republic of Croatia, personal identification number: 16959950253, to protect and preserve the value of the property which, due to its nature or other circumstances, is under danger of disappearance, loss of value or is jeopardised in another way.

4. to order the competent register of business entities to make annotation of the existence of this decision and to make an annotation of the prohibitions, and of entrusting the management to the foreign representative.

**Reasoning**

Ante Ramijak, foreign representative of *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničarsko društvo Zagreb* and Agrokor's affiliates and subsidiaries, has submitted to the court, through his attorney, the application for recognition of a foreign main insolvency proceeding, and the request for assistance within the meaning of Article 194 of the Insolvency Act of Montenegro. In the application, he stated that on 7 April 2017 Agrokor had submitted to the competent Commercial Court in Zagreb, Republic of Croatia, a petition for the opening of an extraordinary administration proceeding due to the existence of pre-insolvency grounds related to Agrokor and its affiliates and subsidiaries, which can be jointly considered a company that is of systemic importance to the Republic of Croatia within the meaning of the provisions of Article 4 paragraph 2 of the Extraordinary Administration for Companies with Systemic Importance for the Republic of Croatia Act (Croatian Law published in the Official Gazette no. 32/2017). Agrokor's petition was based on the fact that indebtedness of Agrokor and/or its affiliates and subsidiaries, which in 2016 employed more than 5,000 people, amounted to more than KN 7,500,000,000.00 on the date of filing the petition (7 April  2017), which the law recognised as legal grounds for initiating an extraordinary administration proceeding. He further stated that on 10 April 2017 the Commercial Court in Zagreb issued the Decision on opening of the extraordinary administration proceeding number St-1138/17-3, supplemented by Decision No. St-1138/17-52 of 21 April 2017, which served to open the extraordinary administration proceeding over the debtor *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničarsko društvo Zagreb* and its affiliates and subsidiaries listed in the petition. He stated that all the companies over which extraordinary administration proceeding was opened have registered offices in the Republic of Croatia, where the centre of their business activities is located, and that certain companies over which the extraordinary administration proceeding was opened - more precisely Agrokor and Ledo dd Zagreb - have property in Montenegro, which mostly consists of the rights to stakes in companies that have been founded in Montenegro. For this reason, he believed that it was of utmost importance that the present foreign proceeding, i.e. the decision of a foreign court, be recognised in Montenegro, and that the competent court in Montenegro provide assistance after the submission of the application for the recognition of the proceeding, prohibit compulsory enforcement against the assets of companies in Montenegro, and prohibit the initiation of new and order the termination of pending proceedings concerning the property, rights and obligations of the

listed companies in Montenegro. He stated that, in addition to the listed property owned by said companies in Montenegro, it is possible that in the territory Montenegro there might also be other assets that were not known to the foreign representative at the time of submission of the application, and that he reserved the right, if it became known that such property existed and if the need arose, to file a request to supplement the application in relation to such property.

In the application he further stated that provisions of Articles 178 to 207 of the Insolvency Act, Part IX - International Insolvency, represented the legal basis for filing the application. He pointed out that authorisation for the filing of application by the foreign representative, which is what the capacity of the extraordinary administrator was in the proceeding that was being carried out in the Republic of Croatia, and whose recognition was being sought in Montenegro, stemmed from the provisions of Articles 178 paragraph 4, 186, 188 and 189 of the Insolvency Act, which prescribe that a foreign representative is a person or body, including temporarily appointed persons or bodies, authorised in a foreign proceeding to conduct reorganisation, bankruptcy or liquidation of the debtor's assets or business operations, or undertake actions in the capacity of representative of a foreign proceeding, and that the foreign representative has the right to directly act before the courts in Montenegro, and that when taking action before the courts he is obliged to submit evidence to the court of his capacity, and that he has the right to file a motion for the initiation of an insolvency proceeding and, following the recognition of a foreign proceeding, to participate in a proceeding carried out against the debtor. He stated that the proceeding whose recognition was sought in Montenegro was being carried out before the Commercial Court in Zagreb in relation to the above companies, as a result of the existence of insolvency/pre-insolvency grounds in connection with Agrokor (Article 4 paragraph 1 of the Extraordinary Administration for Companies with Systemic Importance for the Republic of Croatia Act), and that the rules on the legal consequences of the opening of insolvency proceedings shall apply to the legal consequences of the opening of the extraordinary administration proceeding. As the purpose of initiating the proceeding before the competent court in the Republic of Croatia is the implementation of swift and effective procedure for preventive restructuring of Agrokor and its affiliates and subsidiaries in order to ensure liquidity, sustainability and stability of business operations, he stated that such a proceeding represents, in all its aspects, a foreign proceeding envisaged by the provision of Article 178 paragraph 2 of the Insolvency Act of Montenegro. The extraordinary administrator was appointed by the Decision on the Extraordinary Administration and in accordance with Article 37 paragraph 2 of the Extraordinary Administration Act, which explicitly entrusts the extraordinary administrator with rights and obligations of the insolvency receiver from the Croatian Insolvency Act, unless otherwise provided by the Extraordinary Administration Act. Accordingly, he believes that it is undisputed that, in the extraordinary administration proceeding, the extraordinary administrator should be considered a foreign representative in accordance with the provision of Article 178 paragraph 4 of the Insolvency Act. He stated that the recognition of a foreign proceeding in Montenegro is being sought in order to allow the implementation of the powers granted to the extraordinary administrator and enable implementation of the decision on the opening of the extraordinary administration proceeding and the prohibition of enforcement on the property of the debtor and its affiliates and subsidiaries, implementation of the decision to allow the foreign representative to take immediate action to implement the decision on the opening of extraordinary administration proceeding, and the powers granted in the proceedings before the courts and other authorities

in Montenegro to protect the business operations, interests and assets of the companies in Montenegro. In his opinion, without the recognition of this proceeding in Montenegro, the purpose of the foreign proceeding could not be achieved, and this would jeopardise the liquidity, sustainability and stability of the company's business operations. He stated that the assets of the companies included in the extraordinary administration in Montenegro consisted of stakes/shares in the following companies registered in Montenegro: Ledo d.o.o. Podgorica, registration number 50020822, tax number: 02126265, with a registered office in Podgorica, Liješnje bb - 100% shares in Ledo d.d. Zagreb and Super kartica d.o.o. Podgorica, registration number 50764274, tax number: 03093972 with a registered office in Podgorica, Put Radomira Ivanovića 2 -100% stake owned by Agrokor d.d. Zagreb.

Therefore, he requested that the extraordinary administration proceeding which was opened by the Decision of the Commercial Court in Zagreb on the opening of extraordinary administration proceeding no. St-1138/17-3 of 10 April 2017, supplemented by the decision of the Commercial Court in Zagreb number St-1138/17-52 of 21 April 2017 over the debtor *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb* be recognised as a foreign main proceeding; he also requested the recognition of Ante Ramljak, who was appointed in the above foreign proceeding as extraordinary administrator of the companies concerned, as foreign representative; he also requested that the court prohibit the initiation of new and the termination of any pending proceedings that have been initiated in connection with the property, rights and obligations or the responsibilities of the above companies; to prohibit compulsory enforcement on the property of the companies concerned, to prohibit the transfer, encumbrance and other disposal of the property of the companies concerned; and to order the Central Register of Business Entities to register annotation of the existence of this decision on the recognition of a foreign proceeding, with the above prohibitions in relation to companies registered in Montenegro.

In addition to the application for the recognition of a foreign proceeding, the applicant's attorney also submitted a request in accordance with the provision of Article 194 of the Insolvency Act, because he believed that there was a need for urgent assistance to protect the property of the debtor and the interests of creditors. Namely, according to the foreign representative, to the day of submission of the request to the competent court no civil, enforcement or other similar proceeding had been initiated in Montenegro with regard to the assets of the companies included in the extraordinary administrative proceeding, but there was a justified risk of the initiation and conduct of such proceedings, whereby the debtor and his creditors would be exposed to irreversible damage which would jeopardise the purpose of initiating the extraordinary administration proceeding in the Republic of Croatia. He stated that this proceeding was initiated with the aim of securing the liquidity, sustainability and stability of Agrokor's business operations and those of its affiliates and subsidiaries, and that, for this reason, it was necessary that the competent the court urgently issue the measures of assistance reflected in the prohibition of initiating and carrying out proceedings that would endanger the debtor's assets or the interests of creditors. Given the above reasons, he believes that it is necessary for the court to grant the proposed interim measures prior to deciding on the application for the recognition of a foreign proceeding, i.e. immediately upon receipt of this petition, and to issue the proposed measures and extend their duration until the termination of the foreign proceeding before the Commercial Court in Zagreb, Republic of Croatia, under the reference number 47. St 1138/17, so as to prevent the diminishing of the

value of the assets of the above companies in Montenegro and prevent hindering the extraordinary administration proceeding in the Republic of Croatia.

Therefore, he requested that the court prohibit enforcement on the stakes of *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb* and its affiliates and subsidiaries that are undergoing the extraordinary administration proceeding before the Commercial Court in Zagreb, ref. number St-1138/17-52, in the companies established in Montenegro: Ledo d.o.o. Podgorica and Super kartica d.o.o. Podgorica; that the court prohibit the initiation of new and continuation of pending proceedings initiated against the property of the above companies; that the court entrust the management or sale of the property or part of the property of the debtor referred to in item 1, paragraph II of the operative part of the decision, located in Montenegro, to the foreign representative Ante Ramljak, address: Nova Cesta 126, Zagreb, Republic of Croatia, personal identification number: 16959950253 so that he may protect and preserve the value of the property which, due to its nature or other circumstances, is under danger of disappearance, loss of value or is jeopardised is another way; and that the court order the competent register of business entities to make a record of the existence of this decision and to make a record of the prohibitions, and of entrusting the management to the foreign representative.

The Court reviewed the evidence submitted together with the application, as follows: the Decision of the Commercial Court in Zagreb, St-1138/17 of 10 April 2017, provided with a validity clause dated 29 May 2017 and the enforceability clause dated 10 April 2017, the Decision of the Commercial Court in Zagreb, St 1138/17-52 of 21 April 2017, provided with a validity clause dated 28 June 2017 and the enforceability clause 21 April 2017, excerpts from the court register issued by Public Notary  Katica Valić from Zagreb concerning the following companies: PIK VINKOVCI DD Vinkovci, EKO BIOGRAD DOO Vinkovci, FELIX DOO Vinkovci, POLJOPRIVREDA j.doo Vinkovci, ROTO ULAGANJA DOORijeka, SOLANA PAG DD Pag, TISAK DD Zagreb,               BACKSTAGE               DOO               Zagreb, TISAK USLUGE DOO Zagreb, TISAK INPOST DOO Zagreb, PHOTO BOUTIOUE DOO Zagreb, VJESNIK - USLUGE DOO Zagreb , ZVIJEZDA DD Zagreb, SOJARA DOO Zadar, VUKOVARSKI POLJOPRIVREDNI KOMBINAT DD Vukovar, A007 DOO Zagreb, 360 MARKETING DOO Zagreb, ADRIA RETAiL DOO Zagreb, ADRIATICA NET DOO Zagreb, ATLAS DD Dubrovnik, KOMPAS DOO Poreč, GO.ADRIATICA DOO Zagreb, ALIQUANTUM ULAGANJA DOO Zagreb, HOTEL FORUM DOO Zagreb, PLODOVI PODRAVINE DOO Ferdinandovac, POLIKLINIKA AVIVA Zagreb, RIVIJERA DD Ičići, BELJE ABC DOO Beli Manastir, DALMARINA DOO Zagreb, KONSOLIDATOR DOO Zagreb, GULLIVER TRAVEL DOO Dubrovnik, KARISMA HOTEL ADRIATIC DOO Zagreb, ADRIASENSE DOO Zagreb, KHA TRI DOO Zagreb, KHA PET DOO Zagreb, HOTELI KOLOČEP DD Koločep, HOTELI ŽIVOGOŠĆE DD Živogošće, KHA ČETIRI DOO Zagreb, KOR - BROKER DOO Zagreb, PROJEKTGRADNJA DOO Gornja Vrba, ZAGREB PLAKAT DOO Zagreb, AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednimproizvodima DD Zagreb, AGROKOR-TRGOVINA DOO Zagreb, A. N. P ENERGIJA DOO Zagreb, AGROKOR-ENERGIJA DOO Zagreb, ENERGIJA GRADEC DOO Zagreb, AGROLAGUNA DD Poreč, BELJE DD Darda, BELJE AGRO - VET DOO Darda, JAMNICA DD Zagreb, MLADINA DD Jastebarsko, ROTO DINAMIC DOO Zagreb, VINARIJA NOVI GRAD DOO Rijeka, DB KANTUN VELEPRODAJA DOO

- 9 -

Zagreb, KONZUM DD Zagreb, PIK VRBOVEC - MESNA INDUSTrlJA DD Vrbovec, INDUSTRIJA MESA DOO Zagreb, ŽITNJAK DD Zagreb, EUROVIBA DOO Zagreb, KRKA DOO Šibenik, MULTIPLUS CARD DOO Zagreb, AUREUM STELLA DOO Zagreb, BIO-ZONE DOO Zagreb, JOLLY PROJEKTI JEDAN DOO Drnjiš, SK-735 DOO Zagreb, LATERE TERRAM DOO Zagreb, PET-PROM ULAGANJA DOO Zagreb, VELPRO - CENTAR DOO Zagreb, TERRA ARGENTA DOO Vukovar, LEDO DD Zagreb, IRIDA DOO Daruvar, LOVNO GOSPODARSTVO MOSLAVINA DOO Zagreb, MSTART DOO Zagreb, MONDO-TERA DOO Zagreb, the statement of Ante Ramljak of 31 July 2017 on owning property in Montenegro, certified by the Notary Public Katica Valić; the statement of Ante Ramljak of 31 July 2017 on initiated foreign proceedings, certified by the Notary Public Katica Valić' excerpt from the Central Register of Business Entities for the company "SUPER KARTICA" DOO Podgorica and excerpt from the Central Register of Business Entities for the company "LEDO" DOO Podgorica.

Having assessed the Applicant's allegations and inspected the presented evidence, the Court decided as in the decision, for the following reasons:


Namely, the Applicant requested that, in the present proceeding, the extraordinary administration proceeding which was opened against debtor *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb* by the Decision of the Commercial Court in Zagreb on the opening of the extraordinary administration proceeding number St-1138/17-3 of 10 April 2017, supplemented by the Decision of the Commercial Court in Zagreb number St- 1138/17-52 of 21 April 2017, be recognised as a foreign main proceeding, all in the sense of the provisions of the Insolvency Act of Montenegro, i.e. the provisions pertaining to international insolvency governed by said request.

The extraordinary administration proceeding was opened against the debtor AGROKOR and its affiliates and subsidiaries pursuant to the provisions of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act.

The primary objective of this Act, as defined in its Article 1, is the protection of creditors of companies that are of systemic importance for the Republic of Croatia which, operating independently or together with its subsidiaries and affiliates, influence the overall economic, social and functional stability of the Republic of Croatia, and that the level of protection that is achieved by this Act shall be necessary, appropriate and proportionate to the interest of the Republic of Croatia to implement a prompt and efficient procedure of preventive restructuring of the companies of systemic importance for the Republic of Croatia in order to ensure liquidity, sustainability and stability of their business operations.

The main objective of the insolvency proceeding, defined in Article 2 of the Insolvency Act of Montenegro, is that the insolvency proceeding should be carried out for the purpose of collective settlement of the creditors of the insolvency debtor by realising the debtor's assets and distributing the proceeds to the creditors.

The provision of Article 178 paragraph 1 of the Insolvency Act of Montenegro provides that the provisions on international insolvency shall be applied: 1) if a foreign court or another foreign authority that performs control or supervision over the property or business operations of the

debtor, or a foreign representative, requests assistance in connection with a foreign proceeding; 2) if a court or insolvency receiver requests assistance in a foreign country in connection with the insolvency proceeding carried out in Montenegro in accordance with this Act; and 3) if the foreign proceeding is carried out simultaneously with the insolvency proceeding that is being carried out in Montenegro in accordance with this Act. Paragraph 2 prescribes that a foreign proceeding, for the purposes of this Act, means a judicial or administrative proceeding, including a preliminary proceeding, that is carried out for the purpose of collective settlement of creditors through reorganisation, bankruptcy or liquidation in a foreign country, in accordance with the regulation governing insolvency, in which the property and business operations of the debtor are under the control or supervision of a foreign court or another competent authority, while paragraph 3 provides that the debtor, within the meaning of paragraph 2 of this Article, may be; 1) a company, i.e. a legal entity which does not have a registered seat in Montenegro, and 2) a natural person who is not a resident of Montenegro. Paragraph 4 of the above Article stipulates that a foreign representative, within the meaning of paragraph 1 of this Article, means a person or body, including temporarily appointed persons and bodies, authorised in a foreign proceeding to conduct reorganisation, bankruptcy or liquidation of the debtor's property or business operations or take actions in the capacity of representative of a foreign proceeding.

Basing its opinion on the quoted provisions of the Insolvency Act and the main purpose of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act, the court finds that the extraordinary administration proceeding provided for in this Act does not constitute a proceeding aimed at the collective settlement of creditors as defined by Insolvency Act of Montenegro.

Namely, the universal principles of insolvency proceedings are the principle of protection of insolvency creditors, the principle of equal treatment and equality, and the most favourable settlement of creditors, that is, as a way of highest possible level of settlement of their claims. These principles are the key criteria in respect of a settlement of creditors, and are explicitly prescribed under Articles 3, 4 and 5 of the Insolvency Act. Starting from the basic objective of the Insolvency Act of Montenegro, i.e. the imperative provision of Article 2 of the Act, and the principles of the insolvency proceedings, and bearing in mind that the Insolvency Act of the Republic of Croatia stipulates, in its Article 2 paragraph 2, that the insolvency proceedings shall be conducted for the purpose of the collective settlement of the creditors of the insolvency debtor through realisation of its property and the distribution of collected proceeds to its creditors, the court finds that the extraordinary administration proceeding is not a foreign proceeding in terms of Article 178 paragraph 2 of the Insolvency Act, since it is not a proceeding aimed at the collective settlement of creditors, but at protecting and maintaining economic, social and financial stability of the Republic of Croatia, that is, the sustainability of business operations of certain companies that are of systemic importance for the Republic of Croatia. Therefore, the extraordinary administration proceeding whose recognition is sought, which has been opened in accordance with the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act, aims to protect the interests of the Republic of Croatia, i.e. the interests of the state and not the interests of creditors of the debtor and its affiliates and subsidiaries. In addition, the sustainability of the business operations of a company that is of importance to a state cannot be the object of a foreign proceeding in the sense of the provision of Article 178 paragraph 2 of the Insolvency Act, since

a state can only be a creditor which is afforded equal treatment in accordance with Article 4 of the Insolvency Act.

In addition, although Article 37 paragraph 1 of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act stipulates that, unless otherwise provided by this Act, the rules on the legal consequences of the opening of an insolvency proceeding prescribed by a special law governing bankruptcy apply appropriately to the legal consequences of the opening of the extraordinary administration proceeding, the Court finds that the above provision does not make the extraordinary administration proceeding an insolvency proceeding, i.e. that it cannot be recognised as a foreign proceeding in the sense of the provisions of Article 178 paragraph 2 of the Insolvency Act. This is because Article 7 paragraph 2 of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act stipulates that, if the extraordinary administration proceeding has been initiated, until its completion it is prohibited to initiate a pre-insolvency i.e. insolvency proceedings, while in Montenegro, pursuant to the Insolvency Act, an insolvency proceeding is carried out precisely for the purpose of the collective settlement of creditors. Therefore, the present proceeding, whose recognition is sought, cannot, for these reasons, be recognised as a foreign proceeding, as it is not aimed at the collective settlement of creditors, since due to the opening of the extraordinary administration proceeding, no insolvency proceedings can be opened, and it is impossible to carry out the collective settlement of the creditors, which proceedings, in accordance with the provisions of the Insolvency Act of Montenegro and the Insolvency Act of the Republic of Croatia, are carried out precisely for the purpose of achieving this objective, that is, for the purpose of the collective settlement of creditors.

In order for a foreign proceeding to be recognised before a court in Montenegro as a foreign main proceeding - in this particular case before the Commercial Court of Montenegro, which has subject matter and territorial jurisdiction - as required by the application, such proceeding, pursuant to Article 192 paragraph 1 item 1 of the Insolvency Act, must have the characteristics of a foreign proceeding referred to in Article 178 paragraph 2 of this Act, i.e. the judicial or administrative proceeding, including preliminary proceeding, must be carried out in a foreign country with the aim of collective settlement of creditors through reorganisation, bankruptcy or liquidation, in accordance with the regulation governing insolvency, and the assets and business operations of the debtor must be under control or supervision of a foreign court or other competent authority.

Article 4 paragraph 1 of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act stipulates that the extraordinary administration proceeding shall be applied to the debtor organized as a joint-stock company and all its affiliates and subsidiaries if the existence is established of any of the insolvency grounds referred to in Article 5 of the Insolvency Act or pre-insolvency grounds referred to in Article 4 of the Insolvency Act in relation to the debtor as the governing company, which joint stock company happens to be, independently or together with its affiliates or subsidiaries, of systemic importance for the Republic of Croatia; while Article 5 of the same Act prescribes that the extraordinary administration proceeding shall also be carried out against companies that do not meet the requirements referred to in Article 4 paragraphs 1 and 2 of this Act, provided that they are considered subsidiary companies within the meaning of Article 475 of the Companies Act, or affiliated companies, and that the governing company, independently or

- 12 -

together with its subsidiaries or affiliates, meets the requirements referred to in Article 4 of this Act.

The Insolvency Act of the Republic of Croatia prescribes in Article 4 that an insolvency proceeding may be opened if the court establishes the existence of a threat of incapacity for payment. A threat of incapacity for payment exists if the court is convinced that the debtor will not be able to fulfil its existing obligations at the time of their maturity. According to Article 5 of the Insolvency Act of the Republic of Croatia, incapacity for payment and over-indebtedness represent event that lead to the insolvency.

Based on the above, it follows that the extraordinary administration proceeding is also carried out against companies in relation to which the existence of insolvency grounds from the Insolvency Act of the Republic of Croatia have not been established; therefore, the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act is not a regulation that governs insolvency, and therefore the present extraordinary administration proceeding, whose recognition is sought, does not have the character of a foreign proceeding. Namely, the above Act provides for and extraordinary administration proceeding also against affiliates and subsidiaries that are not insolvent, and are without any insolvency grounds; consequently, the extraordinary administration proceeding can also include solvent companies if they are connected with the governing company, which ultimately does not make this Act a regulation that governs insolvency within the meaning of Article 178 paragraph 2 of the Insolvency Act.

Article 192 of the Insolvency Act of Montenegro stipulates that, except in the case referred to in Article 183 of this Act, a foreign proceeding shall be recognised: 1) if it has the characteristics of the proceeding referred to in Article 178 paragraph 2 of this Act; 2) if the foreign representative submitting the application for recognition is a person or body referred to in Article 178, paragraph 4 of this Act; 3) if the application meets the requirements referred to in Article 186 paragraph 2 of this Act; and 4) if the application was submitted to the competent court in accordance with Articles 179 and 180 of this Act.

Taking into account the above provision, and the requirements that must be cumulatively fulfilled in order for a proceeding to be recognised as a foreign proceeding, the Court finds that the requirement referred to in Article 192 paragraph 1 item 1 of the Insolvency Act is not fulfilled, i.e. that the proceeding whose recognition is sought does not have the characteristics of the proceeding referred to in Article 178 paragraph of this Act.

Namely, the objective of the extraordinary administration proceeding which has been opened by the Decision of the Commercial Court in Zagreb on the opening of the extraordinary administration proceedings number St-1138/17-3 dated 10 April 2017, supplemented by the Decision of the Commercial Court in Zagreb number St- 1138/17-52 dated 21 April 2017, against the debtor *AGROKOR koncern za upravljanje društvima, proizvodnju i trgovinu poljoprivrednim proizvodima, dioničko društvo Zagreb*, Trg Dražena Petrovića 3, tax ID number: 05937759187 and its affiliates and subsidiaries, is not the collective settlement of creditors, considering the provisions of the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act which regulates this proceeding, and the Extraordinary Administration in Companies with Systemic Importance for the Republic of Croatia Act does not represent a regulation on the basis of which insolvency is regulated; it is, instead, a regulation governing one and the same extraordinary administration proceeding,

- 13 -

carried out against both solvent and insolvent companies, depending on whether these companies are of systemic importance to the Republic of Croatia.

Based on the above, and given the fact that the substantive and legal requirements for the recognition of proceedings under article 192 paragraph 1 item 1, and in conjunction with Article 178 paragraph 2 of the Insolvency Act have not been met, the Court decided as in paragraph I point 1 of the operative part of the decision, and rejected the application for recognition of the foreign main proceeding. By failing to recognise the foreign main proceedings, the Court also rejected the requests contained in paragraph I points 2, 3, 4, 5 and 6, as deciding on these issues required a prior positive decision concerning the recognition of a foreign proceeding, which was rejected for the above reasons.

The Application also contained a request for assistance in accordance with the provision of Article 194 of the Insolvency Act, as the Applicant believed that there was a need for urgent assistance to protect the property of the debtor, as well as the interests of the creditors.

However, as the Court rejected the Application for recognition of the foreign main proceeding, for the reasons mentioned above, accordingly it was not possible to apply the measures referred to in Article 194 of the Insolvency Act i.e. the request for assistance; therefore, the Court decided as in paragraph II of the operative part of the decision.

**THE COMMERCIAL COURT OF MONTENEGRO**

16 October 2017

PRESIDENT OF THE COURT – JUDGE

Blažo Jovanić

**LEGAL REMEDY:**

A dissatisfied party shall have the right to file an

appeal against this decision to the Appellate Court

of Montenegro in Podgorica, within 8 days of its receipt,

through this court, in three copies.

Clerk: Raduša Janković

/circular seal, handwritten initial/

## **Appendix B-6**

**Decision of the Court of the Canton of Zug, Switzerland**

Canton Zug                                    Court of the Canton of Zug

**Single Judge**                              **EN 2017 6**

| |
|---|
| **Informal translation**<br>Lenz & Staehelin<br>5 April 2018 |

lic.iur. P. Stüdli, Judge of the Court of the Canton of Zug

**Decision of 2 February 2018**

in matter of

**Agrokor d.d.**, Trg Drazena Petrovica 3, HR 1000 Zagreb, acting through extraordinary commissioner
Ante Ramljak, c/o d.d., Trg Drezena Petrovica 3, HR-1000 Zagreb,
represented by Attorney at Law Tanja Luginbühl and/or Attorney at Law Dr.iur. Roland Fischer, Lenz
& Staehelin, Brandschenkestrasse 24, 8027 Zurich,
**Applicant**,

regarding

recognition of the Croatian extraordinary administration proceedings

After examination of the application and the submission of the Applicant and considering that:

- the recognition of the Croatian extraordinary administration proceedings is to be granted
  pursuant to art. 175 of the Swiss Private International Law Act ("**PILA**") because there are no
  international treaties (art. 1 par. 2 PILA) and the international provisions regarding bankruptcy
  are to be applied by analogy (Bopp, Commentary Basel, 3rd ed. 2013, art. 175 PILA side
  note 2 ["Bopp, Commentary Basel"];

- an approval of the composition agreement or similar proceedings by a foreign competent
  authority will be recognised in Switzerland (art. 175 PILA), whereby also the court or official
  decision opening such proceedings may be the object of recognition (Bopp, Commentary
  Basel, art. 175 PILA side note 3; ZR 94/1995 p. 193 s.; Bopp, Restructuring under the
  international insolvency law of Switzerland, 2004, p. 184; cf. BGE 137 III 140 consideration
  2.1; Ziltener/Späth, The recognition of foreign bankruptcies, ZZZ 2005 p. 64 s.);

- the court of the Canton of Zug, sitting as single judge, is competent in summary proceedings
  with regard to the recognition of similar proceedings pursuant to art. 175 PILA because it has
  been plausibly shown that the Applicant has assets located in Switzerland (claim against
  Agrokor AG with domicile in Zug, cf. act. 1 p. 3; act. 1/3-6; art. 335 par. 3 in conjunction with
  art. 339 par. 2 of the Swiss Civil Procedure Code ["CPC"]; § 28 par. 2 letter k Judicial
  Organisation Act);

- the requirements for the recognition of foreign composition agreements or similar proceedings are the following: (i) the qualification of the foreign proceedings as restructuring proceedings pursuant to art. 175 PILA, (ii) the opening of the proceedings at the residence or domicile of the debtor, (iii) the enforceability of the decision which is to be recognised, (iv) the absence of grounds of refusal pursuant to art. 27 PILA and (v) the grant of reciprocity by the state that has opened the proceedings (Bopp, Commentary Basel, art. 175 PILA side note 6);

- the Applicant as common debtor, acting through the court appointed extraordinary commissioner Ante Ramljak, is authorised to request such recognition (Bopp, Commentary Basel, art. 175 PILA side note 23, act. 1/7, cf. also Ziltener/Späth, ZZZ 2005, p. 64; Staehelin, the recognition of foreign bankruptcies and moratorium contracts in Switzerland [art. 166 ss. PILA], 1989, p. 180; ZR 94/1995 p. 194);

- the recognition of foreign moratorium composition proceedings with effect for Switzerland mainly depends on whether the composition agreement pursues a purpose in accordance with Swiss law is pursued (art. 293 ss. of the Swiss Debt Enforcement and Bankruptcy Act ["DEBA"]) and whether such composition agreement must be approved by a competent authority in order to become valid (Ziltener/Späth, p. 63; Staehelin, p. 178; ZR 94/1995 p. 194);

- the Applicant has not enclosed to its submission a composition agreement approved by an authority which raises the question whether the effects arising from the opening of the moratorium composition proceedings abroad can be recognised as such (cf. ZR 94/1995 p. 193);

- the Croatian extraordinary administration proceedings according to the Act on Extraordinary Management of Companies with Systemic Significance for the Republic of Croatia ("Zakon o postupku izvanredne uprave u trgovačkim društvima od sistemskog značaja za Republiku Hrvatsku" [AZVG]) aim at maintaining the business activities of the common debtor as a systemically important company by way of restructuring proceedings if there are reasons for insolvency or bankruptcy (act. 1 side note 25, act. 1/11, in particular art. 1 and 4 AZVG);

- during the extraordinary administration proceedings with respect to the debtor, it is not permitted to initiate liquidation or pre-bankruptcy and bankruptcy proceedings, respectively (art. 7 AZVG);

- for the purpose of representing the debtor, an extraordinary commissioner under the supervision of the court (art. 14 AZVG) is to be appointed, who has the rights and duties of a corporate body (art. 12 par. 1 AZVG);

- the Commercial Court of Zagreb is exclusively competent for ordering extraordinary administration proceedings (act. 1/11, art. 6 AZVG, art. 10 AZVG), that any composition agreement that may have been concluded must also be submitted to the Commercial Court of Zagreb for confirmation (art. 43 par. 15 AZVG) and that only the Commercial Court of Zagreb may close or terminate the extraordinary administration proceedings (art. 46 and 47 AZVG);

- in summary, the opening order and the effects arising from the opening of the extraordinary administrative proceedings in Croatia with respect to the common debtor, respectively, must be comparable to the orders and effects of Swiss moratorium composition proceedings and any composition agreement must be approved by the Commercial Court of Zagreb in order to become valid.

- therefore, the order of the Commercial Court of Zagreb regarding the opening of extraordinary administration proceedings against the Applicant dated 10 April 2017 (file number No 47.St-1128/17) is a "similar proceeding" as required pursuant to art. 175 PILA (act. 1/7; Bopp, p. 184; cf. decision of the Camera die esecuzione e fallimenti del Tribunale d'appello N.14.2008.116 dated 16 December 2008 consideration 6.1 [act. 1/13 and 4/1] as well as N.14.2009.29 dated 27 April 2009 [act. 1/14 and 4/2]);

- the complete, legalised and apostilled Croatian opening decision regarding the extraordinary administration proceedings (accompanied by a translation) has been made available (act. 1/7);

- according to the confirmation set out on the cover page of the decision, the decision has become enforceable on 10 April 2017 and final on 29 May 2017 (act. 1/7);

- as already mentioned, the Commercial Court of Zagreb is exclusively competent for the extraordinary administration proceedings in Croatia, irrespective of the domicile of the debtor (art. 6 par. 1 AZVG) and that the opening decision dated 10 April 2017 was issued in Zagreb (where also the debtor has its domicile) and is enforceable in Croatia (act. 1/7 and 1/8; art. 166 par. 1 lit. a PILA; Bopp, Commentary Basel, art. 175 PILA side note 7);

- no obstacles to recognition (in particular no violation of the Swiss *ordre public* or of essential principles of procedural law) are apparent;

- in determining whether reciprocity is granted by a certain foreign state, it is not required that congruent reciprocity is granted (with regard to bankruptcy proceedings Volken, Commentary Zurich, 2n ed 2014, art. 166 PILA side note 101, cf. BGE 141 III 222 consideration 4). Rather, it is required that the foreign law would recognise Swiss moratorium composition proceedings in an identical case under requirements that are not sensibly less favourable than the requirements imposed by Swiss law on the recognition of the foreign proceedings (Bopp, Commentary Basel, art. 175 PILA side note 20);

- in other words, it is decisive whether, conversely, a particular state is in principle prepared to accept moratorium composition proceedings opened in Switzerland and to allow a direct or indirect inclusion of assets located in its territory or to accept, at least in principle, a settlement of liabilities in a composition agreement, respectively (Bopp, Commentary Basel, art. 175 PILA side note 20; so-called partial reciprocity according to Staehelin, p. 180);

- art. 417 par. 1 of the Croatian Bankruptcy Act clearly states that in general bankruptcy and other insolvency proceedings are subject to the same rules (act. 1 side note 31), meaning these rules would also apply to Swiss moratorium composition proceedings;

- the decision of a foreign state opening composition proceedings would be recognised in Croatia pursuant to the general rules and that the effects of these proceedings extend, in principle, to the territory of the Republic of Croatia, provided that the basic principles of the Croatian bankruptcy law are respected (in particular in light of the *ordre public*), unless the law provides otherwise (art. 400, 403 and 411 of the Croatian Bankruptcy Act; act. 1 side note 33 s.);

- according to the memorandum of law prepared by the law firm Gajski, Grlic, Prka & Partners LLC dated 7 December 2017 (act. 1/15), Swiss composition moratorium proceedings would be recognised pursuant to the rules of Croatian insolvency law (cf. art. 395 ss. of the Croatian Bankruptcy Act, in particular art. 400, 403 and 411; act. 1 side note 30 ss; act. 1/15 and act. 4/3 p. 2 and 6 s.) and that, therefore, Croatia grants reciprocity. Accordingly, this point does not stand in the way of recognizing the Croatian extraordinary administration proceedings either;

- the Applicant has paid the advance on costs in an amount of CHF 1,000.00 as required by the Court of the Canton of Zug;

- as a result, the formal and substantive requirements for recognition of the extraordinary administration proceedings are complied with and the Applicant's application for recognition of the decision of the Commercial Court of Zagreb regarding the opening of the extraordinary administration proceedings against Agrokor d.d. dated 10 April 2017 may be granted;

- the Applicant requests that it be dispensed with the need for ancillary proceedings in Switzerland and that the extraordinary commissioner be authorised to represent the Applicant in Switzerland and to dispose of the assets located in Switzerland (act. 1 prayers for relief cipher 2 and 3);

- the determination of the effects of a recognition of foreign composition proceedings is left to the national legislator and the PILA deliberately grants wide discretion to the authorities to put the effects in concrete terms (Bopp, p. 246 with reference to BBI 1983 I 430, 210.6; Staehelin, p. 182);

- the recognition of foreign restructuring proceedings does not lead to the opening of ancillary moratorium composition proceedings in Switzerland with an independent restructuring plan. However, certain procedural steps must be carried out with regard to the assets located in Switzerland which is why modified ancillary restructuring proceedings are to be opened and which have to be coordinated with the foreign proceedings as far as possible (Bopp, p. 261 ss. with further reference; decision of the Camera die esecuzione e fallimenti del tribunale d'appello N.14.2008.116 dated 16 December 2008 consideration 7.2/a-b [act. 1/13 and 4/1] and N.14.2009.29 dated 27 April 2009 consideration 6.2 [act. 1/14 and 4/2]);

- the procedural steps to be taken in Switzerland are limited to the recognition of the foreign decision regarding the opening the proceedings and the restructuring plan, to the specification of the effects of the composition moratorium and, pursuant to art. 172 par. 1 PILA, to ensure that the distribution rules with regard to assets located in Switzerland are complied with (Bopp, p. 263);

- the foreign debtor remains authorised and entitled to dispose of the assets located in Switzerland (Bopp, p. 227) and that, in principle, an extraordinary commissioner is to be appointed in order to monitor the debtor's actions with regard to the assets located in Switzerland;

- it is possible and permissible to appoint the foreign extraordinary commissioner for such purpose – under the supervision of the competent court pursuant to art. 167 PILA – provided that he offers assurances that he will comply with the provisions of Swiss law (Bopp, Commentary Basel, art. 175 PILA side note 34 f with reference to the decision of the Swiss Federal Supreme Court 5A_267/2007 dated 30 September 2008 consideration 5, according to which assets located in Switzerland can be handed over directly to the foreign insolvency administrator and no special proceedings with respect to the assets located in Switzerland are necessary), in particular with respect to the rights of privileged creditors, since recognition of a foreign composition agreement means a controlled extension of its effects on Swiss territory and such composition agreement becomes binding for all claims with the exception of claims of the privileged creditors pursuant to art. 172 PILA (decision of the Camera die esecuzione e fallimenti del Tribunale d'appello N.14.2008.116 dated 16 December 2008 consideration 7.2 a-b [act. 1/13 and 4/1] and N.14.2009.29 dated 27 April 2009 consideration 6.2 [act. 1/14 and 4/2]; cf. BGE 140 III 379 consideration 4.2.1.);

- there is no need to appoint an ad hoc administrator, unless a privileged creditor has come forward and there are no assets in Switzerland which must be liquidated by way of debt enforcement or bankruptcy proceedings (decision of the Camera die esecuzione e fallimenti del Tribunale d'appello N.14.2008.116 dated 16 December 2008 consideration E. 7.2 b [act. 1/13 and 4/1]);

- it must therefore be decided on a case-by-case basis whether ancillary Swiss proceedings within the scope of art. 175 PILA are indeed required and whether the foreign extraordinary commissioner may be authorised to represent the debtor within the scope of the powers assigned to him, taking into account in particular the existence of privileged creditors (BGE 140 III 379 consideration 4.2.1; decision of the Swiss Federal Supreme Court 5A_267/2007 dated 30 September 2008 consideration 5.3);

- according to a confirmation by Ante Ramljak, no privileged creditors with residence or domicile in Switzerland have been registered in the Croatian extraordinary administration proceedings following a creditors' call and no creditor of the Applicant claims to have a lien on assets located in Switzerland (act. 1/16);

- for these reasons and in accordance with the application, Ante Ramljak is authorised as extraordinary commissioner of Agrokor d.d. to represent the Applicant in Switzerland within the statutory limits and to dispose of the assets of Agrokor d.d. located in Switzerland;

- the extraordinary commissioner, however, must publish in the Swiss Official Gazette of Commerce a creditors' call to creditors of Agrokor d.d. with residence or domicile in Switzerland and to those who claim to have a lien on assets located in Switzerland and invite them to submit their claims in writing within 30 days in order to verify the information from the Croatian extraordinary administration proceedings (art. 300 DEBA, cf. decision of the

Camera die esecuzione e fallimenti del Tribunale d'appello N.14.2008.116 dated 16 December 2008 [act. 1/13 and 4/1] and N.14.2019.29 dated 27 April 2009 [act 1/14 and 4/2]);

- the Canton of Zug pursuant to art. 5 DEBA is exclusively and externally liable for any damage caused by the extraordinary commissioner and that such provision also applies to damages caused by a foreign extraordinary commissioner, which is why the extraordinary commissioner must show that he has sufficient insurance coverage for financial losses of at least CHF 2m per event. Otherwise, the mandate will be revoked (Bopp, p. 281 s.);

- although art. 175 PILA requires all creditors with residence or domicile in Switzerland to be heard in recognition proceedings regarding foreign restructuring proceedings, the Swiss Federal Supreme Court decided that the common debtor or any other interested party do not have to be heard before the decision on recognition is rendered if an appeal can be lodged against the decision (Bopp, p. 238 with reference);

- therefore, the creditors' right to be heard is respected by publishing this recognition decision;

- there is currently no need to secure the privileged claims, since such privileged claims may be secured until the foreign restructuring plan is recognised in Switzerland and that the recognition of the foreign decision regarding the opening of composition moratorium proceedings does not yet lead to an actual restructuring of the legal relationship between the creditors and the debtor (Bopp, p. 286 s.);

- according to the Applicant, the distribution plan has not yet been drawn up (cf. act. 1 side note 47) and that even in the case of purely domestic moratorium composition proceedings, privileged claims do not have to be secured already in the opening stage;

- however, privileged creditors are to be invited in the creditors' call to be published by the extraordinary commissioner to request that their claims be secured (by filing such request with the composition judge) and that this question, therefore, still can be re-examined at that time;

- the Applicant is responsible for the costs associated with the recognition of the foreign extraordinary administration proceedings (art. 96 CPC and § 6 of the Ordinance of the Canton of Zug on the Costs of Civil and Criminal Justice; cf. art. 169 par. 2 DEBA) and that the appointed extraordinary commissioner has waived the right to request an advance on costs;

the following **decision** is made

1. The decision of the Commercial Court of Zagreb dated 10 April 2017 (file number 47. St-1138/17) regarding the opening of extraordinary administration proceedings with respect to Agrokor d.d. as well as the appointment of Ante Ramljak as extraordinary commissioner of Agrokor d.d. is recognised.

2. Ante Ramljak, c/o Agrokor d.d., Trg Drazena Petrovica 3, 1000 HR-Zagreb is appointed as extraordinary commissioner with respect to the assets of Agrokor d.d. located in Switzerland. The capacity of Agrokor d.d. to dispose of its assets located in Switzerland is cancelled and transferred to the extraordinary commissioner.

3.   The extraordinary commissioner is assigned the following task in particular:

-   Determination of the assets of Agrokor d.d. located in Switzerland as well as implementation of measures to preserve such assets;

-   Representation of Agrokor d.d. in Switzerland within the statutory limits;

-   Publication of a creditors' call in the Swiss Federal Gazette of Commerce by means of which the privileged creditors of Agrokor d.d. domiciled in Switzerland as well as creditors secured by a pledge located in Switzerland are requested to submit their claims in writing and, if relevant, demand that their claims be secured with the Court within 30 days; and

-   Preparation and submission of a report summarizing the results of the extraordinary commissioner's activities in Switzerland with the Court by no later than 3 April 2018 (date of post stamp).

4.   The extraordinary commissioner is requested to provide within 10 days proof of sufficient liability insurance, i.e. insurance coverage for damages of at least CHF 2m per damage, otherwise the mandate will be revoked.

5.   The costs of this decision amount to CHF 1,000.00 and will be offset against the advance payment made by the Applicant.

6.   An appeal against this decision may be lodged with the High Court of the Canton of Zug within 10 days of notification in writing, with specific prayers for relief, accompanied by the contested decision. The incorrect application of the law and/or the obviously incorrect determination of the facts of the case may be reprimanded (art. 320 CPC). The notice of appeal may be filed in paper form (one copy for the court and each counterparty) or electronically with a recognised electronic signature (art. 130 par. 1 and 2 CPC). In summary proceedings, the provisions on the standstill of deadlines pursuant to art. 145 par. 2 letter b CPC ("court vacations") do not apply.

7.   Notification to:

-   Applicant

-   Extraordinary commissioner Ante Ramljak (together with the form "confirmation")

-   Publication in the Swiss Official Gazette of Commerce and Official Gazette of the Canton of Zug (limited to information regarding the recognition of the decision of the Commercial Court of Zagreb dated 10 April 2017 regarding the opening of extraordinary administration proceedings with respect to Agrokor d.d., appointment of Ante Ramljak as extraordinary commissioner concerning the assets of Agrokor d.d. located in Switzerland and notice of appeal)

-   Debt enforcement agency of the Canton of Zug (for information)

-   Land registry and surveying office of the Canton of Zug (for information)

- Commercial Register of the Canton of Zug (for information)

- Bankruptcy Office Zug (for information)

- Court cashier


Court of the Canton of Zug

Single Judge

[*signature*]

lic.iur. P. Stüdli

Judge of the Canton of Zug


dispatched: 2 February 2018

**<u>Appendix C</u>**

**Excerpt from Agrokor June Monthly Report**



# MONTHLY REPORT ON ECONOMIC AND FINANCIAL STATE AND THE IMPLEMENTATION OF THE MEASURES OF EXTRAORDINARY ADMINISTRATION OF AGROKOR D.D.

## FOR THE PERIOD BETWEEN 11 JUNE 2018 AND 10 JULY 2018

*Prepared pursuant to Article 12 paragraph 9 of the Act on the procedure of Extraordinary Administration in commercial companies of systemic importance for the Republic of Croatia (Official Gazette 32/2017)*



## CONTENTS

1. **Executive summary** ...................................................................................................**4**

2. **State of companies under the Extraordinary Administration during the reporting period.....7**

   **2.1. Agrokor Group**.......................................................................................................**9**

   **2.2. Companies in the retail and wholesale sector**...................................................**10**

   **2.2.1.** **Companies in the retail and wholesale sector:  Konzum d.d.** ................................**11**

   **2.2.2.** **Companies in the retail and wholesale sector: Konzum BiH** .................................**12**

   **2.2.3.** **Companies in the retail and wholesale sector: Tisak d.d.** ......................................**14**

   **2.2.4.** **Companies in the retail and wholesale sector: Velpro - Centar d.o.o.** ..................**15**

   **2.3.  Companies in the food sector**............................................................................**16**

   **2.3.1.** **Companies in the Food sector: Jamnica  d.d.** ......................................................**17**

   **2.3.2.** **Companies in the Food sector: Roto dinamic d.o.o.** .............................................**18**

   **2.2.3.** **Companies in the Food sector: Sarajevski kiseljak d.d.** ..........................................**19**

   **2.2.4.** **Companies in the Food sector: Ledo  d.d.** .............................................................**20**

   **2.2.5.** **Companies in the Food sector: Ledo Čitluk d.o.o.** .................................................**21**

   **2.2.6.** **Companies in the Food sector: Frikom d.o.o.** ........................................................**22**

   **2.2.7.** **Companies in the Food sector: Zvijezda d.d.** .........................................................**23**

   **2.2.8.** **Companies in the Food sector: Dijamant a.d.**.........................................................**24**

   **2.2.9.** **Companies in the Food sector: PIK Vrbovec d.d.** ..................................................**25**

   **2.3.  Companies in the agriculture sector**.................................................................**26**

   **2.3.3.** **Companies in the agriculture sector: Belje d.d.** ....................................................**27**

   **2.3.4.** **Companies in the agriculture sector: PIK Vinkovci d.d.** ......................................**28**

   **2.3.5.** **Companies in the agriculture sector: Vupik d.d.** ..................................................**29**

3. **Short-term cash position** .............................................................................................**30**

4. **Cost of Extraordinary Administration and operational business of Agrokor d.d.** ...............**33**

5. **Litigation** .....................................................................................................................**35**

6. **Temporary Creditors' Council** ......................................................................................**36**



**7. Registration of claims** .................................................................................................................**37**

**8. Stakeholder relations and communications** ...............................................................................**38**



# 1. Executive summary

This monthly report relates to the period from 11 June to 10 July 2018. The objective of the report is to follow the development of the economic and financial situation within the Agrokor Group over the course of this period and to outline the realization of operating activities of the Extraordinary Administration as well as the overall operations of both the parent company Agrokor d.d. and some of its major subsidiaries (the **Group**).

Revenues generated by the Group over the course of the first five months were below budget. In spite of this, EBITDA was higher than budgeted, amounting to HRK 449.4m at the Group level for the period to May, outperforming budget by 10.5%.

The Retail and Wholesale sector has in all companies been focused on lowering operating costs and improving profitability. Aggregated revenues generated over the period were slightly below budget, although some companies within the sector exceeded both budgeted and last year's revenues in May, indicating that the positive trend of increasing revenues and stabilizing operations has continued. Although generated revenues were lower than planned, the continuous reduction in operating costs resulted in EBITDA exceeding budget. It is therefore particularly important to point out the operating results of Konzum. As against the comparable retail network in 2017, May saw an increase in the Konzum store footfall of 6.5% and the growing number of customers delivered an increase in the average basket of 11%, which resulted in an almost 20 per cent higher turnover than in May 2017. In addition, turnover was 8% higher than planned, while the margin exceeded budget by almost 7%.

The Food sector outperformed plans both in terms of sales revenues and operating result (EBITDA). Particularly worth noting are the frozen food and ice cream segment, as well as the drinks segment, which generated EBITDA above budget.

Operations of the Agriculture sector in May continued to be impacted by the drop in finisher and pork prices at the commodity exchanges. In spite of this, the drop in revenues of 4.7% was offset by the increase in other activities, therefore stabilizing the EBITDA decline.

The most important news of this reporting period relates to the Settlement Plan receiving a majority affirmative vote. The Group's creditors voted in favour of the Settlement Plan at the Settlement Plan voting hearing held on 4 July 2018 at the Dražen Petrović Basketball Center – Cibona Hall in Zagreb. The Settlement Plan received an affirmative vote from 80.2% of the total amount of claims held by the Group's creditors, or HRK 27,075,097,019.27 out of HRK 33,759,582,335.23 of total claims.

Attendees registered at the hearing represented around 450 creditors with HRK 23.359bn of determined and outstanding claims present. All creditors, advisors, Members of the Temporary Creditors' Council and the Extraordinary Commissioner were invited to the voting hearing.
Those entitled to vote at the hearing were all creditors whose claims had been determined, with the value of their vote being the outstanding amount of their claim to the extent that any



of their claims had been partially recovered. Accordingly, creditors whose claims had been recovered in full were not entitled to vote.

Those not entitled to vote included affiliates and subsidiaries subject to the Extraordinary Administration procedure. Creditors of challenged claims were invited to the hearing as well. Their right to vote was recognized by both the Extraordinary Administration and those creditors with voting rights who were present.

The registration and identification of creditors was followed by the first vote, on whether to grant voting rights to creditors with challenged claims and secondly the vote on the Settlement Plan. In the first stage of the voting pertaining to granting voting rights to creditors of challenged claims present, the right to vote was granted to claims in the amount of HRK 8,433,348,110 of present creditors with challenged claims.

The amount of claims with the right to vote on the Settlement Plan held by creditors who were present was HRK 31,858,553,744.74 and the total amount of claims with rights to vote on the Settlement Plan was HRK 33,759,582,335.23, representing 2,978 creditors.

Once the ruling by the High Commercial Court, which is expected during the course of October, becomes effective, the implementation of the Settlement Plan will start and this is expected to last between three and four months. The process in question is technically very demanding, with more than 70,000 steps identified to date – from founding mirror companies and transferring assets to them, to transferring all types of contracts – employment, supplier and all business partner contracts.   The operations of the New Group and the mirror companies are expected to commence at the beginning of 2019. However, this goal depends in the first place on when the Settlement Plan will become effective, which is entirely in the hands of the Court.

Around seven thousand three hundred pages of the Settlement Plan and related schedules constitute an agreement by which the creditors have achieved a viable solution in one of the currently most demanding financial restructurings worldwide. More than 5,700 Agrokor creditors filed almost HRK 58bn of claims in the Extraordinary Administration procedure. Representatives of all creditors were involved in the Settlement Plan negotiations – from large international and local lenders, Croatian and foreign suppliers to representatives of small and micro companies and family farms.

By achieving the settlement which received an affirmative vote from the majority of creditors, the main goal of the Extraordinary Administration has been accomplished within the statutory deadline. This is the result of a long and occasionally very difficult six-month negotiation process in which the Extraordinary Administration tried to reconcile the interests of creditors, which were often diametrically opposed, and enable them to achieve a mutually acceptable agreement. Thus, thanks to the rapid and determined reaction of the Government, a great success has been accomplished, with the potential collapse of Croatia's largest company, which would have had devastating consequences for the economies of Croatia and the region, having been addressed and successfully resolved within a period of only 14 months.

5



Achieving the settlement has enabled the Group to look forward to a new future, preserve jobs and ensure sustainable operations going forward.



## 2. State of companies under the Extraordinary Administration during the reporting period

The financial information in the table below relates to cumulative revenue and EBITDA for the first five months of 2018, for certain key companies of the Group. This monthly report contains financial reporting for the 16 key Group companies. The financial results for individual Group companies included in this section of the report are preliminary and unaudited. Please note that all comparisons to budgets in this section are with reference to the viability plans.

| January - May 2018 performance* | | | |
| --- | --- | --- | --- |
| HRK m | Retail and Wholesale | Food | Agriculture |
| Revenue | 4,932 | 2,934 | 813 |
| EBITDA | 3.3 | 381.3 | 64.7 |
| EBITDA % | 0.1% | 13.0% | 8.0% |

- **Retail and Wholesale** includes four companies' summarized results:
    - *Retail*: Konzum Croatia, Konzum BiH, Tisak
    - *Wholesale:* Velpro - Centar
- **Food** includes nine companies' summarized results:
    - *Beverages:* Jamnica, Sarajevski kiseljak and Roto dinamic
    - *Ice Cream and Frozen Food:* Ledo, Frikom and Ledo Čitluk
    - *Oil:* Zvijezda and Dijamant
    - *Meat:* PIK Vrbovec
- **Agriculture** includes three companies' summarized results:
    - Belje, PIK Vinkovci and Vupik

*Notes:*

- *Summarized results for the period (without elimination of intercompany transactions and consolidation adjustments).*
- *Revenues include sales of goods and services on domestic and foreign markets, and excludes revenues from services not related to regular operating activities.*
- *EBITDA = EBIT + amortization/depreciation + value adjustments and impairments + provisions + management and restructuring fees.*
- *Source of information – management accounts*
- *Preliminary YTD results; FY17 closing has not been fully finalized – possible changes in balance sheet amounts used for calculation of KPIs*
- *2017 information presented has not been restated*
- *The presented budget data is related to the latest approved budgets for food companies in 2018, and approved viability plans for retail, wholesale and agriculture companies in 2018.*
- *Monthly allocation of FY18 budget has been prepared and is the basis for comparison.*

7



Within the scope of this report, the Agrokor Group comprises 16 companies in three sectors: Retail and Wholesale, Food and Agriculture. Over the course of the first five months, the overall revenues generated at Group level were slightly lower than planned, but despite this there was an increase in EBITDA as against budget. Actual EBITDA generation at the Group level in the 5 months to May amounted to HRK 449.4m, exceeding plan by 10.5%.

The Retail and Wholesale sector has continued to generate better-than-planned results. Additional focus has been put on the restructuring process, cost reduction and profitability improvements. All companies within the sector have lower-than-planned operating costs, demonstrating that the goals and measures set over the course of the restructuring process have been successfully realized. Aggregated revenues over the period were slightly lower than budgeted, however individual companies within the sector have exceeded both the budgeted and last year's revenues in May, indicating that the positive trend of increasing revenues and stabilizing operations has been maintained. Although actual revenues were lower than budgeted, the continuous reduction of operating costs has resulted in EBITDA exceeding planned levels.

The trend of generating positive results in the Food sector has continued. Sales revenues and the operating result (EBITDA) exceeded budget. The companies continued to launch innovative products on the market. Above average sales revenues and increased operating efficiency resulted in continued extraordinary results in the frozen food and ice cream segment. The operating result of the drinks segment was above budget, in spite of the slightly lower-than-planed sales revenues. The meat segment generated higher-than-budgeted operating profits as a result of lower raw-material prices and the implementation of a cost control program. Continued and intensive pressure on sunflower prices in some markets continues to negatively affect the results in the oils segment.

The Agriculture sector has recorded a 4.7% drop in revenues as against plan in May due to the continued depressed prices of finishers and pork at the commodity exchanges. The drop in revenues has been somewhat mitigated and the decrease in EBITDA stabilized by the strengthening of other activities. In the forthcoming period it is planned to set off the significant loss generated due to the price drop in European commodity exchanges with positive natural results (i.e. from the harvest) in the forthcoming season.

8



## 2.1. Agrokor Group

Within the scope of this report, the Agrokor Group includes 16 companies in three business segments: Retail and Wholesale (Konzum Croatia, Tisak, Konzum B&H and Velpro - Centar); Food (Drinks - Jamnica, Roto dinamic, Sarajevski kiseljak; Ice cream and frozen food - Ledo, Frikom, Ledo Čitluk; Oil - Zvijezda, Dijamant and Meat - PIK Vrbovec) and Agriculture (Belje, PIK Vinkovci and Vupik).

The table shows summarized results of cumulative revenues and EBITDA by month for all companies of the Group comprised in this report, while the results for individual business segments and companies are set out in the subsections to follow.






*NOTE: All results are preliminary.*

**Agrokor Group reporting includes 16 companies:**

- **Retail and Wholesale** includes four companies' summarized results:
  - *Retail*: Konzum Croatia, Konzum BiH, Tisak
  - *Wholesale:* Velpro - Centar
- **Food** includes nine companies' summarized results:
  - *Beverages:* Jamnica, Sarajevski kiseljak and Roto dinamic
  - *Ice Cream and Frozen Food:* Ledo, Frikom and Ledo Čitluk
  - *Oil:* Zvijezda and Dijamant
  - *Meat:* PIK Vrbovec
- **Agriculture** includes three companies' summarized results:

9



## 2.2. Companies in the retail and wholesale sector

Companies in the retail and wholesale sector are Konzum, Konzum BiH, Tisak and Velpro - Centar. The table below shows the cumulative revenue and EBITDA by month for the sector, with results of individual companies portrayed in detail in subsections which follow.

### Cumulative revenue and EBITDA by month 2018 (HRK m) *

**Retail & Wholesale**





Includes four companies' summarized results:

- ▪ *Retail:*        Konzum Croatia, Konzum BiH, Tisak
- ▪ *Wholesale:*    Velpro - Centar

*NOTE: All results are preliminary.*

■ Cumulative YTD budget        ■ Cumulative YTD actual



## 2.2.1. Companies in the retail and wholesale sector:  Konzum d.d.

### 2.2.1.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 3,313 | 3,298 |
| EBITDA | 42.6 | -1.6 |
| EBITDA % | 1.2% | -0.1% |

*NOTE: All results are preliminary.*

### 2.2.1.2.  Commentary on recent trading

- Konzum has stabilized its operations and in the current year is fully realizing the goals of the Viability Plan.
- In May, there was a positive trend in the return of customers, with 6.5% more than the comparable retail network (LFL) in 2017. More customers, with an average basket increase of 11.3%, has resulted in a higher turnover than in May 2017 by 18.5% on the comparable retail network (LFL).
- Retail revenues in the first 5 months are above the plan by 4.2%, while in May it is up by 7.9%. Total cumulative revenue is slightly below the plan due to the lower performance of non-core businesses (wholesale and gas stations) which, by design, achieve a lower relative margin and therefore do not significantly affect the overall business performance.
- Total retail margin in May was 8.7% higher than the plan, while the year-on-year increase was 3.4%.
- Rationalization measures and cost management resulted in cumulative operating expenses being lower than planned by 2.3%, although in May, a seasonal bonus of HRK 1,200 that had been planned for June was paid to all employees.
- EBITDA in May is positive and as in every month of this year it is above the plan, which in the year to date results in an out-performance of HRK 44.2 million compared to the plan.
- As an employee care program in May, HRK 1,200 was paid to each employee as a seasonal bonus. Annual salaries increased by 6% for 1,900 retail employees in a continuation of the initiative started in the summer of 2017, whereby a total of 6,000 employees in retail have now received a 6% increase in income and 836 employees have been promoted. So far, in 2018, over 700 new employees have been hired.
- In May, Konzum was rewarded with the award "Najdonator" as the retailer who donated the most food to charity in 2017 and also received sincere thanks from the Ana Rukavina Foundation as employees in the administrative offices of Konzum joined the Croatian Register of voluntary stem cells donors at the beginning of 2018.
- In May, a transition was made to the new ISO 14001: 2015 environment management system, which brings new areas of focus, such as identifying risks and opportunities related to the environment.

11



### 2.2.2. Companies in the retail and wholesale sector: Konzum BiH

### 2.2.2.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 524 | 538 |
| EBITDA | -11.1 | -8.7 |
| EBITDA % | -2.1% | -1.6% |

*NOTE: All results are preliminary.*

### 2.2.2.2.  Commentary on recent trading

- Accumulated revenue from January to May is 2.5% behind the plan, while the May revenue is 12% behind due to the annual calendar shift of Ramadan, driving considerably lower consumption during this time.
- LFL turnover for May decreased by 2.5% in relation to the same period of the previous year, footfall decreased by 3.2%, while the basket size increased by 0.8%.
- The realized margin percentage from January to May increased by 0.2 percentage points compared to the accumulated margin percentage of the first four months. Absolute margin in May follows the revenue decrease in relation to the plan, while cumulatively absolute margin decreased by 5%.
- During May, many promotional marketing activities and campaigns were implemented:
  - Campaigns related to seasonal cleaning, spring, BBQ season, as well as spending time with nature / in the outdoors.
  - Activities related to Ramadan (special promotional activities, sponsorships, the Ramadan broadcast and brand product placement)
  - Special edition themed catalogue on the topics: Appliances and Summer assortment
  - Preparation of assortment, presentation of the offer and leasing of a special media space in preparation for the World Cup.
  - Activities related to the regular catalogue, Price of the day, Top Saturday
  - Continuous prize games and customers' rewarding via digital channels
- Realized costs and expenses in the period from January to May 2018 are lower than planned by 0.5%, while they are also within the plan for May.
- The revenue decrease in May meant a positive EBITDA was not achieved, which contributed to a reduction in cumulative EBITDA.
- During June, further focus will be put on marketing and pricing activities related to marketing the World Cup and Bayram, as well as the continuous promotion of new products from the assortment.





### 2.2.3. Companies in the retail and wholesale sector: Tisak d.d.

#### 2.2.3.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 717 | 807 |
| EBITDA | -11.3 | 4.1 |
| EBITDA % | -1.6% | 0.5% |

*NOTE: All results are preliminary.*

#### 2.2.3.2.  Commentary on recent trading

- The gross margin percentage in May 2018 continues with a positive trend, and as in April was better than projected (actual 22.9% vs projected 22.3%). As in the previous period Tisak continues to feel the positive effects of the sale of albums and stickers related to the World Cup, the introduction of new (broader) assortments, new price policies and a reduction in the wholesale business that worked with a significantly smaller margin.

- EBITDA development, as started in H2 2017, continues to improve, as a result of the implementation of the restructuring measures. However, the May 2018 result, a negative EBITDA of HRK 2.4 million, was below plan. The main reason for this result is the payment of a one-off vacation benefit paid to employees in the amount of HRK 5 million. Without this one-off expense EBITDA would have been positive HRK 2.6 million, which demonstrates the continuation of the significant positive trends over the period outside and before the tourist season.

- After achieving budgeted gross margin in April, the retail segment improved its gross margin in May by HRK 0.4 million. As in April, the May results of tobacco and commodity goods sales were above expectations due to sales activities, and newspapers sales were slightly below expectations. The sales of ZET travel tickets, which had been suspended until the end of April, didn't achieve the budgeted amount. Revenue and gross margin in the wholesale segment are below expectations (as in the previous months) in the category of commercial commodities and telecom vouchers due to delays in extending a new assortment. Furthermore, revenues from courier services were below expectations in the package distribution category. However, the finalisation of contract negotiations with new suppliers, which commenced at the end of April, is expected to result in a positive outcome imminently.

- Thanks to previously implemented restructuring measures, the budgeted monthly operating cost of HRK 40.6 million was realized. However, these results include the one-off vacation benefit to employees in the amount of HRK 5 million (the payment was budgeted for in June 2018). Excluding this, the expenses were HRK 0.3 million below the plan. The next steps in restructuring the company will be aimed at finalizing logistics improvements. Due to its complexity it is taking longer than anticipated to implement this and realize higher revenue and gross margins.

14



### 2.2.4. Companies in the retail and wholesale sector: Velpro - Centar d.o.o.

#### 2.2.4.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 379 | 520 |
| EBITDA | -16.9 | -8.8 |
| EBITDA % | -4.5% | -1.7% |

*NOTE: All results are preliminary.*

#### 2.2.4.2.  Commentary on recent trading

- In May, the gap between budget and actual revenue was lower than in previous months. Cumulative revenue remains below the plan due to uncertainty in the market, implementation of the Laws on Unfair Commercial Practice and the later than expected start of the season for the HoReCa sales channel.

- Although the realized costs were slightly higher than planned, cumulative expenditure remains in line with the plan.

- The absolute gross margin achieved in May was slightly above the plan, while the realized margin percentage was 5.4 percentage points better than planned. The cumulative margin percentage is higher than the plan.

- The cumulative EBITDA is below the plan as a result of lower revenues than the budget- Results are expected to  improve during the critical summer months

- The most significant business activities during the reporting period are as follows:

  o New credit control policies were applied which have resulted in significant positive effects in cash inflows and billing.

  o Negotiations with the remaining key suppliers were concluded and co-operation for the current year was agreed.

15



## 2.3. Companies in the food sector

Companies in the food sector are Jamnica, Sarajevski kiseljak, Roto dinamic, Ledo, Frikom, Ledo Čitluk, Zvijezda, Dijamant, and PIK Vrbovec. The table below shows cumulative revenue and EBITDA by month for the sector, with results of individual companies within the sector portrayed in detail in the subsections which follow.

### Cumulative revenue and EBITDA by month 2018 (HRK m) *

**Food**





Includes nine companies' summarized results:

- *Beverage:* Jamnica, Sarajevski kiseljak and Roto dinamic
- *Ice Cream and Frozen Food:* Ledo, Frikom and Ledo Čitluk
- *Oil:* Zvijezda and Dijamant
- *Meat:* PIK Vrbovec

*NOTE: All results are preliminary.*

■ Cumulative YTD actual     ■ Cumulative YTD budget

16



### 2.3.1. Companies in the Food sector: Jamnica  d.d.

#### 2.3.1.1.   Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 427 | 437 |
| EBITDA | 82.3 | 75.1 |
| EBITDA % | 19.3% | 17.2% |

*NOTE: All results are preliminary*

#### 2.3.1.2.   Commentary on recent trading

- EBITDA generated in May exceeded budget as a result of increased revenues, improved efficiency and operating cost savings.

- Generated sales revenues were above budget. The main reason for increased revenues on the domestic market were higher than expected average temperatures and the closing of agreements with certain customers with whom there was no agreement in place due to the implementation of the Unfair Trading Practices Act, which became effective on 1 April 2018.

- May saw the start of the first phase of the new campaign "Deep Above All", further to the launch of Jana with the redesigned label.

17



### 2.3.2. Companies in the Food sector: Roto dinamic d.o.o.

#### 2.3.2.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 291 | 316 |
| EBITDA | 16.0 | 3.7 |
| EBITDA % | 5.5% | 1.2% |

*NOTE: All results are preliminary*

#### 2.3.2.2.  Commentary on recent trading

- Sales revenues overall in May were slightly below budget. Sales exceeded plan in the regions of Istria and Kvarner due to the timely preparation for the season and attracting new customers, while the regions of Dalmatia and Slavonia generated sales revenues slightly below budget.

- Sales in the region of Zagreb and Greater Zagreb have been negatively affected due to new competitors entering the market and as a consequence the focus has been on activities designed to retain market share.

- All of the above resulted in lower-than-planned EBITDA generation in May, although the cumulative EBITDA is still well ahead of budget.

18



### 2.2.3. Companies in the Food sector: Sarajevski kiseljak d.d.

#### 2.3.3.1.   Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 128 | 130 |
| EBITDA | 26.6 | 26.2 |
| EBITDA % | 20.8% | 20.2% |

*NOTE: All results are preliminary.*

#### 2.3.3.2.   Commentary on recent trading

- EBITDA generated in May was in line with budget.

- Sales revenues exceeded budget, mainly thanks to strong sales in the domestic market due to the favourable weather conditions.

- Sarajevski kiseljak launched several innovations in May: 'The Irresistible Taste of Sensation Rose', to join other original flavors of Sensation and the slightly carbonated Sarajevski kiseljak intended for those with a more sensitive palate. The positive customer reactions to these products have been reflected in good sales results.



### 2.2.4. Companies in the Food sector: Ledo  d.d.

#### 2.2.4.1.   Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 400 | 365 |
| EBITDA | 59.3 | 54.3 |
| EBITDA % | 14.8% | 14.9% |

*NOTE: All results are preliminary.*

#### 2.2.4.2.   Commentary on recent trading

- EBITDA generated in May exceeded the plan due to higher sales revenues and increased operating efficiency.

- With an extensive marketing campaign and the quality of sales activities, sales revenues exceeded budget, particularly in the most profitable category – ice cream.

- May saw the start of intensive marketing communication in the ice cream category.

- In the frozen food category a new product line, Smoothie Mix, was launched.



### 2.2.5. Companies in the Food sector: Ledo Čitluk d.o.o.

#### 2.2.5.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 126 | 109 |
| EBITDA | 23.5 | 17.7 |
| EBITDA % | 18.6% | 16.1% |

*NOTE: All results are preliminary.*

#### 2.2.5.2.  Commentary on recent trading

- Ledo Čitluk has continued the trend of record results in May, having generated better-than-planned EBITDA.

- The growth of sales revenues in May exceeded plans, mostly in the ice cream category. The extremely warm weather resulted in ice cream sales above average and revenue generation better than expected.



### 2.2.6. Companies in the Food sector: Frikom d.o.o.

#### 2.2.6.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 334 | 305 |
| EBITDA | 78.5 | 54.3 |
| EBITDA % | 23.5% | 17.8% |

*NOTE: All results are preliminary.*

#### 2.2.6.2.  Commentary on recent trading

- EBITDA in May exceeded budget as a result of increased operating efficiency, focusing on profitable product groups and a lower level of COGS.

- Sales revenues were significantly higher than budgeted as a consequence of increased sales of all ice cream categories due to favourable weather conditions as well as significant sales of new products launched over the course of this year.

- A significantly higher number of points of delivery as well as a significantly better market positioning were also important factors which have led to sales growth.



## 2.2.7. Companies in the Food sector: Zvijezda d.d.

### 2.2.7.1.   Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 271 | 258 |
| EBITDA | 26.2 | 22.6 |
| EBITDA % | 9.6% | 8.8% |

*NOTE: All results are preliminary.*

### 2.2.7.2.   Commentary on recent trading

- May saw the growth of sales revenues in the own products and merchandise segments. Sales growth was generated in the key categories: oil, mayonnaise and ketchup.

- The start of the "supporter" campaign for ketchup (adjusting the existing TV campaign) and the limited edition, checkered fan-packaging of 500g bottles in retail contributed to generating higher sales revenues.

- EBITDA generation in May was slightly lower than budgeted.



## 2.2.8. Companies in the Food sector: Dijamant a.d.

### 2.2.8.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 291 | 363 |
| EBITDA | 13.6 | 16.8 |
| EBITDA % | 4.7% | 4.6% |

*NOTE: All results are preliminary.*

### 2.2.8.2.  Commentary on recent trading

- Due to the continued extreme pricing pressure on sunflower oil, sales revenues generated in May were lower than budgeted.

- Revenues in the other key categories – mayonnaise, industrial margarine, marinaded horseradish, ketchup, vinegar and merchandise were above plan.

- Revenues from sales of sunflower and soya meal also exceeded budget, given the positive trend in the Serbian market and foreign markets. Due to significant exports of sunflower oil, the price growth trend is expected to continue during June and July, with a positive impact on revenues and profitability.

- Given the high share of oil sales revenues in total revenues, EBITDA was lower than budgeted.



### 2.2.9. Companies in the Food sector: PIK Vrbovec d.d.

#### 2.2.9.1.   Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 666 | 679 |
| EBITDA | 55.4 | 47.9 |
| EBITDA % | 8.3% | 7.1% |

*NOTE: All results are preliminary.*

#### 2.2.9.2.   Commentary on recent trading

- EBITDA generated in May was significantly higher than planned, as a result of stable revenues, raw material prices which were lower than planned as well as on-going controlled cost management.

- Revenues generated in May were in line with the budget.

- The month saw the launch of new grill sausages which generated additional sales. Fresh packaged meat and the fresh grill assortment have also had increased exposure in all retail chains.



### 2.3. Companies in the agriculture sector

Companies in the agriculture sector are Belje, PIK Vinkovci and Vupik. The table below shows the cumulative revenue and EBITDA for the sector, with results of individual companies portrayed in detail in subsections which follow.






Includes three companies' summarized results:
- Belje, PIK Vinkovci and Vupik

*NOTE: All results are preliminary.*

■ Cumulative YTD actual     ■ Cumulative YTD budget



### 2.3.3. Companies in the agriculture sector: Belje d.d.

#### 2.3.3.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 469 | 516 |
| EBITDA | 47.0 | 65.8 |
| EBITDA % | 10.0% | 12.8% |

*NOTE: All results are preliminary.*

#### 2.3.3.2.  Commentary on recent trading

- Revenues from products and services in the current period were below budget, mostly due to the prices of finishers and semi-hard cheese, which are significantly below planned sales prices.

- Due to the lower-than-planned sales prices of finishers and semi-hard cheese, EBITDA generated in the current period was below budget.

- The planned price of finishers was HRK 9.38/kg, while the actual price realized in the current period amounted to HRK 8.06/kg, with a negative effect on EBITDA in the amount of HRK 16.7m.

- The budgeted price of semi-hard cheese was HRK 27.66/kg and the actual price was HRK 19.34/kg, with a negative effect on EBITDA of HRK 12.7m.

- In spite of the total effect of lower prices of finishers and semi-hard cheese on EBITDA being HRK 29.4m, EBITDA was lower than planned by HRK 18.8m thanks to cost optimization strategies such as a reduced cost per product unit. Significant savings were made on raw-material and material costs, mainly due to lower input prices of raw materials for animal feed production, seeds for crop productions, plant protection chemicals and meat for cured meat production. The establishment of a direct relationship with suppliers also resulted in lower input prices of animal feed components and packaging.

- Inventory levels were higher at the end of the current period as against the same period last year, mainly due to raw material and material inventories for the production of animal feed, which were repurchased during the season at prices lower than the current market prices.



### 2.3.4. Companies in the agriculture sector: PIK Vinkovci d.d.

#### 2.3.4.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 254 | 244 |
| EBITDA | 11,9 | 18,8 |
| EBITDA % | 4,7% | 7,7% |

*NOTE: All results are preliminary.*

#### 2.3.4.2.  Commentary on recent trading

- In May and for the cumulative period, the main sales revenues are accounted for by sales of oil and cereal crops and sales of production materials to contract farmers – in particular mineral fertilizers, sales of soya meal, piglets, fresh fruit and vegetables. Sales revenues exceeded budget by ca. 4.3%, except for sales of piglets where, due to the drop in prices as against plan and lower quantities sold, sales revenues as well as EBITDA were lower than planned by HRK 5.4m.   Here the budgeted price was HRK 18/kg with an actual average price realized of HRK 12.63/kg. A higher volume of sales were generated due to sales of cereal crops being  59.8% higher than  plan, sales of soya meal exceeding plan by 28.4% and sales of reproduction materials to contract farmers being 14% higher than planned. The difference in EBITDA as against plan is also due to slightly lower-than-planned sales prices and quantities of fresh vegetables, mainly onions, sold.

- May saw the trend of increased trading activities, reduced DSO and DPO continue. The reduced DPO in May as against April resulted from the new legal provisions and maturity periods reduced from 60 to 30 days. This mostly applies to suppliers from whom the company has repurchased fresh fruit and vegetables. With the continued increased sales of goods in May and faster rotation of merchandise, the drop in DIO as against the previous period has continued.



### 2.3.5. Companies in the agriculture sector: Vupik d.d.

#### 2.3.5.1.  Financial results YTD and KPIs

| Financial results* | Jan-May 2018 (HRK m) | Budget 2018 (HRK m) |
|---|---|---|
| Revenue | 90 | 94 |
| EBITDA | 5.8 | 18.5 |
| EBITDA % | 6.5% | 19.7% |

*NOTE: All results are preliminary.*

#### 2.3.5.2.  Commentary on recent trading

- Revenues from sales of products and services in the cumulative period were lower than budgeted, mostly due to the drop in prices of finishers and the abandonment of the contract farming business. The abandonment of contract farming in 2018 has resulted in lower sales revenues as against 2017, but also in lower COGS. The sales price of finishers in May was lower compared to the previous month, directly affecting the company's profits.

- Cumulative EBITDA for the first five months was lower than budgeted due to the continued low market value of finishers.

- The levels of raw-materials, materials and finished products as against last month have increased due to the receipt of new animal feed quantities from crop husbandry.



## 3. Short-term cash position

### 3.1. Cash management

The Group continues to actively manage its liquidity with cash flow forecasts being updated on a fortnightly basis, and weekly/fortnightly payment budgets being derived on that basis. Payment requests of the Croatian Group companies are reviewed/approved in order to execute payments. In the period since the new financing was raised in June 2017 to the beginning of June 2018, net funds of HRK 1.4 billion have been deployed into the businesses to assist with liquidity.

As discussed in previous monthly reports, this cash was used primarily to unwind trade payables in relation to the period post 10 April 2017, and to restock the businesses. It continues to enable the operating companies of the Group to fully prepare for the seasonal summer business in 2018, as it did in 2017. This is seen as one of the major achievements of the overall restructuring process during the Extraordinary Administration.

The table below provides a summary of the current and previous cash flow forecast:

| CW25 Forecast - 19 Core Subsidiaries 13 Week STCF vs prior week (HRK m) | | |
|---|---|---|
| | Current STCF (CW 25) | Prior week STCF (CW 23) |
| Minimum cash balance (13w) | 786 | 679 |
| Maximum cash balance (13w) | 1,343 | 1,308 |
| Minimum Liquidity covenant | 296 | 296 |
| **Available liquidity** | **490 – 1,047** | **383 – 1,012** |

### 3.2. Supplier claims settlement

**Basket for Payment of Pre-Petition Trade Claims**

The SPFA provided for a basket of EUR 150 million for payment of pre-petition trade claims which became due and payable prior to the opening of the EA Proceedings which was communicated publicly in the week ending 28th July 2017. The purpose of these funds was to benefit the EA Proceedings by ensuring continuous support of the Agrokor Group's business by trade suppliers. This EUR 150 million tranche was split into three pools:



## (a) Pool A

Pool A is a dedicated pool of up to EUR 30 million for pre-petition debt (excluding Border Claims (as defined below)) held by 'micro' suppliers, defined as family farms (OPG), small entrepreneurs and micro-suppliers. Micro suppliers were defined as suppliers with (i) annual revenue of less than HRK 5.2 million, or (ii) a maximum of HRK 2.6 million in assets and (iii) up to 10 employees, and designed to protect the most vulnerable suppliers and secure their continued supply to the Agrokor Group. Approx. 2,500 micro suppliers received 100% settlement of their pre-petition debt (excluding Border Claims) with Pool A utilisation.

EUR 19 million has been paid.

## (b) Pool B

Pool B is a dedicated pool of up to EUR 110 million open to all suppliers (except the Pool A micro suppliers) set up for the purpose of helping to return suppliers to favourable terms and improve the working capital and liquidity position of the Agrokor Group. Concerned suppliers were required to confirm that they will return to historic and/or industry standard terms of supply in order to be eligible. The funds in Pool B were allocated to suppliers based on their claims and ongoing support for the business. The overarching approach to allocation was split between the following two tranches:

– pro rata tranche (Tranche 1): EUR 27.5 million distributed on a pro rata basis to all old debt suppliers that filed their claims in the EA Proceedings; and

– proportional tranche (Tranche 2): allocated on a proportional basis to suppliers holding pre-petition claims which became due prior to the opening of the EA Proceedings, that filed their claims in the EA Proceedings and agreed to sign an agreement with the Agrokor Group to return to historic supplier terms going forward, to a maximum of 40% of supplier's pre-petition debt (excluding Border Claims), taking into account any amounts paid previously for pre-petition debt (excluding Border Claims).

In order to determine the amounts to be allocated in Pool B, a two-step eligibility assessment process was applied:

– in a first step, each EA Entity identified its important suppliers and offered new supply contracts; and

– in a second step, suppliers with signed contracts were eligible for allocation of Tranche 2 from Pool B.



**(c) Pool C**

Pool C is a discretionary pool of up to EUR 10 million for settlement of trade supplier claims in respect of claims which accrued prior to the opening of the EA Proceedings, in accordance with identified business needs with the purpose of setting aside funds to be made available for business-critical payments required to handle any special situations which would prevent damage to the business' operations.

To date, the total amount of cash payments under Pool C is EUR 4.3m.

Any residual unused funds from EUR 150 million basket were used for structured Border Claims payments.

The total amount of cash payments for pre-petition debt (excluding Border Claims) under Pool B is EUR 84.9 million.

### 3.2.3. Border claims

During 2018 the Extraordinary Administration paid border claims in order to reach a minimum of 54.59% of the supplier's border claim to those suppliers who had signed agreements with the Group to return to historic supplier terms.

### 3.2.4. Trade finance facility

The EUR 100m pool previously reported has been allocated to eligible suppliers that have a high goods turnover.

A total of 44 suppliers signed up to access the trade facility in the total amount of EUR 96.5m, which represents a total of EUR 48.24m for goods and services. Of this amount, EUR 47.8m of goods and services have already been provided.



## 4. Cost of Extraordinary Administration and operational business of Agrokor d.d.

As in previous months, the Extraordinary Administration continues to manage accrued operational business expenses. These expenses relate wholly and directly to the various centralized services provided across the Group.

An overview of the Group's operating costs paid to the end of May 2018, grouped by cost type, can be found in the table overleaf. These figures are reported net of VAT to enhance the transparency of the true costs to the Group. The cost categories detailed include all advisors whether instructed before or after the Extraordinary Administration commenced.

Invoices continue to be booked and paid on an *ad hoc* basis, in line with services delivered. In recent weeks, the Group has negotiated variations to the fee arrangements of a number of advisors due to the change in the type and amount of work, team structure and their assignments which has resulted in certain reductions of fees.

Total employee headcount at the end of May 2018 was 91 and severance payments totaling HRK 82,550 have been made in the reporting period.

The largest contributor to the overall increase in operational costs for May 2018 of HRK 97.5 million was the HRK 75.1 million in legal costs and HRK 15.9 million in restructuring costs, in the run up to delivery of the settlement plan.



| OPERATING COSTS of AGROKOR D.D. (HRK) | Apr-Dec 2017 | January 2018 | February 2018 | March 2018 | April 2018 | May 2018 | Total |
|---|---|---|---|---|---|---|---|
| **Total cost of salaries and fees** | | | | | | | |
| Commissioner's fee | 1,040,991 | 118,970 | 118,970 | 118,970 | 118,970 | 118,970 | 1,635,843 |
| Employees and service contracts (Bruto II included) [3] | 53,190,186 | 4,068,203 | 4,082,330 | 4,620,014 | 4,576,878 | 4,413,914 | 74,951,526 |
| Severance payments | 24,960,182 | - | - | - | - | 82,550 | 25,042,732 |
| | **79,191,359** | **4,187,174** | **4,201,301** | **4,738,985** | **4,695,848** | **4,615,434** | **101,630,101** |
| | | | | | | | |
| **Consultant fees [4]** | | | | | | | |
| Legal | 81,513,524 | 10,221,146 | 7,838,672 | 11,097,443 | 8,184,446 | 75,126,322 | 193,981,553 |
| Financial | 31,579,403 | 3,685,064 | 1,911,455 | 386,072 | 2,058,234 | 15,898,809 | 55,519,036 |
| Restructuring | 116,997,520 | 12,758,536 | 14,873,768 | 14,507,483 | 12,239,724 | 18,973,150 | 190,350,182 |
| Other (forensics, HR) | 9,847,447 | 1,902,977 | 989,393 | 1,272,985 | - | 562,567 | 14,575,369 |
| | **239,937,894** | **28,567,723** | **25,613,288** | **27,263,983** | **22,482,404** | **110,560,848** | **454,426,140** |
| | | | | | | | |
| **Audit and tax services** | **10,026,887** | **738,751** | **3,717,381** | **3,058,887** | **1,246,049** | **7,118,605** | **25,906,560** |
| | | | | | | | |
| **Utilities costs** | **2,281,818** | **195,547** | **143,328** | **270,254** | **146,675** | **237,543** | **3,275,165** |
| | | | | | | | |
| **Material costs** | | | | | | | |
| Transportation costs (insurance, maintenance, fuel, etc.) | 5,261,724 | 218,024 | 359,076 | 385,199 | 364,957 | 391,549 | 6,980,528 |
| Ongoing maintenance | 3,126,412 | 417,521 | 561,198 | 408,148 | 306,668 | 414,842 | 5,234,790 |
| Other | 4,732,845 | 54,537 | 39,846 | 996,524 | 1,445,142 | 4,006,573 | 11,275,467 |
| | **13,120,981** | **690,082** | **960,120** | **1,789,871** | **2,116,767** | **4,812,964** | **23,490,785** |
| | | | | | | | |
| **Insurance costs - management liability insurance** | **14,971,419** | **-** | **-** | **-** | **-** | **-** | **14,971,419** |
| | | | | | | | |
| **Cost of new financing** | **47,018,273** | **-** | **-** | **11,596,358** | **1,794,011** | **126** | **60,408,769** |
| | | | | | | | |
| **Travel costs / education** | **402,597** | **38,735** | **27,017** | **52,219** | **55,794** | **77,632** | **653,994** |
| | | | | | | | |
| **Other costs [5]** | **46,605,780** | **1,451,243** | **218,782** | **1,371,182** | **2,549,091** | **5,128,296** | **57,324,374** |
| | | | | | | | |
| **Amortization / Depreciation** | **4,758,083** | **-** | **905,559** | **452,779** | **452,917** | **452,371** | **7,021,711** |
| | | | | | | | |
| **Total [1,2]**<br>(April 2017 adjusted for operating costs after 10 April 2017) | **458,315,093** | **35,869,254** | **35,786,776** | **50,594,518** | **35,539,557** | **133,003,819** | **749,109,018** |

**Notes:**

1. Total operating costs of Agrokor d.d. (without adjustments or deduction of costs for the period from 1 April 2017 to 10 April 2017) plus all subsequent month's amount to the total operating costs of Agrokor d.d. (this is the number in SAP; HRK 776,973,295).

2. Total operating costs in the sum of HRK 749,109,018 is the best representation of the operating costs of Agrokor d.d. since the start of the Extraordinary Administration (being total costs excluding the period 1 April 2017 to 10 April 2017).

3. The Deputy Extraordinary Administrator's fee is categorized as an employee cost as opposed to a Commissioner fee.

4. Consultant fees are adjusted for the proportion of their costs related to VAT and the pro-rata system Agrokor is in, for the Extraordinary Administration.

5. Adjustments totaling HRK 27,864,277 have been made for operating costs that relate to the period 1 April 2017 to 10 April 2017. Other costs include all other SAP accounts which are not separately listed in the above table. Hence, this can result in negative amounts in certain categories for a given period. Furthermore, it includes suppliers after 10 April 2017 which are not captured within consultant fees.

6. The above table remains subject to change; however, operating costs shown are the best representation as at the date of this report and includes an estimate for amortization which is yet to be actualized.

7. As invoice bookings and payments do not necessarily correspond with the period for which services were provided, operating costs in the above table may be reallocated between months once payments are complete to best reflect when services were provided. The monthly categorization in the above table is therefore the best representation as at the date of this report.

34



## 5. Litigation

The present reporting period saw some developments in the various litigation and enforcement proceedings formally issued against the Group.

There were no updates in Croatia, or Montenegro during this period.

In England and Wales, following an agreement between the parties and confirmation by the Court of Appeal, the hearing that had been listed to take place before three Lord Justices of Appeal in London on 19 and 20 June 2018 was vacated. The hearing will be relisted for the first available date after 1 October 2018.

In Serbia, the Extraordinary Administration's legal counsel attended a hearing in the litigation brought by Banca Intesa against Agrokor d.d. (case no. P-6465/17). Both parties had filed expert evidence in the matter, and the court directed that a further independent expert be appointed to give an opinion to the court. A further hearing will be scheduled once that evidence has been delivered. According to the Serbian court's online portal, the second instance court also upheld the decisions of the first instance court in the cases brought by Sberbank d.d. Zagreb against Konzum d.d. (case no. P 6397/2017, appeal ref Pz 2911/2018) and Jamnica d.d (case no. P 5726/2017, appeal ref Pz 1640/2018), in each case concluding that the Serbian court is not competent to hear the proceedings.

In Slovenia, Sberbank of Russia filed a reply in the proceedings against Agrokor d.d. seeking a temporary injunction over the shares in Mercator d.d. (case no. is Zg 32/2017) and the decision is awaited.

In Bosnia and Herzegovina, the Supreme Court of the Federation of Bosnia and Herzegovina reached a decision in the proceedings brought by Sberbank of Russia against Jamnica d.d. (case no. 51 0 Ps 126516 17 Mo), confirming the decision of the Municipal court in Travnik that it was not competent to hear the proceedings.

Finally, on the Finality of the Court Order as defined in the Settlement Plan the litigation brought by Sberbank of Russia and its affiliates will be withdrawn.



## 6. Temporary Creditors' Council

At its session held on 19 June 2018 the Temporary Creditors' Council unanimously consented to the the proposed final wording of the Settlement Plan . Further to the approval given by the Temporary Creditors' Council, the Extraordinary Administration submitted the proposed Settlement Plan to all creditors by way of publication at the Court's e-bulletin board.



## 7. Registration of claims

In the reported period, the Extraordinary Administration's challenges of individual claims have been withdrawn (Hircus d.o.o. – HRK 24,237,745.17, M.O.F. Development of Trading Centers d.o.o. – HRK 46,190,115.54, Sberbank Group – HRK 8,523,712,095.51).

On 11 June 2018 the Extraordinary Administration, pursuant to the Decision of the High Commercial Court of the Republic of Croatia, docket no. Pž-1834/2018 dated 26 April 2018, submitted to the court a supplement to the table of verified claims, which verified additional claims from Imex banka d.d., Municipality Draž, DS Smith Belišće Croatia d.o.o., Tutus Projekt d.o.o. and Gorenjska Banka d.d.

After the implementation of all of the above mentioned changes as well as the withdrawal of claim filings, the final status of determined claims is HRK 41,973,827,407.65 (of which HRK 25,326,234,225.07 are determined non-settled claims, excluding internal claims), while the total of contested claims amounts to HRK 12,775,491,263.64.

On 4 July 2018 the creditors accepted the Settlement Plan at the settlement plan voting hearing. A majority of 80.20%, consisting of creditors with claims of HRK 27,075,097,019.27 out of a total claim pool of HRK 33,759,582,335.23 with voting rights voted in favour of the proposed Settlement Plan.



# 8. Stakeholder relations and communications

This reporting period again saw continued dynamic and transparent communication and interaction with all key stakeholders.

The most important news of the reporting period relates to the Settlement Plan receiving an affirmative vote from the Group's creditors at the hearing held on 4 July, 2018. The Settlement Plan was passed with 80.20% of total claims voting in favour.

At a session of the Croatian Parliament's Board of Economy dedicated to Agrokor, held on 27 June 2018, Fabris Peruško, Extraordinary Commissioner for Agrokor and Irena Weber, Deputy Extraordinary Commissioner, presented a report on the course of the settlement and other operating processes at Agrokor and replied to questions raised by Members of Parliament.

The media communication segment oversaw frequent communications with the media including more than 70 various media activities, such as media queries, press releases, media statements, interviews, representatives of the Extraordinary Administration participating in various TV and radio broadcasts and so on.

All communication activities realized in the reporting period were intended to support a successful closing of the Settlement Plan.

Report prepared by:


Fabris Peruško                                          Irena Weber
Extraordinary Trustee                    Deputy Extraordinary Trustee
Agrokor d.d.                                            Agrokor d.d.

## **Appendix D**

**Recast Insolvency Regulation (EU) 2015/848**

5.6.2015          [EN]          Official Journal of the European Union          L 141/19

**REGULATION (EU) 2015/848 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL**

**of 20 May 2015**

**on insolvency proceedings**

**(recast)**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 81 thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Having regard to the opinion of the European Economic and Social Committee (¹),

Acting in accordance with the ordinary legislative procedure (²),

Whereas:

(1)    On 12 December 2012, the Commission adopted a report on the application of Council Regulation (EC) No 1346/2000 (³). The report concluded that the Regulation is functioning well in general but that it would be desirable to improve the application of certain of its provisions in order to enhance the effective administration of cross-border insolvency proceedings. Since that Regulation has been amended several times and further amendments are to be made, it should be recast in the interest of clarity.

(2)    The Union has set the objective of establishing an area of freedom, security and justice.

(3)    The proper functioning of the internal market requires that cross-border insolvency proceedings should operate efficiently and effectively. This Regulation needs to be adopted in order to achieve that objective, which falls within the scope of judicial cooperation in civil matters within the meaning of Article 81 of the Treaty.

(4)    The activities of undertakings have more and more cross-border effects and are therefore increasingly being regulated by Union law. The insolvency of such undertakings also affects the proper functioning of the internal market, and there is a need for a Union act requiring coordination of the measures to be taken regarding an insolvent debtor's assets.

(5)    It is necessary for the proper functioning of the internal market to avoid incentives for parties to transfer assets or judicial proceedings from one Member State to another, seeking to obtain a more favourable legal position to the detriment of the general body of creditors (forum shopping).

(6)    This Regulation should include provisions governing jurisdiction for opening insolvency proceedings and actions which are directly derived from insolvency proceedings and are closely linked with them. This Regulation should also contain provisions regarding the recognition and enforcement of judgments issued in such proceedings, and provisions regarding the law applicable to insolvency proceedings. In addition, this Regulation should lay down rules on the coordination of insolvency proceedings which relate to the same debtor or to several members of the same group of companies.

(7)    Bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings and actions related to such proceedings are excluded from the scope of Regulation (EU) No 1215/2012 of the European Parliament and of the Council (⁴). Those proceedings should be covered by this Regulation. The interpretation of this Regulation should as much as possible avoid regulatory loopholes between the two instruments. However, the mere fact that a national procedure is not listed in Annex A to this Regulation should not imply that it is covered by Regulation (EU) No 1215/2012.

---

(¹) OJ C 271, 19.9.2013, p. 55.
(²) Position of the European Parliament of 5 February 2014 (not yet published in the Official Journal) and position of the Council at first reading of 12 March 2015 (not yet published in the Official Journal). Position of the European Parliament of 20 May 2015 (not yet published in the Official Journal).
(³) Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (OJ L 160, 30.6.2000, p. 1).
(⁴) Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (OJ L 351, 20.12.2012, p. 1).

(8)     In order to achieve the aim of improving the efficiency and effectiveness of insolvency proceedings having cross-border effects, it is necessary, and appropriate, that the provisions on jurisdiction, recognition and applicable law in this area should be contained in a Union measure which is binding and directly applicable in Member States.

(9)     This Regulation should apply to insolvency proceedings which meet the conditions set out in it, irrespective of whether the debtor is a natural person or a legal person, a trader or an individual. Those insolvency proceedings are listed exhaustively in Annex A. In respect of the national procedures contained in Annex A, this Regulation should apply without any further examination by the courts of another Member State as to whether the conditions set out in this Regulation are met. National insolvency procedures not listed in Annex A should not be covered by this Regulation.

(10)    The scope of this Regulation should extend to proceedings which promote the rescue of economically viable but distressed businesses and which give a second chance to entrepreneurs. It should, in particular, extend to proceedings which provide for restructuring of a debtor at a stage where there is only a likelihood of insolvency, and to proceedings which leave the debtor fully or partially in control of its assets and affairs. It should also extend to proceedings providing for a debt discharge or a debt adjustment in relation to consumers and self-employed persons, for example by reducing the amount to be paid by the debtor or by extending the payment period granted to the debtor. Since such proceedings do not necessarily entail the appointment of an insolvency practitioner, they should be covered by this Regulation if they take place under the control or supervision of a court. In this context, the term 'control' should include situations where the court only intervenes on appeal by a creditor or other interested parties.

(11)    This Regulation should also apply to procedures which grant a temporary stay on enforcement actions brought by individual creditors where such actions could adversely affect negotiations and hamper the prospects of a restructuring of the debtor's business. Such procedures should not be detrimental to the general body of creditors and, if no agreement on a restructuring plan can be reached, should be preliminary to other procedures covered by this Regulation.

(12)    This Regulation should apply to proceedings the opening of which is subject to publicity in order to allow creditors to become aware of the proceedings and to lodge their claims, thereby ensuring the collective nature of the proceedings, and in order to give creditors the opportunity to challenge the jurisdiction of the court which has opened the proceedings.

(13)    Accordingly, insolvency proceedings which are confidential should be excluded from the scope of this Regulation. While such proceedings may play an important role in some Member States, their confidential nature makes it impossible for a creditor or a court located in another Member State to know that such proceedings have been opened, thereby making it difficult to provide for the recognition of their effects throughout the Union.

(14)    The collective proceedings which are covered by this Regulation should include all or a significant part of the creditors to whom a debtor owes all or a substantial proportion of the debtor's outstanding debts provided that the claims of those creditors who are not involved in such proceedings remain unaffected. Proceedings which involve only the financial creditors of a debtor should also be covered. Proceedings which do not include all the creditors of a debtor should be proceedings aimed at rescuing the debtor. Proceedings that lead to a definitive cessation of the debtor's activities or the liquidation of the debtor's assets should include all the debtor's creditors. Moreover, the fact that some insolvency proceedings for natural persons exclude specific categories of claims, such as maintenance claims, from the possibility of a debt-discharge should not mean that such proceedings are not collective.

(15)    This Regulation should also apply to proceedings that, under the law of some Member States, are opened and conducted for a certain period of time on an interim or provisional basis before a court issues an order confirming the continuation of the proceedings on a non-interim basis. Although labelled as 'interim', such proceedings should meet all other requirements of this Regulation.

(16)    This Regulation should apply to proceedings which are based on laws relating to insolvency. However, proceedings that are based on general company law not designed exclusively for insolvency situations should not be considered to be based on laws relating to insolvency. Similarly, the purpose of adjustment of debt should not include specific proceedings in which debts of a natural person of very low income and very low asset value are written off, provided that this type of proceedings never makes provision for payment to creditors.

(17) This Regulation's scope should extend to proceedings which are triggered by situations in which the debtor faces non-financial difficulties, provided that such difficulties give rise to a real and serious threat to the debtor's actual or future ability to pay its debts as they fall due. The time frame relevant for the determination of such threat may extend to a period of several months or even longer in order to account for cases in which the debtor is faced with non-financial difficulties threatening the status of its business as a going concern and, in the medium term, its liquidity. This may be the case, for example, where the debtor has lost a contract which is of key importance to it.

(18) This Regulation should be without prejudice to the rules on the recovery of State aid from insolvent companies as interpreted by the case-law of the Court of Justice of the European Union.

(19) Insolvency proceedings concerning insurance undertakings, credit institutions, investment firms and other firms, institutions or undertakings covered by Directive 2001/24/EC of the European Parliament and of the Council (¹) and collective investment undertakings should be excluded from the scope of this Regulation, as they are all subject to special arrangements and the national supervisory authorities have wide-ranging powers of intervention.

(20) Insolvency proceedings do not necessarily involve the intervention of a judicial authority. Therefore, the term 'court' in this Regulation should, in certain provisions, be given a broad meaning and include a person or body empowered by national law to open insolvency proceedings. In order for this Regulation to apply, proceedings (comprising acts and formalities set down in law) should not only have to comply with the provisions of this Regulation, but they should also be officially recognised and legally effective in the Member State in which the insolvency proceedings are opened.

(21) Insolvency practitioners are defined in this Regulation and listed in Annex B. Insolvency practitioners who are appointed without the involvement of a judicial body should, under national law, be appropriately regulated and authorised to act in insolvency proceedings. The national regulatory framework should provide for proper arrangements to deal with potential conflicts of interest.

(22) This Regulation acknowledges the fact that as a result of widely differing substantive laws it is not practical to introduce insolvency proceedings with universal scope throughout the Union. The application without exception of the law of the State of the opening of proceedings would, against this background, frequently lead to difficulties. This applies, for example, to the widely differing national laws on security interests to be found in the Member States. Furthermore, the preferential rights enjoyed by some creditors in insolvency proceedings are, in some cases, completely different. At the next review of this Regulation, it will be necessary to identify further measures in order to improve the preferential rights of employees at European level. This Regulation should take account of such differing national laws in two different ways. On the one hand, provision should be made for special rules on the applicable law in the case of particularly significant rights and legal relationships (e.g. rights *in rem* and contracts of employment). On the other hand, national proceedings covering only assets situated in the State of the opening of proceedings should also be allowed alongside main insolvency proceedings with universal scope.

(23) This Regulation enables the main insolvency proceedings to be opened in the Member State where the debtor has the centre of its main interests. Those proceedings have universal scope and are aimed at encompassing all the debtor's assets. To protect the diversity of interests, this Regulation permits secondary insolvency proceedings to be opened to run in parallel with the main insolvency proceedings. Secondary insolvency proceedings may be opened in the Member State where the debtor has an establishment. The effects of secondary insolvency proceedings are limited to the assets located in that State. Mandatory rules of coordination with the main insolvency proceedings satisfy the need for unity in the Union.

(24) Where main insolvency proceedings concerning a legal person or company have been opened in a Member State other than that of its registered office, it should be possible to open secondary insolvency proceedings in the Member State of the registered office, provided that the debtor is carrying out an economic activity with human means and assets in that State, in accordance with the case-law of the Court of Justice of the European Union.

(25) This Regulation applies only to proceedings in respect of a debtor whose centre of main interests is located in the Union.

_____

(¹) Directive 2001/24/EC of the European Parliament and of the Council of 4 April 2001 on the reorganisation and winding-up of credit institutions (OJ L 125, 5.5.2001, p. 15).

(26) The rules of jurisdiction set out in this Regulation establish only international jurisdiction, that is to say, they designate the Member State the courts of which may open insolvency proceedings. Territorial jurisdiction within that Member State should be established by the national law of the Member State concerned.

(27) Before opening insolvency proceedings, the competent court should examine of its own motion whether the centre of the debtor's main interests or the debtor's establishment is actually located within its jurisdiction.

(28) When determining whether the centre of the debtor's main interests is ascertainable by third parties, special consideration should be given to the creditors and to their perception as to where a debtor conducts the administration of its interests. This may require, in the event of a shift of centre of main interests, informing creditors of the new location from which the debtor is carrying out its activities in due course, for example by drawing attention to the change of address in commercial correspondence, or by making the new location public through other appropriate means.

(29) This Regulation should contain a number of safeguards aimed at preventing fraudulent or abusive forum shopping.

(30) Accordingly, the presumptions that the registered office, the principal place of business and the habitual residence are the centre of main interests should be rebuttable, and the relevant court of a Member State should carefully assess whether the centre of the debtor's main interests is genuinely located in that Member State. In the case of a company, it should be possible to rebut this presumption where the company's central administration is located in a Member State other than that of its registered office, and where a comprehensive assessment of all the relevant factors establishes, in a manner that is ascertainable by third parties, that the company's actual centre of management and supervision and of the management of its interests is located in that other Member State. In the case of an individual not exercising an independent business or professional activity, it should be possible to rebut this presumption, for example where the major part of the debtor's assets is located outside the Member State of the debtor's habitual residence, or where it can be established that the principal reason for moving was to file for insolvency proceedings in the new jurisdiction and where such filing would materially impair the interests of creditors whose dealings with the debtor took place prior to the relocation.

(31) With the same objective of preventing fraudulent or abusive forum shopping, the presumption that the centre of main interests is at the place of the registered office, at the individual's principal place of business or at the individual's habitual residence should not apply where, respectively, in the case of a company, legal person or individual exercising an independent business or professional activity, the debtor has relocated its registered office or principal place of business to another Member State within the 3-month period prior to the request for opening insolvency proceedings, or, in the case of an individual not exercising an independent business or professional activity, the debtor has relocated his habitual residence to another Member State within the 6-month period prior to the request for opening insolvency proceedings.

(32) In all cases, where the circumstances of the matter give rise to doubts about the court's jurisdiction, the court should require the debtor to submit additional evidence to support its assertions and, where the law applicable to the insolvency proceedings so allows, give the debtor's creditors the opportunity to present their views on the question of jurisdiction.

(33) In the event that the court seised of the request to open insolvency proceedings finds that the centre of main interests is not located on its territory, it should not open main insolvency proceedings.

(34) In addition, any creditor of the debtor should have an effective remedy against the decision to open insolvency proceedings. The consequences of any challenge to the decision to open insolvency proceedings should be governed by national law.

(35) The courts of the Member State within the territory of which insolvency proceedings have been opened should also have jurisdiction for actions which derive directly from the insolvency proceedings and are closely linked with them. Such actions should include avoidance actions against defendants in other Member States and actions concerning obligations that arise in the course of the insolvency proceedings, such as advance payment for costs of the proceedings. In contrast, actions for the performance of the obligations under a contract concluded by the debtor prior to the opening of proceedings do not derive directly from the proceedings. Where such an action is related to another action based on general civil and commercial law, the insolvency practitioner should be able to

5.6.2015     [EN]     Official Journal of the European Union     L 141/23

bring both actions in the courts of the defendant's domicile if he considers it more efficient to bring the action in that forum. This could, for example, be the case where the insolvency practitioner wishes to combine an action for director's liability on the basis of insolvency law with an action based on company law or general tort law.

(36)    The court having jurisdiction to open the main insolvency proceedings should be able to order provisional and protective measures as from the time of the request to open proceedings. Preservation measures both prior to and after the commencement of the insolvency proceedings are important to guarantee the effectiveness of the insolvency proceedings. In that connection, this Regulation should provide for various possibilities. On the one hand, the court competent for the main insolvency proceedings should also be able to order provisional and protective measures covering assets situated in the territory of other Member States. On the other hand, an insolvency practitioner temporarily appointed prior to the opening of the main insolvency proceedings should be able, in the Member States in which an establishment belonging to the debtor is to be found, to apply for the preservation measures which are possible under the law of those Member States.

(37)    Prior to the opening of the main insolvency proceedings, the right to request the opening of insolvency proceedings in the Member State where the debtor has an establishment should be limited to local creditors and public authorities, or to cases in which main insolvency proceedings cannot be opened under the law of the Member State where the debtor has the centre of its main interests. The reason for this restriction is that cases in which territorial insolvency proceedings are requested before the main insolvency proceedings are intended to be limited to what is absolutely necessary.

(38)    Following the opening of the main insolvency proceedings, this Regulation does not restrict the right to request the opening of insolvency proceedings in a Member State where the debtor has an establishment. The insolvency practitioner in the main insolvency proceedings or any other person empowered under the national law of that Member State may request the opening of secondary insolvency proceedings.

(39)    This Regulation should provide for rules to determine the location of the debtor's assets, which should apply when determining which assets belong to the main or secondary insolvency proceedings, or to situations involving third parties' rights *in rem*. In particular, this Regulation should provide that European patents with unitary effect, a Community trade mark or any other similar rights, such as Community plant variety rights or Community designs, should only be included in the main insolvency proceedings.

(40)    Secondary insolvency proceedings can serve different purposes, besides the protection of local interests. Cases may arise in which the insolvency estate of the debtor is too complex to administer as a unit, or the differences in the legal systems concerned are so great that difficulties may arise from the extension of effects deriving from the law of the State of the opening of proceedings to the other Member States where the assets are located. For that reason, the insolvency practitioner in the main insolvency proceedings may request the opening of secondary insolvency proceedings where the efficient administration of the insolvency estate so requires.

(41)    Secondary insolvency proceedings may also hamper the efficient administration of the insolvency estate. Therefore, this Regulation sets out two specific situations in which the court seised of a request to open secondary insolvency proceedings should be able, at the request of the insolvency practitioner in the main insolvency proceedings, to postpone or refuse the opening of such proceedings.

(42)    First, this Regulation confers on the insolvency practitioner in main insolvency proceedings the possibility of giving an undertaking to local creditors that they will be treated as if secondary insolvency proceedings had been opened. That undertaking has to meet a number of conditions set out in this Regulation, in particular that it be approved by a qualified majority of local creditors. Where such an undertaking has been given, the court seised of a request to open secondary insolvency proceedings should be able to refuse that request if it is satisfied that the undertaking adequately protects the general interests of local creditors. When assessing those interests, the court should take into account the fact that the undertaking has been approved by a qualified majority of local creditors.

(43)    For the purposes of giving an undertaking to local creditors, the assets and rights located in the Member State where the debtor has an establishment should form a sub-category of the insolvency estate, and, when distributing them or the proceeds resulting from their realisation, the insolvency practitioner in the main insolvency proceedings should respect the priority rights that creditors would have had if secondary insolvency proceedings had been opened in that Member State.

L 141/24         EN         Official Journal of the European Union                    5.6.2015

(44)   National law should be applicable, as appropriate, in relation to the approval of an undertaking. In particular, where under national law the voting rules for adopting a restructuring plan require the prior approval of creditors' claims, those claims should be deemed to be approved for the purpose of voting on the undertaking. Where there are different procedures for the adoption of restructuring plans under national law, Member States should designate the specific procedure which should be relevant in this context.

(45)   Second, this Regulation should provide for the possibility that the court temporarily stays the opening of secondary insolvency proceedings, when a temporary stay of individual enforcement proceedings has been granted in the main insolvency proceedings, in order to preserve the efficiency of the stay granted in the main insolvency proceedings. The court should be able to grant the temporary stay if it is satisfied that suitable measures are in place to protect the general interest of local creditors. In such a case, all creditors that could be affected by the outcome of the negotiations on a restructuring plan should be informed of the negotiations and be allowed to participate in them.

(46)   In order to ensure effective protection of local interests, the insolvency practitioner in the main insolvency proceedings should not be able to realise or re-locate, in an abusive manner, assets situated in the Member State where an establishment is located, in particular, with the purpose of frustrating the possibility that such interests can be effectively satisfied if secondary insolvency proceedings are opened subsequently.

(47)   This Regulation should not prevent the courts of a Member State in which secondary insolvency proceedings have been opened from sanctioning a debtor's directors for violation of their duties, provided that those courts have jurisdiction to address such disputes under their national law.

(48)   Main insolvency proceedings and secondary insolvency proceedings can contribute to the efficient administration of the debtor's insolvency estate or to the effective realisation of the total assets if there is proper cooperation between the actors involved in all the concurrent proceedings. Proper cooperation implies the various insolvency practitioners and the courts involved cooperating closely, in particular by exchanging a sufficient amount of information. In order to ensure the dominant role of the main insolvency proceedings, the insolvency practitioner in such proceedings should be given several possibilities for intervening in secondary insolvency proceedings which are pending at the same time. In particular, the insolvency practitioner should be able to propose a restructuring plan or composition or apply for a suspension of the realisation of the assets in the secondary insolvency proceedings. When cooperating, insolvency practitioners and courts should take into account best practices for cooperation in cross-border insolvency cases, as set out in principles and guidelines on communication and cooperation adopted by European and international organisations active in the area of insolvency law, and in particular the relevant guidelines prepared by the United Nations Commission on International Trade Law (Uncitral).

(49)   In light of such cooperation, insolvency practitioners and courts should be able to enter into agreements and protocols for the purpose of facilitating cross-border cooperation of multiple insolvency proceedings in different Member States concerning the same debtor or members of the same group of companies, where this is compatible with the rules applicable to each of the proceedings. Such agreements and protocols may vary in form, in that they may be written or oral, and in scope, in that they may range from generic to specific, and may be entered into by different parties. Simple generic agreements may emphasise the need for close cooperation between the parties, without addressing specific issues, while more detailed, specific agreements may establish a framework of principles to govern multiple insolvency proceedings and may be approved by the courts involved, where the national law so requires. They may reflect an agreement between the parties to take, or to refrain from taking, certain steps or actions.

(50)   Similarly, the courts of different Member States may cooperate by coordinating the appointment of insolvency practitioners. In that context, they may appoint a single insolvency practitioner for several insolvency proceedings concerning the same debtor or for different members of a group of companies, provided that this is compatible with the rules applicable to each of the proceedings, in particular with any requirements concerning the qualification and licensing of the insolvency practitioner.

(51)   This Regulation should ensure the efficient administration of insolvency proceedings relating to different companies forming part of a group of companies.

(52) Where insolvency proceedings have been opened for several companies of the same group, there should be proper cooperation between the actors involved in those proceedings. The various insolvency practitioners and the courts involved should therefore be under a similar obligation to cooperate and communicate with each other as those involved in main and secondary insolvency proceedings relating to the same debtor. Cooperation between the insolvency practitioners should not run counter to the interests of the creditors in each of the proceedings, and such cooperation should be aimed at finding a solution that would leverage synergies across the group.

(53) The introduction of rules on the insolvency proceedings of groups of companies should not limit the possibility for a court to open insolvency proceedings for several companies belonging to the same group in a single jurisdiction if the court finds that the centre of main interests of those companies is located in a single Member State. In such cases, the court should also be able to appoint, if appropriate, the same insolvency practitioner in all proceedings concerned, provided that this is not incompatible with the rules applicable to them.

(54) With a view to further improving the coordination of the insolvency proceedings of members of a group of companies, and to allow for a coordinated restructuring of the group, this Regulation should introduce procedural rules on the coordination of the insolvency proceedings of members of a group of companies. Such coordination should strive to ensure the efficiency of the coordination, whilst at the same time respecting each group member's separate legal personality.

(55) An insolvency practitioner appointed in insolvency proceedings opened in relation to a member of a group of companies should be able to request the opening of group coordination proceedings. However, where the law applicable to the insolvency so requires, that insolvency practitioner should obtain the necessary authorisation before making such a request. The request should specify the essential elements of the coordination, in particular an outline of the coordination plan, a proposal as to whom should be appointed as coordinator and an outline of the estimated costs of the coordination.

(56) In order to ensure the voluntary nature of group coordination proceedings, the insolvency practitioners involved should be able to object to their participation in the proceedings within a specified time period. In order to allow the insolvency practitioners involved to take an informed decision on participation in the group coordination proceedings, they should be informed at an early stage of the essential elements of the coordination. However, any insolvency practitioner who initially objects to inclusion in the group coordination proceedings should be able to subsequently request to participate in them. In such a case, the coordinator should take a decision on the admissibility of the request. All insolvency practitioners, including the requesting insolvency practitioner, should be informed of the coordinator's decision and should have the opportunity of challenging that decision before the court which has opened the group coordination proceedings.

(57) Group coordination proceedings should always strive to facilitate the effective administration of the insolvency proceedings of the group members, and to have a generally positive impact for the creditors. This Regulation should therefore ensure that the court with which a request for group coordination proceedings has been filed makes an assessment of those criteria prior to opening group coordination proceedings.

(58) The advantages of group coordination proceedings should not be outweighed by the costs of those proceedings. Therefore, it is necessary to ensure that the costs of the coordination, and the share of those costs that each group member will bear, are adequate, proportionate and reasonable, and are determined in accordance with the national law of the Member State in which group coordination proceedings have been opened. The insolvency practitioners involved should also have the possibility of controlling those costs from an early stage of the proceedings. Where the national law so requires, controlling costs from an early stage of proceedings could involve the insolvency practitioner seeking the approval of a court or creditors' committee.

(59) Where the coordinator considers that the fulfilment of his or her tasks requires a significant increase in costs compared to the initially estimated costs and, in any case, where the costs exceed 10 % of the estimated costs, the coordinator should be authorised by the court which has opened the group coordination proceedings to exceed such costs. Before taking its decision, the court which has opened the group coordination proceedings should give the possibility to the participating insolvency practitioners to be heard before it in order to allow them to communicate their observations on the appropriateness of the coordinator's request.

L 141/26          [EN]          Official Journal of the European Union          5.6.2015

(60)  For members of a group of companies which are not participating in group coordination proceedings, this Regulation should also provide for an alternative mechanism to achieve a coordinated restructuring of the group. An insolvency practitioner appointed in proceedings relating to a member of a group of companies should have standing to request a stay of any measure related to the realisation of the assets in the proceedings opened with respect to other members of the group which are not subject to group coordination proceedings. It should only be possible to request such a stay if a restructuring plan is presented for the members of the group concerned, if the plan is to the benefit of the creditors in the proceedings in respect of which the stay is requested, and if the stay is necessary to ensure that the plan can be properly implemented.

(61)  This Regulation should not prevent Member States from establishing national rules which would supplement the rules on cooperation, communication and coordination with regard to the insolvency of members of groups of companies set out in this Regulation, provided that the scope of application of those national rules is limited to the national jurisdiction and that their application would not impair the efficiency of the rules laid down by this Regulation.

(62)  The rules on cooperation, communication and coordination in the framework of the insolvency of members of a group of companies provided for in this Regulation should only apply to the extent that proceedings relating to different members of the same group of companies have been opened in more than one Member State.

(63)  Any creditor which has its habitual residence, domicile or registered office in the Union should have the right to lodge its claims in each of the insolvency proceedings pending in the Union relating to the debtor's assets. This should also apply to tax authorities and social insurance institutions. This Regulation should not prevent the insolvency practitioner from lodging claims on behalf of certain groups of creditors, for example employees, where the national law so provides. However, in order to ensure the equal treatment of creditors, the distribution of proceeds should be coordinated. Every creditor should be able to keep what it has received in the course of insolvency proceedings, but should be entitled only to participate in the distribution of total assets in other proceedings if creditors with the same standing have obtained the same proportion of their claims.

(64)  It is essential that creditors which have their habitual residence, domicile or registered office in the Union be informed about the opening of insolvency proceedings relating to their debtor's assets. In order to ensure a swift transmission of information to creditors, Regulation (EC) No 1393/2007 of the European Parliament and of the Council (¹) should not apply where this Regulation refers to the obligation to inform creditors. The use of standard forms available in all official languages of the institutions of the Union should facilitate the task of creditors when lodging claims in proceedings opened in another Member State. The consequences of the incomplete filing of the standard forms should be a matter for national law.

(65)  This Regulation should provide for the immediate recognition of judgments concerning the opening, conduct and closure of insolvency proceedings which fall within its scope, and of judgments handed down in direct connection with such insolvency proceedings. Automatic recognition should therefore mean that the effects attributed to the proceedings by the law of the Member State in which the proceedings were opened extend to all other Member States. The recognition of judgments delivered by the courts of the Member States should be based on the principle of mutual trust. To that end, grounds for non-recognition should be reduced to the minimum necessary. This is also the basis on which any dispute should be resolved where the courts of two Member States both claim competence to open the main insolvency proceedings. The decision of the first court to open proceedings should be recognised in the other Member States without those Member States having the power to scrutinise that court's decision.

(66)  This Regulation should set out, for the matters covered by it, uniform rules on conflict of laws which replace, within their scope of application, national rules of private international law. Unless otherwise stated, the law of the Member State of the opening of proceedings should be applicable (lex concursus). This rule on conflict of laws should be valid both for the main insolvency proceedings and for local proceedings. The lex concursus determines all the effects of the insolvency proceedings, both procedural and substantive, on the persons and legal relations concerned. It governs all the conditions for the opening, conduct and closure of the insolvency proceedings.

(67)  Automatic recognition of insolvency proceedings to which the law of the State of the opening of proceedings normally applies may interfere with the rules under which transactions are carried out in other Member States. To protect legitimate expectations and the certainty of transactions in Member States other than that in which proceedings are opened, provision should be made for a number of exceptions to the general rule.

---

(¹)  Regulation (EC) No 1393/2007 of the European Parliament and of the Council of 13 November 2007 on the service in the Member States of judicial and extrajudicial documents in civil and commercial matters (service of documents), and repealing Council Regulation (EC) No 1348/2000 (OJ L 324, 10.12.2007, p. 79).

5.6.2015        [EN]        Official Journal of the European Union        L 141/27

(68)    There is a particular need for a special reference diverging from the law of the opening State in the case of rights *in rem*, since such rights are of considerable importance for the granting of credit. The basis, validity and extent of rights *in rem* should therefore normally be determined according to the *lex situs* and not be affected by the opening of insolvency proceedings. The proprietor of a right *in rem* should therefore be able to continue to assert its right to segregation or separate settlement of the collateral security. Where assets are subject to rights *in rem* under the *lex situs* in one Member State but the main insolvency proceedings are being carried out in another Member State, the insolvency practitioner in the main insolvency proceedings should be able to request the opening of secondary insolvency proceedings in the jurisdiction where the rights *in rem* arise if the debtor has an establishment there. If secondary insolvency proceedings are not opened, any surplus on the sale of an asset covered by rights *in rem* should be paid to the insolvency practitioner in the main insolvency proceedings.

(69)    This Regulation lays down several provisions for a court to order a stay of opening proceedings or a stay of enforcement proceedings. Any such stay should not affect the rights *in rem* of creditors or third parties.

(70)    If a set-off of claims is not permitted under the law of the State of the opening of proceedings, a creditor should nevertheless be entitled to the set-off if it is possible under the law applicable to the claim of the insolvent debtor. In this way, set-off would acquire a kind of guarantee function based on legal provisions on which the creditor concerned can rely at the time when the claim arises.

(71)    There is also a need for special protection in the case of payment systems and financial markets, for example in relation to the position-closing agreements and netting agreements to be found in such systems, as well as the sale of securities and the guarantees provided for such transactions as governed in particular by Directive 98/26/EC of the European Parliament and of the Council (¹). For such transactions, the only law which is relevant should be that applicable to the system or market concerned. That law is intended to prevent the possibility of mechanisms for the payment and settlement of transactions, and provided for in payment and set-off systems or on the regulated financial markets of the Member States, being altered in the case of insolvency of a business partner. Directive 98/26/EC contains special provisions which should take precedence over the general rules laid down in this Regulation.

(72)    In order to protect employees and jobs, the effects of insolvency proceedings on the continuation or termination of employment and on the rights and obligations of all parties to such employment should be determined by the law applicable to the relevant employment agreement, in accordance with the general rules on conflict of laws. Moreover, in cases where the termination of employment contracts requires approval by a court or administrative authority, the Member State in which an establishment of the debtor is located should retain jurisdiction to grant such approval even if no insolvency proceedings have been opened in that Member State. Any other questions relating to the law of insolvency, such as whether the employees' claims are protected by preferential rights and the status such preferential rights may have, should be determined by the law of the Member State in which the insolvency proceedings (main or secondary) have been opened, except in cases where an undertaking to avoid secondary insolvency proceedings has been given in accordance with this Regulation.

(73)    The law applicable to the effects of insolvency proceedings on any pending lawsuit or pending arbitral proceedings concerning an asset or right which forms part of the debtor's insolvency estate should be the law of the Member State where the lawsuit is pending or where the arbitration has its seat. However, this rule should not affect national rules on recognition and enforcement of arbitral awards.

(74)    In order to take account of the specific procedural rules of court systems in certain Member States flexibility should be provided with regard to certain rules of this Regulation. Accordingly, references in this Regulation to notice being given by a judicial body of a Member State should include, where a Member State's procedural rules so require, an order by that judicial body directing that notice be given.

(75)    For business considerations, the main content of the decision opening the proceedings should be published, at the request of the insolvency practitioner, in a Member State other than that of the court which delivered that decision. If there is an establishment in the Member State concerned, such publication should be mandatory. In neither case, however, should publication be a prior condition for recognition of the foreign proceedings.

_____

(¹) Directive 98/26/EC of the European Parliament and of the Council of 19 May 1998 on settlement finality in payment and securities settlement systems (OJ L 166, 11.6.1998, p. 45).

(76) In order to improve the provision of information to relevant creditors and courts and to prevent the opening of parallel insolvency proceedings, Member States should be required to publish relevant information in cross-border insolvency cases in a publicly accessible electronic register. In order to facilitate access to that information for creditors and courts domiciled or located in other Member States, this Regulation should provide for the interconnection of such insolvency registers via the European e-Justice Portal. Member States should be free to publish relevant information in several registers and it should be possible to interconnect more than one register per Member State.

(77) This Regulation should determine the minimum amount of information to be published in the insolvency registers. Member States should not be precluded from including additional information. Where the debtor is an individual, the insolvency registers should only have to indicate a registration number if the debtor is exercising an independent business or professional activity. That registration number should be understood to be the unique registration number of the debtor's independent business or professional activity published in the trade register, if any.

(78) Information on certain aspects of insolvency proceedings is essential for creditors, such as time limits for lodging claims or for challenging decisions. This Regulation should, however, not require Member States to calculate those time-limits on a case-by-case basis. Member States should be able to fulfil their obligations by adding hyperlinks to the European e-Justice Portal, where self-explanatory information on the criteria for calculating those time-limits is to be provided.

(79) In order to grant sufficient protection to information relating to individuals not exercising an independent business or professional activity, Member States should be able to make access to that information subject to supplementary search criteria such as the debtor's personal identification number, address, date of birth or the district of the competent court, or to make access conditional upon a request to a competent authority or upon the verification of a legitimate interest.

(80) Member States should also be able not to include in their insolvency registers information on individuals not exercising an independent business or professional activity. In such cases, Member States should ensure that the relevant information is given to the creditors by individual notice, and that claims of creditors who have not received the information are not affected by the proceedings.

(81) It may be the case that some of the persons concerned are not aware that insolvency proceedings have been opened, and act in good faith in a way that conflicts with the new circumstances. In order to protect such persons who, unaware that foreign proceedings have been opened, make a payment to the debtor instead of to the foreign insolvency practitioner, provision should be made for such a payment to have a debt-discharging effect.

(82) In order to ensure uniform conditions for the implementation of this Regulation, implementing powers should be conferred on the Commission. Those powers should be exercised in accordance with Regulation (EU) No 182/2011 of the European Parliament and of the Council [1].

(83) This Regulation respects the fundamental rights and observes the principles recognised in the Charter of Fundamental Rights of the European Union. In particular, this Regulation seeks to promote the application of Articles 8, 17 and 47 concerning, respectively, the protection of personal data, the right to property and the right to an effective remedy and to a fair trial.

(84) Directive 95/46/EC of the European Parliament and of the Council [2] and Regulation (EC) No 45/2001 of the European Parliament and of the Council [3] apply to the processing of personal data within the framework of this Regulation.

(85) This Regulation is without prejudice to Regulation (EEC, Euratom) No 1182/71 of the Council [4].

---

[1] Regulation (EU) No 182/2011 of the European Parliament and of the Council of 16 February 2011 laying down the rules and general principles concerning mechanisms for control by the Member States of the Commission's exercise of implementing powers (OJ L 55, 28.2.2011, p. 13).
[2] Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ L 281, 23.11.1995, p. 31).
[3] Regulation (EC) No 45/2001 of the European Parliament and of the Council of 18 December 2000 on the protection of individuals with regard to the processing of personal data by the Community institutions and bodies and on the free movement of such data (OJ L 8, 12.1.2001, p. 1).
[4] Regulation (EEC, Euratom) No 1182/71 of the Council of 3 June 1971 determining the rules applicable to periods, dates and time limits (OJ L 124, 8.6.1971, p. 1).

5.6.2015          [EN]          Official Journal of the European Union          L 141/29

(86)  Since the objective of this Regulation cannot be sufficiently achieved by the Member States but can rather, by reason of the creation of a legal framework for the proper administration of cross-border insolvency proceedings, be better achieved at Union level, the Union may adopt measures in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union. In accordance with the principle of proportionality, as set out in that Article, this Regulation does not go beyond what is necessary in order to achieve that objective.

(87)  In accordance with Article 3 and Article 4a(1) of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union, the United Kingdom and Ireland have notified their wish to take part in the adoption and application of this Regulation.

(88)  In accordance with Articles 1 and 2 of Protocol No 22 on the position of Denmark annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union, Denmark is not taking part in the adoption of this Regulation and is not bound by it or subject to its application.

(89)  The European Data Protection Supervisor was consulted and delivered an opinion on 27 March 2013 ($^1$),

HAVE ADOPTED THIS REGULATION:

CHAPTER I

**GENERAL PROVISIONS**

*Article 1*

**Scope**

1.    This Regulation shall apply to public collective proceedings, including interim proceedings, which are based on laws relating to insolvency and in which, for the purpose of rescue, adjustment of debt, reorganisation or liquidation:

(a)  a debtor is totally or partially divested of its assets and an insolvency practitioner is appointed;

(b)  the assets and affairs of a debtor are subject to control or supervision by a court; or

(c)  a temporary stay of individual enforcement proceedings is granted by a court or by operation of law, in order to allow for negotiations between the debtor and its creditors, provided that the proceedings in which the stay is granted provide for suitable measures to protect the general body of creditors, and, where no agreement is reached, are preliminary to one of the proceedings referred to in point (a) or (b).

Where the proceedings referred to in this paragraph may be commenced in situations where there is only a likelihood of insolvency, their purpose shall be to avoid the debtor's insolvency or the cessation of the debtor's business activities.

The proceedings referred to in this paragraph are listed in Annex A.

2.    This Regulation shall not apply to proceedings referred to in paragraph 1 that concern:

(a)  insurance undertakings;

(b)  credit institutions;

(c)  investment firms and other firms, institutions and undertakings to the extent that they are covered by Directive 2001/24/EC; or

(d)  collective investment undertakings.

*Article 2*

**Definitions**

For the purposes of this Regulation:

(1)  'collective proceedings' means proceedings which include all or a significant part of a debtor's creditors, provided that, in the latter case, the proceedings do not affect the claims of creditors which are not involved in them;

($^1$) OJ C 358, 7.12.2013, p. 15.

L 141/30          EN          Official Journal of the European Union          5.6.2015

(2) 'collective investment undertakings' means undertakings for collective investment in transferable securities (UCITS) as defined in Directive 2009/65/EC of the European Parliament and of the Council (¹) and alternative investment funds (AIFs) as defined in Directive 2011/61/EU of the European Parliament and of the Council (²);

(3) 'debtor in possession' means a debtor in respect of which insolvency proceedings have been opened which do not necessarily involve the appointment of an insolvency practitioner or the complete transfer of the rights and duties to administer the debtor's assets to an insolvency practitioner and where, therefore, the debtor remains totally or at least partially in control of its assets and affairs;

(4) 'insolvency proceedings' means the proceedings listed in Annex A;

(5) 'insolvency practitioner' means any person or body whose function, including on an interim basis, is to:

    (i)   verify and admit claims submitted in insolvency proceedings;

    (ii)  represent the collective interest of the creditors;

    (iii) administer, either in full or in part, assets of which the debtor has been divested;

    (iv) liquidate the assets referred to in point (iii); or

    (v)  supervise the administration of the debtor's affairs.

    The persons and bodies referred to in the first subparagraph are listed in Annex B;

(6) 'court' means:

    (i)   in points (b) and (c) of Article 1(1), Article 4(2), Articles 5 and 6, Article 21(3), point (j) of Article 24(2), Articles 36 and 39, and Articles 61 to 77, the judicial body of a Member State;

    (ii)  in all other articles, the judicial body or any other competent body of a Member State empowered to open insolvency proceedings, to confirm such opening or to take decisions in the course of such proceedings;

(7) 'judgment opening insolvency proceedings' includes:

    (i)   the decision of any court to open insolvency proceedings or to confirm the opening of such proceedings; and

    (ii)  the decision of a court to appoint an insolvency practitioner;

(8) 'the time of the opening of proceedings' means the time at which the judgment opening insolvency proceedings becomes effective, regardless of whether the judgment is final or not;

(9) 'the Member State in which assets are situated' means, in the case of:

    (i)   registered shares in companies other than those referred to in point (ii), the Member State within the territory of which the company having issued the shares has its registered office;

    (ii)  financial instruments, the title to which is evidenced by entries in a register or account maintained by or on behalf of an intermediary ('book entry securities'), the Member State in which the register or account in which the entries are made is maintained;

    (iii) cash held in accounts with a credit institution, the Member State indicated in the account's IBAN, or, for cash held in accounts with a credit institution which does not have an IBAN, the Member State in which the credit institution holding the account has its central administration or, where the account is held with a branch, agency or other establishment, the Member State in which the branch, agency or other establishment is located;

    (iv) property and rights, ownership of or entitlement to which is entered in a public register other than those referred to in point (i), the Member State under the authority of which the register is kept;

    (v)  European patents, the Member State for which the European patent is granted;

(¹) Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) (OJ L 302, 17.11.2009, p. 32).
(²) Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 (OJ L 174, 1.7.2011, p. 1).

5.6.2015          EN          Official Journal of the European Union          L 141/31

(vi)  copyright and related rights, the Member State within the territory of which the owner of such rights has its habitual residence or registered office;

(vii)  tangible property, other than that referred to in points (i) to (iv), the Member State within the territory of which the property is situated;

(viii)  claims against third parties, other than those relating to assets referred to in point (iii), the Member State within the territory of which the third party required to meet the claims has the centre of its main interests, as determined in accordance with Article 3(1);

(10)  'establishment' means any place of operations where a debtor carries out or has carried out in the 3-month period prior to the request to open main insolvency proceedings a non-transitory economic activity with human means and assets;

(11)  'local creditor' means a creditor whose claims against a debtor arose from or in connection with the operation of an establishment situated in a Member State other than the Member State in which the centre of the debtor's main interests is located;

(12)  'foreign creditor' means a creditor which has its habitual residence, domicile or registered office in a Member State other than the State of the opening of proceedings, including the tax authorities and social security authorities of Member States;

(13)  'group of companies' means a parent undertaking and all its subsidiary undertakings;

(14)  'parent undertaking' means an undertaking which controls, either directly or indirectly, one or more subsidiary undertakings. An undertaking which prepares consolidated financial statements in accordance with Directive 2013/34/EU of the European Parliament and of the Council (¹) shall be deemed to be a parent undertaking.

*Article 3*

**International jurisdiction**

1.    The courts of the Member State within the territory of which the centre of the debtor's main interests is situated shall have jurisdiction to open insolvency proceedings ('main insolvency proceedings'). The centre of main interests shall be the place where the debtor conducts the administration of its interests on a regular basis and which is ascertainable by third parties.

In the case of a company or legal person, the place of the registered office shall be presumed to be the centre of its main interests in the absence of proof to the contrary. That presumption shall only apply if the registered office has not been moved to another Member State within the 3-month period prior to the request for the opening of insolvency proceedings.

In the case of an individual exercising an independent business or professional activity, the centre of main interests shall be presumed to be that individual's principal place of business in the absence of proof to the contrary. That presumption shall only apply if the individual's principal place of business has not been moved to another Member State within the 3-month period prior to the request for the opening of insolvency proceedings.

In the case of any other individual, the centre of main interests shall be presumed to be the place of the individual's habitual residence in the absence of proof to the contrary. This presumption shall only apply if the habitual residence has not been moved to another Member State within the 6-month period prior to the request for the opening of insolvency proceedings.

2.    Where the centre of the debtor's main interests is situated within the territory of a Member State, the courts of another Member State shall have jurisdiction to open insolvency proceedings against that debtor only if it possesses an establishment within the territory of that other Member State. The effects of those proceedings shall be restricted to the assets of the debtor situated in the territory of the latter Member State.

3.    Where insolvency proceedings have been opened in accordance with paragraph 1, any proceedings opened subsequently in accordance with paragraph 2 shall be secondary insolvency proceedings.

_____
(¹)  Directive 2013/34/EU of the European Parliament and of the Council of 26 June 2013 on the annual financial statements, consolidated financial statements and related reports of certain types of undertaking, amending Directive 2006/43/EC of the European Parliament and of the Council and repealing Council Directives 78/660/EEC and 83/349/EEC (OJ L 182, 29.6.2013, p. 19).

L 141/32          EN          Official Journal of the European Union          5.6.2015

4.    The territorial insolvency proceedings referred to in paragraph 2 may only be opened prior to the opening of main insolvency proceedings in accordance with paragraph 1 where

(a)  insolvency proceedings under paragraph 1 cannot be opened because of the conditions laid down by the law of the Member State within the territory of which the centre of the debtor's main interests is situated; or

(b)  the opening of territorial insolvency proceedings is requested by:

   (i)  a creditor whose claim arises from or is in connection with the operation of an establishment situated within the territory of the Member State where the opening of territorial proceedings is requested; or

   (ii) a public authority which, under the law of the Member State within the territory of which the establishment is situated, has the right to request the opening of insolvency proceedings.

When main insolvency proceedings are opened, the territorial insolvency proceedings shall become secondary insolvency proceedings.


## Article 4

### Examination as to jurisdiction

1.    A court seised of a request to open insolvency proceedings shall of its own motion examine whether it has jurisdiction pursuant to Article 3. The judgment opening insolvency proceedings shall specify the grounds on which the jurisdiction of the court is based, and, in particular, whether jurisdiction is based on Article 3(1) or (2).

2.    Notwithstanding paragraph 1, where insolvency proceedings are opened in accordance with national law without a decision by a court, Member States may entrust the insolvency practitioner appointed in such proceedings to examine whether the Member State in which a request for the opening of proceedings is pending has jurisdiction pursuant to Article 3. Where this is the case, the insolvency practitioner shall specify in the decision opening the proceedings the grounds on which jurisdiction is based and, in particular, whether jurisdiction is based on Article 3(1) or (2).


## Article 5

### Judicial review of the decision to open main insolvency proceedings

1.    The debtor or any creditor may challenge before a court the decision opening main insolvency proceedings on grounds of international jurisdiction.

2.    The decision opening main insolvency proceedings may be challenged by parties other than those referred to in paragraph 1 or on grounds other than a lack of international jurisdiction where national law so provides.


## Article 6

### Jurisdiction for actions deriving directly from insolvency proceedings and closely linked with them

1.    The courts of the Member State within the territory of which insolvency proceedings have been opened in accordance with Article 3 shall have jurisdiction for any action which derives directly from the insolvency proceedings and is closely linked with them, such as avoidance actions.

2.    Where an action referred to in paragraph 1 is related to an action in civil and commercial matters against the same defendant, the insolvency practitioner may bring both actions before the courts of the Member State within the territory of which the defendant is domiciled, or, where the action is brought against several defendants, before the courts of the Member State within the territory of which any of them is domiciled, provided that those courts have jurisdiction pursuant to Regulation (EU) No 1215/2012.

The first subparagraph shall apply to the debtor in possession, provided that national law allows the debtor in possession to bring actions on behalf of the insolvency estate.

3.    For the purpose of paragraph 2, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

*Article 7*

**Applicable law**

1.    Save as otherwise provided in this Regulation, the law applicable to insolvency proceedings and their effects shall be that of the Member State within the territory of which such proceedings are opened (the 'State of the opening of proceedings').

2.    The law of the State of the opening of proceedings shall determine the conditions for the opening of those proceedings, their conduct and their closure. In particular, it shall determine the following:

(a)  the debtors against which insolvency proceedings may be brought on account of their capacity;

(b)  the assets which form part of the insolvency estate and the treatment of assets acquired by or devolving on the debtor after the opening of the insolvency proceedings;

(c)  the respective powers of the debtor and the insolvency practitioner;

(d)  the conditions under which set-offs may be invoked;

(e)  the effects of insolvency proceedings on current contracts to which the debtor is party;

(f)  the effects of the insolvency proceedings on proceedings brought by individual creditors, with the exception of pending lawsuits;

(g)  the claims which are to be lodged against the debtor's insolvency estate and the treatment of claims arising after the opening of insolvency proceedings;

(h)  the rules governing the lodging, verification and admission of claims;

(i)  the rules governing the distribution of proceeds from the realisation of assets, the ranking of claims and the rights of creditors who have obtained partial satisfaction after the opening of insolvency proceedings by virtue of a right *in rem* or through a set-off;

(j)  the conditions for, and the effects of closure of, insolvency proceedings, in particular by composition;

(k)  creditors' rights after the closure of insolvency proceedings;

(l)  who is to bear the costs and expenses incurred in the insolvency proceedings;

(m) the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to the general body of creditors.

*Article 8*

**Third parties' rights *in rem***

1.    The opening of insolvency proceedings shall not affect the rights *in rem* of creditors or third parties in respect of tangible or intangible, moveable or immoveable assets, both specific assets and collections of indefinite assets as a whole which change from time to time, belonging to the debtor which are situated within the territory of another Member State at the time of the opening of proceedings.

2.    The rights referred to in paragraph 1 shall, in particular, mean:

(a)  the right to dispose of assets or have them disposed of and to obtain satisfaction from the proceeds of or income from those assets, in particular by virtue of a lien or a mortgage;

(b)  the exclusive right to have a claim met, in particular a right guaranteed by a lien in respect of the claim or by assignment of the claim by way of a guarantee;

(c)  the right to demand assets from, and/or to require restitution by, anyone having possession or use of them contrary to the wishes of the party so entitled;

(d)  a right *in rem* to the beneficial use of assets.

3.    The right, recorded in a public register and enforceable against third parties, based on which a right *in rem* within the meaning of paragraph 1 may be obtained shall be considered to be a right *in rem*.

4.   Paragraph 1 shall not preclude actions for voidness, voidability or unenforceability as referred to in point (m) of Article 7(2).


*Article 9*

**Set-off**

1.   The opening of insolvency proceedings shall not affect the right of creditors to demand the set-off of their claims against the claims of a debtor, where such a set-off is permitted by the law applicable to the insolvent debtor's claim.

2.   Paragraph 1 shall not preclude actions for voidness, voidability or unenforceability as referred to in point (m) of Article 7(2).


*Article 10*

**Reservation of title**

1.   The opening of insolvency proceedings against the purchaser of an asset shall not affect sellers' rights that are based on a reservation of title where at the time of the opening of proceedings the asset is situated within the territory of a Member State other than the State of the opening of proceedings.

2.   The opening of insolvency proceedings against the seller of an asset, after delivery of the asset, shall not constitute grounds for rescinding or terminating the sale and shall not prevent the purchaser from acquiring title where at the time of the opening of proceedings the asset sold is situated within the territory of a Member State other than the State of the opening of proceedings.

3.   Paragraphs 1 and 2 shall not preclude actions for voidness, voidability or unenforceability as referred to in point (m) of Article 7(2).


*Article 11*

**Contracts relating to immoveable property**

1.   The effects of insolvency proceedings on a contract conferring the right to acquire or make use of immoveable property shall be governed solely by the law of the Member State within the territory of which the immoveable property is situated.

2.   The court which opened main insolvency proceedings shall have jurisdiction to approve the termination or modification of the contracts referred to in this Article where:

(a) the law of the Member State applicable to those contracts requires that such a contract may only be terminated or modified with the approval of the court opening insolvency proceedings; and

(b) no insolvency proceedings have been opened in that Member State.


*Article 12*

**Payment systems and financial markets**

1.   Without prejudice to Article 8, the effects of insolvency proceedings on the rights and obligations of the parties to a payment or settlement system or to a financial market shall be governed solely by the law of the Member State applicable to that system or market.

2.   Paragraph 1 shall not preclude any action for voidness, voidability or unenforceability which may be taken to set aside payments or transactions under the law applicable to the relevant payment system or financial market.

5.6.2015      EN      Official Journal of the European Union      L 141/35

*Article 13*

### Contracts of employment

1.    The effects of insolvency proceedings on employment contracts and relationships shall be governed solely by the law of the Member State applicable to the contract of employment.

2.    The courts of the Member State in which secondary insolvency proceedings may be opened shall retain jurisdiction to approve the termination or modification of the contracts referred to in this Article even if no insolvency proceedings have been opened in that Member State.

The first subparagraph shall also apply to an authority competent under national law to approve the termination or modification of the contracts referred to in this Article.

*Article 14*

### Effects on rights subject to registration

The effects of insolvency proceedings on the rights of a debtor in immoveable property, a ship or an aircraft subject to registration in a public register shall be determined by the law of the Member State under the authority of which the register is kept.

*Article 15*

### European patents with unitary effect and Community trade marks

For the purposes of this Regulation, a European patent with unitary effect, a Community trade mark or any other similar right established by Union law may be included only in the proceedings referred to in Article 3(1).

*Article 16*

### Detrimental acts

Point (m) of Article 7(2) shall not apply where the person who benefited from an act detrimental to all the creditors provides proof that:

(a)  the act is subject to the law of a Member State other than that of the State of the opening of proceedings; and

(b)  the law of that Member State does not allow any means of challenging that act in the relevant case.

*Article 17*

### Protection of third-party purchasers

Where, by an act concluded after the opening of insolvency proceedings, a debtor disposes, for consideration, of:

(a)  an immoveable asset;

(b)  a ship or an aircraft subject to registration in a public register; or

(c)  securities the existence of which requires registration in a register laid down by law;

the validity of that act shall be governed by the law of the State within the territory of which the immoveable asset is situated or under the authority of which the register is kept.

*Article 18*

### Effects of insolvency proceedings on pending lawsuits or arbitral proceedings

The effects of insolvency proceedings on a pending lawsuit or pending arbitral proceedings concerning an asset or a right which forms part of a debtor's insolvency estate shall be governed solely by the law of the Member State in which that lawsuit is pending or in which the arbitral tribunal has its seat.

CHAPTER II

**RECOGNITION OF INSOLVENCY PROCEEDINGS**

*Article 19*

**Principle**

1.    Any judgment opening insolvency proceedings handed down by a court of a Member State which has jurisdiction pursuant to Article 3 shall be recognised in all other Member States from the moment that it becomes effective in the State of the opening of proceedings.

The rule laid down in the first subparagraph shall also apply where, on account of a debtor's capacity, insolvency proceedings cannot be brought against that debtor in other Member States.

2.    Recognition of the proceedings referred to in Article 3(1) shall not preclude the opening of the proceedings referred to in Article 3(2) by a court in another Member State. The latter proceedings shall be secondary insolvency proceedings within the meaning of Chapter III.

*Article 20*

**Effects of recognition**

1.    The judgment opening insolvency proceedings as referred to in Article 3(1) shall, with no further formalities, produce the same effects in any other Member State as under the law of the State of the opening of proceedings, unless this Regulation provides otherwise and as long as no proceedings referred to in Article 3(2) are opened in that other Member State.

2.    The effects of the proceedings referred to in Article 3(2) may not be challenged in other Member States. Any restriction of creditors' rights, in particular a stay or discharge, shall produce effects vis-à-vis assets situated within the territory of another Member State only in the case of those creditors who have given their consent.

*Article 21*

**Powers of the insolvency practitioner**

1.    The insolvency practitioner appointed by a court which has jurisdiction pursuant to Article 3(1) may exercise all the powers conferred on it, by the law of the State of the opening of proceedings, in another Member State, as long as no other insolvency proceedings have been opened there and no preservation measure to the contrary has been taken there further to a request for the opening of insolvency proceedings in that State. Subject to Articles 8 and 10, the insolvency practitioner may, in particular, remove the debtor's assets from the territory of the Member State in which they are situated.

2.    The insolvency practitioner appointed by a court which has jurisdiction pursuant to Article 3(2) may in any other Member State claim through the courts or out of court that moveable property was removed from the territory of the State of the opening of proceedings to the territory of that other Member State after the opening of the insolvency proceedings. The insolvency practitioner may also bring any action to set aside which is in the interests of the creditors.

3.    In exercising its powers, the insolvency practitioner shall comply with the law of the Member State within the territory of which it intends to take action, in particular with regard to procedures for the realisation of assets. Those powers may not include coercive measures, unless ordered by a court of that Member State, or the right to rule on legal proceedings or disputes.

*Article 22*

**Proof of the insolvency practitioner's appointment**

The insolvency practitioner's appointment shall be evidenced by a certified copy of the original decision appointing it or by any other certificate issued by the court which has jurisdiction.

EN

A translation into the official language or one of the official languages of the Member State within the territory of which it intends to act may be required. No legalisation or other similar formality shall be required.

*Article 23*

**Return and imputation**

1.     A creditor which, after the opening of the proceedings referred to in Article 3(1), obtains by any means, in particular through enforcement, total or partial satisfaction of its claim on the assets belonging to a debtor situated within the territory of another Member State, shall return what it has obtained to the insolvency practitioner, subject to Articles 8 and 10.

2.     In order to ensure the equal treatment of creditors, a creditor which has, in the course of insolvency proceedings, obtained a dividend on its claim shall share in distributions made in other proceedings only where creditors of the same ranking or category have, in those other proceedings, obtained an equivalent dividend.

*Article 24*

**Establishment of insolvency registers**

1.     Member States shall establish and maintain in their territory one or several registers in which information concerning insolvency proceedings is published ('insolvency registers'). That information shall be published as soon as possible after the opening of such proceedings.

2.     The information referred to in paragraph 1 shall be made publicly available, subject to the conditions laid down in Article 27, and shall include the following ('mandatory information'):

(a)  the date of the opening of insolvency proceedings;

(b)  the court opening insolvency proceedings and the case reference number, if any;

(c)  the type of insolvency proceedings referred to in Annex A that were opened and, where applicable, any relevant subtype of such proceedings opened in accordance with national law;

(d)  whether jurisdiction for opening proceedings is based on Article 3(1), 3(2) or 3(4);

(e)  if the debtor is a company or a legal person, the debtor's name, registration number, registered office or, if different, postal address;

(f)  if the debtor is an individual whether or not exercising an independent business or professional activity, the debtor's name, registration number, if any, and postal address or, where the address is protected, the debtor's place and date of birth;

(g)  the name, postal address or e-mail address of the insolvency practitioner, if any, appointed in the proceedings;

(h)  the time limit for lodging claims, if any, or a reference to the criteria for calculating that time limit;

(i)  the date of closing main insolvency proceedings, if any;

(j)  the court before which and, where applicable, the time limit within which a challenge of the decision opening insolvency proceedings is to be lodged in accordance with Article 5, or a reference to the criteria for calculating that time limit.

3.     Paragraph 2 shall not preclude Member States from including documents or additional information in their national insolvency registers, such as directors' disqualifications related to insolvency.

4.     Member States shall not be obliged to include in the insolvency registers the information referred to in paragraph 1 of this Article in relation to individuals not exercising an independent business or professional activity, or to make such information publicly available through the system of interconnection of those registers, provided that known foreign creditors are informed, pursuant to Article 54, of the elements referred to under point (j) of paragraph 2 of this Article.

L 141/38          EN          Official Journal of the European Union          5.6.2015

Where a Member State makes use of the possibility referred to in the first subparagraph, the insolvency proceedings shall not affect the claims of foreign creditors who have not received the information referred to in the first subparagraph.

5.    The publication of information in the registers under this Regulation shall not have any legal effects other than those set out in national law and in Article 55(6).

*Article 25*

**Interconnection of insolvency registers**

1.    The Commission shall establish a decentralised system for the interconnection of insolvency registers by means of implementing acts. That system shall be composed of the insolvency registers and the European e-Justice Portal, which shall serve as a central public electronic access point to information in the system. The system shall provide a search service in all the official languages of the institutions of the Union in order to make available the mandatory information and any other documents or information included in the insolvency registers which the Member States choose to make available through the European e-Justice Portal.

2.    By means of implementing acts in accordance with the procedure referred to in Article 87, the Commission shall adopt the following by 26 June 2019:

(a)  the technical specification defining the methods of communication and information exchange by electronic means on the basis of the established interface specification for the system of interconnection of insolvency registers;

(b)  the technical measures ensuring the minimum information technology security standards for communication and distribution of information within the system of interconnection of insolvency registers;

(c)  minimum criteria for the search service provided by the European e-Justice Portal based on the information set out in Article 24;

(d)  minimum criteria for the presentation of the results of such searches based on the information set out in Article 24;

(e)  the means and the technical conditions of availability of services provided by the system of interconnection; and

(f)  a glossary containing a basic explanation of the national insolvency proceedings listed in Annex A.

*Article 26*

**Costs of establishing and interconnecting insolvency registers**

1.    The establishment, maintenance and future development of the system of interconnection of insolvency registers shall be financed from the general budget of the Union.

2.    Each Member State shall bear the costs of establishing and adjusting its national insolvency registers to make them interoperable with the European e-Justice Portal, as well as the costs of administering, operating and maintaining those registers. This shall be without prejudice to the possibility to apply for grants to support such activities under the Union's financial programmes.

*Article 27*

**Conditions of access to information via the system of interconnection**

1.    Member States shall ensure that the mandatory information referred to in points (a) to (j) of Article 24(2) is available free of charge via the system of interconnection of insolvency registers.

2.    This Regulation shall not preclude Member States from charging a reasonable fee for access to the documents or additional information referred to in Article 24(3) via the system of interconnection of insolvency registers.

3.    Member States may make access to mandatory information concerning individuals who are not exercising an independent business or professional activity, and concerning individuals exercising an independent business or professional activity when the insolvency proceedings are not related to that activity, subject to supplementary search criteria relating to the debtor in addition to the minimum criteria referred to in point (c) of Article 25(2).

4.    Member States may require that access to the information referred to in paragraph 3 be made conditional upon a request to the competent authority. Member States may make access conditional upon the verification of the existence of a legitimate interest for accessing such information. The requesting person shall be able to submit the request for information electronically by means of a standard form via the European e-Justice Portal. Where a legitimate interest is required, it shall be permissible for the requesting person to justify his request by electronic copies of relevant documents. The requesting person shall be provided with an answer by the competent authority within 3 working days.

The requesting person shall not be obliged to provide translations of the documents justifying his request, or to bear any costs of translation which the competent authority may incur.

*Article 28*

**Publication in another Member State**

1.    The insolvency practitioner or the debtor in possession shall request that notice of the judgment opening insolvency proceedings and, where appropriate, the decision appointing the insolvency practitioner be published in any other Member State where an establishment of the debtor is located in accordance with the publication procedures provided for in that Member State. Such publication shall specify, where appropriate, the insolvency practitioner appointed and whether the jurisdiction rule applied is that pursuant to Article 3(1) or (2).

2.    The insolvency practitioner or the debtor in possession may request that the information referred to in paragraph 1 be published in any other Member State where the insolvency practitioner or the debtor in possession deems it necessary in accordance with the publication procedures provided for in that Member State.

*Article 29*

**Registration in public registers of another Member State**

1.    Where the law of a Member State in which an establishment of the debtor is located and this establishment has been entered into a public register of that Member State, or the law of a Member State in which immovable property belonging to the debtor is located, requires information on the opening of insolvency proceedings referred to in Article 28 to be published in the land register, company register or any other public register, the insolvency practitioner or the debtor in possession shall take all the necessary measures to ensure such a registration.

2.    The insolvency practitioner or the debtor in possession may request such registration in any other Member State, provided that the law of the Member State where the register is kept allows such registration.

*Article 30*

**Costs**

The costs of the publication and registration provided for in Articles 28 and 29 shall be regarded as costs and expenses incurred in the proceedings.

*Article 31*

**Honouring of an obligation to a debtor**

1.    Where an obligation has been honoured in a Member State for the benefit of a debtor who is subject to insolvency proceedings opened in another Member State, when it should have been honoured for the benefit of the insolvency practitioner in those proceedings, the person honouring the obligation shall be deemed to have discharged it if he was unaware of the opening of the proceedings.

2.    Where such an obligation is honoured before the publication provided for in Article 28 has been effected, the person honouring the obligation shall be presumed, in the absence of proof to the contrary, to have been unaware of the opening of insolvency proceedings. Where the obligation is honoured after such publication has been effected, the person honouring the obligation shall be presumed, in the absence of proof to the contrary, to have been aware of the opening of proceedings.

*Article 32*

**Recognition and enforceability of other judgments**

1.    Judgments handed down by a court whose judgment concerning the opening of proceedings is recognised in accordance with Article 19 and which concern the course and closure of insolvency proceedings, and compositions approved by that court, shall also be recognised with no further formalities. Such judgments shall be enforced in accordance with Articles 39 to 44 and 47 to 57 of Regulation (EU) No 1215/2012.

The first subparagraph shall also apply to judgments deriving directly from the insolvency proceedings and which are closely linked with them, even if they were handed down by another court.

The first subparagraph shall also apply to judgments relating to preservation measures taken after the request for the opening of insolvency proceedings or in connection with it.

2.    The recognition and enforcement of judgments other than those referred to in paragraph 1 of this Article shall be governed by Regulation (EU) No 1215/2012 provided that that Regulation is applicable.

*Article 33*

**Public policy**

Any Member State may refuse to recognise insolvency proceedings opened in another Member State or to enforce a judgment handed down in the context of such proceedings where the effects of such recognition or enforcement would be manifestly contrary to that State's public policy, in particular its fundamental principles or the constitutional rights and liberties of the individual.

CHAPTER III

SECONDARY INSOLVENCY PROCEEDINGS

*Article 34*

**Opening of proceedings**

Where main insolvency proceedings have been opened by a court of a Member State and recognised in another Member State, a court of that other Member State which has jurisdiction pursuant to Article 3(2) may open secondary insolvency proceedings in accordance with the provisions set out in this Chapter. Where the main insolvency proceedings required that the debtor be insolvent, the debtor's insolvency shall not be re-examined in the Member State in which secondary insolvency proceedings may be opened. The effects of secondary insolvency proceedings shall be restricted to the assets of the debtor situated within the territory of the Member State in which those proceedings have been opened.

*Article 35*

**Applicable law**

Save as otherwise provided for in this Regulation, the law applicable to secondary insolvency proceedings shall be that of the Member State within the territory of which the secondary insolvency proceedings are opened.

*Article 36*

**Right to give an undertaking in order to avoid secondary insolvency proceedings**

1.    In order to avoid the opening of secondary insolvency proceedings, the insolvency practitioner in the main insolvency proceedings may give a unilateral undertaking (the 'undertaking') in respect of the assets located in the Member State in which secondary insolvency proceedings could be opened, that when distributing those assets or the proceeds received as a result of their realisation, it will comply with the distribution and priority rights under national law that creditors would have if secondary insolvency proceedings were opened in that Member State. The undertaking shall specify the factual assumptions on which it is based, in particular in respect of the value of the assets located in the Member State concerned and the options available to realise such assets.

5.6.2015          EN          Official Journal of the European Union          L 141/41

2.    Where an undertaking has been given in accordance with this Article, the law applicable to the distribution of proceeds from the realisation of assets referred to in paragraph 1, to the ranking of creditors' claims, and to the rights of creditors in relation to the assets referred to in paragraph 1 shall be the law of the Member State in which secondary insolvency proceedings could have been opened. The relevant point in time for determining the assets referred to in paragraph 1 shall be the moment at which the undertaking is given.

3.    The undertaking shall be made in the official language or one of the official languages of the Member State where secondary insolvency proceedings could have been opened, or, where there are several official languages in that Member State, the official language or one of the official languages of the place in which secondary insolvency proceedings could have been opened.

4.    The undertaking shall be made in writing. It shall be subject to any other requirements relating to form and approval requirements as to distributions, if any, of the State of the opening of the main insolvency proceedings.

5.    The undertaking shall be approved by the known local creditors. The rules on qualified majority and voting that apply to the adoption of restructuring plans under the law of the Member State where secondary insolvency proceedings could have been opened shall also apply to the approval of the undertaking. Creditors shall be able to participate in the vote by distance means of communication, where national law so permits. The insolvency practitioner shall inform the known local creditors of the undertaking, of the rules and procedures for its approval, and of the approval or rejection of the undertaking.

6.    An undertaking given and approved in accordance with this Article shall be binding on the estate. If secondary insolvency proceedings are opened in accordance with Articles 37 and 38, the insolvency practitioner in the main insolvency proceedings shall transfer any assets which it removed from the territory of that Member State after the undertaking was given or, where those assets have already been realised, their proceeds, to the insolvency practitioner in the secondary insolvency proceedings.

7.    Where the insolvency practitioner has given an undertaking, it shall inform local creditors about the intended distributions prior to distributing the assets and proceeds referred to in paragraph 1. If that information does not comply with the terms of the undertaking or the applicable law, any local creditor may challenge such distribution before the courts of the Member State in which main insolvency proceedings have been opened in order to obtain a distribution in accordance with the terms of the undertaking and the applicable law. In such cases, no distribution shall take place until the court has taken a decision on the challenge.

8.    Local creditors may apply to the courts of the Member State in which main insolvency proceedings have been opened, in order to require the insolvency practitioner in the main insolvency proceedings to take any suitable measures necessary to ensure compliance with the terms of the undertaking available under the law of the State of the opening of main insolvency proceedings.

9.    Local creditors may also apply to the courts of the Member State in which secondary insolvency proceedings could have been opened in order to require the court to take provisional or protective measures to ensure compliance by the insolvency practitioner with the terms of the undertaking.

10.    The insolvency practitioner shall be liable for any damage caused to local creditors as a result of its non-compliance with the obligations and requirements set out in this Article.

11.    For the purpose of this Article, an authority which is established in the Member State where secondary insolvency proceedings could have been opened and which is obliged under Directive 2008/94/EC of the European Parliament and of the Council (¹) to guarantee the payment of employees' outstanding claims resulting from contracts of employment or employment relationships shall be considered to be a local creditor, where the national law so provides.

_____

(¹) Directive 2008/94/EC of the European Parliament and of the Council of 22 October 2008 on the protection of employees in the event of the insolvency of their employer (OJ L 283, 28.10.2008, p. 36).

*Article 37*

**Right to request the opening of secondary insolvency proceedings**

1.    The opening of secondary insolvency proceedings may be requested by:

(a)  the insolvency practitioner in the main insolvency proceedings;

(b)  any other person or authority empowered to request the opening of insolvency proceedings under the law of the Member State within the territory of which the opening of secondary insolvency proceedings is requested.

2.    Where an undertaking has become binding in accordance with Article 36, the request for opening secondary insolvency proceedings shall be lodged within 30 days of having received notice of the approval of the undertaking.

*Article 38*

**Decision to open secondary insolvency proceedings**

1.    A court seised of a request to open secondary insolvency proceedings shall immediately give notice to the insolvency practitioner or the debtor in possession in the main insolvency proceedings and give it an opportunity to be heard on the request.

2.    Where the insolvency practitioner in the main insolvency proceedings has given an undertaking in accordance with Article 36, the court referred to in paragraph 1 of this Article shall, at the request of the insolvency practitioner, not open secondary insolvency proceedings if it is satisfied that the undertaking adequately protects the general interests of local creditors.

3.    Where a temporary stay of individual enforcement proceedings has been granted in order to allow for negotiations between the debtor and its creditors, the court, at the request of the insolvency practitioner or the debtor in possession, may stay the opening of secondary insolvency proceedings for a period not exceeding 3 months, provided that suitable measures are in place to protect the interests of local creditors.

The court referred to in paragraph 1 may order protective measures to protect the interests of local creditors by requiring the insolvency practitioner or the debtor in possession not to remove or dispose of any assets which are located in the Member State where its establishment is located unless this is done in the ordinary course of business. The court may also order other measures to protect the interest of local creditors during a stay, unless this is incompatible with the national rules on civil procedure.

The stay of the opening of secondary insolvency proceedings shall be lifted by the court of its own motion or at the request of any creditor if, during the stay, an agreement in the negotiations referred to in the first subparagraph has been concluded.

The stay may be lifted by the court of its own motion or at the request of any creditor if the continuation of the stay is detrimental to the creditor's rights, in particular if the negotiations have been disrupted or it has become evident that they are unlikely to be concluded, or if the insolvency practitioner or the debtor in possession has infringed the prohibition on disposal of its assets or on removal of them from the territory of the Member State where the establishment is located.

4.    At the request of the insolvency practitioner in the main insolvency proceedings, the court referred to in paragraph 1 may open a type of insolvency proceedings as listed in Annex A other than the type initially requested, provided that the conditions for opening that type of proceedings under national law are fulfilled and that that type of proceedings is the most appropriate as regards the interests of the local creditors and coherence between the main and secondary insolvency proceedings. The second sentence of Article 34 shall apply.

*Article 39*

**Judicial review of the decision to open secondary insolvency proceedings**

The insolvency practitioner in the main insolvency proceedings may challenge the decision to open secondary insolvency proceedings before the courts of the Member State in which secondary insolvency proceedings have been opened on the ground that the court did not comply with the conditions and requirements of Article 38.

*Article 40*

**Advance payment of costs and expenses**

Where the law of the Member State in which the opening of secondary insolvency proceedings is requested requires that the debtor's assets be sufficient to cover in whole or in part the costs and expenses of the proceedings, the court may, when it receives such a request, require the applicant to make an advance payment of costs or to provide appropriate security.

*Article 41*

**Cooperation and communication between insolvency practitioners**

1.    The insolvency practitioner in the main insolvency proceedings and the insolvency practitioner or practitioners in secondary insolvency proceedings concerning the same debtor shall cooperate with each other to the extent such cooperation is not incompatible with the rules applicable to the respective proceedings. Such cooperation may take any form, including the conclusion of agreements or protocols.

2.    In implementing the cooperation set out in paragraph 1, the insolvency practitioners shall:

(a)  as soon as possible communicate to each other any information which may be relevant to the other proceedings, in particular any progress made in lodging and verifying claims and all measures aimed at rescuing or restructuring the debtor, or at terminating the proceedings, provided appropriate arrangements are made to protect confidential information;

(b)  explore the possibility of restructuring the debtor and, where such a possibility exists, coordinate the elaboration and implementation of a restructuring plan;

(c)  coordinate the administration of the realisation or use of the debtor's assets and affairs; the insolvency practitioner in the secondary insolvency proceedings shall give the insolvency practitioner in the main insolvency proceedings an early opportunity to submit proposals on the realisation or use of the assets in the secondary insolvency proceedings.

3.    Paragraphs 1 and 2 shall apply mutatis mutandis to situations where, in the main or in the secondary insolvency proceedings or in any territorial insolvency proceedings concerning the same debtor and open at the same time, the debtor remains in possession of its assets.

*Article 42*

**Cooperation and communication between courts**

1.    In order to facilitate the coordination of main, territorial and secondary insolvency proceedings concerning the same debtor, a court before which a request to open insolvency proceedings is pending, or which has opened such proceedings, shall cooperate with any other court before which a request to open insolvency proceedings is pending, or which has opened such proceedings, to the extent that such cooperation is not incompatible with the rules applicable to each of the proceedings. For that purpose, the courts may, where appropriate, appoint an independent person or body acting on its instructions, provided that it is not incompatible with the rules applicable to them.

2.    In implementing the cooperation set out in paragraph 1, the courts, or any appointed person or body acting on their behalf, as referred to in paragraph 1, may communicate directly with, or request information or assistance directly from, each other provided that such communication respects the procedural rights of the parties to the proceedings and the confidentiality of information.

3.    The cooperation referred to in paragraph 1 may be implemented by any means that the court considers appropriate. It may, in particular, concern:

(a)  coordination in the appointment of the insolvency practitioners;

(b)  communication of information by any means considered appropriate by the court;

(c)  coordination of the administration and supervision of the debtor's assets and affairs;

(d)  coordination of the conduct of hearings;

(e)  coordination in the approval of protocols, where necessary.

EN

*Article 43*

**Cooperation and communication between insolvency practitioners and courts**

1.    In order to facilitate the coordination of main, territorial and secondary insolvency proceedings opened in respect of the same debtor:

(a) an insolvency practitioner in main insolvency proceedings shall cooperate and communicate with any court before which a request to open secondary insolvency proceedings is pending or which has opened such proceedings;

(b) an insolvency practitioner in territorial or secondary insolvency proceedings shall cooperate and communicate with the court before which a request to open main insolvency proceedings is pending or which has opened such proceedings; and

(c) an insolvency practitioner in territorial or secondary insolvency proceedings shall cooperate and communicate with the court before which a request to open other territorial or secondary insolvency proceedings is pending or which has opened such proceedings;

to the extent that such cooperation and communication are not incompatible with the rules applicable to each of the proceedings and do not entail any conflict of interest.

2.    The cooperation referred to in paragraph 1 may be implemented by any appropriate means, such as those set out in Article 42(3).

*Article 44*

**Costs of cooperation and communication**

The requirements laid down in Articles 42 and 43 shall not result in courts charging costs to each other for cooperation and communication.

*Article 45*

**Exercise of creditors' rights**

1.    Any creditor may lodge its claim in the main insolvency proceedings and in any secondary insolvency proceedings.

2.    The insolvency practitioners in the main and any secondary insolvency proceedings shall lodge in other proceedings claims which have already been lodged in the proceedings for which they were appointed, provided that the interests of creditors in the latter proceedings are served by doing so, subject to the right of creditors to oppose such lodgement or to withdraw the lodgement of their claims where the law applicable so provides.

3.    The insolvency practitioner in the main or secondary insolvency proceedings shall be entitled to participate in other proceedings on the same basis as a creditor, in particular by attending creditors' meetings.

*Article 46*

**Stay of the process of realisation of assets**

1.    The court which opened the secondary insolvency proceedings shall stay the process of realisation of assets in whole or in part on receipt of a request from the insolvency practitioner in the main insolvency proceedings. In such a case, it may require the insolvency practitioner in the main insolvency proceedings to take any suitable measure to guarantee the interests of the creditors in the secondary insolvency proceedings and of individual classes of creditors. Such a request from the insolvency practitioner may be rejected only if it is manifestly of no interest to the creditors in the main insolvency proceedings. Such a stay of the process of realisation of assets may be ordered for up to 3 months. It may be continued or renewed for similar periods.

5.6.2015            EN            Official Journal of the European Union            L 141/45

2.    The court referred to in paragraph 1 shall terminate the stay of the process of realisation of assets:

(a)  at the request of the insolvency practitioner in the main insolvency proceedings;

(b)  of its own motion, at the request of a creditor or at the request of the insolvency practitioner in the secondary insolvency proceedings if that measure no longer appears justified, in particular, by the interests of creditors in the main insolvency proceedings or in the secondary insolvency proceedings.

*Article 47*

**Power of the insolvency practitioner to propose restructuring plans**

1.    Where the law of the Member State where secondary insolvency proceedings have been opened allows for such proceedings to be closed without liquidation by a restructuring plan, a composition or a comparable measure, the insolvency practitioner in the main insolvency proceedings shall be empowered to propose such a measure in accordance with the procedure of that Member State.

2.    Any restriction of creditors' rights arising from a measure referred to in paragraph 1 which is proposed in secondary insolvency proceedings, such as a stay of payment or discharge of debt, shall have no effect in respect of assets of a debtor that are not covered by those proceedings, without the consent of all the creditors having an interest.

*Article 48*

**Impact of closure of insolvency proceedings**

1.    Without prejudice to Article 49, the closure of insolvency proceedings shall not prevent the continuation of other insolvency proceedings concerning the same debtor which are still open at that point in time.

2.    Where insolvency proceedings concerning a legal person or a company in the Member State of that person's or company's registered office would entail the dissolution of the legal person or of the company, that legal person or company shall not cease to exist until any other insolvency proceedings concerning the same debtor have been closed, or the insolvency practitioner or practitioners in such proceedings have given consent to the dissolution.

*Article 49*

**Assets remaining in the secondary insolvency proceedings**

If, by the liquidation of assets in the secondary insolvency proceedings, it is possible to meet all claims allowed under those proceedings, the insolvency practitioner appointed in those proceedings shall immediately transfer any assets remaining to the insolvency practitioner in the main insolvency proceedings.

*Article 50*

**Subsequent opening of the main insolvency proceedings**

Where the proceedings referred to in Article 3(1) are opened following the opening of the proceedings referred to in Article 3(2) in another Member State, Articles 41, 45, 46, 47 and 49 shall apply to those opened first, in so far as the progress of those proceedings so permits.

*Article 51*

**Conversion of secondary insolvency proceedings**

1.    At the request of the insolvency practitioner in the main insolvency proceedings, the court of the Member State in which secondary insolvency proceedings have been opened may order the conversion of the secondary insolvency proceedings into another type of insolvency proceedings listed in Annex A, provided that the conditions for opening that type of proceedings under national law are fulfilled and that that type of proceedings is the most appropriate as regards the interests of the local creditors and coherence between the main and secondary insolvency proceedings.

2.    When considering the request referred to in paragraph 1, the court may seek information from the insolvency practitioners involved in both proceedings.


*Article 52*

**Preservation measures**

Where the court of a Member State which has jurisdiction pursuant to Article 3(1) appoints a temporary administrator in order to ensure the preservation of a debtor's assets, that temporary administrator shall be empowered to request any measures to secure and preserve any of the debtor's assets situated in another Member State, provided for under the law of that Member State, for the period between the request for the opening of insolvency proceedings and the judgment opening the proceedings.


CHAPTER IV

**PROVISION OF INFORMATION FOR CREDITORS AND LODGEMENT OF THEIR CLAIMS**

*Article 53*

**Right to lodge claims**

Any foreign creditor may lodge claims in insolvency proceedings by any means of communication, which are accepted by the law of the State of the opening of proceedings. Representation by a lawyer or another legal professional shall not be mandatory for the sole purpose of lodging of claims.


*Article 54*

**Duty to inform creditors**

1.    As soon as insolvency proceedings are opened in a Member State, the court of that State having jurisdiction or the insolvency practitioner appointed by that court shall immediately inform the known foreign creditors.

2.    The information referred to in paragraph 1, provided by an individual notice, shall in particular include time limits, the penalties laid down with regard to those time limits, the body or authority empowered to accept the lodgement of claims and any other measures laid down. Such notice shall also indicate whether creditors whose claims are preferential or secured *in rem* need to lodge their claims. The notice shall also include a copy of the standard form for lodging of claims referred to in Article 55 or information on where that form is available.

3.    The information referred to in paragraphs 1 and 2 of this Article shall be provided using the standard notice form to be established in accordance with Article 88. The form shall be published in the European e-Justice Portal and shall bear the heading 'Notice of insolvency proceedings' in all the official languages of the institutions of the Union. It shall be transmitted in the official language of the State of the opening of proceedings or, if there are several official languages in that Member State, in the official language or one of the official languages of the place where insolvency proceedings have been opened, or in another language which that State has indicated it can accept, in accordance with Article 55(5), if it can be assumed that that language is easier to understand for the foreign creditors.

4.    In insolvency proceedings relating to an individual not exercising a business or professional activity, the use of the standard form referred to in this Article shall not be obligatory if creditors are not required to lodge their claims in order to have their claims taken into account in the proceedings.


*Article 55*

**Procedure for lodging claims**

1.    Any foreign creditor may lodge its claim using the standard claims form to be established in accordance with Article 88. The form shall bear the heading 'Lodgement of claims' in all the official languages of the institutions of the Union.

5.6.2015          EN          Official Journal of the European Union          L 141/47

2.    The standard claims form referred to in paragraph 1 shall include the following information:

(a)   the name, postal address, e-mail address, if any, personal identification number, if any, and bank details of the foreign creditor referred to in paragraph 1;

(b)   the amount of the claim, specifying the principal and, where applicable, interest and the date on which it arose and the date on which it became due, if different;

(c)   if interest is claimed, the interest rate, whether the interest is of a legal or contractual nature, the period of time for which the interest is claimed and the capitalised amount of interest;

(d)   if costs incurred in asserting the claim prior to the opening of proceedings are claimed, the amount and the details of those costs;

(e)   the nature of the claim;

(f)   whether any preferential creditor status is claimed and the basis of such a claim;

(g)   whether security *in rem* or a reservation of title is alleged in respect of the claim and if so, what assets are covered by the security interest being invoked, the date on which the security was granted and, where the security has been registered, the registration number; and

(h)   whether any set-off is claimed and, if so, the amounts of the mutual claims existing on the date when insolvency proceedings were opened, the date on which they arose and the amount net of set-off claimed.

The standard claims form shall be accompanied by copies of any supporting documents.

3.    The standard claims form shall indicate that the provision of information concerning the bank details and the personal identification number of the creditor referred to in point (a) of paragraph 2 is not compulsory.

4.    When a creditor lodges its claim by means other than the standard form referred to in paragraph 1, the claim shall contain the information referred to in paragraph 2.

5.    Claims may be lodged in any official language of the institutions of the Union. The court, the insolvency practitioner or the debtor in possession may require the creditor to provide a translation in the official language of the State of the opening of proceedings or, if there are several official languages in that Member State, in the official language or one of the official languages of the place where insolvency proceedings have been opened, or in another language which that Member State has indicated it can accept. Each Member State shall indicate whether it accepts any official language of the institutions of the Union other than its own for the purpose of the lodging of claims.

6.    Claims shall be lodged within the period stipulated by the law of the State of the opening of proceedings. In the case of a foreign creditor, that period shall not be less than 30 days following the publication of the opening of insolvency proceedings in the insolvency register of the State of the opening of proceedings. Where a Member State relies on Article 24(4), that period shall not be less than 30 days following a creditor having been informed pursuant to Article 54.

7.    Where the court, the insolvency practitioner or the debtor in possession has doubts in relation to a claim lodged in accordance with this Article, it shall give the creditor the opportunity to provide additional evidence on the existence and the amount of the claim.

CHAPTER V

INSOLVENCY PROCEEDINGS OF MEMBERS OF A GROUP OF COMPANIES

SECTION 1

*Cooperation and communication*

Article 56

Cooperation and communication between insolvency practitioners

1.    Where insolvency proceedings relate to two or more members of a group of companies, an insolvency practitioner appointed in proceedings concerning a member of the group shall cooperate with any insolvency practitioner appointed in proceedings concerning another member of the same group to the extent that such cooperation is appropriate to

L 141/48          EN          Official Journal of the European Union          5.6.2015

facilitate the effective administration of those proceedings, is not incompatible with the rules applicable to such proceedings and does not entail any conflict of interest. That cooperation may take any form, including the conclusion of agreements or protocols.

2.    In implementing the cooperation set out in paragraph 1, insolvency practitioners shall:

(a) as soon as possible communicate to each other any information which may be relevant to the other proceedings, provided appropriate arrangements are made to protect confidential information;

(b) consider whether possibilities exist for coordinating the administration and supervision of the affairs of the group members which are subject to insolvency proceedings, and if so, coordinate such administration and supervision;

(c) consider whether possibilities exist for restructuring group members which are subject to insolvency proceedings and, if so, coordinate with regard to the proposal and negotiation of a coordinated restructuring plan.

For the purposes of points (b) and (c), all or some of the insolvency practitioners referred to in paragraph 1 may agree to grant additional powers to an insolvency practitioner appointed in one of the proceedings where such an agreement is permitted by the rules applicable to each of the proceedings. They may also agree on the allocation of certain tasks amongst them, where such allocation of tasks is permitted by the rules applicable to each of the proceedings.

*Article 57*

**Cooperation and communication between courts**

1.    Where insolvency proceedings relate to two or more members of a group of companies, a court which has opened such proceedings shall cooperate with any other court before which a request to open proceedings concerning another member of the same group is pending or which has opened such proceedings to the extent that such cooperation is appropriate to facilitate the effective administration of the proceedings, is not incompatible with the rules applicable to them and does not entail any conflict of interest. For that purpose, the courts may, where appropriate, appoint an independent person or body to act on its instructions, provided that this is not incompatible with the rules applicable to them.

2.    In implementing the cooperation set out in paragraph 1, courts, or any appointed person or body acting on their behalf, as referred to in paragraph 1, may communicate directly with each other, or request information or assistance directly from each other, provided that such communication respects the procedural rights of the parties to the proceedings and the confidentiality of information.

3.    The cooperation referred to in paragraph 1 may be implemented by any means that the court considers appropriate. It may, in particular, concern:

(a) coordination in the appointment of insolvency practitioners;

(b) communication of information by any means considered appropriate by the court;

(c) coordination of the administration and supervision of the assets and affairs of the members of the group;

(d) coordination of the conduct of hearings;

(e) coordination in the approval of protocols where necessary.

*Article 58*

**Cooperation and communication between insolvency practitioners and courts**

An insolvency practitioner appointed in insolvency proceedings concerning a member of a group of companies:

(a) shall cooperate and communicate with any court before which a request for the opening of proceedings in respect of another member of the same group of companies is pending or which has opened such proceedings; and

(b) may request information from that court concerning the proceedings regarding the other member of the group or request assistance concerning the proceedings in which he has been appointed;

to the extent that such cooperation and communication are appropriate to facilitate the effective administration of the proceedings, do not entail any conflict of interest and are not incompatible with the rules applicable to them.

5.6.2015          EN          Official Journal of the European Union          L 141/49

*Article 59*

**Costs of cooperation and communication in proceedings concerning members of a group of companies**

The costs of the cooperation and communication provided for in Articles 56 to 60 incurred by an insolvency practitioner or a court shall be regarded as costs and expenses incurred in the respective proceedings.

*Article 60*

**Powers of the insolvency practitioner in proceedings concerning members of a group of companies**

1.    An insolvency practitioner appointed in insolvency proceedings opened in respect of a member of a group of companies may, to the extent appropriate to facilitate the effective administration of the proceedings:

(a)  be heard in any of the proceedings opened in respect of any other member of the same group;

(b)  request a stay of any measure related to the realisation of the assets in the proceedings opened with respect to any other member of the same group, provided that:

   (i)   a restructuring plan for all or some members of the group for which insolvency proceedings have been opened has been proposed under point (c) of Article 56(2) and presents a reasonable chance of success;

   (ii)  such a stay is necessary in order to ensure the proper implementation of the restructuring plan;

   (iii) the restructuring plan would be to the benefit of the creditors in the proceedings for which the stay is requested; and

   (iv)  neither the insolvency proceedings in which the insolvency practitioner referred to in paragraph 1 of this Article has been appointed nor the proceedings in respect of which the stay is requested are subject to coordination under Section 2 of this Chapter;

(c)  apply for the opening of group coordination proceedings in accordance with Article 61.

2.    The court having opened proceedings referred to in point (b) of paragraph 1 shall stay any measure related to the realisation of the assets in the proceedings in whole or in part if it is satisfied that the conditions referred to in point (b) of paragraph 1 are fulfilled.

Before ordering the stay, the court shall hear the insolvency practitioner appointed in the proceedings for which the stay is requested. Such a stay may be ordered for any period, not exceeding 3 months, which the court considers appropriate and which is compatible with the rules applicable to the proceedings.

The court ordering the stay may require the insolvency practitioner referred to in paragraph 1 to take any suitable measure available under national law to guarantee the interests of the creditors in the proceedings.

The court may extend the duration of the stay by such further period or periods as it considers appropriate and which are compatible with the rules applicable to the proceedings, provided that the conditions referred to in points (b)(ii) to (iv) of paragraph 1 continue to be fulfilled and that the total duration of the stay (the initial period together with any such extensions) does not exceed 6 months.

*SECTION 2*

***Coordination***

Subsection 1

**Procedure**

*Article 61*

**Request to open group coordination proceedings**

1.    Group coordination proceedings may be requested before any court having jurisdiction over the insolvency proceedings of a member of the group, by an insolvency practitioner appointed in insolvency proceedings opened in relation to a member of the group.

2.    The request referred to in paragraph 1 shall be made in accordance with the conditions provided for by the law applicable to the proceedings in which the insolvency practitioner has been appointed.

3.    The request referred to in paragraph 1 shall be accompanied by:

(a) a proposal as to the person to be nominated as the group coordinator ('the coordinator'), details of his or her eligibility pursuant to Article 71, details of his or her qualifications and his or her written agreement to act as coordinator;

(b) an outline of the proposed group coordination, and in particular the reasons why the conditions set out in Article 63(1) are fulfilled;

(c) a list of the insolvency practitioners appointed in relation to the members of the group and, where relevant, the courts and competent authorities involved in the insolvency proceedings of the members of the group;

(d) an outline of the estimated costs of the proposed group coordination and the estimation of the share of those costs to be paid by each member of the group.

*Article 62*

**Priority rule**

Without prejudice to Article 66, where the opening of group coordination proceedings is requested before courts of different Member States, any court other than the court first seised shall decline jurisdiction in favour of that court.

*Article 63*

**Notice by the court seised**

1.    The court seised of a request to open group coordination proceedings shall give notice as soon as possible of the request for the opening of group coordination proceedings and of the proposed coordinator to the insolvency practitioners appointed in relation to the members of the group as indicated in the request referred to in point (c) of Article 61(3), if it is satisfied that:

(a) the opening of such proceedings is appropriate to facilitate the effective administration of the insolvency proceedings relating to the different group members;

(b) no creditor of any group member expected to participate in the proceedings is likely to be financially disadvantaged by the inclusion of that member in such proceedings; and

(c) the proposed coordinator fulfils the requirements laid down in Article 71.

2.    The notice referred to in paragraph 1 of this Article shall list the elements referred to in points (a) to (d) of Article 61(3).

3.    The notice referred to in paragraph 1 shall be sent by registered letter, attested by an acknowledgment of receipt.

4.    The court seised shall give the insolvency practitioners involved the opportunity to be heard.

*Article 64*

**Objections by insolvency practitioners**

1.    An insolvency practitioner appointed in respect of any group member may object to:

(a) the inclusion within group coordination proceedings of the insolvency proceedings in respect of which it has been appointed; or

(b) the person proposed as a coordinator.

2.    Objections pursuant to paragraph 1 of this Article shall be lodged with the court referred to in Article 63 within 30 days of receipt of notice of the request for the opening of group coordination proceedings by the insolvency practitioner referred to in paragraph 1 of this Article.

5.6.2015          EN          Official Journal of the European Union          L 141/51

The objection may be made by means of the standard form established in accordance with Article 88.

3.    Prior to taking the decision to participate or not to participate in the coordination in accordance with point (a) of paragraph 1, an insolvency practitioner shall obtain any approval which may be required under the law of the State of the opening of proceedings for which it has been appointed.

*Article 65*

**Consequences of objection to the inclusion in group coordination**

1.    Where an insolvency practitioner has objected to the inclusion of the proceedings in respect of which it has been appointed in group coordination proceedings, those proceedings shall not be included in the group coordination proceedings.

2.    The powers of the court referred to in Article 68 or of the coordinator arising from those proceedings shall have no effect as regards that member, and shall entail no costs for that member.

*Article 66*

**Choice of court for group coordination proceedings**

1.    Where at least two-thirds of all insolvency practitioners appointed in insolvency proceedings of the members of the group have agreed that a court of another Member State having jurisdiction is the most appropriate court for the opening of group coordination proceedings, that court shall have exclusive jurisdiction.

2.    The choice of court shall be made by joint agreement in writing or evidenced in writing. It may be made until such time as group coordination proceedings have been opened in accordance with Article 68.

3.    Any court other than the court seised under paragraph 1 shall decline jurisdiction in favour of that court.

4.    The request for the opening of group coordination proceedings shall be submitted to the court agreed in accordance with Article 61.

*Article 67*

**Consequences of objections to the proposed coordinator**

Where objections to the person proposed as coordinator have been received from an insolvency practitioner which does not also object to the inclusion in the group coordination proceedings of the member in respect of which it has been appointed, the court may refrain from appointing that person and invite the objecting insolvency practitioner to submit a new request in accordance with Article 61(3).

*Article 68*

**Decision to open group coordination proceedings**

1.    After the period referred to in Article 64(2) has elapsed, the court may open group coordination proceedings where it is satisfied that the conditions of Article 63(1) are met. In such a case, the court shall:

(a)  appoint a coordinator;

(b)  decide on the outline of the coordination; and

(c)  decide on the estimation of costs and the share to be paid by the group members.

2.    The decision opening group coordination proceedings shall be brought to the notice of the participating insolvency practitioners and of the coordinator.

*Article 69*

**Subsequent opt-in by insolvency practitioners**

1.    In accordance with its national law, any insolvency practitioner may request, after the court decision referred to in Article 68, the inclusion of the proceedings in respect of which it has been appointed, where:

(a) there has been an objection to the inclusion of the insolvency proceedings within the group coordination proceedings; or

(b) insolvency proceedings with respect to a member of the group have been opened after the court has opened group coordination proceedings.

2.    Without prejudice to paragraph 4, the coordinator may accede to such a request, after consulting the insolvency practitioners involved, where

(a) he or she is satisfied that, taking into account the stage that the group coordination proceedings has reached at the time of the request, the criteria set out in points (a) and (b) of Article 63(1) are met; or

(b) all insolvency practitioners involved agree, subject to the conditions in their national law.

3.    The coordinator shall inform the court and the participating insolvency practitioners of his or her decision pursuant to paragraph 2 and of the reasons on which it is based.

4.    Any participating insolvency practitioner or any insolvency practitioner whose request for inclusion in the group coordination proceedings has been rejected may challenge the decision referred to in paragraph 2 in accordance with the procedure set out under the law of the Member State in which the group coordination proceedings have been opened.

*Article 70*

**Recommendations and group coordination plan**

1.    When conducting their insolvency proceedings, insolvency practitioners shall consider the recommendations of the coordinator and the content of the group coordination plan referred to in Article 72(1).

2.    An insolvency practitioner shall not be obliged to follow in whole or in part the coordinator's recommendations or the group coordination plan.

If it does not follow the coordinator's recommendations or the group coordination plan, it shall give reasons for not doing so to the persons or bodies that it is to report to under its national law, and to the coordinator.

Subsection 2

**General provisions**

*Article 71*

**The coordinator**

1.    The coordinator shall be a person eligible under the law of a Member State to act as an insolvency practitioner.

2.    The coordinator shall not be one of the insolvency practitioners appointed to act in respect of any of the group members, and shall have no conflict of interest in respect of the group members, their creditors and the insolvency practitioners appointed in respect of any of the group members.

*Article 72*

**Tasks and rights of the coordinator**

1.    The coordinator shall:

(a) identify and outline recommendations for the coordinated conduct of the insolvency proceedings;

(b) propose a group coordination plan that identifies, describes and recommends a comprehensive set of measures appropriate to an integrated approach to the resolution of the group members' insolvencies. In particular, the plan may contain proposals for:

(i)  the measures to be taken in order to re-establish the economic performance and the financial soundness of the group or any part of it;

(ii)  the settlement of intra-group disputes as regards intra-group transactions and avoidance actions;

(iii)  agreements between the insolvency practitioners of the insolvent group members.

2.    The coordinator may also:

(a)  be heard and participate, in particular by attending creditors' meetings, in any of the proceedings opened in respect of any member of the group;

(b)  mediate any dispute arising between two or more insolvency practitioners of group members;

(c)  present and explain his or her group coordination plan to the persons or bodies that he or she is to report to under his or her national law;

(d)  request information from any insolvency practitioner in respect of any member of the group where that information is or might be of use when identifying and outlining strategies and measures in order to coordinate the proceedings; and

(e)  request a stay for a period of up to 6 months of the proceedings opened in respect of any member of the group, provided that such a stay is necessary in order to ensure the proper implementation of the plan and would be to the benefit of the creditors in the proceedings for which the stay is requested; or request the lifting of any existing stay. Such a request shall be made to the court that opened the proceedings for which a stay is requested.

3.    The plan referred to in point (b) of paragraph 1 shall not include recommendations as to any consolidation of proceedings or insolvency estates.

4.    The coordinator's tasks and rights as defined under this Article shall not extend to any member of the group not participating in group coordination proceedings.

5.    The coordinator shall perform his or her duties impartially and with due care.

6.    Where the coordinator considers that the fulfilment of his or her tasks requires a significant increase in the costs compared to the cost estimate referred to in point (d) of Article 61(3), and in any case, where the costs exceed 10 % of the estimated costs, the coordinator shall:

(a)  inform without delay the participating insolvency practitioners; and

(b)  seek the prior approval of the court opening group coordination proceedings.

*Article 73*

**Languages**

1.    The coordinator shall communicate with the insolvency practitioner of a participating group member in the language agreed with the insolvency practitioner or, in the absence of an agreement, in the official language or one of the official languages of the institutions of the Union, and of the court which opened the proceedings in respect of that group member.

2.    The coordinator shall communicate with a court in the official language applicable to that court.

*Article 74*

**Cooperation between insolvency practitioners and the coordinator**

1.    Insolvency practitioners appointed in relation to members of a group and the coordinator shall cooperate with each other to the extent that such cooperation is not incompatible with the rules applicable to the respective proceedings.

2.    In particular, insolvency practitioners shall communicate any information that is relevant for the coordinator to perform his or her tasks.

*Article 75*

**Revocation of the appointment of the coordinator**

The court shall revoke the appointment of the coordinator of its own motion or at the request of the insolvency practitioner of a participating group member where:

(a) the coordinator acts to the detriment of the creditors of a participating group member; or

(b) the coordinator fails to comply with his or her obligations under this Chapter.

*Article 76*

**Debtor in possession**

The provisions applicable, under this Chapter, to the insolvency practitioner shall also apply, where appropriate, to the debtor in possession.

*Article 77*

**Costs and distribution**

1.    The remuneration for the coordinator shall be adequate, proportionate to the tasks fulfilled and reflect reasonable expenses.

2.    On having completed his or her tasks, the coordinator shall establish the final statement of costs and the share to be paid by each member, and submit this statement to each participating insolvency practitioner and to the court opening coordination proceedings.

3.    In the absence of objections by the insolvency practitioners within 30 days of receipt of the statement referred to in paragraph 2, the costs and the share to be paid by each member shall be deemed to be agreed. The statement shall be submitted to the court opening coordination proceedings for confirmation.

4.    In the event of an objection, the court that opened the group coordination proceedings shall, upon the application of the coordinator or any participating insolvency practitioner, decide on the costs and the share to be paid by each member in accordance with the criteria set out in paragraph 1 of this Article, and taking into account the estimation of costs referred to in Article 68(1) and, where applicable, Article 72(6).

5.    Any participating insolvency practitioner may challenge the decision referred to in paragraph 4 in accordance with the procedure set out under the law of the Member State where group coordination proceedings have been opened.

CHAPTER VI

**DATA PROTECTION**

*Article 78*

**Data protection**

1.    National rules implementing Directive 95/46/EC shall apply to the processing of personal data carried out in the Member States pursuant to this Regulation, provided that processing operations referred to in Article 3(2) of Directive 95/46/EC are not concerned.

2.    Regulation (EC) No 45/2001 shall apply to the processing of personal data carried out by the Commission pursuant to this Regulation.

*Article 79*

**Responsibilities of Member States regarding the processing of personal data in national insolvency registers**

1.    Each Member State shall communicate to the Commission the name of the natural or legal person, public authority, agency or any other body designated by national law to exercise the functions of controller in accordance with point (d) of Article 2 of Directive 95/46/EC, with a view to its publication on the European e-Justice Portal.

5.6.2015          [EN]          Official Journal of the European Union          L 141/55

2.    Member States shall ensure that the technical measures for ensuring the security of personal data processed in their national insolvency registers referred to in Article 24 are implemented.

3.    Member States shall be responsible for verifying that the controller, designated by national law in accordance with point (d) of Article 2 of Directive 95/46/EC, ensures compliance with the principles of data quality, in particular the accuracy and the updating of data stored in national insolvency registers.

4.    Member States shall be responsible, in accordance with Directive 95/46/EC, for the collection and storage of data in national databases and for decisions taken to make such data available in the interconnected register that can be consulted via the European e-Justice Portal.

5.    As part of the information that should be provided to data subjects to enable them to exercise their rights, and in particular the right to the erasure of data, Member States shall inform data subjects of the accessibility period set for personal data stored in insolvency registers.

*Article 80*

**Responsibilities of the Commission in connection with the processing of personal data**

1.    The Commission shall exercise the responsibilities of controller pursuant to Article 2(d) of Regulation (EC) No 45/2001 in accordance with its respective responsibilities defined in this Article.

2.    The Commission shall define the necessary policies and apply the necessary technical solutions to fulfil its responsibilities within the scope of the function of controller.

3.    The Commission shall implement the technical measures required to ensure the security of personal data while in transit, in particular the confidentiality and integrity of any transmission to and from the European e-Justice Portal.

4.    The obligations of the Commission shall not affect the responsibilities of the Member States and other bodies for the content and operation of the interconnected national databases run by them.

*Article 81*

**Information obligations**

Without prejudice to the information to be given to data subjects in accordance with Articles 11 and 12 of Regulation (EC) No 45/2001, the Commission shall inform data subjects, by means of publication through the European e-Justice Portal, about its role in the processing of data and the purposes for which those data will be processed.

*Article 82*

**Storage of personal data**

As regards information from interconnected national databases, no personal data relating to data subjects shall be stored in the European e-Justice Portal. All such data shall be stored in the national databases operated by the Member States or other bodies.

*Article 83*

**Access to personal data via the European e-Justice Portal**

Personal data stored in the national insolvency registers referred to in Article 24 shall be accessible via the European e-Justice Portal for as long as they remain accessible under national law.

CHAPTER VII

**TRANSITIONAL AND FINAL PROVISIONS**

*Article 84*

**Applicability in time**

1.    The provisions of this Regulation shall apply only to insolvency proceedings opened after 26 June 2017. Acts committed by a debtor before that date shall continue to be governed by the law which was applicable to them at the time they were committed.

2.    Notwithstanding Article 91 of this Regulation, Regulation (EC) No 1346/2000 shall continue to apply to insolvency proceedings which fall within the scope of that Regulation and which have been opened before 26 June 2017.

*Article 85*

**Relationship to Conventions**

1.    This Regulation replaces, in respect of the matters referred to therein, and as regards relations between Member States, the Conventions concluded between two or more Member States, in particular:

(a)    the Convention between Belgium and France on Jurisdiction and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Paris on 8 July 1899;

(b)    the Convention between Belgium and Austria on Bankruptcy, Winding-up, Arrangements, Compositions and Suspension of Payments (with Additional Protocol of 13 June 1973), signed at Brussels on 16 July 1969;

(c)    the Convention between Belgium and the Netherlands on Territorial Jurisdiction, Bankruptcy and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Brussels on 28 March 1925;

(d)    the Treaty between Germany and Austria on Bankruptcy, Winding-up, Arrangements and Compositions, signed at Vienna on 25 May 1979;

(e)    the Convention between France and Austria on Jurisdiction, Recognition and Enforcement of Judgments on Bankruptcy, signed at Vienna on 27 February 1979;

(f)    the Convention between France and Italy on the Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 3 June 1930;

(g)    the Convention between Italy and Austria on Bankruptcy, Winding-up, Arrangements and Compositions, signed at Rome on 12 July 1977;

(h)    the Convention between the Kingdom of the Netherlands and the Federal Republic of Germany on the Mutual Recognition and Enforcement of Judgments and other Enforceable Instruments in Civil and Commercial Matters, signed at The Hague on 30 August 1962;

(i)    the Convention between the United Kingdom and the Kingdom of Belgium providing for the Reciprocal Enforcement of Judgments in Civil and Commercial Matters, with Protocol, signed at Brussels on 2 May 1934;

(j)    the Convention between Denmark, Finland, Norway, Sweden and Iceland on Bankruptcy, signed at Copenhagen on 7 November 1933;

(k)    the European Convention on Certain International Aspects of Bankruptcy, signed at Istanbul on 5 June 1990;

(l)    the Convention between the Federative People's Republic of Yugoslavia and the Kingdom of Greece on the Mutual Recognition and Enforcement of Judgments, signed at Athens on 18 June 1959;

(m)    the Agreement between the Federative People's Republic of Yugoslavia and the Republic of Austria on the Mutual Recognition and Enforcement of Arbitral Awards and Arbitral Settlements in Commercial Matters, signed at Belgrade on 18 March 1960;

(n)  the Convention between the Federative People's Republic of Yugoslavia and the Italian Republic on Mutual Judicial Cooperation in Civil and Administrative Matters, signed at Rome on 3 December 1960;

(o)  the Agreement between the Socialist Federative Republic of Yugoslavia and the Kingdom of Belgium on Judicial Cooperation in Civil and Commercial Matters, signed at Belgrade on 24 September 1971;

(p)  the Convention between the Governments of Yugoslavia and France on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Paris on 18 May 1971;

(q)  the Agreement between the Czechoslovak Socialist Republic and the Hellenic Republic on Legal Aid in Civil and Criminal Matters, signed at Athens on 22 October 1980, still in force between the Czech Republic and Greece;

(r)  the Agreement between the Czechoslovak Socialist Republic and the Republic of Cyprus on Legal Aid in Civil and Criminal Matters, signed at Nicosia on 23 April 1982, still in force between the Czech Republic and Cyprus;

(s)  the Treaty between the Government of the Czechoslovak Socialist Republic and the Government of the Republic of France on Legal Aid and the Recognition and Enforcement of Judgments in Civil, Family and Commercial Matters, signed at Paris on 10 May 1984, still in force between the Czech Republic and France;

(t)  the Treaty between the Czechoslovak Socialist Republic and the Italian Republic on Legal Aid in Civil and Criminal Matters, signed at Prague on 6 December 1985, still in force between the Czech Republic and Italy;

(u)  the Agreement between the Republic of Latvia, the Republic of Estonia and the Republic of Lithuania on Legal Assistance and Legal Relationships, signed at Tallinn on 11 November 1992;

(v)  the Agreement between Estonia and Poland on Granting Legal Aid and Legal Relations on Civil, Labour and Criminal Matters, signed at Tallinn on 27 November 1998;

(w)  the Agreement between the Republic of Lithuania and the Republic of Poland on Legal Assistance and Legal Relations in Civil, Family, Labour and Criminal Matters, signed at Warsaw on 26 January 1993;

(x)  the Convention between the Socialist Republic of Romania and the Hellenic Republic on legal assistance in civil and criminal matters and its Protocol, signed at Bucharest on 19 October 1972;

(y)  the Convention between the Socialist Republic of Romania and the French Republic on legal assistance in civil and commercial matters, signed at Paris on 5 November 1974;

(z)  the Agreement between the People's Republic of Bulgaria and the Hellenic Republic on Legal Assistance in Civil and Criminal Matters, signed at Athens on 10 April 1976;

(aa)  the Agreement between the People's Republic of Bulgaria and the Republic of Cyprus on Legal Assistance in Civil and Criminal Matters, signed at Nicosia on 29 April 1983;

(ab)  the Agreement between the Government of the People's Republic of Bulgaria and the Government of the French Republic on Mutual Legal Assistance in Civil Matters, signed at Sofia on 18 January 1989;

(ac)  the Treaty between Romania and the Czech Republic on judicial assistance in civil matters, signed at Bucharest on 11 July 1994;

(ad)  the Treaty between Romania and the Republic of Poland on legal assistance and legal relations in civil cases, signed at Bucharest on 15 May 1999.

2.    The Conventions referred to in paragraph 1 shall continue to have effect with regard to proceedings opened before the entry into force of Regulation (EC) No 1346/2000.

3.    This Regulation shall not apply:

(a)  in any Member State, to the extent that it is irreconcilable with the obligations arising in relation to bankruptcy from a convention concluded by that Member State with one or more third countries before the entry into force of Regulation (EC) No 1346/2000;

(b)  in the United Kingdom of Great Britain and Northern Ireland, to the extent that is irreconcilable with the obligations arising in relation to bankruptcy and the winding-up of insolvent companies from any arrangements with the Commonwealth existing at the time Regulation (EC) No 1346/2000 entered into force.

*Article 86*

**Information on national and Union insolvency law**

1.    The Member States shall provide, within the framework of the European Judicial Network in civil and commercial matters established by Council Decision 2001/470/EC (¹), and with a view to making the information available to the public, a short description of their national legislation and procedures relating to insolvency, in particular relating to the matters listed in Article 7(2).

2.    The Member States shall update the information referred to in paragraph 1 regularly.

3.    The Commission shall make information concerning this Regulation available to the public.

*Article 87*

**Establishment of the interconnection of registers**

The Commission shall adopt implementing acts establishing the interconnection of insolvency registers as referred to in Article 25. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 89(3).

*Article 88*

**Establishment and subsequent amendment of standard forms**

The Commission shall adopt implementing acts establishing and, where necessary, amending the forms referred to in Article 27(4), Articles 54 and 55 and Article 64(2). Those implementing acts shall be adopted in accordance with the advisory procedure referred to in Article 89(2).

*Article 89*

**Committee procedure**

1.    The Commission shall be assisted by a committee. That committee shall be a committee within the meaning of Regulation (EU) No 182/2011.

2.    Where reference is made to this paragraph, Article 4 of Regulation (EU) No 182/2011 shall apply.

3.    Where reference is made to this paragraph, Article 5 of Regulation (EU) No 182/2011 shall apply.

*Article 90*

**Review clause**

1.    No later than 27 June 2027, and every 5 years thereafter, the Commission shall present to the European Parliament, the Council and the European Economic and Social Committee a report on the application of this Regulation. The report shall be accompanied where necessary by a proposal for adaptation of this Regulation.

2.    No later than 27 June 2022, the Commission shall present to the European Parliament, the Council and the European Economic and Social Committee a report on the application of the group coordination proceedings. The report shall be accompanied where necessary by a proposal for adaptation of this Regulation.

3.    No later than 1 January 2016, the Commission shall submit to the European Parliament, the Council and the European Economic and Social Committee a study on the cross-border issues in the area of directors' liability and disqualifications.

4.    No later than 27 June 2020, the Commission shall submit to the European Parliament, the Council and the European Economic and Social Committee a study on the issue of abusive forum shopping.

_____
(¹) Council Decision 2001/470/EC of 28 May 2001 establishing a European Judicial Network in civil and commercial matters (OJ L 174, 27.6.2001, p. 25).

5.6.2015　　　　　EN　　　　Official Journal of the European Union　　　　　L 141/59

*Article 91*

**Repeal**

Regulation (EC) No 1346/2000 is repealed.

References to the repealed Regulation shall be construed as references to this Regulation and shall be read in accordance with the correlation table set out in Annex D to this Regulation.

*Article 92*

**Entry into force**

This Regulation shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

It shall apply from 26 June 2017, with the exception of:

(a)  Article 86, which shall apply from 26 June 2016;

(b)  Article 24(1), which shall apply from 26 June 2018; and

(c)  Article 25, which shall apply from 26 June 2019.

This Regulation shall be binding in its entirety and directly applicable in the Member States in accordance with the Treaties.

Done at Strasbourg, 20 May 2015.

|  |  |
|---|---|
| *For the European Parliament* | *For the Council* |
| *The President* | *The President* |
| M. SCHULZ | Z. KALNIŅA-LUKAŠEVICA |

———

ANNEX A

**Insolvency proceedings referred to in point (4) of Article 2**

BELGIQUE/BELGIË

— Het faillissement/La faillite,

— De gerechtelijke reorganisatie door een collectief akkoord/La réorganisation judiciaire par accord collectif,

— De gerechtelijke reorganisatie door een minnelijk akkoord/La réorganisation judiciaire par accord amiable,

— De gerechtelijke reorganisatie door overdracht onder gerechtelijk gezag/La réorganisation judiciaire par transfert sous autorité de justice,

— De collectieve schuldenregeling/Le règlement collectif de dettes,

— De vrijwillige vereffening/La liquidation volontaire,

— De gerechtelijke vereffening/La liquidation judiciaire,

— De voorlopige ontneming van beheer, bepaald in artikel 8 van de faillissementswet/Le dessaisissement provisoire, visé à l'article 8 de la loi sur les faillites,

БЪЛГАРИЯ

— Производство по несъстоятелност,

ČESKÁ REPUBLIKA

— Konkurs,

— Reorganizace,

— Oddlužení,

DEUTSCHLAND

— Das Konkursverfahren,

— Das gerichtliche Vergleichsverfahren,

— Das Gesamtvollstreckungsverfahren,

— Das Insolvenzverfahren,

EESTI

— Pankrotimenetlus,

— Võlgade ümberkujundamise menetlus,

ÉIRE/IRELAND

— Compulsory winding-up by the court,

— Bankruptcy,

— The administration in bankruptcy of the estate of persons dying insolvent,

— Winding-up in bankruptcy of partnerships,

— Creditors' voluntary winding-up (with confirmation of a court),

— Arrangements under the control of the court which involve the vesting of all or part of the property of the debtor in the Official Assignee for realisation and distribution,

— Examinership,

— Debt Relief Notice,

— Debt Settlement Arrangement,

— Personal Insolvency Arrangement,

ΕΛΛΑΔΑ

— Η πτώχευση,

— Η ειδική εκκαθάριση εν λειτουργία,

— Σχέδιο αναδιοργάνωσης,

— Απλοποιημένη διαδικασία επί πτωχεύσεων μικρού αντικειμένου,

— Διαδικασία Εξυγίανσης,

ESPAÑA

— Concurso,

— Procedimiento de homologación de acuerdos de refinanciación,

— Procedimiento de acuerdos extrajudiciales de pago,

— Procedimiento de negociación pública para la consecución de acuerdos de refinanciación colectivos, acuerdos de refinanciación homologados y propuestas anticipadas de convenio,

FRANCE

— Sauvegarde,

— Sauvegarde accélérée,

— Sauvegarde financière accélérée,

— Redressement judiciaire,

— Liquidation judiciaire,

HRVATSKA

— Stečajni postupak,

ITALIA

— Fallimento,

— Concordato preventivo,

— Liquidazione coatta amministrativa,

— Amministrazione straordinaria,

— Accordi di ristrutturazione,

— Procedure di composizione della crisi da sovraindebitamento del consumatore (accordo o piano),

— Liquidazione dei beni,

ΚΥΠΡΟΣ

— Υποχρεωτική εκκαθάριση από το Δικαστήριο,

— Εκούσια εκκαθάριση από μέλη,

— Εκούσια εκκαθάριση από πιστωτές

— Εκκαθάριση με την εποπτεία του Δικαστηρίου,

— Διάταγμα Παραλαβής και πτώχευσης κατόπιν Δικαστικού Διατάγματος,

— Διαχείριση της περιουσίας προσώπων που απεβίωσαν αφερέγγυα,

LATVIJA

— Tiesiskās aizsardzības process,

— Juridiskās personas maksātnespējas process,

— Fiziskās personas maksātnespējas process,

L 141/62          EN          Official Journal of the European Union          5.6.2015

LIETUVA

— Įmonės restruktūrizavimo byla,

— Įmonės bankroto byla,

— Įmonės bankroto procesas ne teismo tvarka,

— Fizinio asmens bankroto procesas,

LUXEMBOURG

— Faillite,

— Gestion contrôlée,

— Concordat préventif de faillite (par abandon d'actif),

— Régime spécial de liquidation du notariat,

— Procédure de règlement collectif des dettes dans le cadre du surendettement,

MAGYARORSZÁG

— Csődeljárás,

— Felszámolási eljárás,

MALTA

— Xoljiment,

— Amministrazzjoni,

— Stralċ volontarju mill-membri jew mill-kredituri,

— Stralċ mill-Qorti,

— Falliment f'każ ta' kummerċjant,

— Proċedura biex kumpanija tirkupra,

NEDERLAND

— Het faillissement,

— De surséance van betaling,

— De schuldsaneringsregeling natuurlijke personen,

ÖSTERREICH

— Das Konkursverfahren (Insolvenzverfahren),

— Das Sanierungsverfahren ohne Eigenverwaltung (Insolvenzverfahren),

— Das Sanierungsverfahren mit Eigenverwaltung (Insolvenzverfahren),

— Das Schuldenregulierungsverfahren,

— Das Abschöpfungsverfahren,

— Das Ausgleichsverfahren,

POLSKA

— Postępowanie naprawcze,

— Upadłość obejmująca likwidację,

— Upadłość z możliwością zawarcia układu,

PORTUGAL

— Processo de insolvência,

— Processo especial de revitalização,

ROMÂNIA

— Procedura insolvenței,

— Reorganizarea judiciară,

— Procedura falimentului,

— Concordatul preventiv,

SLOVENIJA

— Postopek preventivnega prestrukturiranja,

— Postopek prisilne poravnave,

— Postopek poenostavljene prisilne poravnave,

— Stečajni postopek: stečajni postopek nad pravno osebo, postopek osebnega stečaja and postopek stečaja zapuščine,

SLOVENSKO

— Konkurzné konanie,

— Reštrukturalizačné konanie,

— Oddlženie,

SUOMI/FINLAND

— Konkurssi/konkurs,

— Yrityssaneeraus/företagssanering,

— Yksityishenkilön velkajärjestely/skuldsanering för privatpersoner,

SVERIGE

— Konkurs,

— Företagsrekonstruktion,

— Skuldsanering,

UNITED KINGDOM

— Winding-up by or subject to the supervision of the court,

— Creditors' voluntary winding-up (with confirmation by the court),

— Administration, including appointments made by filing prescribed documents with the court,

— Voluntary arrangements under insolvency legislation,

— Bankruptcy or sequestration.

_____

L 141/64        EN        Official Journal of the European Union        5.6.2015

*ANNEX B*

**Insolvency practitioners referred to in point (5) of Article 2**

BELGIQUE/BELGIË

— De curator/Le curateur,

— De gedelegeerd rechter/Le juge-délégué,

— De gerechtsmandataris/Le mandataire de justice,

— De schuldbemiddelaar/Le médiateur de dettes,

— De vereffenaar/Le liquidateur,

— De voorlopige bewindvoerder/L'administrateur provisoire,

БЪЛГАРИЯ

— Назначен предварително временен синдик,

— Временен синдик,

— (Постоянен) синдик,

— Служебен синдик,

ČESKÁ REPUBLIKA

— Insolvenční správce,

— Předběžný insolvenční správce,

— Oddělený insolvenční správce,

— Zvláštní insolvenční správce,

— Zástupce insolvenčního správce,

DEUTSCHLAND

— Konkursverwalter,

— Vergleichsverwalter,

— Sachwalter (nach der Vergleichsordnung),

— Verwalter,

— Insolvenzverwalter,

— Sachwalter (nach der Insolvenzordnung),

— Treuhänder,

— Vorläufiger Insolvenzverwalter,

— Vorläufiger Sachwalter,

EESTI

— Pankrotihaldur,

— Ajutine pankrotihaldur,

— Usaldusisik,

ÉIRE/IRELAND

— Liquidator,

— Official Assignee,

— Trustee in bankruptcy,

— Provisional Liquidator,

— Examiner,

— Personal Insolvency Practitioner,

— Insolvency Service,

ΕΛΛΑΔΑ

— Ο σύνδικος,

— Ο εισηγητής,

— Η επιτροπή των πιστωτών,

— Ο ειδικός εκκαθαριστής,

ESPAÑA

— Administrador concursal,

— Mediador concursal,

FRANCE

— Mandataire judiciaire,

— Liquidateur,

— Administrateur judiciaire,

— Commissaire à l'exécution du plan,

HRVATSKA

— Stečajni upravitelj,

— Privremeni stečajni upravitelj,

— Stečajni povjerenik,

— Povjerenik,

ITALIA

— Curatore,

— Commissario giudiziale,

— Commissario straordinario,

— Commissario liquidatore,

— Liquidatore giudiziale,

— Professionista nominato dal Tribunale,

— Organismo di composizione della crisi nella procedura di composizione della crisi da sovraindebitamento del consumatore,

— Liquidatore,

ΚΥΠΡΟΣ

— Εκκαθαριστής και Προσωρινός Εκκαθαριστής,

— Επίσημος Παραλήπτης,

— Διαχειριστής της Πτώχευσης,

LATVIJA

— Maksātnespējas procesa administrators,

LIETUVA

— Bankroto administratorius,

— Restruktūrizavimo administratorius,


LUXEMBOURG

— Le curateur,

— Le commissaire,

— Le liquidateur,

— Le conseil de gérance de la section d'assainissement du notariat,

— Le liquidateur dans le cadre du surendettement,


MAGYARORSZÁG

— Vagyonfelügyelő,

— Felszámoló,


MALTA

— Amministratur Proviżorju,

— Riċevitur Uffiċjali,

— Stralċjarju,

— Manager Speċjali,

— Kuraturi f'każ ta' proċeduri ta' falliment,

— Kontrolur Speċjali,


NEDERLAND

— De curator in het faillissement,

— De bewindvoerder in de surséance van betaling,

— De bewindvoerder in de schuldsaneringsregeling natuurlijke personen,


ÖSTERREICH

— Masseverwalter,

— Sanierungsverwalter,

— Ausgleichsverwalter,

— Besonderer Verwalter,

— Einstweiliger Verwalter,

— Sachwalter,

— Treuhänder,

— Insolvenzgericht,

— Konkursgericht,


POLSKA

— Syndyk,

— Nadzorca sądowy,

— Zarządca,

PORTUGAL

— Administrador da insolvência,

— Administrador judicial provisório,

ROMÂNIA

— Practician în insolvenţă,

— Administrator concordatar,

— Administrator judiciar,

— Lichidator judiciar,

SLOVENIJA

— Upravitelj,

SLOVENSKO

— Predbežný správca,

— Správca,

SUOMI/FINLAND

— Pesänhoitaja/boförvaltare,

— Selvittäjä/utredare,

SVERIGE

— Förvaltare,

— Rekonstruktör,

UNITED KINGDOM

— Liquidator,

— Supervisor of a voluntary arrangement,

— Administrator,

— Official Receiver,

— Trustee,

— Provisional Liquidator,

— Interim Receiver,

— Judicial factor.

―――――

*ANNEX C*

**Repealed Regulation with list of the successive amendments thereto**

Council Regulation (EC) No 1346/2000

(OJ L 160, 30.6.2000, p. 1)

Council Regulation (EC) No 603/2005

(OJ L 100, 20.4.2005, p. 1)

Council Regulation (EC) No 694/2006

(OJ L 121, 6.5.2006, p. 1)

Council Regulation (EC) No 1791/2006

(OJ L 363, 20.12.2006, p. 1)

Council Regulation (EC) No 681/2007

(OJ L 159, 20.6.2007, p. 1)

Council Regulation (EC) No 788/2008

(OJ L 213, 8.8.2008, p. 1)

Implementing Regulation of the Council (EU) No 210/2010

(OJ L 65, 13.3.2010, p. 1)

Council Implementing Regulation (EU) No 583/2011

(OJ L 160, 18.6.2011, p. 52)

Council Regulation (EU) No 517/2013

(OJ L 158, 10.6.2013, p. 1)

Council Implementing Regulation (EU) No 663/2014

(OJ L 179, 19.6.2014, p. 4)

Act concerning the conditions of accession of the Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia and the Slovak Republic and the adjustments to the Treaties on which the European Union is founded

(OJ L 236, 23.9.2003, p. 33)

_____

5.6.2015    EN    Official Journal of the European Union    L 141/69

*ANNEX D*

**Correlation table**

| Regulation (EC) No 1346/2000 | This Regulation |
| --- | --- |
| Article 1 | Article 1 |
| Article 2, introductory words | Article 2, introductory words |
| Article 2, point (a) | Article 2, point (4) |
| Article 2, point (b) | Article 2, point (5) |
| Article 2, point (c) | — |
| Article 2, point (d) | Article 2, point (6) |
| Article 2, point (e) | Article 2, point (7) |
| Article 2, point (f) | Article 2, point (8) |
| Article 2, point (g), introductory words | Article 2, point (9), introductory words |
| Article 2, point (g), first indent | Article 2, point (9)(vii) |
| Article 2, point (g), second indent | Article 2, point (9)(iv) |
| Article 2, point (g), third indent | Article 2, point (9)(viii) |
| Article 2, point (h) | Article 2, point 10 |
| — | Article 2, points (1) to (3) and (11) to (13) |
| — | Article 2, point (9)(i) to (iii), (v), (vi) |
| Article 3 | Article 3 |
| — | Article 4 |
| — | Article 5 |
| — | Article 6 |
| Article 4 | Article 7 |
| Article 5 | Article 8 |
| Article 6 | Article 9 |
| Article 7 | Article 10 |
| Article 8 | Article 11(1) |
| — | Article 11(2) |
| Article 9 | Article 12 |
| Article 10 | Article 13(1) |
| — | Article 13(2) |
| Article 11 | Article 14 |
| Article 12 | Article 15 |
| Article 13, first indent | Article 16, point (a) |
| Article 13, second indent | Article 16, point (b) |
| Article 14, first indent | Article 17, point (a) |
| Article 14, second indent | Article 17, point (b) |

L 141/70          EN          Official Journal of the European Union          5.6.2015

| Regulation (EC) No 1346/2000 | This Regulation |
|---|---|
| Article 14, third indent | Article 17, point (c) |
| Article 15 | Article 18 |
| Article 16 | Article 19 |
| Article 17 | Article 20 |
| Article 18 | Article 21 |
| Article 19 | Article 22 |
| Article 20 | Article 23 |
| — | Article 24 |
| — | Article 25 |
| — | Article 26 |
| — | Article 27 |
| Article 21(1) | Article 28(2) |
| Article 21(2) | Article 28(1) |
| Article 22 | Article 29 |
| Article 23 | Article 30 |
| Article 24 | Article 31 |
| Article 25 | Article 32 |
| Article 26 | Article 33 |
| Article 27 | Article 34 |
| Article 28 | Article 35 |
| — | Article 36 |
| Article 29 | Article 37(1) |
| — | Article 37(2) |
| — | Article 38 |
| — | Article 39 |
| Article 30 | Article 40 |
| Article 31 | Article 41 |
| — | Article 42 |
| — | Article 43 |
| — | Article 44 |
| Article 32 | Article 45 |
| Article 33 | Article 46 |
| Article 34(1) | Article 47(1) |
| Article 34(2) | Article 47(2) |
| Article 34(3) | — |
| — | Article 48 |
| Article 35 | Article 49 |
| Article 36 | Article 50 |
| Article 37 | Article 51 |

5.6.2015    EN    Official Journal of the European Union    L 141/71

| Regulation (EC) No 1346/2000 | This Regulation |
|---|---|
| Article 38 | Article 52 |
| Article 39 | Article 53 |
| Article 40 | Article 54 |
| Article 41 | Article 55 |
| Article 42 | — |
| — | Article 56 |
| — | Article 57 |
| — | Article 58 |
| — | Article 59 |
| — | Article 60 |
| — | Article 61 |
| — | Article 62 |
| — | Article 63 |
| — | Article 64 |
| — | Article 65 |
| — | Article 66 |
| — | Article 67 |
| — | Article 68 |
| — | Article 69 |
| — | Article 70 |
| — | Article 71 |
| — | Article 72 |
| — | Article 73 |
| — | Article 74 |
| — | Article 75 |
| — | Article 76 |
| — | Article 77 |
| — | Article 78 |
| — | Article 79 |
| — | Article 80 |
| — | Article 81 |
| — | Article 82 |
| — | Article 83 |
| Article 43 | Article 84(1) |
| — | Article 84(2) |
| Article 44 | Article 85 |
| — | Article 86 |
| Article 45 | — |
| — | Article 87 |
| — | Article 88 |

| Regulation (EC) No 1346/2000 | This Regulation |
|---|---|
| — | Article 89 |
| Article 46 | Article 90(1) |
| — | Article 90(2) to (4) |
| — | Article 91 |
| Article 47 | Article 92 |
| Annex A | Annex A |
| Annex B | — |
| Annex C | Annex B |
| — | Annex C |
| — | Annex D |

6.7.2018      EN      Official Journal of the European Union      L 171/1

I

*(Legislative acts)*

# REGULATIONS

**REGULATION (EU) 2018/946 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL**

**of 4 July 2018**

**replacing Annexes A and B to Regulation (EU) 2015/848 on insolvency proceedings**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 81 thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Acting in accordance with the ordinary legislative procedure (¹),

Whereas:

(1) Annexes A and B to Regulation (EU) 2015/848 of the European Parliament and of the Council (²) list the designations given in the national law of the Member States to the insolvency proceedings and to the insolvency practitioners to which that Regulation applies. Annex A lists the insolvency proceedings referred to in point (4) of Article 2 of Regulation (EU) 2015/848 and Annex B lists the insolvency practitioners referred to in point (5) of that Article.

(2) On 3 January 2017, the Republic of Croatia notified the Commission of recent changes in its domestic insolvency law that introduce new types of insolvency proceedings. Those new types of insolvency proceedings are consistent with the definition of insolvency proceedings under Regulation (EU) 2015/848.

(3) After the Commission presented its proposal, it received further notifications from the Republic of Bulgaria, the Republic of Croatia, the Republic of Latvia and the Portuguese Republic relating to recent changes to their domestic law that introduce new types of insolvency proceedings or insolvency practitioners. Furthermore, the Kingdom of Belgium notified the Commission of the adoption of a new law that introduces changes to its domestic insolvency law. That new law entered into force on 1 May 2018. Those new types of insolvency proceedings and insolvency practitioners comply with the requirements set out in Regulation (EU) 2015/848 and make it necessary to amend Annexes A and B to that Regulation.

(4) In accordance with Article 3 and Article 4a(1) of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union, the United Kingdom has notified, by letter of 15 November 2017, its wish to take part in the adoption and application of this Regulation.

(5) In accordance with Articles 1 and 2 and Article 4a(1) of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union, and without prejudice to Article 4 of that Protocol, Ireland is not taking part in the adoption of this Regulation and is not bound by it or subject to its application.

---

(¹) Position of the European Parliament of 13 June 2018 (not yet published in the Official Journal) and decision of the Council of 26 June 2018.
(²) Regulation (EU) 2015/848 of the European Parliament and of the Council of 20 May 2015 on insolvency proceedings (OJ L 141, 5.6.2015, p. 19).

L 171/2          EN          Official Journal of the European Union          6.7.2018

(6)    In accordance with Articles 1 and 2 of Protocol No 22 on the position of Denmark, annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union, Denmark is not taking part in the adoption of this Regulation and is not bound by it or subject to its application.

(7)    Annexes A and B to Regulation (EU) 2015/848 should therefore be amended accordingly,

HAVE ADOPTED THIS REGULATION:

*Article 1*

Annexes A and B to Regulation (EU) 2015/848 are replaced by the text set out in the Annex to this Regulation.

*Article 2*

This Regulation shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

This Regulation shall be binding in its entirety and directly applicable in the Member States in accordance with the Treaties.

Done at Strasbourg, 4 July 2018.

| *For the European Parliament* | *For the Council* |
|:---:|:---:|
| *The President* | *The President* |
| A. TAJANI | K. EDTSTADLER |

_____

*ANNEX*

'ANNEX A

**Insolvency proceedings referred to in point (4) of Article 2**

BELGIQUE/BELGIË

— Het faillissement/La faillite,

— De gerechtelijke reorganisatie door een collectief akkoord/La réorganisation judiciaire par accord collectif,

— De gerechtelijke reorganisatie door een minnelijk akkoord/La réorganisation judiciaire par accord amiable,

— De gerechtelijke reorganisatie door overdracht onder gerechtelijk gezag/La réorganisation judiciaire par transfert sous autorité de justice,

— De collectieve schuldenregeling/Le règlement collectif de dettes,

— De vrijwillige vereffening/La liquidation volontaire,

— De gerechtelijke vereffening/La liquidation judiciaire,

— De voorlopige ontneming van het beheer, als bedoeld in artikel XX.32 van het Wetboek van economisch recht/Le dessaisissement provisoire de la gestion, visé à l'article XX.32 du Code de droit économique,

БЪЛГАРИЯ

— Производство по несъстоятелност,

— Производство по стабилизация на търговеца,

ČESKÁ REPUBLIKA

— Konkurs,

— Reorganizace,

— Oddlužení,

DEUTSCHLAND

— Das Konkursverfahren,

— Das gerichtliche Vergleichsverfahren,

— Das Gesamtvollstreckungsverfahren,

— Das Insolvenzverfahren,

EESTI

— Pankrotimenetlus,

— Võlgade ümberkujundamise menetlus,

ÉIRE/IRELAND

— Compulsory winding-up by the court,

— Bankruptcy,

— The administration in bankruptcy of the estate of persons dying insolvent,

— Winding-up in bankruptcy of partnerships,

— Creditors' voluntary winding-up (with confirmation of a court),

— Arrangements under the control of the court which involve the vesting of all or part of the property of the debtor in the Official Assignee for realisation and distribution,

— Examinership,

— Debt Relief Notice,

— Debt Settlement Arrangement,

— Personal Insolvency Arrangement,

L 171/4          EN          Official Journal of the European Union          6.7.2018

ΕΛΛΑΔΑ

— Η πτώχευση,

— Η ειδική εκκαθάριση εν λειτουργία,

— Σχέδιο αναδιοργάνωσης,

— Απλοποιημένη διαδικασία επί πτωχεύσεων μικρού αντικειμένου,

— Διαδικασία εξυγίανσης,

ESPAÑA

— Concurso,

— Procedimiento de homologación de acuerdos de refinanciación,

— Procedimiento de acuerdos extrajudiciales de pago,

— Procedimiento de negociación pública para la consecución de acuerdos de refinanciación colectivos, acuerdos de refinanciación homologados y propuestas anticipadas de convenio,

FRANCE

— Sauvegarde,

— Sauvegarde accélérée,

— Sauvegarde financière accélérée,

— Redressement judiciaire,

— Liquidation judiciaire,

HRVATSKA

— Stečajni postupak,

— Predstečajni postupak,

— Postupak stečaja potrošača,

— Postupak izvanredne uprave u trgovačkim društvima od sistemskog značaja za Republiku Hrvatsku,

ITALIA

— Fallimento,

— Concordato preventivo,

— Liquidazione coatta amministrativa,

— Amministrazione straordinaria,

— Accordi di ristrutturazione,

— Procedure di composizione della crisi da sovraindebitamento del consumatore (accordo o piano),

— Liquidazione dei beni,

ΚΥΠΡΟΣ

— Υποχρεωτική εκκαθάριση από το Δικαστήριο,

— Εκούσια εκκαθάριση από μέλη,

— Εκούσια εκκαθάριση από πιστωτές

— Εκκαθάριση με την εποπτεία του Δικαστηρίου,

— Διάταγμα παραλαβής και πτώχευσης κατόπιν Δικαστικού Διατάγματος,

— Διαχείριση της περιουσίας προσώπων που απεβίωσαν αφερέγγυα,

LATVIJA

— Tiesiskās aizsardzības process,

— Juridiskās personas maksātnespējas process,

— Fiziskās personas maksātnespējas process,

6.7.2018     EN     Official Journal of the European Union     L 171/5

LIETUVA

— Įmonės restruktūrizavimo byla,

— Įmonės bankroto byla,

— Įmonės bankroto procesas ne teismo tvarka,

— Fizinio asmens bankroto procesas,

LUXEMBOURG

— Faillite,

— Gestion contrôlée,

— Concordat préventif de faillite (par abandon d'actif),

— Régime spécial de liquidation du notariat,

— Procédure de règlement collectif des dettes dans le cadre du surendettement,

MAGYARORSZÁG

— Csődeljárás,

— Felszámolási eljárás,

MALTA

— Xoljiment,

— Amministrazzjoni,

— Stralċ volontarju mill-membri jew mill-kredituri,

— Stralċ mill-Qorti,

— Falliment f'każ ta' kummerċjant,

— Proċedura biex kumpanija tirkupra,

NEDERLAND

— Het faillissement,

— De surséance van betaling,

— De schuldsaneringsregeling natuurlijke personen,

ÖSTERREICH

— Das Konkursverfahren (Insolvenzverfahren),

— Das Sanierungsverfahren ohne Eigenverwaltung (Insolvenzverfahren),

— Das Sanierungsverfahren mit Eigenverwaltung (Insolvenzverfahren),

— Das Schuldenregulierungsverfahren,

— Das Abschöpfungsverfahren,

— Das Ausgleichsverfahren,

POLSKA

— Upadłość,

— Postępowanie o zatwierdzenie układu,

— Przyspieszone postępowanie układowe,

— Postępowanie układowe,

— Postępowanie sanacyjne,

PORTUGAL

— Processo de insolvência,

— Processo especial de revitalização,

— Processo especial para acordo de pagamento,

ROMÂNIA

— Procedura insolvenţei,

— Reorganizarea judiciară,

— Procedura falimentului,

— Concordatul preventiv,

SLOVENIJA

— Postopek preventivnega prestrukturiranja,

— Postopek prisilne poravnave,

— Postopek poenostavljene prisilne poravnave,

— Stečajni postopek: stečajni postopek nad pravno osebo, postopek osebnega stečaja in postopek stečaja zapuščine,

SLOVENSKO

— Konkurzné konanie,

— Reštrukturalizačné konanie,

— Oddlženie,

SUOMI/FINLAND

— Konkurssi/konkurs,

— Yrityssaneeraus/företagssanering,

— Yksityishenkilön velkajärjestely/skuldsanering för privatpersoner,

SVERIGE

— Konkurs,

— Företagsrekonstruktion,

— Skuldsanering,

UNITED KINGDOM

— Winding-up by or subject to the supervision of the court,

— Creditors' voluntary winding-up (with confirmation by the court),

— Administration, including appointments made by filing prescribed documents with the court,

— Voluntary arrangements under insolvency legislation,

— Bankruptcy or sequestration.

6.7.2018 | EN | Official Journal of the European Union | L 171/7

*ANNEX B*

**Insolvency practitioners referred to in point (5) of Article 2**

BELGIQUE/BELGIË

— De curator/Le curateur,

— De gerechtsmandataris/Le mandataire de justice,

— De schuldbemiddelaar/Le médiateur de dettes,

— De vereffenaar/Le liquidateur,

— De voorlopige bewindvoerder/L'administrateur provisoire,

БЪЛГАРИЯ

— Назначен предварително временен синдик,

— Временен синдик,

— (Постоянен) синдик,

— Служебен синдик,

— Доверено лице,

ČESKÁ REPUBLIKA

— Insolvenční správce,

— Předběžný insolvenční správce,

— Oddělený insolvenční správce,

— Zvláštní insolvenční správce,

— Zástupce insolvenčního správce,

DEUTSCHLAND

— Konkursverwalter,

— Vergleichsverwalter,

— Sachwalter (nach der Vergleichsordnung),

— Verwalter,

— Insolvenzverwalter,

— Sachwalter (nach der Insolvenzordnung),

— Treuhänder,

— Vorläufiger Insolvenzverwalter,

— Vorläufiger Sachwalter,

EESTI

— Pankrotihaldur,

— Ajutine pankrotihaldur,

— Usaldusisik,

ÉIRE/IRELAND

— Liquidator,

— Official Assignee,

— Trustee in bankruptcy,

— Provisional Liquidator,

— Examiner,

— Personal Insolvency Practitioner,

— Insolvency Service,

L 171/8    EN    Official Journal of the European Union    6.7.2018

ΕΛΛΑΔΑ

— Ο σύνδικος,

— Ο εισηγητής,

— Η επιτροπή των πιστωτών,

— Ο ειδικός εκκαθαριστής,

ESPAÑA

— Administrador concursal,

— Mediador concursal,

FRANCE

— Mandataire judiciaire,

— Liquidateur,

— Administrateur judiciaire,

— Commissaire à l'exécution du plan,

HRVATSKA

— Stečajni upravitelj,

— Privremeni stečajni upravitelj,

— Stečajni povjerenik,

— Povjerenik,

— Izvanredni povjerenik,

ITALIA

— Curatore,

— Commissario giudiziale,

— Commissario straordinario,

— Commissario liquidatore,

— Liquidatore giudiziale,

— Professionista nominato dal Tribunale,

— Organismo di composizione della crisi nella procedura di composizione della crisi da sovraindebitamento del consumatore,

— Liquidatore,

ΚΥΠΡΟΣ

— Εκκαθαριστής και Προσωρινός Εκκαθαριστής,

— Επίσημος Παραλήπτης,

— Διαχειριστής της Πτώχευσης,

LATVIJA

— Maksātnespējas procesa administrators,

— Tiesiskās aizsardzības procesa uzraugošā persona,

LIETUVA

— Bankroto administratorius,

— Restruktūrizavimo administratorius,

LUXEMBOURG

— Le curateur,

— Le commissaire,

— Le liquidateur,

— Le conseil de gérance de la section d'assainissement du notariat,

— Le liquidateur dans le cadre du surendettement,

MAGYARORSZÁG

— Vagyonfelügyelő,

— Felszámoló,

MALTA

— Amministratur Proviżorju,

— Riċevitur Uffiċjali,

— Stralċjarju,

— Manager Speċjali,

— Kuraturi f'każ ta' proċeduri ta' falliment,

— Kontrolur Speċjali,

NEDERLAND

— De curator in het faillissement,

— De bewindvoerder in de surséance van betaling,

— De bewindvoerder in de schuldsaneringsregeling natuurlijke personen,

ÖSTERREICH

— Masseverwalter,

— Sanierungsverwalter,

— Ausgleichsverwalter,

— Besonderer Verwalter,

— Einstweiliger Verwalter,

— Sachwalter,

— Treuhänder,

— Insolvenzgericht,

— Konkursgericht,

POLSKA

— Syndyk,

— Nadzorca sądowy,

— Zarządca,

— Nadzorca układu,

— Tymczasowy nadzorca sądowy,

— Tymczasowy zarządca,

— Zarządca przymusowy,

PORTUGAL

— Administrador da insolvência,

— Administrador judicial provisório,

ROMÂNIA

— Practician în insolvenţă,

— Administrator concordatar,

— Administrator judiciar,

— Lichidator judiciar,

SLOVENIJA

— Upravitelj,

L 171/10    EN    Official Journal of the European Union    6.7.2018

SLOVENSKO

— Predbežný správca,

— Správca,

SUOMI/FINLAND

— Pesänhoitaja/boförvaltare,

— Selvittäjä/utredare,

SVERIGE

— Förvaltare,

— Rekonstruktör,

UNITED KINGDOM

— Liquidator,

— Supervisor of a voluntary arrangement,

— Administrator,

— Official Receiver,

— Trustee,

— Provisional Liquidator,

— Interim Receiver,

— Judicial factor.'

———————————