**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re: |
| |
| AGROKOR d.d., *et. al.*, |
| |
| Foreign Debtors. |

**FOR PUBLICATION**

Case No. 18-12104
Chapter 15

---

## MEMORANDUM OPINION GRANTING RECOGNITION AND ENFORCEMENT OF FOREIGN DEBTORS' SETTLEMENT AGREEMENT WITHIN THE TERRITORIAL JURISDICTION OF THE UNITED STATES

*A P P E A R A N C E S*:

KIRKLAND & ELLIS LLP
*Counsel to the Foreign Representative*
601 Lexington Avenue
New York, New York 10022
By:    James H.M. Sprayregen, Esq.
       Daniel Rudewicz, Esq.

KIRKLAND & ELLIS LLP
*Counsel to the Foreign Representative*
300 North LaSalle
Chicago, Illinois 60654
By:    Adam C. Paul, Esq.
       Brad Weiland, Esq.
       Whitney Fogelberg, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Agrokor d.d. ("Agrokor") and eight debtor affiliates filed these Chapter 15 cases.[1]  They

are a small part of a larger group of 77 companies headquartered in the Republic of Croatia that

are the subject of an extraordinary administration proceeding in a Croatian court under a new

Croatian law applicable to systemically important business entities or groups.  The foreign

---

[1]        The Chapter 15 cases were filed by Agrokor d.d.; Agrokor Trgovina d.o.o.; Belje d.d.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK-Vinkovci d.d.; Vupik d.d.; and Zvjezda d.d. (hereinafter, the "Foreign Debtors").

representative appointed by the Croatian court (the "Foreign Representative" or "Extraordinary Administrator") asks this Court to recognize the Croatian proceeding as a foreign main proceeding, to recognize him as the foreign representative and to recognize and enforce the restructuring plan reached in the Croatian proceeding (the "Settlement Agreement") within the territorial jurisdiction of the United States.

The proceeding in Croatia (the "Croatian Proceeding") was filed under Croatia's "Act on the Extraordinary Administration Proceedings in Companies of Systemic Importance of the Republic of Croatia" (the "EA Law"). The statute's purpose is the "protection of sustainability of operations of the companies of systemic importance for the Republic of Croatia which with its operations individually or together with its controlled or affiliated companies affect the entire economic, social, and financial stability of the Republic of Croatia." The law was adopted on April 7, 2017, shortly before Agrokor and its debtor affiliates commenced the proceeding in the Croatian court. The new law will be available to all companies that are determined to be systemically important to the Republic of Croatia; it is not a specialized law only applicable to Agrokor. That said, Agrokor and its debtor affiliates' (the "Agrokor Group") financial distress and the resulting threat of systemic impact upon the Croatian economy was, no doubt, the impetus for the creation of the new law.

One of the more controversial aspects of the EA Law is that its provisions for reorganization and adjustment of debts apply to enterprise groups of companies that have a principal place of business in Croatia and exist under Croatian law, though they may operate both in and outside of Croatia. In this case, while 77 companies of the group are based in Croatia, they are part of a larger group of approximately 155 companies that operate outside of

Croatia as well.  How to deal with the cross-border insolvency of enterprise groups raises some

of the most important issues in evolving cross-border insolvency law and practice.[2]

The Agrokor Group was, and remains, the largest private company by revenue in Croatia.

It was insolvent and qualified by amount of debt and number of employees for eligibility to file

under the EA Law.  Once a company qualifies for an extraordinary administration proceeding,

the Croatian statute includes provisions for the negotiation, acceptance by creditors and approval

by the Croatian court of a settlement agreement—essentially a plan of reorganization that adjusts

the debt and ownership interests of distressed companies.  In accordance with the law's

provisions, the Settlement Agreement was successfully negotiated, approved by the requisite

vote of creditors and then approved by the Commercial Court of Zagreb in Croatia.  Final

approval of the Settlement Agreement is pending in the High Commercial Court, where 92

appeals were lodged against the ruling confirming the Settlement Agreement.  According to

counsel to the Foreign Representative's *Brief in Further Support*, the decisions of the High

Commercial Court are not expected before the end of November 2018.  ("Brief in Further

Support," ECF Doc. # 24 ¶ 45.)  The Foreign Representative asks that, in addition to recognizing

him as the "foreign representative" within the meaning of the Bankruptcy Code and recognizing

the Croatian Proceeding as a foreign main proceeding within the meaning of the Bankruptcy

Code, this Court should also recognize and enforce the Settlement Agreement within the

territorial jurisdiction of the United States.

The requests to recognize the Foreign Representative as the "foreign representative," and

the Croatian Proceeding as a foreign main proceeding, present relatively straightforward

---

[2]    UNCITRAL Working Group V continues its work developing principles for dealing with such issues.  *See* UNCITRAL: WORKING GROUP V, http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency .html (last visited Oct. 22, 2018).

questions of the application of Chapter 15; both requests were approved by this Court in an

Order entered on September 21, 2018.  (ECF Doc. # 30.)  That Order reserved decision on the

request to recognize and enforce the Settlement Agreement, as it raised more challenging issues.

Recognition and enforcement of the Settlement Agreement within the territorial

jurisdiction of the United States require this Court to determine whether it may and should

enforce provisions of the Settlement Agreement that modify English law governed debt.  While

the Croatian Proceeding of Agrokor has been recognized as a foreign main proceeding in the

High Court of England and Wales, that court has not so far been asked to recognize and enforce

the Settlement Agreement.  English case law may not permit a court outside of England and

Wales (such as the Croatian court that approved the Settlement Agreement) to approve a

discharge or modification of English law governed debt so that recognition and enforcement of

the Settlement Agreement by that court might not be granted.  For the reasons explained below,

however, the Court resolves this challenging issue, recognizing and enforcing the Settlement

Agreement, including the provisions modifying the English law governed debt, within the

territorial jurisdiction of the United States.[3]

This case presents challenging issues with very practical consequences.  The Foreign

Debtors (with their COMI in Croatia) presently have over €1,660 million of debt governed by

English law (English Law Governed Loans, defined below) and over €925 million of debt

governed by New York law (New York Law Governed Notes, defined below); thus, the majority

(about 64%) of the debt to be restructured under the Settlement Agreement is governed by

---

[3]    Because final approval of the Settlement Agreement awaits the outcome of the pending appeals in Croatia, this Court will not enter an order recognizing and enforcing the Settlement Agreement unless and until the Settlement Agreement becomes effective in Croatia.  If material changes are made in the Settlement Agreement before it becomes effective in Croatia, the Foreign Representative will need to seek further approval from the Court before an order recognizing and enforcing the Settlement Agreement, as amended, is entered.

English law.  Can it really be that a court in Croatia that properly has jurisdiction over the

Foreign Debtors' insolvency proceeding cannot oversee and approve the Foreign Debtors'

reorganization, and the resolution of all claims against the Foreign Debtors, under a national

insolvency law and court procedures that satisfy widely recognized standards of fairness and due

process?  More directly to the point, should a U.S. Bankruptcy Court decline to extend comity to

the decision of the court in Croatia to recognize and enforce within the territorial jurisdiction of

the United States the Settlement Agreement that was approved by the required vote of creditors

and by the court in Croatia in a proceeding that satisfied due process standards?  Of course, such

a decision by this Court recognizing and enforcing the Settlement Agreement would not mean

that the Settlement Agreement would be recognized and enforced in other countries.  So, the

Foreign Debtors might well be wise either to seek recognition and enforcement of the Settlement

Agreement in the courts of England and Wales, or to commence an insolvency proceeding or

scheme of arrangement in England, if either of those things can be done, even if it requires costly

and duplicative proceedings in England.

The difficulties here arise because the courts in England and Wales still apply the so-

called "*Gibbs*" rule, based on an 1890 decision of the Court of Appeal in *Antony Gibbs & Sons v.*

*La Societe Industrielle et Commerciale des Metaux* (1890) 25 QBD 399 (hereinafter, "*Gibbs*").

While *Gibbs* is discussed further below, the essence of the decision is that where a debtor, in that

case domiciled in France, made a contract governed by English law and to be performed in

England, was declared a bankrupt and its debts discharged under foreign law in a foreign

proceeding (there, French law in a French proceeding), the plaintiff was not bound by the

discharge and could maintain an action on the contract and recover damages in an English court.

*Id.* at 406.  So, then, can Agrokor's creditors holding English law governed debt (or, at least,

those creditors who did not approve of the Settlement Agreement or did not submit to the jurisdiction of the court in Croatia) bring an action in the courts of England to recover damages on the old English law governed debt?  And, even if the creditors can do so in the courts in England, should that prevent this Court from recognizing and enforcing the Settlement Agreement and barring any efforts by creditors to enforce the original debt obligations within the territorial jurisdiction of the United States?  While not determinative of the outcome, it should not be lost on anyone that this Court, based on comity principles, has recognized and enforced an English court decision modifying New York law debt in an English scheme of arrangement proceeding.  *See In re Avanti Commc'n Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018).

Whether the *Gibbs* rule as written still applies more than 120 years after the decision was rendered remains an important issue in cross-border insolvency cases, particularly because of the substantial changes that have taken place across the globe in insolvency laws and recognition and enforcement of decisions of other courts.  Courts in England and Wales, and elsewhere, still grapple with the *Gibbs* rule and the issue is currently on appeal in the Court of Appeal of England and Wales.  Whatever the outcome of that decision, the matter remains to be decided by this Court whether to recognize and enforce the Settlement Agreement approved by the court in Croatia within the territorial jurisdiction of the United States.[4]

---

[4]    During the recognition hearing on August 27, 2018 the Court raised questions and suggested that it seemed more appropriate to defer decision whether the Croatian court could approve modification of English law debt to the court in England that has already recognized the Croatian Proceeding as a foreign main proceeding.  As explained in this Opinion, the Court has concluded that it is appropriate for this Court to decide whether, in the exercise of comity, the Croatian court-approved Settlement Agreement—including provisions modifying English law debt— should be recognized and enforced *within the territorial jurisdiction of the United States.*  Of course, if presented with the issue whether the Settlement Agreement should be recognized and enforced in England and Wales (and perhaps in other Commonwealth jurisdictions), the English court is obviously free to decide the issue as it believes appropriate.  The Court has concluded that a U.S. court should not leave to another court (here the High Court in London) the decision whether U.S. comity principles entitle the Croatian court decision to recognition and enforcement.  The Foreign Representative's counsel argued that a recognized exception to the *Gibbs* rule (*e.g.*, that creditors holding English law debt filed claims or submitted to the jurisdiction of the Croatian court and are therefore bound by the Settlement Agreement) allows this Court to decide that the *Gibbs* rule does not apply.  The Court believes that is an issue for the English court to decide if the issue is raised in a proceeding in England.

In deciding whether to recognize and enforce the Settlement Agreement, the Court will also discuss the outcomes in recognition proceedings the Foreign Debtors filed in other jurisdictions. Those proceedings resulted in a patchwork of decisions, recognizing the Croatian Proceeding in cross-border cases in England and Switzerland and denying recognition in cross-border cases in Bosnia-Herzegovina, Montenegro, Serbia and Slovenia. As already stated, this Court has already entered an order recognizing the Croatian Proceeding as a foreign main proceeding. The Court will discuss the rationale of the courts that have either recognized or refused to recognize the Croatian Proceeding. But recognition of the Croatian Proceeding as a foreign main proceeding in this Court is determined by the relevant provisions of the Bankruptcy Code and not by the decisions of the other courts.

Additionally, the Settlement Agreement releases and discharges written guarantees by non-debtor affiliates of both the English law and New York law debt. In appropriate circumstances in Chapter 15 cases, this Court has recognized and enforced such releases. The Court concludes here that those provisions in the Settlement Agreement should be recognized and enforced in these Chapter 15 cases with respect to the nine Foreign Debtors that filed these Chapter 15 cases.

Based upon the analysis that follows, the Court believes that recognition and enforcement of the Settlement Agreement within the United States with respect to the nine Foreign Debtors is an appropriate exercise of comity and application of U.S. law.

# I.    BACKGROUND

## A.    The Agrokor Group

Agrokor is the parent company of more than 155 direct and indirect subsidiaries, including not fully owned subsidiaries.  ("Settlement Agreement," ECF Doc. # 4 Exhibit C § 3.1.2.)  It is a joint stock company under the laws of the Republic of Croatia and has registered share capital amounting to HRK 180.1 million.  (*Id.* § 3.1.1.)  The shares are divided into 360,246 regular registered shares (which are designated AGKR-R-A), each of which hold a nominal value of HRK 500.00 per share.  (*Id.*)

According to the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* ("Verified Petition," ECF Doc. # 4), Agrokor and its subsidiaries that have at least 25% of their shares held by Agrokor are subject to the Croatian Proceeding and are referred to as the EA Group, as set forth in article 5, paragraph 2 of the EA Law, described below.  There are currently 77 Agrokor Group entities that are parties in the Croatian Proceeding, although as already indicated, only nine of those companies filed the Chapter 15 petitions in these cases. (Verified Petition at 1.)  Approximately 80 direct and indirect affiliates of Agrokor that are part of the Agrokor Group are not based in Croatia and are not parties to the extraordinary administration proceeding in Croatia.  Those companies predominately operate in Slovenia, Serbia and Bosnia-Herzegovina.[5]

---

[5]       Annex 2 to the Settlement Agreement lists the non-Croatian subsidiaries and affiliates of the Agrokor Group.  23 are located in Serbia, 18 are located in Bosnia and Herzegovina, 15 are located in Slovenia, 6 are in the U.S., 4 are in Montenegro, 3 are in Hungary, and 2 are located in both Macedonia and the Netherlands.  There are approximately 11 remaining locations that each contain one or fewer Agrokor Group subsidiaries.  Only Croatian subsidiaries and affiliates are subject to the Croatian Proceeding.

### B.    Business of the Agrokor Group

The Agrokor Group has been in operation since 1989 and, today, is one of the largest

companies in Croatia.  ("Declaration of Foreign Representative," ECF Doc. # 5 ¶ 4.)  The

Agrokor Group's primary businesses include Croatia's largest supermarket chain (Konzum d.d.),

producer of mineral and spring water (Jamnica d.d.), and producer and distributor of ice cream

and frozen foods (Ledo d.d.).  In addition, the Agrokor Group contains businesses related to

food, agriculture and other sectors.  (Declaration of Foreign Representative ¶ 4.)

In April 2017, at the start of the Croatian Proceeding, Agrokor employed more than

60,000 people across Croatia, Slovenia, Serbia and Bosnia-Herzegovina.  Its annual revenue was

approximately €6.5 billion, which represents approximately 15 percent of the gross domestic

product of Croatia.  Suppliers and other businesses that are dependent on the Agrokor Group's

operations represent a significant further proportion of Croatia's gross domestic product.

(Declaration of Foreign Representative ¶ 5.)

Agrokor is structured as a holding company and has historically overseen M&A

transactions on behalf of the Agrokor Group.  It also sought to provide group-wide: (1) financial

reporting, (2) management of capital markets financing and (3) facilitation of operational

synergies following M&A transactions.  Agrokor's main assets from a macroeconomic

perspective are shareholdings in and loans to its operating subsidiaries.  Additionally, these

subsidiaries pay management fees to cover the costs of central management.  (Settlement

Agreement § 3.4.)  In more concrete terms, Agrokor owns the following key assets, allowing it to

perform the above operations, collectively forming the Agrokor Group: (1) shares in its

subsidiaries and minority shareholdings in certain other entities; (2) loans, deposits and other

receivables due to the debtor; and (3) certain directly owned real estate (including buildings, tools, plants and machinery).  (*Id.*)

### C.    Capital Structure

In late 2016, Agrokor undertook a substantial refinancing of its existing unsecured debt. (Declaration of Foreign Representative ¶ 6.)  Lenders were granted springing maturity clauses in new and amended facilities.  (*Id.*)  The terms of these new and amended facilities were structured such that each facility would mature early if Agrokor failed to refinance a PIK loan issued by its non-debtor parent company, Adria Group Holding BV (the "PIK Loan") by March 8, 2018.  (*Id.*) The PIK Loan was, in turn, secured by a pledge granted by Adria Group Holding BV of all shares it held in Agrokor.  (*Id.*)  As part of this refinancing, Agrokor also sought a syndicated facility (the "F2 Club Loan") to refinance its existing bonds.  (*Id.* ¶ 7.)  The F2 Club Loan was entered and the syndication process began in September 2016.  (*Id.*)  However, the syndication process failed approximately half a year later, in January 2017.  (*Id.*)  Agrokor began to experience liquidity strains because of, among other things, concerns arising from the failure of the F2 Club Loan syndication, the impact of the PIK Loan springing maturity clauses and the information provided in Agrokor's accounting records.  (*Id.* ¶ 8.)

In response to these liquidity concerns, Agrokor sought new financing and ultimately entered the €100 million loan with Sberbank ("Sberbank Loan") in early 2017.  (*Id.* ¶ 9.)  The Sberbank Loan proved insufficient to avoid an insolvency proceeding.  (*Id.*)  As a result, on April 7, 2017, Agrokor filed for the commencement of the Croatian Proceeding under the EA Law.  The Croatian Proceeding was commenced by order of the Commercial Court of Zagreb (the "Croatian Court") on April 10, 2017, supplemented on April 21, 2017, July 5, 2017 and July 13, 2017 (the "Commencement Order").  (*Id.*)

The valuation of the assets of the Agrokor Group took a substantial blow after the commencement of the Croatian Proceeding.  Agrokor announced on April 27, 2017 that there were potential irregularities in its 2016 financial statements which would result in a delay of the publication of its financials.  Following this announcement, in May of 2017, PricewaterhouseCoopers ("PWC") was appointed as auditor of the Agrokor Group's Croatia-based companies.  In accordance with audit requirements, PwC undertook an audit of twenty-seven of the Agrokor Group's companies in the Republic of Croatia, three companies in Serbia and three companies in Bosnia-Herzegovina.  (Settlement Agreement § 3.7.)  The consolidated changes in equity in the period from December 31, 2015 to December 31, 2016 resulted in a total equity reduction of approximately €2.9 billion.  Overall, this meant that liabilities exceeded total assets by HRK 14.5 billion (€1.9 billion) for that period.  (*Id.*)  On December 31, 2017, liabilities exceeded total assets by HRK 23.3 billion, a reduction of approximately HRK 9 billion from the preceding year.

The financial results for 2017, published by the Extraordinary Administrator on May 14, 2018, showed that liabilities exceeded assets for that period as well.  This financial statement described a consolidation of 105 companies over which the Foreign Debtors exercised control, 52 of which are in the Republic of Croatia (the consolidated group as described in the 2017 Annual Report, "Consolidated Group").  (*Id.*)

       1.      *U.S. Debt*

As of the opening of the EA Proceeding, the Settlement Agreement described the total amount of third-party financial liabilities of Agrokor and some of its subsidiaries at HRK 31.5 billion.  One large chunk of this debt is comprised of unsecured notes governed by New York

law.  According to the Settlement Agreement, the Agrokor Group issued the following unsecured

notes (the "New York Law Governed Notes" or "Notes"):

> (1) EUR 325 million 9.125% New York law governed senior notes due to mature in 2020 and USD 300 million 8.875% New York law governed senior notes due to mature in 2020 issued by the Debtor pursuant to an indenture dated as of 10 October 2012; and
> (2) EUR 300 million 9.875% New York law governed senior notes due to mature in 2019 issued by the Debtor pursuant to an indenture dated as of 25 April 2012.

(Settlement Agreement § 3.5.1.1; *see also* Brief in Further Support, ECF Doc. # 24 ¶ 12.)

> 2.    *English Debt*

The Agrokor Group has substantial additional liabilities governed by English law.  The

Settlement Agreement lists the following unsecured bank debt obligations (the "English Law

Governed Loans"):

> (1) EUR 600 million English law governed loan facility agreement dated 14th March 2014, as amended from time to time, between, among others, Agrokor and Sberbank of Russia and Sberbank Europe AG;
> (2) EUR 50 million English law governed loan facility agreement dated 16th July 2015, as amended from time to time, between, among others, Agrokor and Sberbank Europe AG;
> (3) EUR 350 million English law governed loan facility agreement dated 28th April 2016, as amended from time to time, between, among others, Agrokor and Sberbank of Russia;
> (4) EUR 100 million English law governed term loan facility agreement dated 21st February 2017, as amended from time to time, between, among others, Agrokor and Sberbank of Russia (the "EUR 100m Sberbank Loan");
> (5) EUR 100 million English law governed loan facility agreement dated 14th September 2016, as amended from time to time, between, among others, Agrokor and a group of lenders;
> (6) EUR 100 million English law governed syndicated loan facility agreement dated 14th September 2016, as amended from time to time, between, among others, Agrokor and a group of lenders (the F2 Club Loan); and
> (7) EUR 360 million English law governed loan facility agreement dated 21st June 2014, and as amended by way of an amendment agreement dated 28th October 2016, between, among others, Agrokor and VTB Bank (Austria) AG.

(Settlement Agreement § 3.5.1.2*; see also* Brief in Further Support ¶ 12.)

      *3.*     *Third Party Releases*

There are two forms of third-party releases contemplated by the Settlement Agreement. The Verified Petition of the Foreign Debtors argues that this Court should enforce the Settlement Agreement and the third-party releases contemplated therein. The Verified Petition provides, in relevant part: "The Settlement Agreement contains the Trustee Release and the Bosnian-Herzegovinian Guarantor Release. The Trustee Release Parties and the Bosnian-Herzegovinian Guarantors are not debtors in the Croatian Proceeding. As explained below, this Court may nevertheless adhere to principles of comity and enforce the Trustee Release and the Bosnian-Herzegovinian Guarantor Release." (Verified Petition ¶ 70.)

The English Law Governed Loans and New York Law Governed Notes both benefit from guarantees granted by the following entities: Agrokor Trgovina d.o.o.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK-Vinkovci d.d.; Zvijezda d.d.; Belje d.d.; Vupik d.d.; Ledo d.o.o. Čitluk; Sarajevski kiseljak d.d.; and Konzum d.o.o. Sarajevo. (Verified Petition ¶ 20.) Of the guarantors, the following are Foreign Debtors: Agrokor Trgovina d.o.o.; Ledo d.d.; Jamnica d.d.; Konzum d.d.; PIK- Vinkovci d.d.; Zvijezda d.d.; Belje d.d.; and Vupik d.d. The remaining entities—namely Ledo d.o.o. Čitluk; Sarajevski kiseljak d.d.; and Konzum d.o.o. Sarajevo—are the "Bosnian-Herzegovinian Guarantors," as described in the Verified Petition.[6] (Verified

---

[6]      Paragraph 63 of the Verified Petition provides, "As part of this reorganization, the Settlement Agreement contemplates (i) a release of any and all claim claims, obligations, suits judgments, damages, rights, causes of action and liabilities arising from, in connection with, or relating to the Unsecured Notes or related indentures against The Bank of New York Mellon and BNY Mellon Corporate Trustee Services Limited in their respective capacities as trustee of the Unsecured Notes under the relevant indenture and its current and former affiliates and subsidiaries, and such entities' and their current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (such parties, the 'Trustee Released Parties' and such release, the 'Trustee Release'), *see* Settlement Agreement, 18.3.2, and (ii) a release of certain bond

Petition ¶ 63.)  These three entities are not Foreign Debtors in these Chapter 15 cases and

nothing in this Opinion determines the rights of these entities or of their creditors.  The Bosnian-

Herzegovinian Guarantors are affiliates of Agrokor.  (Annex 2 to the Settlement Agreement) (not

available on ECF.)  The Bosnian-Herzegovinian Guarantor Release is provided for in section

29.8 of the Settlement Agreement, which is titled "Releases."  (Settlement Agreement § 29.8.)

The final sentence of section 29.8.1 of the Settlement Agreement, which deals with

releases, contains a carve out.  It clarifies that directors, officers and members of management or

supervisory boards of any member of the Agrokor Group are not released from liability arising

from their conduct.  The section states:

> [N]othing in this Cl. 29.8.1 shall operate or be construed to release any
> person who was a director and/or officer (or member of the management
> board or supervisory board) of any member of the Agrokor Group prior to
> the commencement of the EA Proceedings from any liability arising from
> his or her conduct in such capacity prior to that time.

(Settlement Agreement § 29.8.1.)  Two of the Bosnian-Herzegovinian Guarantors—Ledo d.o.o.

Čitluk and Sarajevski kiseljak d.d.—are affiliates of the Foreign Debtors and listed as voting

"FOR" the Settlement Agreement.  ("Croatian Court Order Approving the Settlement

Agreement," ECF Doc. # 4 Exhibit B at 302–07.)  Both are listed as creditors in voting class B.

(*Id.*)

The Court believes it must consider whether these "insider" votes (and any other

"insider" votes) taint approval of the Settlement Agreement insofar as recognition and

enforcement is concerned.  As this Court explained in *In re Avanti Commc'ns. Grp. PLC*, 582

B.R. at 617–18, the Fifth Circuit in *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1043 (5th Cir.

---

guarantees governed by New York law, including guarantees by three non-debtor entities from Bosnia-
Herzegovina granted by Ledo d.o.o. Čitluk, Sarajevski kiseljak d.d., and Konzum d.o.o. Sarajevo (such
guarantors, the 'Bosnian-Herzegovinian Guarantors' and such release, the 'Bosnian- Herzegovinian
Guarantor Release'), *see* Settlement Agreement, 29.8." (Verified Petition ¶ 63.)

14

2012), affirmed a bankruptcy court's decision in a Chapter 15 case declining to grant comity and

to enforce a Mexican court order approving a Mexican reorganization plan that released

guarantees of US-based non-debtor affiliates of the Mexican debtor's debt.  The *Vitro* plan

created only a single class of unsecured creditors and the necessary creditor votes to approve the

plan were only achieved by counting the votes of insiders.  *In re Vitro S.A.B. de C.V.*, 701 F.3d at

1039.  Insider votes are not counted under the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(10)

("If a class is impaired under the plan, at least one class of claims that is impaired under the plan

has accepted the plan, *determined without including any acceptance of the plan by any insider.*")

(emphasis added).  Absent the subsidiaries' votes of intercompany debt in favor of the plan, the

*Vitro* plan could not have been approved.  *Vitro*, 701 F.3d at 1039.  Because the Settlement

Agreement here was approved by the required majority vote of creditors, even excluding the

"insider" affiliate votes, the Court concludes that *Vitro* does not stand in the way of recognition

and enforcement of the Settlement Agreement.  Of the total number of creditors entitled to vote,

78.52% of non-insiders by claim amount voted in favor of the plan—this is comfortably above

the requisite two-thirds of all voting creditors by claim amount necessary to confirm the plan

without including the votes of affiliates.

Section 18.3.2 of the Settlement Agreement discusses the trustee release of BNY Mellon.

The agreement provides:

> To the maximum extent permitted under New York law, having regard for
> (i) the critical, ministerial services heretofore performed and to be
> performed by BNY Mellon in its respective capacity as trustee of the Notes
> under the relevant Indenture and pursuant to this Settlement Plan, (ii) the
> risk that BNY Mellon could incur further fees and expenses under the broad
> expense reimbursement and indemnification provisions of the Notes and the
> Indentures to the detriment of the [Agrokor], the Bond Guarantors, their
> Creditors and their estates, and (iii) the reasonable, commercial
> expectations of the Noteholders, the [Agrokor] and the Bond Guarantors
> that the terms of the Notes and the Indentures will be upheld and enforced

15

> as written under New York law, each of the [Agrokor], the Bond Guarantors and the Noteholders, as of the Settlement Confirmation Date, shall be deemed to have unconditionally released BNY Mellon in its respective capacity as trustee of the Notes under the relevant Indenture, and its current and former affiliates and subsidiaries, and such entities' and their current and former officers, directors, managers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, principals, members, employees, agents, attorneys, consultants, advisors, representatives and other professionals (the "Trustee Released Parties") from any and all claims, obligations, suits judgments, damages, rights, causes of action and liabilities arising from, in connection with, or relating to the Notes or the Indentures, which any such party may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise . . . .

(Settlement Agreement § 18.3.2.)

The section goes on to clarify that BNY Mellon will not be released from any claims for gross negligence or willful misconduct in BNY Mellon's actions as trustee of the Notes. Additionally, BNY Mellon is not deemed released from its obligations in its capacity as trustee of the Notes to take actions necessary under the Settlement Agreement. BNY Mellon and BNY Mellon Corporate Trustee Services Limited are shown as comprising their own class—class C—out of a list of 664 creditors grouped into classes A through E, as listed in the Croatian Court Order Approving the Settlement Agreement. (ECF Doc. # 4 Exhibit D at 287.)

### D.    Settlement Agreement

Under the Settlement Agreement,[7] the following waterfall is provided for the priority of claims:

> (1)    Estate Claims. Unpaid prepetition employee claims; certain court costs, fees, and expenses incurred in connection with the Croatian Proceeding; and post- petition claims have priority over all other claims of the EA Group.
> (2)    SPFA Claims. Amounts outstanding under the Super-Priority Term Facilities Agreement.
> (3)    Unsecured Claims. All unsecured claims including deficiency claims, intercompany claims and unsecured guarantees of other entities' claims.
> (4)    Equity Value. Equity value consists of the remaining Distributable Value after all debt claims are satisfied in full.

(Settlement Agreement § 7.5.)

Impaired claims with a Settlement Recovery amount of less than HRK 40,000 (equivalent to approximately $6,151.48 as of August 10, 2018) (the "Minor Impaired Claims") will receive a payment of a monetary amount in euros, corresponding to the Settlement Recovery of such claim (the "Cash-Out Payment").  (Settlement Agreement § 16.1.2.)  The difference between the registered amount of the Minor Impaired Claim and the Settlement Recovery amount paid as a Cash-Out Payment will be discharged.  (*Id.*)

Impaired Claims with a Settlement Recovery amount of HRK 40,000 and above will receive a combination of depository receipts of Aisle STAK, which holds all the shares of Aisle Dutch TopCo (the "Depository Receipts") and convertible bonds of Aisle Dutch TopCo in an aggregate nominal amount of up to €1,149 million (the "Convertible Bonds").  (Settlement Agreement § 5.4.)  The percentage recovery to the holders of English Law Governed Loans and New York Law Governed Notes is projected to be 50.8 percent.

---

[7]    Capitalized terms not defined within this section shall have the meaning attributed to them in the Settlement Agreement.

Each of the Foreign Debtors has secured debt obligations, including loans and operating leases to specific Agrokor Group entities that are secured by share pledges and fixed security over the Agrokor Group's real estate assets.  Like section 506(a)(1) of the Bankruptcy Code, a portion of each secured claim against the Foreign Debtors in the Croatian Proceeding will be treated as an unsecured prepetition claim against the debtor entity (and an unsecured prepetition liability) to the extent that the amount of the secured claim exceeds the value of the related secured collateral.  (*See* Settlement Agreement § 5.1.)

For secured claims with a separate satisfaction right ("SSR") against any of the Foreign Debtors where the debtor is either (a) the owner of the collateral of the relevant SSR (a "Sole Security Debtor") or (b) if more than one EA Group member granted an SSR, the owner of the collateral that comprises over 50 percent of the total value of SSR securing the relevant claim (a "Main Security Debtor") will assume the secured obligation.  More specifically, the holder of such secured claim will retain its SSR and receive a monetary claim in an amount equal to the appraised value of the collateral.  (*See* Settlement Agreement § 23.2.1.)  This secured claim will be paid back over an eight-year term following a grace period, which is the greater of the original maturity date or two years after the Implementation Commencement Date, at an interest rate of three percent that accrues during the grace period and increases by two percent if in default. (Settlement Agreement § 23.2.1.)

For secured claims with an SSR against any of the Foreign Debtors where the debtor is not a Sole Security Debtor or the Main Security Debtor, the holder of such secured claim will retain its SSR and receive a monetary claim against Aisle HoldCo, in an amount equal to the appraised value of the collateral, and such claim will be paid back over an eight-year term following a grace period, which is the greater of the original maturity date or two years after and

18

the Implementation Commencement Date, at an interest rate of three percent that accrues during the grace period and increases by two percent if in default. The amount of any secured claim of any of the Foreign Debtors that exceeds the appraised value of all objects of the SSR is treated as an unsecured claim. (Settlement Agreement § 23.2.2.)

### E.      Recognition of the Croatian Proceeding in Other Jurisdictions

Though the EA Law aims to centralize a debtor's claims in a single court, several jurisdictions have refused to recognize the Croatian Proceeding under their own laws. According to the *Memo on Foreign Recognition Hearings* ("Memo on Foreign Hearings," ECF Doc. # 21) at least some of the Agrokor Group sought recognition of the Croatian Proceeding in six jurisdictions in addition to the United States. Of these foreign recognition requests, only Switzerland has made a final decision to recognize the commencement of the Croatian Proceeding and to give effect to the Extraordinary Administrator to represent debtors and to deal with their assets in Switzerland under the Swiss International Private Law Act. (*Id.* at 4.) The High Court of England and Wales also agreed to recognize the Croatian Proceeding of Agrokor, but an appeal of that decision is pending. Appeals of decisions *rejecting* recognition of the Croatian Proceeding are pending in Slovenia, Serbia, Bosnia-Herzegovina and Montenegro. (*Id.* at 13–122.) A summary of the foreign recognition proceedings relating to the Croatian Proceeding follows.[8] These decisions have no direct impact upon the decision to recognize and enforce the Croatian Proceeding and Settlement Agreement in the U.S.

---

[8]      References to ECF Doc. # 21 in the following sections refer to copies or English translations of the foreign recognition opinions, which are appended to the Memo on Foreign Hearings. These opinions are cited according to page number (and paragraph where possible) for clarity.

### 1.    Slovenia

The Supreme Court of the Republic of Slovenia ("Slovenian Court") decided the issue on March 14, 2018.  (ECF Doc. # 21 at 13.)  The Slovenian Court explained:

> Since the recognition of a foreign court decision means recognition of its legal effects on the territory of the Republic of Slovenia, only a decision (procedure) which corresponds to the fundamental legal principles of procedures due to insolvency under ZFPPIPP may be recognized.  A recognition of a foreign extraordinary administration procedure, that does not ensure an equal treatment of creditors, would adversely affect the public interest of the Republic of Slovenia, which in domestic insolvency procedures determines (and safeguards) the common (basic) principle of equal treatment of creditors, whereas in insolvency procedures with an international element (on its territory) recognizes only financial restructuring procedures or liquidation procedures of the debtor for the joint account of all creditors (which corresponds to the principle of equal treatment of creditors).

(*Id.* at 27.)

The Slovenian Court proceeded to explain that the EA Law (and therefore the Croatian Proceeding) should not be recognized, primarily because it does not comply with Slovenia's insolvency rule that creditors of equal standing should be provided equal treatment.  The Slovenian Court states, "it does not even provide the basic rights the creditors would have under the Slovenian insolvency legislation."  (*Id.* at 28.)  Additionally, the Slovenian Court argues that the extraordinary administration procedure envisioned by the EA Law is subordinated to the interests of Croatia, since the Croatian government selects the extraordinary administrator to conduct the debtor's business.  (*Id.*)  While not entirely clear, it appears that the Slovenian Court was concerned that the EA Law serves the purpose of protecting the Croatian economy by providing a new form of relief on a somewhat *ad hoc* basis as needed for Agrokor and its subsidiaries.

The Slovenian Court also notes that other countries rejected the recognition of the Croatian extraordinary administration procedure and argued that since several of these countries had laws arising out of the former Yugoslavian Compulsory Composition, Bankruptcy and Liquidation Act (SPPSL), that in a broader public policy context of the region, recognition would not be "justified and proportional." (*Id.* at 28.) Four days after the Supreme Court of the Republic of Slovenia rejected the application for recognition of the Croatian Proceeding, the Extraordinary Administrator appealed that decision to the Constitutional Court of Slovenia; that appeal remains pending.

> 2.   *Serbia*

The Commercial Appellate Court for the Republic of Serbia confirmed rejection of the Croatian Proceeding on November 13, 2017. (*Id.* at 32.) The Serbian court found that under article 174, paragraph 2 of its Law on Bankruptcy, the Croatian extraordinary administration procedure could not be found to be a "foreign proceeding." (*Id.* at 45.) The court provides several grounds for this conclusion. One issue the Serbian court notes is that the EA Law is not a general law that governs all insolvency in Croatia, but rather is a *sui generis* regulation adopted to protect companies of systemic importance to the Republic of Croatia. The court found it problematic that the level of protection determined under the EA Law is determined by the interest of the Republic of Croatia as opposed to the interests of creditors. (*Id.*) The court states, "the aim of this regulation . . . is not the aim of the collective settlement of creditors, but the protection of the interests of the state, the creator of such a regulation." (*Id.* at 46.) On

December 20, 2017, the Croatian Extraordinary Administrator filed an appeal to the

Constitutional Court of Serbia; that appeal remains pending.

### 3. *Federation of Bosnia and Herzegovina*

Article 205, Paragraph 1, item 3 of the Federation of Bosnia and Herzegovina ("FB&H")

Bankruptcy Law states that to recognize a foreign decision on bankruptcy proceedings or

proceedings similar to bankruptcy, such decision must not contravene the legal order of the

Federation. (*Id.* at 52.) The court explains that the basic purpose of bankruptcy proceedings

should be the collective settlement of creditors and that it does not believe that the EA Law was

passed with creditors in mind. The court stated:

> The protection of economic, social and financial stability of the Republic of
> Croatia cannot jeopardize the FB&H legal order, and this opinion of the first
> instance court, contrary to the appeal, is not different from the international
> case law, according to which protection and maintenance of economic,
> social and financial stability of one country in the proceedings of
> recognition of a foreign ruling, in a situation where the compulsory
> regulations are opposed - which is the case here- cannot jeopardize the legal
> order of another country where the decision is to be recognized, as otherwise
> the principle of equality would be breached.

(*Id.* at 53.) The Extraordinary Administrator filed an appeal at the Constitutional Court on

March 16, 2018; that appeal remains pending.

### 4. *Montenegro*

The Montenegro court held that extraordinary administration procedures under the EA

Law did not meet the requirements of the Insolvency Act of Montenegro. The court explained:

> [T]he court finds that the extraordinary administration proceeding is not a
> foreign proceeding in terms of Article 178 paragraph 2 of the Insolvency
> Act, since it is not a proceeding aimed at the collective settlement of
> creditors, but at protecting and maintaining economic, social and financial
> stability of the Republic of Croatia, that is, the sustainability of business
> operations of certain companies that are of systemic importance for the
> Republic of Croatia.

(*Id.* at 109.)  In other words, because the EA Law seemed primarily concerned with the

protection of the interest of the Republic of Croatia rather than the creditors of a certain debtor,

the proceeding did not comply with the requirements for recognition in Montenegro.  An appeal

filed in the Commercial Court of Montenegro is pending.

### 5.    *England and Wales*

The High Court of England and Wales found that the EA Law and Croatian Proceeding

sufficiently satisfied the requirements of a foreign main proceeding under the CBIR, England's

adaptation of the Model Law, over the objections of respondent Sberbank.  As with the above

discussed foreign recognition decisions, it should be noted at the outset that the English decision

was rendered before the Settlement Agreement was finalized or voted upon.  The English

decision was issued on September 11, 2017.  Nearly a year later, creditors voted to approve the

Settlement Agreement on July 4, 2018.  The English decision specifically states that,

"recognition of the settlement agreement is not the real question here.  That is something for the

future.  Such recognition will depend at that stage on other considerations, for example the

submission by the creditors to the jurisdiction of the foreign proceeding."  (*Id.* at 97 ¶ 127.)

Therefore, the decision only grants recognition of a foreign main proceeding; it does not make

any decisions with respect to the later approved Settlement Agreement.

A transcript of the English hearing shows that several contentions were raised against

recognition of the Croatian Proceeding under the Model Law and the CBIR.  First, Sberbank's

counsel argued that recognition of a "foreign proceeding" under the CBIR is limited to a single

debtor and that recognition of the Croatian Proceeding would require recognizing a debtor

grouped together with related, but separate entities, in one proceeding.[9]  Counsel argued this was

---

[9]      Though Sberbank opposed recognition of the Croatian Proceeding before the English court, it took an
active role in negotiating the Settlement Agreement as one of the members of the five-entity interim creditors

problematic because it would allow (1) all the members of the group to participate in a

restructuring without requiring each individual member to prove insolvency as a gateway issue

and (2) in effect, by consolidating a group of entities, the combined procedure could block a

creditor from asserting a distinct claim against a particular debtor.  Counsel argued that the

combined proceeding effectively created a set of third-party releases for affiliated or sub-

companies—counsel for Sberbank gives the example that if someone has advanced finance on

terms where they also have guarantees from companies B, C, D, E and F as well as principal debt

from company A, consolidation into a single pool with one claim would eradicate the value of

any guarantee.  ("English Recognition Hearing Transcript," ECF Doc. # 24 Exhibit B at 42.)  It

argued it was further problematic as applied to Agrokor, because unless Agrokor and its affiliates

are grouped as one debtor, the threshold number of employees required under the EA Law is not

met.  (English Recognition Hearing Transcript at 40.)  However, when referencing these

arguments, Sberbank's attorney also goes through pains to remind the English court that U.S.

courts have adopted the Model Law differently and that the English court is only bound by the

CBIR and not U.S. precedent.  *(Id.* at 47.)  Recognition in England also apparently was sought

for a single debtor, Agrokor, on behalf of the whole group.  As already stated, Chapter 15 cases

were filed in this Court on behalf of nine separate entities.

> The High Court of England and Wales ultimately rejected Sberbank's arguments.  The

High Court concluded:

> The important point is simply this.  There is nothing in the CBIR to prevent
> a foreign proceeding being recognized, which in the foreign court involves
> a group of companies, but the recognition is sought in this country in

---

council.  (Settlement Agreement § 4.1.3.1) (the members of the creditors council are Sberbank of Russia,
Knighthead Capital Management LLC, Zagrebacka Banka d.d., KRAS prehrambena industrija d.d., and Toni Raic).
Additionally, Sberbank *voted in favor* of the Settlement Agreement. (Croatian Court Order Approving the
Settlement Agreement at 301-07.)

> relation only to a particular individual debtor.    In my judgment, the
> respondent's objection here is without foundation.

(ECF Doc. # 21 at 78 ¶ 54.)

Additionally, the English court concluded that (1) the Croatian Extraordinary

Administration Law is a law relating to insolvency for the purposes of CBIR, (2) it is a

proceeding under the control or supervision of a court, (3) it is a collective proceeding, (4) it is a

law for the purposes of reorganization or liquidation within the meaning of the CBIR and (5) it is

not manifestly contrary to English public policy.  (*Id.* at 78–98.)  In reaching this final public

policy conclusion, the court noted that the principal of *pari passu* can be overridden in

appropriate cases under English law.  (*Id.* at 98 ¶ 131.)  The High Court of England and Wales'

decision is further discussed below in relation to the *Gibbs* rule and the possible effects of that

rule on future proceedings in England.  The appeal is to be heard by the Court of Appeal, and the

stay will remain in effect while the English proceedings are ongoing.

### 6.    *Switzerland*

The Court of the Canton of Zug in Switzerland granted recognition of the Croatian

Proceeding in a decision issued on February 2, 2018.  (ECF Doc. # 21 at 113.)  There has been

no appeal of this decision; it is final and binding.

### 7.    *European Union*

On July 4, 2018, the European Parliament added the Recast Insolvency Regulation (EU)

2015/848 to the European Union's Acquis Communautaire the Law on Extraordinary

Administration Proceeding for Companies of Systemic Importance for the Republic of Croatia.

(Recast Insolvency Regulation, "EU Regulation," ECF Doc. # 21 Appendix D at 161–225.)  The

EU insolvency regulation was designed to regulate insolvencies.  This adoption of the EA Law

ostensibly gave the Croatian Proceeding automatic recognition as an insolvency proceeding,

entitled to recognition across all European Union member states.  (*Id.* at 217.)

## II.    DISCUSSION

### A.    EA Law

On April 7, 2017, Croatia published Official Gazette No. 31/17, the *Law on*

*Extraordinary Administration Proceeding in Companies of Systemic Importance in the Republic*

*of Croatia.*  ("Certified Translation from Croatian Language of the Law on Extraordinary

Administration Proceeding in Companies of Systemic Importance for the Republic of Croatia,"

ECF Doc. # 4 Exhibit B at 46–59.)  Part 1, article 1, chapter 1 of the EA Law explains:

> This Law is passed for the purpose of protection of sustainability of
> operations of the companies of systemic importance for the Republic of
> Croatia which with its operations individually or together with its controlled
> or affiliated companies affect the entire economic, social, and financial
> stability of the Republic of Croatia.

(*Id.* at 46.)  The Croatian law was passed to try to prevent a wider economic fallout in Croatia

and surrounding global markets through restructuring companies of systemic importance to

Croatia.  In effect, the new law is somewhat reminiscent of the efforts globally to deal with

problems of "too big to fail."  The Croatian Law appears to be unique in dealing with

systemically important *companies* as opposed to systemically important *financial institutions.*

Article 21 of the EA Law provides that either a debtor of systemic importance or such a

debtor's creditors, with the debtor's permission, may file an extraordinary proceeding.  (*Id.* at

50.)  The petition to commence the proceeding is submitted to the Croatian Court, which must

then inform the Croatian Government within the same day that a petition has been filed.  (*Id.* at

51.)  After a petition has been filed, the debtor is estopped from disposing of any assets until the

petition is either approved or denied, except for those dispositions necessary for debtor to

maintain its ordinary course of business operations.  (*Id.*)  The Croatian Court issues the final

order that commences the extraordinary proceeding, and upon the court's order commencing a

proceeding, notice is posted in the relevant Croatian Court districts, on the public books or

records of the debtor and on the Croatian Court's web pages.  (*Id.* at 52.)  After the

commencement of a proceeding under the EA Law, all relevant parties, further detailed below,

have fifteen months (twelve months' time is allotted automatically, and the option of an

additional three months' time is granted upon request approved by the Croatian Court) to craft a

single settlement agreement to resolve all claims against the debtor.  (*Id.* at 57.)

The EA Law lists two requirements for a debtor to be considered a company of systemic

importance that may file an action under the EA Law.  (*Id.* at 46.)  Article 4, paragraph 2

provides that in the calendar year preceding the filing of the petition, the debtor, alone or with its

controlled or affiliated companies, must (1) employ more than 5,000 employees on average for

the year and (2) have balance sheet liabilities of at least the equivalent of HRK 7,500,000,000.

(*Id.*)  In these calculations determining whether a debtor is of systemic importance to Croatia,

article 5, paragraph 2 specifies that affiliated and controlled companies are companies in which

the debtor holds at least a 25% ownership interest, have a principal place of business in The

Republic of Croatia and exist and operate under Croatian law.  (*Id.* at 47.)  The requisite amount

of debt and employees along with identification of the debtor and its related entities must be

proven by the party who files the petition for the extraordinary proceeding (either the debtor or a

creditor of the debtor).  (*Id.* at 51.)

Article 6 of the EA Law provides that the Croatian Court shall have exclusive jurisdiction

in an EA proceeding.  (*Id.*)  Article 7 further provides that once the EA proceeding has been

instituted, there will be a stay of any liquidation or bankruptcy proceedings, as defined under

Croatian law, against the debtor. (*Id.*) To the extent that the EA law is silent regarding

procedure, article 8 provides that procedural rules from Croatian bankruptcy proceedings will

apply. (*Id.*) Article 10 authorizes the Croatian Court to take any actions or pass any decisions

that are not expressly conferred on another entity as the responsibility of that other entity under

Croatian Law. (*Id.*)

An extraordinary commissioner ("Extraordinary Commissioner") is appointed by the

Croatian Court upon the proposal of the Government of the Republic of Croatia who will

represent the debtor solely and independently. (*Id.*) The Extraordinary Commissioner is subject

to the provisions of the Croatian Bankruptcy Act's rules governing a bankruptcy receiver in

instances where no provision of the EA Law governs directly. (*Id.* at 48.) Together with

deputies who may assist him, upon the proposal of the Croatian government and appointment by

the Croatian Court, the Extraordinary Commissioner may make decisions regarding the debtor's

property but may not make decisions regarding the debtor's property without prior approval of a

creditors' committee if the value of the property exceeds HRK 3,500,000. (*Id.*) The

commissioner may also bring legal actions on behalf of the debtor and, with approval of a

creditors' committee, may assume new debt on behalf of the debtor when necessary to maintain

debtor's operations. (*Id.* at 55.) Additionally, at any time, upon the proposal of the Croatian

government, the Croatian Court may remove the Extraordinary Commissioner and appoint a new

one. (*Id.* at 48.)

The EA Law requires the Extraordinary Commissioner to submit monthly reports

regarding the debtor's financial status and the status of the EA proceedings to the central

authority of the government administration responsible for economic operations in Croatia (the

"Croatian Ministry") for every month between his appointment and the approval of a settlement

agreement under the EA Law.  (*Id.*)  Additionally, the Extraordinary Commissioner is tasked

with electing a restructuring advisor, auditors, legal advisors and other specialized advisors—all

of whom must be given prior approval by the Croatian Ministry prior to appointment.  (*Id.*)

Article 16 establishes an advisory body ("Advisory Body") that, upon request of the

Croatian Ministry or the Croatian Court, will provide opinions regarding the propriety of the

Extraordinary Commissioner's decisions under Croatian Law.  (*Id.* at 49.)  The Advisory Body

has five members: one member serves as a representative of the employees of the debtor and

may be an employee of the debtor; the other four members must be knowledgeable in business

and law, of good reputation and not have been employed by the debtor or any of its affiliates

within the ten years leading up to the filing of an EA proceeding.  (*Id.*)

In addition to the Advisory Body, EA Law article 18 requires the establishment of a

creditors' committee with up to nine members who will serve as representatives of the debtor's

creditors.  (*Id.*)  The Extraordinary Commissioner recommends, and the Croatian Court approves

the members of the creditors' committee, who must be categorized according to their legal

position and may be subcategorized according to their economic interests in the debtor.  (*Id.*)

Article 30 provides that each category of creditors is then entitled to designate one member to

serve as the category's representative on the creditors' committee.  (*Id.* at 53.)  The creditors'

committee has rights to receive information regarding the debtor and to participate in the

preparation and approval of the settlement agreement in conjunction with the Extraordinary

Commissioner.  (*Id.* at 49–50.)  Additionally, article 31 explains that an interim creditors'

council ("ICC") will take the role of the permanent creditors' council in the interim until the

official committee is established.  The ICC assumes and performs all functions of the creditors'

council until the official creditors' council is established.  (*Id.* at 53–4.)

Articles 32 through 36 provide a procedure for the public listing of claims against debtor and contesting claims. (*Id*. at 54.) The Extraordinary Commissioner creates a table of filed claims, a table of preferential claims and a table of rights to separate satisfaction. (*Id.*) Along with these tables, the Extraordinary Commissioner must clearly indicate whether he contests any of the claims listed in the tables. (*Id.*) The tables of claims and the commissioner's stance on each claim are published on the Croatian Court's website. (*Id.*) If a creditor does not commence a civil proceeding within eight days after publication of the table of claims, the right to contest the claim is deemed waived. (*Id.*) Once a final order is made, a claim, the claim's payment rank and the claim's category of creditors are all considered effective as to both the debtor and all the debtor's other creditors. (*Id.*)

Part VI of the EA Law includes provisions for the negotiation, acceptance by creditors and approval by the court of a settlement agreement. (*Id.* at 56–8.) The settlement agreement envisioned and negotiated under the EA Law is essentially the same as what is usually referred to as a plan of reorganization in other restructuring contexts. Within the prescribed twelve-month (and optional additional three month) period, the Extraordinary Commissioner and creditors' committee must create a single settlement agreement. (*Id.* at 57.) After a settlement agreement is created, it is published on the Croatian Court's website; three days after publication, all creditors are deemed to have notice of the agreement. (*Id*.) Within fifteen days after publication of the settlement agreement, the creditors vote upon the settlement agreement at a hearing. (*Id.*)

Article 43, paragraph 14 describes the voting outcome necessary to pass the settlement agreement. It states:

> The settlement agreement, or plan of reorganization, shall be deemed adopted if a simple majority of all creditors voted for it and if in each category of the sum of claims of creditors who voted for the settlement agreement exceeds the sum of claims of the creditors who voted against the

acceptance of the settlement agreement.  Exceptionally, it shall be deemed that the creditors accepted the settlement agreement if the total sum of claims of the creditors who voted for the settlement agreement amounts to at least two thirds of the total claims.

(*Id.*)

Thus, there are two methods of approving a settlement agreement.  (*See id*.)  The settlement agreement is approved either if (1) more than half of *all creditors by number* (including non-voting creditors) vote in favor of the Settlement Agreement *and* more than half of all creditors in each class[10] *by value of claims* vote in favor of the Settlement Agreement or (2) two-thirds of *all voting creditors by claim amount* vote in favor of the Settlement Agreement. (*Id.*)  In other words, even if the first method of approving the Settlement Agreement cannot be achieved, the Settlement Agreement can still be approved if the sum of *all claims who vote in favor* of the agreement is at least two-thirds of the total amount of *all outstanding claims*.  (*Id.*) Article 43, paragraph 18 provides that once the settlement agreement is passed in accordance with paragraph 14, all creditors, even those who do not vote, shall be bound by the agreement. (*Id.* at 58.)  Therefore, it does not matter whether a creditor has appeared or voted on the settlement; if the settlement receives the requisite votes, it can be approved and has binding effect upon all creditors.  (*See Id.*)  These portions of the EA Law governing approval of the settlement agreement therefore create a similar effect to Bankruptcy Code § 1141(d)(1)(A) which provides, in part, that confirmation of a plan "discharges the debtor from any debt that arose

---

[10]    Section 15 of the Settlement Agreement explains "[c]reditors have been classified into classes on the basis of claim type, meaning a single creditor with several types of claims may be represented in multiple classes.  Such classification shall be used for the purposes of voting on this Settlement Plan pursuant to Art. 43 EA Act.  The classification of Creditors per the above Court resolution is as follows: small suppliers, in which class Creditors whose claims do not exceed HRK 100,00 are classified; large suppliers, in which class Creditors whose claims exceed HRK 100,00 are classified; Noteholders, in which class Creditors who are holders of notes issued by the Debtor are classified; unsecured creditors, in which class Creditors whose claims are not secured by a separate satisfaction right are classified; and secured creditors, in which class Creditors whose claims are secured by a separate satisfaction right are classified."  (Settlement Agreement § 15.)

before the date of such confirmation . . . whether or not . . . a proof of claim based on such debt is filed or deemed filed . . . ."  *See* 11 U.S.C. § 1141(d)(1)(A).

### B.    Model Law

In 1997, the United Nations Commission on International Trade Law ("UNCITRAL") promulgated the Model Law on Cross-Border Insolvency (the "Model Law").  Chapter 15 of the Bankruptcy Code, which is based upon the Model Law, was adopted by Congress in 2005.  Before 2005, former section 304 of the Bankruptcy Code provided the statutory framework for dealing with ancillary cases filed in the U.S. relating to foreign insolvency proceedings.  Many of the principles—particularly comity—that were applied in ancillary proceedings under section 304 were carried forward and apply today in Chapter 15 cases.  *See In re Atlas Shipping A/*S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) ("Nevertheless, many of the principles underlying § 304 remain in effect under chapter 15.  Significantly, chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief.  This is evidenced by the pervasiveness with which comity appears in chapter 15's provisions.  For example, § 1509 specifically requires that if the court grants recognition under § 1517, it 'shall grant comity or cooperation to the foreign representative.' 11 U.S.C. § 1509(b)(3).  In addition, § 1507 also explicitly directs the court to consider comity in granting additional assistance to the trustee.").

The Model Law is often described as an attempt to create modified universalism, which essentially entails allowing courts outside of debtors' home countries to open and maintain secondary cases supplemental to the main proceedings.  *See, e.g.*, Ian G. Williams & Adrian J. Walters, *Modified Universalism in Our Time? A Look at Two Recent Cases in the U.S. and U.K.*, 37-JUL Am. Bankr. Inst. J. 24 (2018).  The U.S. has a long tradition of recognizing foreign

restructuring proceedings. For example, the Supreme Court's 1883 decision in *Gebhard* approved the recognition of a Canadian scheme of arrangement. *Canada Southern Railway Co. v. Gebhard,* 109 U.S. 527 (1883). In *Gebhard*, Chief Justice Waite explained that "the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries."[11] *Id.* at 548. *See also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985).

As the Second Circuit explained in *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*:

> We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding. "Since '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions." *Finanz AG,* 192 F.3d at 246 (*quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987)); *Allstate Life Ins. Co.,* 994 F.2d at 999. In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States.

412 F. 3d 418, 424 (2d Cir. 2005).

While *Altos Hornos* was decided based on section 304, before Chapter 15 became effective in the U.S., the same principles are enshrined in Chapter 15. *See Atlas Shipping*, 404 B.R. at 738.

---

[11] The Court's decision in *Gebhard* was reached over a strong dissent by Justice Harlan which relied heavily on English case law and commentaries by Joseph Story, James Kent and others that, consistent with the *Gibbs* rule, would not permit a discharge of contractual obligations other than under the law of the place of contracting. *Id.* at 546–47. Justice Harlan was particularly troubled that the discharge in *Gebhard* was based on a legislative act, with no judicial hearing subject to due process requirements, *id.* at 544, which is not an issue in this case because the loan modification here was approved by a creditor vote followed by court approval following notice and a hearing.

### C.    Comity in Chapter 15

Under the prior section 304 and the current Chapter 15, American courts have

recognized the need to extend comity to foreign bankruptcy proceedings.  The equitable and

orderly distribution of a debtor's property requires assembling *all* claims against the limited

assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would

fail.  "The Second Circuit has frequently underscored the importance of judicial deference to

foreign bankruptcy proceedings."  *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 624 (Bankr.

S.D.N.Y. 2010) (citing *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir.

1999); *Maxwell*, 93 F.3d at 1048; *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999

(2d Cir. 1993); *Cunard*, 773 F.2d at 458).

The issue here is whether this Court, in the exercise of comity, should recognize and

enforce the Settlement Agreement approved by the Croatian Court following creditor approval.

There is nothing exceptional in the Croatian Court's exercise of jurisdiction over the Croatian

Foreign Debtors' assets and creditors' claims in the insolvency proceeding.

In section II.A., the Court has described the provisions of the EA Law in considerable

detail.  In substance and effect, the EA Law tracks closely to the structure of the U.S. Bankruptcy

Code and many other foreign insolvency laws.  Creditors' rights to meaningful participation in

insolvency proceedings is required and creditor approval of a settlement agreement is also

required.  As explained in section II.D., below, the record establishes that the EA Proceeding was

procedurally fair.

While enterprise group aspects of the EA Law are novel, these Chapter 15 cases dealing

with nine entities that have their centers of main interest ("COMI") in Croatia do not push the

boundaries of cross-border insolvency law.  Therefore, recognition and enforcement of the

Settlement Agreement with respect to the Foreign Debtors safely fall within established principles.[12]  As such, is there any basis to decline to recognize and enforce the results?

The Supreme Court concluded in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004), that the discharge of debt in a U.S. bankruptcy proceeding is proper because it is an *in rem* proceeding.  A single court should resolve all claims to property of the debtor, which necessarily requires that the court resolve all creditor claims that have been, or could have been, asserted, provided that the creditors have received the notice required by due process.  Thus, in an *in rem* proceeding, personal jurisdiction over all creditors is not required; the court determines the creditors' rights to receive distributions from all property of the debtor that is part of the estate.  A creditor cannot ignore or avoid a Chapter 11 case and later sue to recover on its prepetition claim.  Upon confirmation of a Chapter 11 plan, section 1141(d)(1)(A) discharges the debtor from any debt that arose before the date of confirmation, whether or not the creditors filed a proof of claim or accepted the plan.  A successful reorganization would not be possible if creditors could simply ignore the bankruptcy proceeding and then seek to recover on their prior claims.  Therefore, the *in rem* classification of a bankruptcy proceeding is key—*in rem* jurisdiction gives the court the authority to administer all the debtor's assets and resolve the rights of all creditors to all the debtor's property, and these are crucial steps in a successful restructuring.  There is no reason that these same principles should not apply when considering recognition of the Croatian Proceeding, with the same consequences for a confirmed settlement agreement—namely, the discharge and modification of prepetition claims like the effect of section 1141(d)(1)(A).  (*See* Settlement Agreement § 16.1.2.)

Federal courts generally extend comity when the foreign court had proper jurisdiction and

---

[12]    It is noteworthy that no objections were filed to recognition and enforcement of the Settlement Agreement within the territorial jurisdiction of the United States.

enforcement does not prejudice the rights of United States citizens or violate domestic public policy. *See also Cunard S.S. Co. Ltd.,* 733 F.2d at 457. "Comity takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.r.L.,* 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) (citing *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.),* 93 F.3d 1036, 1048 (2d Cir. 1996)).

From the record before this Court—particularly since no objections have been filed—the Court concludes that the Croatian Proceeding was procedurally fair, provided proper notice to all creditors and, through the Settlement Agreement, determined the rights of all creditors to property that was subject to the jurisdiction of the Croatian Court. Is there any reason, then, not to recognize and enforce the Settlement Agreement within the territorial jurisdiction of the United States? This Court believes there is not. Nonetheless, the issue (of whether recognition of the entire Settlement Agreement is appropriate within the territorial U.S.) arises because of the English courts' enforcement of the *Gibbs* rule, discussed below, which could lead an English court to conclude that certain aspects of the Settlement Agreement cannot be enforced in England against creditors holding English law governed debt. Such a refusal of the English court to enforce parts of the Settlement Agreement would most certainly cause the Settlement Agreement to fail considering the amount of prepetition debt governed by English law.[13] That would be unfortunate, indeed.

---

[13] As Chief Justice Waite said in *Gebhard*, 109 U.S. at 539, "[u]nless all parties in interest, wherever they reside, can be bound by the arrangement which is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries."

While recognition of the foreign proceeding turns on the objective criteria under section 1517, "relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing §§ 1507, 1521 and 1525). Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity. *See generally* Allan L. Gropper, *Current Devs. in Int'l Insolvency Law: A United States Perspective*, 15 J. BANKR. L. & PRAC. 2, Art. 3, at 3–5 (2006) (hereinafter "Gropper").

The court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *See In re Cozumel Caribe S.A. de C.V.*, 482 B.R. at 114–15 (concluding that a central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings); *Atlas Shipping*, 404 B.R. at 738; *see also In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) (holding that a request for relief by a foreign representative (1) to enforce a foreign reorganization plan and confirmation decision even where the relief provided in the plan conflicts or is inconsistent with the relief available in a Chapter 11 plan, and (2) to enjoin acts in the U.S. in contravention of the plan and decision is relief of a type that courts have previously granted under section 304).

In addition to providing deference to foreign judgements, comity may also allow a U.S. court "to decline to exercise jurisdiction in favor of a pending foreign proceeding," where "the foreign tribunal has taken jurisdiction but not yet issued a judgement." William S. Dodge, *Int'l Comity in Am. Law*, 115 COLUM. L. REV. 2071, 2106 (2015). As between deferring to a foreign judgement or to a foreign pending proceeding, "[w]hat changes is the time at which the question [whether to defer to a foreign tribunal's resolution of a dispute] is asked." *Id.* Courts have

37

generally recognized their ability to decline to exercise jurisdiction in deference to a case already

being adjudicated abroad.  *See, e.g.*, *Mujica v. AirScan Inc.,* 771 F.3d 580, 599 (5th Cir. 2014)

("[A]djudicatory comity involves . . . the discretion of a national court to decline to exercise

jurisdiction over a case before it when that case is pending in a foreign court with proper

jurisdiction."  (citation and quotation marks omitted)); *In re Arcapita Bank B.S.C.(c),* 575 B.R.

229, 238 (S.D.N.Y. 2007) ("[C]omity among the courts or adjudicative comity may be viewed as

a discretionary act of deference by a national court to decline to exercise jurisdiction in a case

properly adjudicated in a foreign state."  (citations and quotation marks omitted)); *In re Ionica*

*PLC*, 241 B.R. 829, 841 (Bankr. S.D.N.Y. 1999) (dismissing ancillary proceeding filed under

former section 304 because of pending insolvency proceeding in the U.K.).

In other words, this case presents a unique challenge in the exercise of comity under

Chapter 15, because the international litigation surrounding the Croatian Proceeding and

Settlement Agreement that this Court is asked to recognize and enforce could be seen as

complicating this Court's own comity analysis by requiring the Court to consider all of the other

countries' decisions in addition to the analysis of whether to extend comity to the Croatian

Proceeding and resulting Settlement Agreement on their own merit.  However, the Court does

not ultimately need to perform the broader analysis of comity with respect to every nation

involved, because the Court's decision to recognize and enforce the Settlement Agreement is

effective within the territorial jurisdiction of the United States.  As such, if a foreign creditor has

a claim governed by English law that is modified by the Settlement Agreement and wants to

challenge the Croatian modification of that claim, the creditor may still challenge enforcement of

the claim in the English courts.

**D.    Recognition of the Croatian Proceeding and Settlement Agreement in the United States**

As previously stated, on September 21, 2018, the Court entered an order recognizing the Croatian Proceeding as a foreign main proceeding.  (ECF Doc. # 30.)  The analysis supporting that conclusion will not be repeated here.  The effects of the decision to recognize the Croatian Proceeding as a foreign main proceeding merit some discussion.

*1. Automatic effects of Chapter 15 Foreign Main Proceeding Recognition*

Upon a court's determination that a proceeding constitutes a foreign main proceeding as described above, section 1520 of the Bankruptcy Code provides that certain relief commences immediately, while section 1521 provides additional relief that may be granted at the court's discretion.  *Compare* 11 U.S.C. § 1520(a) ("Upon recognition of a foreign proceeding that is a foreign main proceeding- (1) sections 361 and 362 apply with respect to . . . property  of the debtor that is within the territorial jurisdiction of the United States . . ."), *with* 11 U.S.C. § 1521(a) ("Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purposes of this chapter . . . *the court may* . . . grant *any appropriate relief* . . . ." (emphasis added)).

Section 1520 details the mandatory relief that is automatically granted upon recognition of a foreign main proceeding under Chapter 15.  11 U.S.C. §1520.  Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's property *that is located within the territorial jurisdiction of the United States*.  The statute refers specifically to the property of the debtor, as opposed to the property of the estate, since there is no estate in a Chapter 15 case.  *See, e.g.*, *Atlas Shipping*, 404 B.R. at 739.  Despite this difference, the automatic effect of recognition of a foreign main proceeding under section 1520(a) is an imposition of an automatic stay on any action regarding the debtor's property located in the United States.  *Id.*

Additionally, once section 1520(a) applies, sections 363, 549 and 552 apply with respect to any transfers of a debtor's interest in property within the United States. 11 U.S.C. §1520(a)(2). These provisions allow a foreign representative to operate the debtor's business in the United States by exercising the rights and powers of a trustee under sections 363 and 552.

### 2. *Discretionary Relief including Recognition of a Plan and Third-Party Releases*

The grant of additional, discretionary relief under Chapter 15 is largely dependent upon principles of comity discussed above. *See Atlas Shipping*, 404 B.R. at 738 ("While recognition of the foreign proceeding turns on the objective criteria under § 1517, 'relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity'" (quoting *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008)). Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity. *See generally* Gropper, at 3–5.

Whether a foreign proceeding is held to be main or non-main, section 1521(a) outlines the discretionary relief that a court may order upon recognition of a foreign proceeding. 11 U.S.C. § 1521(a); *see Atlas Shipping*, 404 B.R. at 738 ("The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors."). That said, section 1522(a) only allows courts to provide additional discretionary relief under section 1519 or 1521 if the interests of creditors are sufficiently protected. The list of forms of discretionary relief provided under section 1521 are considered illustrative, as opposed to exclusive. 11 U.S.C. 1521 (the list of discretionary relief options begins with the word 'including,' indicating that discretionary relief includes, but is not limited to, the following listed items).

40

The Court's discretionary relief under section 1521 of the Code may either allow the foreign representative to merely administer the debtor's assets in the United States, but require that those assets remain here, or may allow the foreign representative to remove the debtor's assets from the United States. 11 U.S.C. §§ 1521(a)(5) and 1521(b); *see, e.g.*, *Atlas Shipping*, 404 B.R. at 740. Section 1521(a)(5) entrusts to the foreign representative the "administration or realization" of the debtor's assets within the United States. 11 U.S.C. § 1521(a)(5). This is part of the relief the Foreign Representative requested in the present case. It is not to be confused with the optional relief provided by section 1521(b), which allows the Court to "entrust the distribution" of the debtor's assets within the United States to the foreign representative. 11 U.S.C. § 1521(b). This alternative provision allows the debtor's assets to exit the United States for *distribution*. *See Atlas Shipping*, 404 B.R. at 740. The Foreign Representative here did not seek relief under section 1521(b).

Finally, section 1507 also deals with additional discretionary relief, which may include recognition and enforcement of a plan reached in a foreign proceeding. As this Court explained in *Atlas Shipping*:

> In addition to § 1521's provisions regarding 'any appropriate relief,' § 1507(b) provides that a court, [i]n determining whether to provide additional assistance ... shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
> (1) just treatment of all holders of claims against or interests in the debtor's property;
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

404 B.R. at 740 (internal citations omitted).

41

"Pursuant to section 1507, the court is authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)." *Rede Energia*, 515 B.R. at 90. As with section 1521, relief under section 1507 may include recognition and enforcement of a plan approved by a foreign court. *Id.* at 94–5.

Thus, the principal question in determining whether to recognize and enforce the Settlement Agreement's terms under Chapter 15 ultimately boils down to a question of the appropriateness of granting comity to the foreign court approval of the Settlement Agreement. In *Metcalfe & Mansfield*, 421 B.R. 685, 688 (Bankr. S.D.N.Y. 2010), this Court considered recognition of a Canadian plan of reorganization, and specifically questioned whether it would be appropriate to extend comity to the Canadian plan if it contained provisions, such as third-party releases, that may not be allowed in plenary United States bankruptcy proceedings under Chapter 11. Even though the Court noted that it was not clear that the third-party releases contained in the Canadian plan would be permitted under U.S. law, the Court found that the proper inquiry was whether the Canadian plan's provisions should nevertheless be enforced under Chapter 15. *Id.* at 696. This Court explained, "Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *Id.* Therefore, even though Chapter 15 contains the explicit public policy exception in section 1506, which provides, "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the policy of the U.S.," the *Metcalfe* decision explained that even if the law in the U.S. may have provided differing results,

this alone did not prevent a recognition of the Canadian plan under broader principals of comity. *See* 11 U.S.C. § 1506; *see also Metcalfe & Mansfield*, 421 B.R. at 697.

What factors, then, should determine whether a U.S. Court should extend comity to a foreign main proceeding's plan of reorganization?  The *Metcalfe & Mansfield* decision noted several factors, including whether the foreign proceeding provided a full and fair opportunity for creditors to be heard consistent with due process, and whether the plan was approved by the debtor's creditors and the foreign court.  *See Metcalfe & Mansfield*, 421 B.R. at 698–99.

Courts should also look to circumstances in which U.S. courts have refused to recognize foreign plans of reorganization to further understand when the denial of comity is appropriate. As already discussed, the Fifth Circuit affirmed the bankruptcy court's refusal to recognize a plan of reorganization approved by a Mexican court due to considerations of comity.  *See Vitro,* 701 F.3d at 1039.  The plan in *Vitro*, like the plan in *Metcalfe & Mansfield*, discharged obligations of creditors as well as of third-party guarantors.  The Court of Appeals decision affirming the bankruptcy court focused on the fact that the plan in *Vitro* was only approved with "insider" votes.  As a result, the Court of Appeals concluded that the bankruptcy court did not abuse its discretion in refusing to grant comity and enforce the Mexican plan.

This Court's recent decision in *Avanti*, 582 B.R. at 617–18, recognized and enforced a scheme of arrangement, including a release of third-party guarantees, that was approved by creditors and by the High Court of England and Wales.  After reviewing *Metcalfe & Mansfield* and *Vitro*, the Court upheld the scheme of arrangement, noting that "Avanti's Scheme Creditors had a full and fair opportunity to vote on, and be heard in connection with, the Scheme."  *Avanti*, 582 B.R. at 618.  The *Avanti* decision also referred to seminal Supreme Court jurisprudence

43

dealing with when a U.S. court should recognize and enforce a foreign judgment under principles

of comity. *Id.* at 616. Quoting *Hilton v. Guyot*, the Court stated:

> The Supreme Court has held that a foreign judgment should not be
> challenged in the US if the foreign forum provides: "[A] full and fair trial
> abroad before a court of competent jurisdiction, conducting the trial upon
> regular proceedings, after due citation or voluntary appearance of the
> defendant, and under a system of jurisprudence likely to secure an impartial
> administration of justice between the citizens of its own country and those
> of other countries, and there is nothing to show either prejudice in the court,
> or in the system of laws under which it [is] sitting . . . ".

*Id.* (quoting *Hilton v. Guyot*, 159 U.S. 113, 202–03 (1985).

The *Avanti* opinion provides a helpful summary of cases in which courts have enforced

third-party releases in foreign proceedings under sections 1507 and 1521. *Avanti*, 582 B.R. at

617; *see also In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and

enforcing scheme of arrangement that released affiliate guarantees); *In re Towergate Fin. plc*,

Case No. 15–10509–SMB (Bankr. S.D.N.Y. Mar. 27, 2015) [ECF Doc. # 16]; *In re New World

Res. N.V.*, Case No. 14–12226–SMB (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF Doc. # 20]; *In re

Sino–Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order

containing third-party releases); *In re Magyar Telecom B.V.*, Case No. 13–13508–SHL, 2013

WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) [ECF Doc. # 26]; *Metcalfe & Mansfield*, 421

B.R. at 696 ("[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases

strongly counsel approval of enforcement in the United States of the third-party non-debtor

release and injunction provisions included in the Canadian Orders, even if those provisions could

not be entered in a plenary chapter 11 case.").

Finally, the decision-making calculus for determining whether to grant comity to a

foreign court's action may be honed by the list of non-exclusive factors used by the Second

Circuit to analyze whether foreign proceedings are procedurally fair.  In analyzing procedural

fairness, the Second Circuit has looked at the following factors:

> (1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Finanz AG Zurich*, 192 F.3d at 249.

With respect to the Croatian Proceeding, the record reflects that the Foreign Debtors'

creditors received proper notice of the Croatian Proceeding and of these Chapter 15 cases.  The

record also reflects that the substance and procedures set forth in the EA Law comport with

broadly recognized principles for insolvency laws.  Moreover, the creditor distributions approved

in the Settlement Agreement closely follow the waterfall provisions of the U.S. Bankruptcy

Code.  Additionally, as discussed above, over two-thirds of non-insider creditors voted to

approve the Settlement Agreement, avoiding the taint of the insider votes that prevented

recognition and enforcement in the *Vitro* case.

Additionally, the standards for due process set forth in the Second Circuit's nonexclusive

list of factors for procedural fairness in *Finanz AG Zurich* were satisfied by the Croatian

Proceeding.  As outlined in the EA Law, creditors have been grouped into five classes and

participated in the drafting and approval of the Settlement Agreement, which provides for payout

where creditors of the same class are treated equally, satisfying the first *Finanz* factor.[14]  The

---

[14]   The Court has already indicated that the percentage recovery to the holders of English Law Governed Loans and New York Law Governed Notes is projected to be 50.8 percent.  The Loans and Notes are both unsecured.

Foreign Representative acts as a fiduciary and is overseen by the Croatian Court throughout this process, which is consistent with the second *Finanz* factor of procedural fairness. After the Settlement Agreement was approved by a majority of creditors and approved by the Croatian court on July 6, 2018, approximately 92 complaints were filed against confirmation, showing that creditors have the right to submit denied or contested claims for further adjudication, consistent with the third *Finanz* factor for procedural fairness. According to Agrokor's official website, the company responded to all 92 complaints in one submission to the Commercial Court on September 4, 2018. The issue is still pending before the Croatian Court; enforcement of the Settlement Agreement will not commence in Croatia until the Court issues its final order. Thus, creditors who opposed the Settlement Agreement have been able to seek further adjudication in the Croatian Court system.

Satisfying the fourth *Finanz* factors, the EA Law required published notification to creditors on the Court's website. Satisfying the fifth *Finanz* factor, the EA Law provides for creditors meetings, which were held. Indeed, the Temporary Creditor's Council continues to meet and was informed of the complaints as well as Agrokor's responses to the complaints at the most recent meeting. Agrokor held its 22nd creditor meeting on September 13, 2018. Representatives of all five creditor groups attended the meeting, including Sberbank as a representative of the unsecured creditors, and Knighthead Capital Management, LLC as the representative of the bond holders' creditor group. *Finanz* factors seven and eight—regarding the creation of a centralized distribution and the creation of an automatic stay—are both provided for by the EA Law.

Finally, no objections to the recognition of the Settlement Agreement have been brought before this Court. All evidence before the Court demonstrates that creditors received due

process and will be better off under the Settlement Agreement than they would be in a

liquidation.  The Foreign Representative affirms that the "Croatian proceedings . . . will allow

the [Foreign] Debtors to restructure in the most efficient manner without jeopardizing creditors'

rights."  (ECF Doc. # 5 ¶ 40.)  The affirmation of a Croatian legal representative who practices

complex commercial litigation in Croatia, provides that "[p]ursuant to the Settlement Agreement,

the creditors will receive a better outcome in respect of their claims than they would in a

Croatian bankruptcy or liquidation process."  (ECF Doc. # 6 ¶ 9.)  Thus, the essential contours of

a foreign proceeding that should be granted comity in the U.S. are present.  As such, the

Settlement Agreement should be recognized in full within the territorial jurisdiction of the

United States, including the provisions modifying the English law governed debt and the New

York law governed debt.  Courts in other jurisdictions will make their own, independent

decisions whether to recognize and enforce the Settlement Agreement.

### E.      The Gibbs Rule

Because Chapter 15's principal criterion for recognizing foreign proceedings and

recognizing and enforcing a reorganization plan is a comity analysis, it is appropriate for this

Court to consider the effects of a decision to extend comity to one nation if doing so could be

seen as a refusal to extend comity to the laws of another—particularly where a majority of the

debt to be modified is governed by the law of the latter nation.  In these circumstances, a

complete comity analysis requires at least consideration of, even if not ultimately lending

deference to, English law.

The *Gibbs* rule remains the governing law in England despite its seeming incongruence

with the principle of modified universalism espoused by the Model Law and a broad consensus

of international insolvency practitioners and jurists.  *See, e.g.*, Kannan Ramesh, *The Gibbs*

*Principle: A Tether on the Feet of Good Forum Shopping*, 29 Sing. Acad. L.J. 42, 43 (2017)
(noting that modified universalism is the theoretical core of the Model Law and is increasingly
recognized by an international consensus as the way cross-border insolvencies should be dealt
with moving forward).  The essence of modified universalism is that "bankruptcy proceedings . .
. should be unitary and universal, recognized internationally and effective in respect of all the
bankrupt's assets." *Id.*  The essence of the *Gibbs* rule, on the other hand, is territorialism.

In *Gibbs*, Lord Esher questions, "Why should the plaintiffs be bound by the law of a
country to which they do not belong, and by which they have not contracted to be bound?"[15]  25
QDB at 406.  Throughout the *Gibbs* opinion, Lord Esher characterizes the recognition of a
foreign insolvency proceeding as an issue of contract law between a single debtor and creditor.
*Id.*  If the contract was made in England and meant to be performed in England, Lord Esher
reasoned that a breach of contract should be determined by the laws in England, not discharged
by a French insolvency proceeding.  *Id.* at 404.  Thus, *Gibbs* characterizes the recognition of
foreign insolvency proceedings as a contractual issue to be settled in the territory with the
governing contract.

Despite the clear territorial slant of the *Gibbs* rule, it was recently followed by the
English High Court.  In a 2018 decision, Justice Hildyard began his opinion by noting the tension
between the *Gibbs* rule and the principle of modified universalism in the CBIR.  *Bakshiyeva v.
Sberbank of Russia, et al.* [2018] EWHC 59 (Ch).  The *Bakshiyeva* court was asked to recognize
and enforce proceedings in Azerbaijan that sought to restructure Azerbaijan's largest bank.

---

[15]    Lord Esher's question may be compared with Supreme Court Justice Waite's commentary seven years
earlier in the *Canada Southern Ry. v. Gebhard* case.  109 U.S. 527 (1883).  In that opinion, Justice Waite says,
"every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign
government . . . .  It follows, therefore, that anything done at the legal home of the corporation, under the authority
of such laws, which discharges it from liability there, discharges it everywhere."  *Id.* at 537-38.

Bakshiyeva, the foreign representative for the Azerbaijan proceeding, sought a permanent stay imposed in England so that English creditors would have to participate in the centralized, Azerbaijan proceedings. Two of the bank's creditors, who held English law governed debt instruments and had not participated in any way in the foreign proceeding, invoked the *Gibbs* rule. Justice Hildyard agreed with the creditors, finding that the CBIR did not allow a foreign court to change or discharge the substantive rights of creditors conferred by English law. The decision reaffirmed the priority of the common law *Gibbs* rule over the more recently adopted CBIR.[16] In addition to governing English cross-border insolvency law for the past century, *Gibbs* has been influential and accepted in other Commonwealth countries including Canada and Australia. *See* Ian F. Fletcher, *Insolvency in Private Int'l Law*, Oxford Private International Law Series at 130 (2d ed, 2005).

Agrokor's counsel argued that although the *Gibbs* rule remains in force in England, an exception to the *Gibbs* rule applies in *Agrokor* to creditors holding English law governed debt because they voted in favor of the Settlement Agreement or otherwise submitted to the jurisdiction of the Croatian court. *Rubin v. Eurofinance SA*, a decision by the Supreme Court of England, was cited as providing the relevant exception to the *Gibbs* rule—when a creditor submits to the jurisdiction of a foreign court, either by submitting its claims in the foreign insolvency proceeding or otherwise agreeing to be bound thereby, then the creditor will be bound in that proceeding and *Gibbs* will no longer apply. *See Rubin v. Eurofinance SA* (2012) UKSC 46 at ¶ 157–67 (Eng.) (holding that creditors who filed proofs of debt and participated in a creditors' meeting, but did not file an appearance, had nonetheless submitted to the jurisdiction

---

[16]        Interestingly, one of the two creditors in the *Bakshiyeva* case, Sberbank, happens to be the largest pre-petition lender of English Law Governed Loans to Agrokor d.d. in the current Croatian Proceeding. In contrast to its position in *Bakshiyeva*, in which it did not participate in any way in the foreign proceedings, Sberbank was a member of the five member Interim Creditors Committee and voted in favor of the Croatian Settlement Agreement.

of an Australian court and were bound by that Australian proceeding). Agrokor's counsel asserted:

> Here, the Gibbs Rule does not govern the English Law Governed Loans compromised by the Settlement Agreement because all holders of Agrokor Group's English Law Governed Loans submitted their claims in full in the Croatian Proceedings and, as such, the holders submitted to the jurisdiction of the Croatian courts.

(Brief in Further Support ¶ 48.)

While counsel argued that all holders of English Law Governed Loans submitted their claims in the EA Proceeding, no evidence was presented to support that contention, and the vote tally in the EA Proceeding shows that not all creditors voted on the Settlement Agreement. The appropriate time and place for the Foreign Debtors to raise their argument will be in any further proceedings in the English court.

While the English court has yet to decide whether to recognize and enforce the Settlement Agreement, the English court discussed *Gibbs* before holding that the Croatian Proceeding should be recognized as a foreign main proceeding in England, concluding that the proceeding did not manifestly violate English public policy. (English Decision ¶ 131.) The court did not reach the issue of whether the *Gibbs* rule applies and bars recognition and enforcement of the Settlement Agreement. The decision whether to recognize and enforce the Settlement Agreement is likely to implicate a more demanding analysis under *Gibbs*.

The fact that England applies the *Gibbs* rule and refuses to recognize a discharge or modification of English law debt approved by a court outside of England is not, in this Court's view, a basis for this Court to decline to recognize and enforce the Settlement Agreement within the territorial jurisdiction of the United States. On this issue, the Court agrees with Justice Kannan Ramesh of the Supreme Court of Singapore in his opinion in *Pacific Andes Resources*

*Development Ltd*, [2016] SGHC 210.  Justice Ramesh explains that, in his view, the parties to a

contractual relationship governed by the law of a jurisdiction adhering to the *Gibbs* rule should

be attributed with the expectation that their claims might be discharged in proceedings in a

jurisdiction where the debtor has an established connection based on residence or ties of

business.  *Pacific Andes*, SGHC 210 at ¶ 48.  This view, of course, contrasts with *Gibbs*, where

the court did not think that it was fair to attribute any expectation of or consent to the jurisdiction

of French bankruptcy law to the English merchant who contracted with the French company that

was domiciled in Paris.  Justice Ramesh's view also differs from the more recent *Rubin* decision,

in which Lord Collins declares it "wholly unrealistic" that "a person who sells goods to a foreign

company accepts the risk of the insolvency legislation of the place of incorporation" without

providing further explanation on the point.[17]  *Rubin*  UKSC 46 at ¶ 116 (Eng.).

In *Pacific Andes*, Justice Ramesh discusses several academic criticisms of the *Gibbs*

rule's continued application in global bankruptcy proceedings.  One of the lengthier excerpts is

the criticism provided by Look Chan Ho, author of *Cross-Border Insolvency: Principles and*

*Practice* (Sweet & Maxwell 2016).  Look Chan Ho criticizes the notion that insolvency

proceedings should be characterized as contractual issues.  As mentioned above, the original

*Gibbs* opinion discussed the idea that parties to a contract should be able to choose the law that

would govern their interactions, even in the potentially unexpected situation of a bankruptcy

proceeding.  The fact that the *Gibbs* rule is premised on a predominately contractual analysis is

reinforced by the *Rubin* exception to the rule, which says that if a party, who otherwise would

not be bound to a foreign proceeding, nonetheless chooses to consent to the foreign forum's

---

[17]    Lord Collins' view about what is "unrealistic" obviously differs markedly from the view of the Chief
Justice Waites in *Gebhard*, decided in 1883, that everyone who deals with a foreign corporation impliedly subjects
himself to foreign law, including a discharge from liability.  109 U.S. at 537–38.

jurisdiction, the rule will no longer apply.  Thus, the *Gibbs* rule centers around the idea of a

party's contractual or consensual choice to be bound to a certain forum's rules.

A theoretical and practical issue with applying such a contractual analysis in the context

of insolvency proceedings, as Look Chan Ho and others argue, is that bankruptcy discharges by

their very nature imply diverging from the terms of most of the debtor's prepetition contracts.

The primary disputes in a bankruptcy are ordinarily not about the rights of a single creditor

against the debtor; insolvency proceedings are collective proceedings in which the rights of *all*

creditors are determined for a slice of a pie that is not big enough to repay all creditors in full.  A

fundamental tenet of the U.S. bankruptcy system, also applied under the new Croatian law and

most other modern insolvency laws, is that creditors of the same class are entitled to equality of

distribution.  Allowing creditors with claims governed by English law to recover a greater

percentage of their claims than creditors with claims governed, for example, by New York law,

would violate the fundamental principle of equality of distribution.  As already discussed, the

Settlement Agreement provides for equality of distribution between the holders of the English

law governed and New York law governed debt.

Additionally, as Look Chan Ho notes, framing the issue of which law should govern a

creditor's rights in a bankruptcy as a solely contractual issue between two parties overlooks

orthodox English classification of bankruptcy as an *in rem* proceeding.[18]  The *Gibbs* rule's

contractual analysis seems to be based on the contractual parties' *expectations*; but if parties'

---

[18]    Though Look Chan Ho refers to an orthodox classification of bankruptcy proceedings as *in rem*
proceedings, the *Rubin* court definitively stated that bankruptcy proceedings were neither in rem nor in personam.
*Rubin* UKSC 46 at ¶ 43 ("if the judgement had to be classified as in personam or in rem the appeal would have to be
allowed, but bankruptcy proceedings did not fall into either category . . . .").  As discussed above, the U.S. Supreme
Court in *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. at 447, concluded that the discharge of debt in a
U.S. bankruptcy proceeding is proper because it is an *in rem* proceeding.

expectations created the rule, is it realistic for creditors to multinational corporations to expect that, in the context of an insolvency proceeding, their contractual bargain will ultimately prevail?

As Justice Ramesh argues, a fundamental problem with the use of the *Gibbs* rule in international insolvency cases is that it mischaracterizes the discharge of debt as a contractual issue, rather than as a bankruptcy or insolvency law issue.[19]  Kannan Ramesh, *The Gibbs Principle: A Tether on the Feet of Good Forum Shopping*, 29 Sing. Acad. L.J. at 49.  A discharge of debts in an insolvency proceeding almost invariably involves some form of cram-down, or modification of creditors' prepetition claims, where a majority of creditors will outweigh a minority of dissenting creditors.  *Id.*  As justice Ramesh explains, "bankruptcy is undergirded by the philosophy that policy is given primacy *over contractual rights*."  *Id.* (emphasis added).  Thus, the basic rationale espoused by Lord Esher in *Gibbs*—that parties consensual, contractual decisions should determine the choice of law of all future legal interactions—is inappropriate when applied in the context of insolvency or bankruptcy proceedings, which inherently involve a societal choice to allow collective proceedings to discharge previously existing contractual obligations.  The Court agrees with Justice Ramesh that a creditor's autonomy is relevant in the context of an insolvency proceeding only to the extent that it does not impede the underlying public policy that governs a collective insolvency or bankruptcy proceeding.[20]  *Id.* at 50.

---

[19]     This criticism of the *Gibbs* rule is relevant in all cases dealing with the foreign recognition and enforcement of judgments in insolvency proceedings.  The Croatian Proceeding is certainly an insolvency proceeding and Agrokor is, most certainly, insolvent.  A separate question, unnecessary for the Court to reach in this case, is whether the *Gibbs* rule should be applied when considering whether to recognize and enforce a foreign scheme of arrangement that modifies English law debt.  Statutory authority for schemes of arrangement typically arise from companies' laws rather than insolvency laws.  *Gibbs*' reasoning that contract law should be applied in determining whether to recognize and enforce a scheme of arrangement that modifies English law debt may have more force. But this Opinion only deals with application of the *Gibbs* rule in an insolvency proceeding.

[20]     Where a contract selects English law, choice of law principles will most likely mean that determining the amount a breach of contract claim should be determined under English law.  Choice of law principles should not dictate that English law applies in determining whether a claim can be discharged or modified in a foreign insolvency proceeding.

53

Professor Ian F. Fletcher, a distinguished professor in England, argues that "[t]he Gibbs

doctrine belongs to an age of Anglocentric reasoning which should be consigned to history."

*Insolvency in Private International Law*, OXFORD PRIVATE INTERNATIONAL LAW SERIES 130

(Oxford University Press, 2d Ed, 2005).  In addition to *Gibbs*' failure to create a system that

allows for the centralized, collective restructuring of debt, Fletcher finds the rule troubling

because English law only narrowly recognizes the effects of foreign discharges in England but

asserts that a discharge resulting from an English proceeding has a universal effect, irrespective

of the governing law.  *Id.* at 129, 209–10 (describing the *Gibbs* rule's effect on English law as "a

form of systemic schizophrenia when contemplating the effects of foreign insolvency

proceedings on obligations to which the debtor was a party").  England, of course, is free to

continue to adhere to the *Gibbs* rule, but that does not mean that a U.S. bankruptcy court must

follow the rule in deciding whether to recognize and enforce the decision of a court of another

jurisdiction.  U.S. Bankruptcy courts have long permitted foreign bankruptcy proceedings to bind

U.S. creditors even where the debtor entered into a contract governed by New York law and

agreed to a New York forum selection clause.  For instance, in *Altos Hornos*, 412 F.3d at 429,

the court considered whether contracting parties choice of New York as the forum for all

contract disputes was enough to override the preference of extending comity to foreign

bankruptcy proceedings.  Though the New York forum clause in that case provided a broad grant

of exclusive authority to New York courts,[21] the Court of Appeals nevertheless concluded that

the Mexican court where the insolvency proceeding was pending should be the court to resolve

the contract dispute that affected the resolution of the Mexican insolvency proceeding.  *Id.* at

---

[21]    The forum selection clause stated that the foreign borrower agreed that the loan would be governed by New York law, agreed to submit any dispute to a New York court and agreed to "irrevocably waive to the fullest extent permitted by applicable law, any claim that any action or proceeding . . . should be dismissed or stayed by reason . . . of any action or proceeding commenced by [debtor] relating in any way to this Agreement . . . ." 412 F.3d at 428.

429.  As the court explained, "*regardless of the parties' pre-litigation agreement*, once a party declares bankruptcy in a foreign state and a foreign court asserts jurisdiction over the distribution of assets, U.S. courts may defer to the foreign bankruptcy proceeding on international comity grounds."  *Id.* (emphasis added); *see also Canada Southern Railway Co. v. Gebhard,* 109 U.S. at 537–38 (where Chief Justice Waite explained that "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government [and] anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere").

In sum, though the concept of comity is broad and may require overlapping considerations of the rights of several parties and nations, the Court believes it is appropriate to extend comity within the territorial jurisdiction of the United States to the Croatian Settlement Agreement if it becomes final, even with respect to the modification or discharge of English law governed debt.

### III.  <u>CONCLUSION</u>

For the reasons explained above, the Court concludes that the Settlement Agreement should be recognized and enforced with respect to the nine Foreign Debtors within the territorial jurisdiction of the United States, if the approval of the Croatian Court becomes final.  When the approval of the Settlement Agreement becomes final, counsel for the Foreign Representative shall submit a proposed order consistent with this Opinion.

Dated:    October 24, 2018
          New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge